# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | CA No. 05-0209 (JJF) |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | |
| Appellee. | ) | |

---

## OPENING BRIEF OF APPELLANTS

---

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
Counsel for Magten Asset Management
Corporation

BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Counsel for Magten Asset Management
Corporation

NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300
Counsel for Law Debenture Trust Company of
New York

SMITH, KATZENSTEIN & FURLOW, LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
Counsel for Law Debenture Trust Company of
New York

Dated: July 27, 2005
Wilmington, Delaware

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BASIS OF APPELLATE JURISDICTION ............................................................................... 5

ISSUES PRESENTED ............................................................................................................... 5

STANDARD OF APPELLATE REVIEW ................................................................................ 6

STATEMENT OF THE CASE .................................................................................................. 7

I.    The Parties ...................................................................................................................... 7

      A.    NorthWestern ....................................................................................................... 7

      B.    Magten ................................................................................................................. 7

      C.    Law Debenture .................................................................................................... 7

II.   The Subject of the Settlement: Litigation and Causes of Action between Magten,
      Law Debenture, NorthWestern and Related Third Parties .................................................. 8

III.  The Terms of the Settlement Agreement ...................................................................... 10

IV.   NorthWestern's Efforts to Withdraw from the Settlement Agreement ........................... 12

V.    The 9019 order ............................................................................................................. 13

ARGUMENT ........................................................................................................................... 14

I.    The Bankruptcy Court Erred in Holding that the Settlement Agreement was not
      Binding on the Parties Absent the Approval of the Bankruptcy Court ............................ 14

II.   The Bankruptcy Court Erred in Holding That The Settlement Agreement Could
      Not Have Been Implemented Without A Plan Amendment ............................................. 20

CONCLUSION ........................................................................................................................ 24

i

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Compass Tech., Inc. v. Tseng Laboratoriess Inc.,*
    71 F.3d 1125 (3d Cir. 1995) ........................................................................ 16

*D.R. by M.R. v. E. Brunswick Board of Education,*
    109 F.3d 896 (3d Cir. 1997) ........................................................................ 15

*Green v. John H. Lewis & Co.,*
    436 F.2d 389 (3d Cir. 1970) ........................................................................ 15

*Halderman v. Pennhurst State Sch. & Hospital,*
    901 F.2d 311 (3d Cir. 1990) ........................................................................ 15

*Leonard v. University of Del.,*
    204 F. Supp. 2d 784 (D. Del. 2002) ........................................................... 15

*In re NVF Co.,*
    309 B.R. 698 (Bankr. D. Del. 2004) ........................................................... 16

*Nelson Co. v. Amqip Corp. (In re Nelson Co.),*
    117 B.R. 813 (Bankr. E.D. Pa. 1990) ......................................................... 16

*Northview Motors, Inc. v. Chrysler Motors Corp.,*
    186 F.3d 346 (3d Cir. 1999) ................................................................... 18, 19

*In re O'Brien Environmental Energy, Inc.,*
    188 F.3d 116 (3d. Civ. 1999). ...................................................................... 6

*Safety National Casualty Corp. v. Kaiser Aluminum & Chemical Corp. (In re*
    *O'Brien Environmental Energy, Inc.)*
    303 B.R. 299 (D. Del. 2003) ........................................................................ 6

*In re W.R.M.J. Johnson Fruit Farm, Inc.,*
    107 B.R. 18 (Bankr. W.D.N.Y. 1989) ........................................................ 17

*In re Wood,*
    47 B.R. 774 (Bankr. W.D. Wis. 1985) ........................................................ 17

120087.01600/40155449v1

## STATE CASES

Martin v. Star Publ'g. Co.,
126 A.2d 238 (Del. Supr. 1956) ................................................................ 22

## UNREPORTED CASES

Bell Atl. Directory Servcs., Inc. v. Del. Law Ctr., Inc.,
2000 WL 33654061, (Del. Com. Pl., Dec. 14, 2000)................................. 22

City of Newark v. NVF Co.,
1980 WL 6367 (Del. Ch. Jan. 10, 1980) .................................................... 21

Intellisource Group, Inc. v. Williams,
No. 98-57, 1999 U.S. Dist. LEXIS 12446, (D. Del. Aug. 11, 1999) .......... 15

Loppert v. Windsortech, Inc.,
2004 Del. Ch. LEXIS 121 (Del. Ch. June 25, 2004)............................. 15, 16

Pro-Tec Services, LLC.,
2004 U.S. Dist. LEXIS 20822 (D. Del. Oct. 4, 2004)................................... 6

Rowe v. Rowe,
2002 WL 1271679 (Del. Ch. May 28, 2002) ....................................... 15, 16

## FEDERAL STATUTES

11 U.S.C. §1129(b)(2)................................................................................ 23

11 U.S.C. § 1141(a)-(b)............................................................................. 17

28 U.S.C. § 158(a)(1) ................................................................................. 5

28 U.S.C. §2075 ........................................................................................ 19

11 U.S.C. § 363 ........................................................... 4, 6, 17, 18, 19

11 U.S.C. § 363(b) ............................................................................... 17, 18

Fed R. Bankr. P. 8001(a)............................................................................. 5

Fed R. Bankr. P. 9019 ............................................................................... 19

## MISC.

17 Am.Jur. 2nd, "Contracts" § 673 .......................................................... 22

120087.01600/40155449v1

## PRELIMINARY STATEMENT

This appeal (the "Appeal") arises from the Order Denying Joint Motion (the "9019 Motion") of Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture" and together with Magten, "Appellants"), entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 10, 2005 (the "9019 Order"). The 9019 Motion sought approval of a global compromise and settlement that would have resolved numerous litigations and appeals, including an appeal from the order confirming the Second Amended and Restated Plan of Reorganization (the "Plan") of NorthWestern Corporation ("NorthWestern"). The Bankruptcy Court denied the 9019 Motion for the reasons set forth in the Memorandum Opinion Denying the 9019 Order (the "9019 Opinion"). However, the 9019 Order and the 9019 Opinion misapplied the applicable law and should be reversed.

Throughout NorthWestern's chapter 11 case, Magten has asserted claims on behalf of the holders of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS") who were victimized by NorthWestern's transfer to itself of certain electric, natural gas and propane utility assets held by its subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork"), for inadequate consideration at a time when NorthWestern was insolvent and was not financially capable of performing its obligations under the indenture governing the QUIPS (the "Transfer"). In April 2004, after the Bankruptcy Court granted Appellants relief from the automatic stay to commence an adversary proceeding, Appellants filed a complaint against NorthWestern seeking to avoid the fraudulent transfer of the utility assets (the "Fraudulent Conveyance Proceeding").

The Fraudulent Conveyance Proceeding has been the central issue in NorthWestern's reorganization. Counsel to NorthWestern acknowledged that the Fraudulent Conveyance Proceeding is the "penultimate piece of litigation" and counsel to the Official Committee of

1

Unsecured Creditors, and now counsel to the Plan Committee, represented to the Bankruptcy Court that the Fraudulent Conveyance Proceeding is "at the heart of this case." See App. Exh. 248 Exh. A. pp. 6 and 81.[1]  Moreover, NorthWestern has disclosed and continues to disclose in its filings with the Securities and Exchange Commission (the "SEC") that the "litigation could adversely affect [NorthWestern's] business, results of operations and financial condition and [its] ability to continue normal operations." See App. Exh. 248, Exh. B at p. 52.

The Fraudulent Conveyance Proceeding has spawned numerous additional causes of action and proceedings and resulted in a contentious chapter 11 case.  These causes of action and proceedings include (i) Magten's objection to and appeal from the order confirming the Plan; (ii) Magten's objection to and appeal from the order approving the Memorandum of Understanding with respect to the settlement of the securities class action; (iii) Magten's motion to disqualify Paul, Hastings, Janofsky & Walker LLP  ("Paul Hastings") as general bankruptcy counsel to NorthWestern and its appeal from the denial of that motion; (iv) Magten's suit against the officers of Clark Fork for breach of their fiduciary duties with respect to the fraudulent transfer of the Montana utility assets that was commenced in the United States District Court for the District of Montana; (v) Magten's suit against Paul Hastings for aiding and abetting the fraudulent transfer that is pending before the United States District Court for the District of Delaware (the "District Court"); (vi) NorthWestern's adversary proceeding against Magten and Talton Embry to reduce or subordinate Magten's claim as a result of Magten's trading activity (the "Magten Adversary"); (vii) Magten's motion to withdraw the reference from the Bankruptcy Court to the District Court as to the Fraudulent Conveyance Proceeding and the Magten Adversary; (viii) Magten's objection to the final fee application of Paul Hastings; and (ix)

---

[1] References to items identified in Appellants' Joint Designation of Items to be Included in the Record on Appeal and Statement of the Issues to be Presented on Appeal of Magten Asset Management Corporation and Law Debenture Trust Company of New York, as Trustee [Bankr. Docket No. 2943] are referred to as "App. Exh. ___."

2

NorthWestern's objections to payment of Law Debenture's fees. All of these various claims and causes of action not only put NorthWestern and certain of its officers and advisors at risk of substantial liability, and put NorthWestern at risk that its plan of reorganization may be unwound, but also will inevitably lead to months and even years of expensive and time consuming litigation.

In January 2005, during the course of discovery in connection with the Magten Adversary, counsel to NorthWestern approached counsel to Magten and suggested that counsel to Magten make a settlement proposal that included (i) payment to non-accepting holders of QUIPS of amounts in excess of the amount provided to such holders in the Plan; (ii) payment of the fees of Law Debenture; and (iii) payment of fees to Magten for its substantial efforts on behalf of the holders of the QUIPS. Following the submission of a proposal, Magten, Law Debenture and NorthWestern (collectively the "Parties") engaged in arms length negotiation over a two-week period and during that time reached an agreement to resolve all outstanding claims and litigations (the "Settlement"). Counsel for NorthWestern then drafted an agreement the "Settlement Agreement") dated as of January 27, 2005, which was executed by the Parties.[2] The Settlement Agreement by its terms was "binding upon and inure[d] to the benefit of the respective successors and assigns of each of the parties hereto." See App. Exh. 248, Exh. C.

After the Settlement Agreement was executed by the Parties, NorthWestern informed both the Bankruptcy Court and the public of the Settlement, by among other things, (i) filing a notice with the Bankruptcy Court canceling the upcoming trial in the Magten Adversary as a

---

[2]    The Settlement Agreement is comprised of two agreements: (i) an agreement between NorthWestern, Magten, and the Trustee setting forth the general terms of the agreement in principle reached with respect to the compromise and settlement of all pending and threatened claims, causes of action, appeals and disputes among the Parties, and (ii) a letter agreement (the "Distribution Letter") between Magten and the Trustee contemplated by the Settlement Agreement setting forth the terms of the allocation of the stock and warrants to be distributed to the holders of the QUIPS pursuant to the terms of the Settlement. A copy of the Distribution Letter was sent to NorthWestern shortly after its execution.

3

result of the Settlement, (See App. Exh. 248, Exh. D), (ii) sending a letter to the mediator assigned to mediate the pending District Court appeals stating that the parties to the appeals have reached a global settlement and, thus, there was no need to proceed with mediation, (See App. Exh. 248, Exh. E), (iii) issuing a press release entitled "NorthWestern Settles Litigation and Bankruptcy Claims with Magten Asset Management and Law Debenture" that disclosed the general terms of the Settlement Agreement, (See App. Exh. 248, Exh. F), and (iv) stating to the Bankruptcy Court at the status conference held on February 10, 2005 that the Settlement was in the best interests of the estate (See App. Exh. 248, Exh. A at pp. 5-15).

After NorthWestern negotiated, drafted and executed the Settlement Agreement – a binding contract that NorthWestern repeatedly publicly advocated as being in its best interest – NorthWestern withdrew from and repudiated that contract because its largest shareholder – Harbert Distressed Investment Master Fund Ltd. ("Harbert") – was unhappy with the Settlement and had created a new "ad hoc" committee, which threatened to oppose the Settlement (the "Ad Hoc Committee"). See App. Exh. 248, Exh. K. Thus, when Appellants brought the 9019 Motion before the Bankruptcy Court, NorthWestern, the Ad Hoc Committee and the Plan Committee raised objections to the Settlement Agreement.

The Bankruptcy Court held a hearing on the matter and ultimately denied the 9019 Motion on various grounds, including that the Settlement Agreement was not a binding contract until such time as it had been approved by the Bankruptcy Court. In doing so, the Bankruptcy Court ignored (i) the clear language of the Settlement Agreement that stated the Settlement was "binding upon and inure[d] to the benefit of the respective successors and assigns of each of the parties hereto," and (ii) the fact that NorthWestern, as a reorganized entity was no longer operating under the protections of chapter 11 and was not constrained by section 363 of the

4

Bankruptcy Code. Moreover, the Bankruptcy Court erroneously held that Settlement Agreement

was inconsistent with the Plan. Because the Settlement Agreement provided the non-accepting

holders of the QUIPS with a recovery that was less than the amount that the holders of the

QUIPS would recover under the Plan on account of their class 9 claim, the Settlement

Agreement was proper and should have been enforced by the Bankruptcy Court. Counsel for

NorthWestern drafted both the Plan and the Settlement Agreement and executed the Settlement

Agreement with full knowledge of the terms of the confirmed Plan and NorthWestern's counsel

affirmatively represented to the Bankruptcy Court that the Settlement was consistent with the

terms of the Plan. Thus, because NorthWestern could have provided Appellants with the full

economic recovery NorthWestern had agreed to without violating the terms of the Plan, the

Bankruptcy Court erred in denying the 9019 Motion.[3] Since the 9019 Order is predicated on

numerous legal errors, it should be reversed.

## BASIS OF APPELLATE JURISDICTION

This is an appeal of the 9019 Order. In accordance with Fed R. Bankr. P. 8001(a) and

8002, on March 17, 2005, Appellants timely filed the Notice of Appeal of the 9019 Order. This

Court, therefore, has jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) and Fed. R.

Bankr. P. 8001(a).

## ISSUES PRESENTED

There are two main issues presented by this Appeal. The first issue is whether the

Bankruptcy Court erred in determining that the Settlement Agreement was not a contract upon its

---

[3]    Under the Plan, the non-accepting holders of the QUIPS have a disputed class 9 claim of approximately $50 million. As class 9 claimants, Magten and Law Debenture and the non-accepting holders of the QUIPS would receive the same treatment as NorthWestern's other general unsecured creditors – an approximately 62% recovery – or $31 million in stock at applicable Plan value. The total Plan value of the stock and warrants that are the subject of the Settlement was $25.5 million, which represents an approximate recovery of 51%. Thus, the economic recovery sought, bargained for and agreed to by NorthWestern was well below the amount recoverable by the non-accepting holders of the QUIPS under the Plan.

execution, but rather required the approval of the Bankruptcy Court to be binding upon the signatories thereto. This issue includes whether NorthWestern, as a reorganized debtor, was free to enter into binding contracts outside of the ordinary course of business without the constraints of section 363 of the Bankruptcy Code.

The second issue is whether the Bankruptcy Court erred in finding that the Settlement Agreement could not be implemented without amending the Plan when the amount payable to the non-accepting holders of the QUIPS under the Settlement was less than the amount recoverable by those holders under the Plan.

<u>**STANDARD OF APPELLATE REVIEW**</u>

When considering an appeal from a ruling by of the United States Bankruptcy Court, a "District Court reviews the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse." <u>Pro-Tec Servs., LLC v. Inacom Corp. (In re Inacom Corp.),</u> No. 04-0390, 2004 U.S. Dist. LEXIS 20822, at *3 (D. Del.  Oct. 4, 2004) (citing <u>Manus Corp. v. NRG Energy, Inc.,</u> 188 F.3d 116, 122 (3d Cir. 1999)); <u>see also</u> <u>Safety Nat'l Cas. Corp. v. Kaiser Aluminum & Chem. Corp. (In re O'Brien Envt'l Energy, Inc.),</u> 303 B.R. 299, 302 (D. Del. 2003) ("In undertaking a review of the issues on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions."). "A bankruptcy court abuses its discretion when its ruling is founded on an error of law or misapplication of law to the facts. In determining whether an error exists, the bankruptcy court's application of the law to the facts is reviewed de novo." <u>Pro-Tec Servs., LLC.</u> 2004 U.S. Dist. LEXIS 20822, at *3-4 (citing <u>Manus Corp.,</u> 188 F.3d at 122)).

6

## STATEMENT OF THE CASE

I.    THE PARTIES

A.    *NorthWestern*

NorthWestern is a publicly traded Delaware corporation that was incorporated in 1923. NorthWestern, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota, and Nebraska. As discussed in further detail below, on September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On October 19, 2004, the Bankruptcy Court entered the order confirming NorthWestern's Plan (the "Confirmation Order"). On November 1, 2004, the Plan became effective and NorthWestern ceased to operate as a debtor in possession.

B.    *Magten*

Magten holds in excess of 40% of the QUIPS issued by Montana Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by The Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The only assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 issued by Montana Power.

C.    *Law Debenture*

Law Debenture is a limited purpose trust company organized under the laws of New York and is the successor trustee to the Bank of New York under the Indenture governing the QUIPS.

7

II.    THE SUBJECT OF THE SETTLEMENT: LITIGATION AND CAUSES OF ACTION
       BETWEEN MAGTEN, LAW DEBENTURE, NORTHWESTERN AND RELATED
       THIRD PARTIES

On April 16, 2004, after the Bankruptcy Court granted Appellants relief from the

automatic stay, and Appellants filed a complaint against NorthWestern in the Bankruptcy Court

on behalf of the holders of the QUIPS seeking to set aside the fraudulent conveyance of the

Montana utility assets. The Fraudulent Conveyance Proceeding seeks the imposition of a

constructive trust for the benefit of the holders of the QUIPS over a substantial portion of

NorthWestern's assets because NorthWestern wrongfully appropriated substantially all of the

assets of its subsidiary.

On May 14, 2004, NorthWestern filed a motion to dismiss the Fraudulent Conveyance

Proceeding. Following completion of briefing, on August 20, 2004, the Bankruptcy Court,

denied NorthWestern's motion to dismiss.

On August 31, 2005, NorthWestern filed the Plan. With respect to the treatment of the

QUIPS, the Plan provided that holders of the QUIPS were classified in Class 8(b). The Plan

required the members of this class to choose between (i) receiving an approximately $.12

recovery in stock and warrants in full satisfaction of all their claims against NorthWestern,

including the release of their claims in the Fraudulent Conveyance Proceeding ("Option 1"), or

(ii) receiving no recovery under the Plan and retaining their right to pursue the Fraudulent

Conveyance Proceeding with any judgment to be treated as a Class 9 claim ("Option 2").[4]

Appellants objected to a number of provisions in the Plan, including the treatment afforded to the

holders of the QUIPS. The Bankruptcy Court subsequently confirmed the Plan over Appellants'

objections, which appeal is currently pending before this Court.

---

[4]    Although the Plan provided for an approximately $0.15 recovery to the holders of the QUIPS that chose
       Option 1, as a result of the valuation ultimately adopted by the Bankruptcy Court, the actual recovery
       provided to those that chose Option 1 was approximately $0.12.

8

On October 4, 2004, Magten filed an amended complaint in the Fraudulent Conveyance Proceeding. Then, on November 17, 2004, Appellants filed a motion to withdraw the reference with respect to the Fraudulent Conveyance Proceeding (the "Withdrawal Motion") in the District Court of Delaware (the "District Court"). The Withdrawal Motion is currently pending in the District Court and the Bankruptcy Court has stayed the Fraudulent Conveyance Proceeding pending the resolution of Magten's appeal of the order confirming the Plan.

Following the commencement of the Fraudulent Conveyance Proceeding, numerous claims and causes of action arising from or related to the Transfer have been brought, including the following:

- On April 19, 2004, Magten filed a complaint in the United States District Court for the District of Montana against the officers and directors of Clark Fork, NorthWestern's subsidiary, for breach of their fiduciary duties in fraudulently transferring the Montana utility assets to NorthWestern for inadequate consideration at a time when NorthWestern was insolvent. The defendants filed a motion for summary judgment, and on January 27, 2005, immediately prior to the Settlement Agreement being executed, the Montana District Court denied defendants summary judgment motion. Upon the motion of the defendants, this action was recently transferred to this Court.

- On May 20, 2004, Magten filed a complaint against Paul Hastings in Montana state court, for breach of its duties to Clark Fork and Clark Fork's creditors in connection with its involvement in the fraudulent conveyance of the Montana utility assets. The proceeding has been removed to federal court and is currently pending before this Court.

- On June 18, 2004, Magten filed a motion seeking to disqualify Paul Hastings as bankruptcy counsel to NorthWestern due to Paul Hastings conflict of interest and lack of disinterestedness as a result of its involvement in the Transfer. The Bankruptcy Court denied the motion, as well as Magten's subsequent motion for reconsideration. Magten appealed the Bankruptcy Court's decision and the appeal is currently pending before this Court.

- On October 26, 2004, Magten filed a motion with the District Court seeking to stay the Confirmation Order pending an appeal. The District Court denied the motion and Magten has appealed the Confirmation Order (the "Confirmation Appeal") as well as and the Order approving the Memorandum of Understanding (the "MOU Appeal"). The Confirmation Appeal and the MOU Appeal have been consolidated and both are pending before this Court.

9

- On January 3, 2005, Magten filed an objection to the final fee application of Paul Hastings as a result of Paul Hastings' conflict of interest and lack of disinterestedness as a result of its involvement in the fraudulent transfer of the Montana utility assets. After a hearing on the matter, Magten's motion was denied by the Bankruptcy Court. Magten has appealed this decision and that appeal is pending before this Court.

- Additionally, as a result of Magten's and Law Debenture's efforts, NorthWestern filed an adversary proceeding against Magten and its principal, Talton Embry. Specifically, On August 20, 2004, NorthWestern initiated an adversary proceeding against Magten and its principal, Talton Embry, seeking damages and equitable relief relating to Magten's trading activities regarding the QUIPS. On November 2, 2004, the Bankruptcy Court held a status conference with respect to both the Fraudulent Conveyance Proceeding and the Magten Adversary. At that status conference, the Bankruptcy Court stayed the Fraudulent Conveyance Proceeding and set forth an expedited discovery schedule for the Magten Adversary with a trial date of February 7, 2005. Although this action was temporarily stayed as a result of the Settlement, after NorthWestern breached the Settlement Agreement, this adversary proceeding was dismissed with prejudice by NorthWestern.

- Magten moved for payment of its fees in connection with its substantial efforts to defend the baseless allegations made by NorthWestern in the Magten Adversary. After a hearing, the Bankruptcy Court denied Magten's motion for fees. Magten has filed a timely notice of appeal from that order.

- On January 3, 2005, NorthWestern filed an objection to the Law Debenture's request for payment of fees and reimbursement of expenses. The Bankruptcy Court subsequently denied the majority of the fees requested by Law Debenture. Law Debenture has timely filed a notice of appeal from that order.

III.   THE TERMS OF THE SETTLEMENT AGREEMENT

In the course of conducting discovery for the trial in the Magten Adversary,

NorthWestern and Magten held a "meet and confer" at the end of which NorthWestern, through

its counsel, solicited Magten to make an offer to settle all pending claims and causes of actions.

In response, Magten submitted an initial settlement proposal to NorthWestern that NorthWestern

took under advisement.

Thereafter, two weeks of extensive settlement discussions ensued, and on January 27,

2005, the Parties reached an agreement in principal concerning the settlement of the claims of

10

NorthWestern, Law Debenture, Magten and the holders of the QUIPS that did not accept

NorthWestern's Plan. NorthWestern drafted the Settlement Agreement, put it in final form,

obtained executed copies of the Settlement Agreement from Magten and Law Debenture, and on

February 10, 2005, presented the terms of the settlement to the Bankruptcy Court. At the same

time, Magten and Law Debenture executed the Distribution Letter, which provided for the

distribution of the stock and warrants pursuant to the Settlement Agreement. See App. Exh. 248,

Exh. G.

Specifically, the salient terms of the Settlement Agreement provided that:

- NorthWestern would distribute to Law Debenture for its own benefit and on behalf of Magten and the non-accepting Class 8(b) QUIPS holders the 382,732 shares of common stock at the reorganization plan value of $20.00 per share ("Plan Value") and the 710,449 warrants not yet distributed to Class 8(b) claimants that would have been distributed to Magten and the non-accepting Class 8(b) QUIPS holders had they accepted NorthWestern's confirmed Plan.

- NorthWestern would distribute to Law Debenture for its own benefit and on behalf of Magten and the other non-accepting Class 8(b) QUIPS holders (a) those shares of common stock of reorganized NorthWestern set aside for such QUIPS holders in the reserve established pursuant to that certain Stipulation and Order Establishing a Disputed Claim Reserve entered as Docket #2298 on November 1, 2004, which stock has a Plan Value of $17.1 million, plus (b) an additional $300,000 of common stock of reorganized NorthWestern at Plan Value, which additional stock will be distributed from the general reserves set aside in Class 9 for pending litigation claims.

- All fees and expenses, including but not limited to attorneys fees and costs, incurred by Law Debenture on behalf of itself and the holders of QUIPS through the date of entry of an order approving the Settlement Agreement would be paid from the sale, disposition or liquidation of common stock and/or warrants to be distributed above. NorthWestern, Magten and Law Debenture (collectively, the "Parties") agreed that Law Debenture had the right to sell into the public market that portion of the common stock and/or warrants distributed to Law Debenture on behalf of QUIPS holders, whether such distribution was through the Plan or the Settlement Agreement, to the extent necessary to pay its fees and expenses and those of its counsel.

11

- The fees and expenses of Magten were to be paid from distributions made pursuant to the Settlement Agreement on account of the non-accepting Class 8(b) QUIPS holders in an amount and in a manner as may be agreed to between Magten and Law Debenture.[5]

- All of the Parties would mutually release between and among each other any and all claims and causes of action (specifically including third party actions initiated by Magten and actions instituted against Magten and Talton Embry), whether or not threatened or pending from the beginning of time through the date of any order approving the Settlement Agreement as entered by the Bankruptcy Court, and would dismiss with prejudice all pending litigation and appeals and withdraw with prejudice pending objections to various claims, and would agree not to file any claims or objections or lawsuits in the future relating to arising out of or from the allegations made or that could have been made in any of the matters referenced on Schedule 1 of the Settlement Agreement.

In the Settlement Agreement, Magten and Law Debenture, on behalf of the QUIPS holders, and NorthWestern agreed to a compromise and settlement with a Plan value of approximately $25.5 million, or approximately 50% of the face amount QUIPS' class 9 claim. Taken as a whole, this economic recovery is less than the 62% recoverable by the holders of the QUIPS under the Plan. Moreover, under the Plan, NorthWestern had the exclusive authority to settle claims. See supra footnote 7. Thus, NorthWestern was well within the parameters of its authority to enter into the Settlement Agreement and settle the QUIPS' claims for less than the full amount of the claim.

IV.    NORTHWESTERN'S EFFORTS TO WITHDRAW FROM THE SETTLEMENT AGREEMENT

After the Settlement Agreement was negotiated and executed, presented to the Bankruptcy Court and made public through NorthWestern's press release, NorthWestern received a letter from Harbert objecting to the terms of the Settlement. In addition, counsel to the Plan Committee also objected to the terms of the Settlement. Thereafter, on February 16,

---

[5]    The terms of the allocation of shares between Magten and Law Debenture are fully described in the Distribution Letter. App. Exh. 248, Exh. G. Because no party has objected to the allocation of the shares pursuant to the Distribution Letter, the subject matter of that agreement is not relevant to this appeal and is not discussed herein.

12

2004, NorthWestern advised Magten and Law Debenture by letter that it would not honor the terms of the Settlement Agreement. See App. Exh. 248, Exh. H.

On February 17, 2005, Magten sent a letter to the Bankruptcy Court requesting a chambers conference to obtain guidance from the Bankruptcy Court as to how to proceed as a result of NorthWestern's wrongful breach of the Settlement Agreement. See App. Exh. 248, Exh. I. In addition, Magten also sent a letter to NorthWestern on February 18, 2005, informing NorthWestern that (i) the Settlement Agreement was binding on all parties and that NorthWestern's attempts to avoid its obligations under the Settlement Agreement were wrongful, and (ii) its public disclosure suggesting that it had the unilateral right to withdraw the settlement was misleading. See App. Exh. 248, Exh. J. Thereafter, the Bankruptcy Court informed the parties that a motion seeking approval of the Settlement Agreement should be filed and that the Bankruptcy Court would hear the motion at its next omnibus hearing. Accordingly, Appellants filed the 9019 Motion. Subsequently, NorthWestern, the Plan Committee and the Ad Hoc Committee (led by Harbert) filed objections to the 9019 Motion. The primary basis of the objections was that the Settlement violated the Plan insofar as it provided to the holders of the QUIPS a recovery under both Option 1 and Option 2, when the Plan required holders of the QUIPS to choose between such options.

V.     THE 9019 ORDER

On March 8, 2005, the Bankruptcy Court held a hearing on the 9019 Motion (the "9019 Hearing"). Two days later, on March 10, 2005, the Bankruptcy Court entered the 9019 Order, denying the 9019 Motion. In the 9019 Opinion, the Bankruptcy Court held that (i) the Settlement was not binding on the Parties absent the approval of the Bankruptcy Court; (ii) the Option 1 distribution could not be effectuated without an amendment to the Plan because NorthWestern did not have the resources to "dip into" the disputed claims reserve created by

13

NorthWestern (the "Disputed Claims Reserve") to satisfy the Option 1 Distribution. See App. Exh. 264, pp. 2, 6.

Following the Bankruptcy Court's denial of the 9019 Motion, in light of the representations that the Disputed Claims Reserve was underfunded, Appellants timely filed a Complaint to Revoke the Order of Confirmation Pursuant to Section 1144 of the Bankruptcy Code and Rule 7001(5) of the Federal Rules of Bankruptcy Procedure and for Breach of Fiduciary Duty (the "1144 Complaint") against NorthWestern and certain members of its senior management (the "1144 Defendants"). App. Suppl. Exh. A.[6] Subsequently, the 1144 Defendants moved to dismiss the 1144 Complaint (the "1144 Motion to Dismiss") contending, among other things, that the Disputed Claims Reserve now contains sufficient stock to satisfy all disputed claims in full. App. Suppl. Exh. B. ("The total amount in the Disputed Claims Reserve is sufficient to cover all disputed claims which are currently pending against the estate.") (1144 Motion to Dismiss); see also App. Suppl. Exh C, Exh A. Further proceedings related to the 1144 Complaint have been stayed by the Bankruptcy Court pending resolution of the Confirmation Appeal.

## ARGUMENT

I.    THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE SETTLEMENT AGREEMENT WAS NOT BINDING ON THE PARTIES ABSENT THE APPROVAL OF THE BANKRUPTCY COURT

The Settlement Agreement, drafted by counsel to NorthWestern, is clear on its face that "the Settlement outlined herein shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto." See App. Exh. 260, Exh. C, p. 4. By

---

6    Magten and NorthWestern are in discussions regarding the filing of a joint motion to designate additional items that may not have originally been included in the record. All references to items not specifically listed in Magten's or NorthWestern's designation of record are included in the appendix and referred to as "App. Suppl. Exh. __."

14

executing the agreement expressly containing that language, the Parties indicated their intent and their consent to be bound by the terms of the agreement upon its execution. The objections raised by Harbert and subsequently echoed by the Plan Committee did not give NorthWestern the ability to unilaterally release itself from its contractual obligations and the Bankruptcy Court erred by permitting NorthWestern to do so.

It is well settled in the Third Circuit that an "agreement to settle a law suit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970). In this regard, settlement agreements should be treated as contracts and when parties enter into a settlement agreement, they enter into a contract. D.R. by M.R. v. E. Brunswick Bd. of Educ., 109 F.3d 896, 901 (3d Cir. 1997); See also, Halderman v. Pennhurst State Sch. & Hosp., 901 F.2d 311, 318 (3d Cir. 1990) (construing a final settlement agreement as a contract); Loppert v. Windsortech, Inc., Index No. 441-N, 2004 Del. Ch. LEXIS 121, at *5, n.19 (Del. Ch. June 25, 2004) ("settlement agreement is enforceable as a contract"); Rowe v. Rowe, Index No. 16119, 2002 WL 1271679 at *3 (Del. Ch. May 28, 2002) ("A settlement agreement is construed using the principles of contract interpretation.").

Likewise, Delaware law is clear that "a contract 'comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms.'" Leonard v. Univ. of Del., 204 F. Supp. 2d 784, 787 (D. Del. 2002) (citing Intellisource Group, Inc. v. Williams, No. 98-57, 1999 U.S. Dist. LEXIS 12446, (D. Del. Aug. 11, 1999) (citations omitted)). Where the intent of the parties "can be cleanly extracted from the clear and unambiguous words that the parties have used, it is equally conventional wisdom that they are

15

held to those words contained in the contract." Compass Tech., Inc. v. Tseng Labs Inc., 71 F.3d

1125, 1131 (3d Cir. 1995). Those who reach a settlement "are bound by its terms and may not

challenge it, pending notice to others and subsequent court approval." Nelson Co. v. Amqip

Corp. (In re Nelson Co.), 117 B.R. 813, 820 n.19 (Bankr. E.D. Pa. 1990).

Moreover, as the author of both the Plan and the Settlement Agreement, NorthWestern

and its counsel are the parties with the most detailed knowledge of the contents of the Plan and

cannot claim ignorance of the terms of the Plan as an excuse to avoid performing under the

contract. In this regard, any ambiguities in either the Plan or the Settlement Agreement should

be construed against NorthWestern – which must be charged with a working knowledge of its

own documents. See In re NVF Co., 309 B.R. 698, 704 (Bankr. D. Del. 2004) ("ambiguous

provisions are construed against the drafter [and] where the Plan is considered an enforceable

contract the interpretation of the ambiguous provisions will be construed against. . .the Plan

proponent.").

Not only should the Plan be construed against NorthWestern because NorthWestern

drafted the Plan but NorthWestern should also have been bound by the representations its

counsel made to the Bankruptcy Court. It is well-settled law in this district that when "an

attorney of record in a pending action acknowledges that a compromise has been reached, he or

she is presumed to have the lawful authority to do so." Rowe, 2002 WL 1271679, at *3. This

apparent authority is not altered by the fact that the client is a corporation, especially where there

is evidence that the corporation was aware of the terms of the settlement. See Loppert, 2004 Del.

Ch. LEXIS 121, at *4. Here, public statements by NorthWestern's CEO in a press release that

the settlement was "in the best interest of [NorthWestern] and its shareholders," demonstrate

NorthWestern's awareness and acceptance of the Settlement Agreement. See App. Exh. 248,

16

Exh. F. Moreover, NorthWestern's awareness of and support for the Settlement was represented
to the Bankruptcy Court when NorthWestern's counsel stated that NorthWestern was seeking a
meeting with the Plan Committee "to say this is a settlement which the management of the
company is recommending." See App. Exh. 260, Exh. B p. 11.

Based on NorthWestern's numerous statements that the Settlement was in the best
interests of the estate, and in light of the clear language of the Settlement Agreement, there can
be little doubt that a binding contract was formed upon the execution of the Settlement.
Moreover, at the time NorthWestern negotiated, drafted and executed the settlement Agreement,
the effective date of the Plan had occurred. As such, NorthWestern was a reorganized debtor,
free to conduct business and enter into outside the ordinary course of business without court
approval.

When a debtor in possession executes a contract that is not in the ordinary course, under
section 363 of the Bankruptcy Code that contract will not be enforced absent court approval.
Here, however, NorthWestern was no longer a debtor in possession and the constraints of section
363(b) of the Bankruptcy Code did not apply. "Section 363(b) speaks of the trustee's right to
sell property of the estate. Once a plan has been confirmed, there is no longer a trustee and no
longer an estate." In re W.R.M.J. Johnson Fruit Farm, Inc. 107 B.R. 18, 19 (Bankr. W.D.N.Y.
1989). "Courts have applied section 363 to transactions in chapter 11 proceedings only where
plans have not yet been confirmed." In re Wood, 47 B.R. 774, 776 (Bankr. W.D. Wis. 1985).
Post–confirmation, the reorganized debtor is no longer required to operate its business as a
debtor in possession as the property of the estate has been vested in the reorganized entity such
that the reorganized entity may dispose of such property at it sees fit – subject to the terms of the
confirmed plan. 11 U.S.C. § 1141(a)-(b). Therefore, because at the time it executed the

17

Settlement Agreement, NorthWestern's Plan had already been confirmed, section 363 of the Bankruptcy Code was inapplicable and court approval of the Settlement Agreement was not a condition precedent to its effectiveness. This is not only consistent with the Bankruptcy Code, but also with NorthWestern's Plan, which provides:

> After the Effective Date, Reorganized Debtor may operate its businesses, and my use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article XIII hereof.

See App. Exh. 260, Exh. E, section 5.14.[7]

Likewise, the ability of NorthWestern to freely enter into contracts was reinforced when the Bankruptcy Court entered the Confirmation Order which, in turn, provided that:

> On or after the Effective Date, the Reorganized Debtor shall be authorized to use, acquire and dispose of property... without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or this Order.

See App. Exh. 260, Exh. F, p. 89.

Because NorthWestern is no longer a debtor in possession and may enter into contracts without the constraints of section 363(b) of the Bankruptcy Code, there is no basis to hold that an agreement executed by NorthWestern is not binding absent court approval. See e.g., Northview

---

[7]    Moreover, the Plan further provides that the "Reorganized Debtor shall have the exclusive authority to compromise, settle, otherwise resolve or withdraw any objections filed by Reorganized Debtor." See App. Exh. 2833, Exh. E, section 7.4   The Plan Committee By-Laws in effect at the time the Settlement Agreement was executed simply provided a structure for the Plan Committee to communicate its views to NorthWestern with respect to any settlements. See App. Exh. 2833, Exh. G, section 1.10.1.1.  Several weeks after the Settlement Agreement was executed, and at some point after the Plan Committee filed their objection to the 9019 Motion, the Plan Committee concocted amendments to the Plan Committee By-Laws to provide, inter alia, that all settlements must be "expressly subject to Bankruptcy Court approval and shall not be binding ... until [an] order is obtained and entered by the Bankruptcy Court." See App. Exh. 2833, Exh. G, section 1.10.1.1 (adopted March 3, 2005) and App. Exh. 2833, Exh. H. Thus, NorthWestern's exclusive right to compromise and settle claims was unaffected by the Plan Committee, as the Plan Committee's only right was to object to NorthWestern's agreements concerning the allowance of claims.

18

Motors, Inc. v. Chrysler Motors Corp. 186 F.3d 346, 351 (3d Cir. 1999) ("Relying on Section 363, we have held that a contract providing for the use or sale of estate property outside the regular course of business is unenforceable absent court approval") (emphasis added). Absent section 363 of the Bankruptcy Code, no substantive law makes settlement agreements unenforceable and the only related Bankruptcy Code section or Bankruptcy Rule is Bankruptcy Rule 9019. Bankruptcy Rule 9019, however, is only a procedural rule and it cannot alter the substantive rights of the parties. See 28 U.S.C. §2075 ("The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under Title 11. Such rules shall not abridge, enlarge or modify any substantive right."). As the Third Circuit has noted:

> As a matter of law, Bankruptcy Rule 9019(a), a rule of procedure, cannot, by itself, create a substantive requirement of judicial approval of the Trustee's settlement of the [the debtors'] claims against Chrysler. However, we adhere to our ruling in Martin, that Section 363 of the Code is the substantive provision requiring court approval.

Northview Motors, 186 F.3d at 351 n.4 (emphasis added) (internal citation omitted).

Thus, since section 363 is not applicable to NorthWestern, Rule 9019 by itself cannot alter substantive contract rights. The provision in the Settlement Agreement providing that the Settlement would be implemented pursuant to a motion under Bankruptcy Rule 9019 was merely a procedural mechanism for implementation of the Settlement. Because section 363 of the Bankruptcy Code was not applicable to NorthWestern and because Bankruptcy Rule 9019 was only a procedural mechanism for the implementation of the Settlement, the Settlement Agreement was a legal and binding contract, and the Bankruptcy Court erred when it held otherwise.

19

II.   THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE SETTLEMENT
      AGREEMENT COULD NOT HAVE BEEN IMPLEMENTED WITHOUT A PLAN
      AMENDMENT

The Bankruptcy Court committed reversible error in concluding that the Settlement

Agreement could not be performed absent a Plan amendment.  As demonstrated *infra*, the

economic terms of the Settlement are well within the parameters of the economic terms of the

Plan.  The Bankruptcy Court's confusion and NorthWestern's contradictory statements about the

adequacy of the Disputed Claims Reserve was simply a red herring.  The Settlement Agreement,

consistent with Third Circuit precedent, should be enforced.

Thus, at the February 10, 2005 omnibus hearing, when NorthWestern's counsel advised

the Bankruptcy Court that the Parties had entered into a settlement and described the terms of

that settlement to the Bankruptcy Court, the Bankruptcy Court specifically asked counsel to

NorthWestern whether a Plan amendment would be necessary to implement the Settlement.  See

App. Exh. 260, Exh. B, p. 13.  Counsel for NorthWestern, which logged more than 7500 hours

drafting the Plan and attending to matter related thereto, responded as follows:

> We're not making an amendment to the plan per se, Your Honor.
> Because we have a pending adversary proceeding, we think we can
> do this under a 9019 settlement.  We don't think it relates to a plan
> amendment because we had actually under the plan reserved a
> significant amount of stock for the Class 9 potential claimants as
> contingent unliquidated claims in connection with going effective.
> So that matter had ultimately been disclosed relative to the
> potential for settling claims.

See App. Exh. 260, Exh. B, p. 13.

From the time the Plan was confirmed, NorthWestern and Law Debenture had numerous

discussions regarding the possibility of permitting those QUIPS holders that chose Option 2

under the Plan with the opportunity to elect to receive the Option 1 distribution, thereby granting

such holders that had rejected the Plan stock and warrants in the reorganized debtor – without the

20

need for a Plan amendment or additional solicitations. See App. Exh. 260, Exh. L. As the

drafter of the Plan, and given that its counsel spent 7500 hours working on the Plan, it was

simply not plausible for NorthWestern to contend that it was unaware of the requirements of the

Plan – especially after it affirmatively represented to the Bankruptcy Court that an amendment to

the Plan was unnecessary.[8]

At the time the Settlement Agreement was executed, NorthWestern and its counsel knew

that a Plan amendment was not necessary to effectuate the Settlement and also knew that

NorthWestern had the exclusive authority under the Plan to settle disputed claims. See infra

footnote 7; see also App. Exh. 260, Exh. B at p. 13. NorthWestern and its counsel drafted and

executed the Settlement Agreement, which provided the non-accepting holders of the QUIPS

with a total recovery of 51% on account of their claim. This Settlement was significantly less

than the 62% recoverable by the holders of the QUIPS under the Plan.

Lastly, there was no change of circumstances between the execution of the Settlement

Agreement and NorthWestern's repudiation of that agreement. Because NorthWestern could

have complied with the terms of the Settlement Agreement by providing the economic

equivalent of the stock and warrants called for by the Settlement from the Disputed Claims

Reserve that NorthWestern had established, there was no reason or basis not to approve the

Settlement. See Newark v. NVF Co., 1980 WL 6367, slip op. at *10 (Del. Ch. Jan. 10, 1980)

("mere inability to perform a contract will not alone relieve the defaulting party … the

---

[8]    Moreover, one of the issues currently before this Court in the Confirmation Appeal is whether the Plan
violated the Bankruptcy Code by forcing the holders of the QUIPS to choose between Option 1 and Option
2. Because that issue has been the subject of an appeal, there exists the possibility that this Court will
determine that the holders of the QUIPS would be entitled – under the Plan – to a recovery on account of
both options. Therefore all parties that received distributions under the Plan were aware that the Option
1/Option 2 dichotomy may be reversed. Providing such recovery to the holders of the QUIPS as part of a
global settlement of not only the Fraudulent Conveyance Proceeding but also the Confirmation Appeal was
foreseeable, entirely proper and did not require an amendment to the Plan.

impossibility of performance or frustration of purpose which will discharge a contractual

obligation must be created by a fortuitous event and not by the voluntary act of the promisor.")

(citations omitted); <u>Bell Atl. Directory Servcs., Inc. v. Del. Law Ctr., Inc.</u>, 2000 WL 33654061,

slip. op. at *1 (Del. Com. Pl. Dec. 14, 2000); (citing 17 <u>Am.Jur. 2nd</u>, "Contracts" § 673) ("To

avail itself of th[e] defense [of impossibility of performance and frustration of purpose], the

[defendant] must carry the burden of proving by affirmative evidence that its performance under

the contract is rendered impossible by an act of God, law or the other party); <u>Martin v. Star</u>

<u>Publ'g. Co.</u>, 126 A.2d 238 (Del. Supr. 1956) (to be released, the party must demonstrate that the

obligation under the contract cannot be performed by any means).

     The Plan gave the non-accepting QUIPS holders a disputed Class 9 claim of at least $50

million and required NorthWestern to establish a disputed claims reserve with sufficient stock to

ensure that holders of disputed claims would receive the same recovery as those whose claims

were allowed.  In creating the reserve, NorthWestern estimated certain claims for the sole

purpose of calculating the amount necessary to be placed in the reserve.  In that regard,

NorthWestern and Law Debenture entered into a stipulation estimating the non-accepting QUIPS

claims at $25 million for the sole purpose of establishing the reserve.  By its terms, the

stipulation did not limit the QUIPS to a $25 million claim and specifically provided that "[t]o the

extent that the Allowed QUIPS Litigation Claims ultimately exceed $25 million, the holders of

such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve (as

such is described in the Plan and the Confirmation Order)."  <u>See</u> App. Exh. 260, Exh. M, p. 3.

This fact was acknowledged by the Bankruptcy Court, "to the extent that the litigation claim

exceeds $25 million, the 'holders of [the claims on account of the Fraudulent Conveyance

Proceeding] shall have any deficiency satisfied out of the general Disputed Claims Reserve'

22

described in the Plan." <u>See</u> App. Exh. 263 at pp. 4-5 (citing App. Ex. Exh. 260, Exh. M). Further, in agreeing to the stipulation, Law Debenture and NorthWestern discussed the amount of disputed claims and NorthWestern assured Law Debenture that the disputed claims reserve contained sufficient stock to pay the QUIPS holders' claims in full when allowed. Indeed, the Plan would not have been confirmable unless sufficient stock was placed in the reserve to ensure that all holders of class 9 claims received equal distributions. <u>See</u> 11 U.S.C. §1129(b)(2).

Under the Plan, the amount recoverable by the non-accepting holders of the QUIPS is $31.5 million of stock at Plan value – significantly less than the total recovery afforded to such creditors by the Settlement. At the 9019 Hearing, however, counsel for NorthWestern argued that it was not possible to satisfy the Settlement from the Disputed Claims Reserve because NorthWestern "wasn't in a position to allocate that large a portion of the reserve by way of settlement." App. Exh. 266 at pp. 44-45. This, in turn, led the Bankruptcy Court to examine the amount of stock contained in the Disputed Claims Reserve and determine that it was "imprudent" to permit distributions from the Disputed Claims Reserve because doing so would likely mean that other holders of Disputed Claims would not have received a distribution. App. Exh. 263 at p. 6.

However, now that Appellants have filed the 1144 Complaint, NorthWestern, the Plan Committee, and the Ad Hoc Committee, which all represented that the Disputed Claims Reserve was insufficient, have changed their tune and now assert that there is sufficient stock in the Disputed Claims Reserve to satisfy all disputed claims in full (including the QUIPS), in the event such claims become allowed. <u>See</u> App. Suppl. Exh B. ("The total amount in the Disputed Claims Reserve is sufficient to cover all disputed claims which are currently pending against the estate."); <u>see also</u> App. Suppl. Exh C, Exh A.

23

As noted above, the Settlement Agreement provided the non-accepting holders of the QUIPS with a 51% recovery on account of their claim – a recovery significantly less than the 62% recovery NorthWestern was authorized to provide under the Plan – such that a Plan Amendment was not necessary to implement the terms of the Settlement. The law in this Circuit is clear: the Settlement Agreement was a binding contract between the Parties and must be enforced.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, Appellants respectfully request this Court reverse the 9019 Order and grant such other relief at it deems appropriate.

Dated: Wilmington, Delaware
       July 27, 2005

**BLANK ROME LLP**

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:   (302) 425-6464
packel@blankrome.com
battista@blankrome.com

- and -

**FRIED, FRANK, HARRIS, SHRIVER &**
**JACOBSON LLP**
Bonnie Steingart, Esq.
Gary Kaplan, Esq.
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
    Corporation

24

– and –


_/s/ Kathleen M. Miller_
Kathleen M. Miller (I.D. No. 2898)
**Smith, Katzenstein & Furlow, LLP**
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Courier 19801
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405
kmiller@skfdelaware.com


– and –


Amanda D. Darwin, Esq. BBO No. 547654
John V. Snellings, Esq., BBO No. 548791
Lee Harrington, Esq. (DE 4046)
**Nixon Peabody LLP**
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Attorneys for Law Debenture Trust Company of
New York

504082