# ATTACHMENT "1"
# UNREPORTED CASES

IN RE: INACOM CORP., et al., Debtors, PRO-TEC SERVICES, LLC, Appellants, v. INACOM CORP., et al., Appellees.

Chapter 11, Case No. 00-2426 (PJW), Civil Action No. 04-390-GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 20822

October 4, 2004, Decided
October 4, 2004, Filed

**DISPOSITION-1:** Bankruptcy court's decision reversed and remanded.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant creditor challenged a decision of the United States Bankruptcy Court for the District of Delaware that denied the creditor's motion to reconsider the allowance of its claims against appellee debtor.

**OVERVIEW:** The creditor and a corporation were parties to a computer repair services agreement. The debtor purchased the corporation and the creditor continued to provide services under the agreement. When the debtor filed Chapter 11, the creditor filed a claim and the debtor objected. The bankruptcy disallowed the claims because the creditor's counsel did not respond to the objection. The creditor sought relief under Fed. R. Civ. P. 60(b). The court reversed the ruling of the bankruptcy court, holding that considering the O'Brien factors, the debtor would not be prejudiced in that (1) the debtor was fully aware of the creditor's claim and thus would not be surprised; (2) because the debtor was still negotiating with other creditors, the value of many unsecured claims was unknown and thus any disputed claim was paid without regard to what other claims existed; (3) there was no evidence as to whether payment of the claim would jeopardize the success of the debtor's reorganization or that allowing the claim would cause a "flood" of motions. In view of the agreement of the parties, the court found that the creditor and its counsel acted in good faith.

**OUTCOME:** The court reversed the decision of the bankruptcy court.

**CORE TERMS:** excusable neglect, reconsideration, notice, litigating, allowance, weigh, Ninth Amendment, confirmed, failure to respond, adversely impact, money to pay, scheduled, excusable, neglect, potential prejudice, alphabetical, disallowing, floodgates, motion to reconsider, danger of prejudice, reasonable control, de novo, reorganization, reconsidering, reconsidered, articulated, jeopardize, surprised, finality, default

**LexisNexis(TM) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals*

[HN1]In reviewing a case on appeal, the district court reviews the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse. A bankruptcy court abuses its discretion when its ruling is founded on an error of law or misapplication of law to the facts. In determining whether an error exists, the bankruptcy court's application of the law to the facts is reviewed de novo.

*Bankruptcy Law > Creditor Claims & Objections > Reconsideration*

[HN2]See 11 U.S.C.S. § 502(j).

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*

*Bankruptcy Law > Creditor Claims & Objections > Reconsideration*

[HN3]See Fed. R. Civ. P. 60(b).

*Bankruptcy Law > Creditor Claims & Objections > Reconsideration*

[HN4]The determination of what type of neglect would be considered "excusable" when a creditor fails to respond to a debtor's objection to a claim is an equitable one taking account of all relevant circumstances surrounding the party's omission. There are four factors to consider in making the excusable neglect determination: the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Bankruptcy Law > Creditor Claims & Objections > Reconsideration*

[HN5]Regarding a bankruptcy court's reconsideration of a denied claim, prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence. Under Third Circuit case law, a detailed analysis of more than whether the plan set aside money to pay the claim at issue is required. Thus, the relevant factors for analysis of prejudice under O'Brien include: whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated; whether the payment of the claim would force the return of amounts already paid out under the confirmed plan or affect the distribution to creditors; whether payment of the claim would jeopardize the success of the debtor's reorganization; whether allowance of the claim would adversely impact the debt or actually or legally; and whether allowance of the claim would open the floodgates to other future claims.

*Civil Procedure > Early Pretrial Judgments > Default > Relief From Default*

[HN6]The cost of enforcing a judgment later vacated and the delay in realizing satisfaction on a claim rarely serves to establish the degree of prejudice sufficient to prevent the opening of a default judgment. Prejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue.

*Civil Procedure > Relief From Judgment > Mistake & Excusable Neglect*

[HN7]The concept of excusable neglect clearly anticipates neglect on the part of the party seeking to be excused.

**COUNSEL:**    **[*1]**    For Inacom Corp., Debtor: Christopher James Lhulier, Pachulski Stang Ziehl Young & Jones PC, Wilmington, DE, Duane David Werb, Werb & Sullivan, Wilmington, DE, E Lyle Kinley, Jr, Omaha, NE, Jean R Robertson, McDonald, Hopkins, Burke & Haber Co. LPA, Cleveland, OH, Kathleen Marshall DePhillips, Pachulski Stang Ziehl Young & Jones PC, Wilmington, DE, Laura Davis Jones, Pachulski Stang Ziehl Young & Jones, Wilmington, DE, Rosalie L. Spelman, Pachulski Stang Ziehl Young Jones, Wilmington, DE, Rosalie L. Spelman, Potter Anderson & Corroon LLP, Wilmington, DE, Sandra G McLamb, Pachulski Stang Ziehl Young Jones, Wilmington, DE.

For Tantara Transportation Group, Inc., Defendant: Daniel J. Anker, Wilmington, DE.

AQUA SYSTEMS USA, INC., Defendant, Pro Se.

For Sun MicroSystems, Inc., Defendant: Regina A. Iorii, Ashby & Geddes, Wilmington, DE.

For Ingram Micro, Inc., Defendant: James E. Huggett, Flaster Greenberg, Wilmington, DE, USA.

For Kingston Technology Company, Inc., Defendant: Rachel B. Mersky, Monzack & Monaco, P. A., Wilmington, DE, USA.

For The Computer Merchant, Ltd., Avantegarde Computer Services, Inc., Defendant: Charles J. Brown, Elzufon Austin Reardon **[*2]**    Tarlov & Mondell, Wilmington, DE.

Joseph J. McMahon Jr., Office of the U.S. Trustee, U.S. Trustee.

For Blank Rome Comisky & McCauley, LLP, Creditor Committee: Bonnie Glantz Fatell, Blank Rome LLP, Wilmington, DE, Deborah Cirilla Sellis, Esq, Akin & Herron, PA, Wilmington, DE.

For Official Committee of Unsecured Creditors, Creditor Committee: William J. Burnett, Blank Rome LLP, Wilmington, DE.

For Statutory Committee of Unsecured Creditors, Creditor Committee: William J. Burnett, Blank Rome LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION: MEMORANDUM**

# I. INTRODUCTION

On June 16, 2000 (the "Petition Date"), Inacom Corp., *et al.* ("Inacom") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. Pro-Tec Services, LLC ("Pro-Tec") filed a timely Proof of Claim on November 2, 2000. On June 13, 2001, Inacom filed its Fifth Omnibus Objection to Claims -- Objections to Claims filed Against Inacom, Inc. or Its Affiliates (the "Objection"). On July 13, 2001, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order disallowing **[*3]** Pro-Tec's claim pursuant to Inacom's Objection. Inacom's plan of liquidation was confirmed on May 23, 2003.

On April 2, 2004, Pro-Tec filed a motion to reconsider its claim. The motion was denied at a hearing before the Bankruptcy Court on April 20, 2004. Because the court agrees that Pro-Tec has made a satisfactory

showing of excusable neglect, its motion to reconsider the allowance of its claims should have been granted by the Bankruptcy Court. Further, because the court disagrees with the Bankruptcy Court's analysis of *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 123 L. Ed. 2d 74, 113 S. Ct. 1489 (1993), as it applies to the facts of this case, the court will reverse the ruling of the Bankruptcy Court and remand the matter for further proceedings consistent with this opinion.

## II. STANDARD OF REVIEW

[HN1]In reviewing a case on appeal, the district court reviews the Bankruptcy Court's legal determinations *de novo,* its factual findings for clear error, and its exercise of discretion for abuse. *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)* 188 F.3d 116, 122 (3d Cir. 1999). A bankruptcy court abuses its discretion when its ruling is founded on [*4] an error of law or misapplication of law to the facts. *Id.* In determining whether an error exists, the bankruptcy court's application of the law to the facts is reviewed *de novo. Id.*

## III. BACKGROUND

The basic facts pertinent to Pro-Tec's motion to reconsider the allowance of its claims are not in dispute. On September 18, 1997, Pro-Tec and Vanstar Corporation ("Vanstar") were parties to a computer and communication repair services agreement (the "Agreement"). Subsequent to the execution of the Agreement, Inacom purchased Vanstar, and Pro-Tec continued to provide services to Inacom under the Agreement. From February 1999 to June 2000, Inacom incurred charges for services rendered by Pro-Tec under the Agreement. On June 16, 2000, Inacom filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the District of Delaware. On August 1, 2000, Inacom filed its Schedules of Assets and Liabilities (the "Schedules"). Pro-Tec was listed on Exhibit F-3 of Inacom's Schedules as a creditor holding unsecured non-priority claims in the amount of $ 195,823.20.

On November 2, 2000, Pro-Tec's counsel timely filed a Proof of Claim (the "Claim"), in the amount [*5] of $ 330,115.61, with Bankruptcy Services, Inc, ("B.S.I."), Inacom's claims agent. On November 6, 2000, B.S.I. stamped the Claim as received, timely, and numbered the Claim 6647. On June 13, 2001, Inacom filed its Objection. The Objection contests approximately 412 claims spread over 96 pages of exhibits. The exhibits are lettered A through H, with some exhibits containing multiple alphabetical listings of objections.

Pro-Tec was listed on the first alphabetical list of Exhibit E to the Objection. The Objection contained a Proof of Service, indicating that it was served on Pro-Tec's counsel, William Sullivan, at his office address. Pro-Tec's counsel did not respond to the Objection. On July 13, 2001, the Bankruptcy Court entered an Order Disallowing Claims, Expunging Claims, Altering the Status of Claims, or Allowing the Claims in a Reduced Amount (the "Order").

On July 22, 2002, Inacom filed the Notice of Debtors Twenty-Ninth Amendment of Schedules (the "Twenty-Ninth Amendment"), seeking to amend the Claim from $ 195,823.20 to $ 0.00. On May 23, 2003, Inacom's Joint Plan of Liquidation (the "Plan") was confirmed. In February 2004, after Pro-Tec did not receive a distribution under [*6] the Plan (which was expected on or about January 30, 2004), Pro-Tec's counsel inquired into the status of distributions. After contacting B.S.I., Pro-Tec was advised of the July 13, 2001 Order disallowing the Claim. Accordingly, Pro-Tec filed its Motion for Reconsideration on April 2, 2004. A hearing on Pro-Tec's motion was held before the Bankruptcy Court on April 20, 2004. The Bankruptcy Court denied Pro-Tec's motion. On April 30, 2004, Pro-Tec appealed the decision.

## IV. DISCUSSION

As a result of the Bankruptcy Court's July 13, 2001 Order, Pro-Tec's Claim in connection with the Agreement was disallowed. It is undisputed that Pro-Tec received the Objection but failed to respond prior to the July 13, 2001 Order, or prior to the May 23, 2003 confirmation of the Plan. Pro-Tec filed a motion for reconsideration pursuant to 11 U.S.C. 502(j) and Fed. R. Bankr. P. 3008. Section 502(j) provides that [HN2]"a claim that has been allowed or disallowed may be reconsidered for cause." Pro-Tec asserts that a motion for reconsideration based on a claim disallowed as a result of the claimant's failure to appear or to produce evidence is usually decided based on whether [*7] the claimant is able to show "excusable neglect." Pro-Tec, therefore, seeks relief from the July 13, 2001 Order under Federal Rule of Civil Procedure Rule 60(b), made applicable to bankruptcy cases by Bankruptcy Rule 9024. Rule 60(b) states, in pertinent part, [HN3]"on motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for mistake, inadvertence, or excusable neglect." The factors a court must consider when determining whether a party has failed to appear or to produce evidence because of excusable neglect were articulated by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*

*Partnership,* 507 U.S. 380, 123 L. Ed. 2d 74, 113 S. Ct. 1489 (1993). The *Pioneer* factors were adopted and applied by the Third Circuit in *In re O'Brien Envtl. Energy, Inc.,* 188 F.3d 116, 125 (3d Cir. 1999). Pro-Tec asserts that its failure to respond to the Objection was the result of excusable neglect, and that the Bankruptcy Court made an inadequate excusable neglect analysis under *Pioneer.* As previously noted, the basic facts pertinent to Pro-Tec's motion are not in dispute. **[*8]** Thus, the court must review *de novo* whether the Bankruptcy Court engaged in a proper analysis under *Pioneer* to make its excusable neglect determination, and whether the Bankruptcy Court abused its discretion in determining that there was no excusable neglect warranting reconsideration of Pro-Tec's claim.

## A. Did the Bankruptcy Court Engage in a Proper *Pioneer* Analysis?

Pro-Tec first argues that the Bankruptcy Court failed to review the totality of the circumstances surrounding Pro-Tec's failure to respond to the Objection and, therefore, failed to adequately apply *Pioneer's* standards for excusable neglect. The court will start with a brief review of *Pioneer* and the excusable neglect factors articulated in that case. In *Pioneer,* the Supreme Court determined that a Chapter 11 creditor was entitled to file its proof of claim after the bar date deadline because its failure to timely reply was the result of excusable neglect, within the meaning of Bankruptcy Rule 9006(b)(1). The Court held that [HN4]the determination of what type of neglect would be considered "excusable" was an equitable one "tak[ing] account of all relevant circumstances surrounding the party's **[*9]** omission." *Pioneer,* 507 U.S. at 395. The Court listed four factors to consider in making the excusable neglect determination: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* Under the facts of *Pioneer,* the Court held that the creditor's failure to timely file was inadvertent, and in good faith. There was no danger of prejudice to the debtor because the untimely claim was accounted for in the reorganization plan and was filed prior to the plan's effective date. Lastly, the court noted that notice of the bar date "was outside the ordinary course" because of its "inconspicuous placement" -- a single sentence in a document regarding a creditors' meeting -- which was not accompanied by a statement of significance and "left a 'dramatic ambiguity' in the notification." *Id.* at 398.

Pro-Tec argues that, while the Bankruptcy Court considered the reason for the delay, including whether it was within the reasonable control of Pro-Tec, and the potential **[*10]** prejudice to Inacom, it did not consider the other *Pioneer* factors. After reviewing the transcript from the April 20, 2004 hearing, the court cannot agree. In making its determination, the Bankruptcy Court made the following findings of fact: (1) overturning the Order would prejudice Inacom because allowing the claims would "open the floodgates to hundreds of these [reconsideration] applications being filed;" (2) allowing the delayed claim "would be a mistake at this very late stage of this case;" and (3) Pro-Tec's counsel was fully responsible for the delay in failing to file a response to the Objection. n1 Tr. at 35-36. Thus, the Bankruptcy Court considered the prejudice to the debtor, the length of the delay and its effect on judicial proceedings, and whether the reason for the delay was in the reasonable control of the movant. The only *Pioneer* factor that the Bankruptcy Court did not consider was the good faith of Pro-Tec's counsel. Inacom, however, acknowledged Pro-Tec's good faith at the April 20, 2004 hearing, which meant that the Bankruptcy Court did not have to consider this factor. For the foregoing reasons, the court finds that the Bankruptcy Court engaged in a **[*11]** proper *Pioneer* analysis. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Bankruptcy Court noted that Pro-Tec's "client's name and your [Pro-Tec's counsel's] name and address with the law firm is [the] first item on Page 11, it's the first Exhibit E in the batch. And I don't see how you could miss it." Tr. at 35:6-9.

n2 In this section of its brief, Pro-Tec argues its counsel's diligence upon receiving omnibus objections to its other clients' claims. Pro-Tec also argues that the Bankruptcy Court's Local Rule 3007-1, implemented in September 2002, addresses the difficulties created by the large omnibus claim objections by limiting them to 150, but does not ameliorate the difficulties posed by omnibus objections filed before September 1, 2002 (Inacom's Objection was filed before September 1, 2002). The court will not address these arguments because they are not material to whether the Bankruptcy Court engaged in a proper *Pioneer* analysis.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## B. Did the Bankruptcy Court Abuse Its Discretion When It Determined There Was No Excusable Neglect? [*12]

Pro-Tec next argues that the Bankruptcy Court abused its discretion in failing to find excusable neglect. In addressing this contention, the court will analyze each of the *Pioneer* factors in turn.

### 1. Danger of Prejudice to the Debtor

The Supreme Court in *Pioneer* noted that lack of any prejudice to the debtor weighs strongly in favor of permitting a tardy claim, but provided little guidance as to what prejudice actually is in the bankruptcy context. The United States Court of Appeals for the Third Circuit has recognized that [HN5]"prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence." *In re O'Brien Envtl. Energy, Inc.,* 188 F.3d 116, 127 (3d Cir. 1999). Under Third Circuit case law, *Pioneer* requires a detailed analysis of more than "whether the Plan set aside money to pay the claim at issue." *Id. at 126.* Thus, the relevant factors for analysis of prejudice under *O'Brien* include: whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated; whether the payment of the claim would force the return of amounts already [*13] paid out under the confirmed Plan or affect the distribution to creditors; whether payment of the claim would jeopardize the success of the debtor's reorganization; whether allowance of the claim would adversely impact the debt or actually or legally; and whether allowance of the claim would open the floodgates to other future claims. *Id. at 126-28.* Pro-Tec argues that none of the prejudice factors articulated in *O'Brien* serve as potential prejudice to Inacom.

With regard to the first *O'Brien* factor, the court cannot conclude that Inacom was surprised or caught unaware by the assertion of a claim that it had not anticipated. Inacom listed Pro-Tec as a creditor holding unsecured non-priority claims in the amount of $ 195,823.20 in the Schedules. Pro-Tec timely filed the Claim, which was stamped as received and numbered by Inacom's claims agent. The Claim remained scheduled for more than one year after it was disallowed by default, on July 13, 2001. In fact, the Claim remained scheduled by Inacom until it filed the Twenty-Ninth Amendment on July 22, 2002, which sought to amend Pro-Tec's scheduled Claim from $ 195,823.00 to $ 0.00. Clearly then, Inacom was aware [*14] of the assertion of the Claim.

The second *O'Brien* factor requires the court to consider whether the payment of the claim would force the return of amounts already paid out under the confirmed Plan or affect the distribution to creditors. Pro-Tec argues that the resolution of the Claim does not impact the recovery being paid to unsecured creditors because Inacom is still litigating the value of many of the unsecured claims. Pro-Tec alleges that unsecured creditors were advised in the Plan that their recovery was uncertain, and, based on the Plan, reconsideration of its Claim will not prejudice other creditors because no creditor will have to return any distribution it may have already received and the ultimate distribution to creditors under the Plan will vary. Inacom notes that the Plan states that "each holder of a Class 4(a) Allowed General Unsecured Claim shall receive such Holder's Pro Rata Share of Available Cash," (Plan at 13, D.I. 4757). However, as Pro-Tec points out, the Plan also states that the recovery of unsecured creditors is uncertain and may vary. Because every creditor is receiving its pro rata share of available amounts, allowing another claim will affect the [*15] distribution to each creditor holding an allowed claim. Pro-Tec argues, however, that Inacom is still litigating the value of many of the unsecured claims and does not know at this time which unsecured creditors will recover or what amount each creditor will recover.

Pro-Tec's argument is persuasive. It is not clear how many creditors will ultimately hold an allowed claim. In addition, the final distributions to creditors will vary based on the results of litigation and the claims resolution process. Moreover, Inacom was not required to allocate funds for each disputed claim under the Plan. n3 Thus, any disputed claim that is allowed is paid without regard to what other claims exist. Lastly, absent from the record is any evidence that Inacom will have to return amounts already paid out under the Plan. Based on these facts, the court finds that payment of the claim will not affect the distribution to creditors.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Pro-Tec urges that whether the plan set aside money to pay the claim at issue is a factor that the Third Circuit held should not be considered in evaluating potential prejudice. The court disagrees. The court in *O'Brien* stated that "*Pioneer* requires a more detailed analysis of prejudice which would account for more than whether the Plan set aside money to pay the claim at issue." *O'Brien,* 188 F.3d at 126. The Third Circuit, however, did not state that an analysis of prejudice should not include whether the Plan set aside money to pay the claim at issue as one of the factors to consider. Rather, the Third Circuit stated

that it should not be the only factor that the Bankruptcy Court considers in determining whether there is potential prejudice to the debtor. The Third Circuit stated "the Bankruptcy Court's prejudice analysis seemed to hinge *solely* on the fact that by virtue of Manus's failure to respond to the Application, its claim was not accounted for in the funding of the plan. We believe that *Pioneer* requires a more detailed analysis which would account for more than whether the Plan set aside money to pay the claim at issue." *Id.* (emphasis added).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*16]**

The third *O'Brien* factor is whether payment of the claim would jeopardize the success of the debtor's reorganization. There is no evidence on the record as to whether payment of the claim would jeopardize the success of Inacom's reorganization. In addition, Pro-Tec and Inacom have not made arguments, nor has the Bankruptcy Court made any findings concerning this factor. Thus, the court will treat this consideration as a neutral factor in its analysis.

The fourth *O'Brien* factor is whether allowance of the claim would adversely impact the debtor actually or legally. Pro-Tec argues that there is no prejudice to Inacom created by the delay in litigating the disallowed Claim because the inquiry to be performed in a reconsideration of the Claim is straightforward. Pro-Tec further argues that Inacom is currently reconsidering other creditors' claims. Finally, Pro-Tec asserts that Inacom scheduled its Claim at the outset of the case, a claim that remained scheduled for more than a year after the Bankruptcy Court entered the Order disallowing the Claim. Inacom could not explain why Pro-Tec was listed on the Twenty-Ninth Amendment when Pro-Tec's claim was disallowed a year earlier, **[*17]** negating the need to amend the schedule with respect to Pro-Tec. Tr. at 32:10-20. Because Pro-Tec was still listed on the Twenty-Ninth Amendment, Pro-Tec contends that Inacom ascribed some validity to its claim. n4 While this may be true, this fact is not relevant to the court's analysis of whether allowance of the claim would adversely impact the debtor actually or legally. Regardless, the court finds that Inacom has not alleged that payment of the Claim would adversely impact it. Rather, Inacom alleges only that one of the policies underlying the *Pioneer* analysis is the value of finality in judicial proceedings.

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 At the hearing in the Bankruptcy Court, Inacom argued that it was irrelevant that Pro-Tec was listed on its Twenty-Ninth Amendment. The Bankruptcy Court agreed, acknowledging that "the debtors' 29th amendment is confusing. But, quite frankly, that was a year "after the disallowance of this claim and I think it's essentially irrelevant to the issue of excusable neglect."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Third Circuit has **[*18]** addressed Inacom's argument in contexts other than a bankruptcy proceeding. In *Feliciano v. Reliant Tooling Co.,* 691 F.2d 653 (3d Cir. 1982), the court held that [HN6]"the cost of enforcing a judgment later vacated and the delay in realizing satisfaction on a claim 'rarely serves to establish the degree of prejudice sufficient to prevent the opening of a default judgment.'" *Id. at 656-57.* In *O'Brien,* the court highlighted, with approval, its decision in *Feliciano,* stating that "prejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue." *O'Brien, 188 F.3d at 127.* Thus, the court finds that the value of finality in judicial proceedings is not sufficient for a finding of prejudice. In addition, there is no evidence in the record showing that payment of Pro-Tec's Claim would adversely impact Inacom or affect the finality of Inacom's judicial proceedings. To the contrary, as previously noted, Inacom is still litigating disputed claims. However, even were there such a showing, the court cannot discern a reason why the rationale of the Court of Appeals would be inapposite **[*19]** merely because the scene has shifted to the bankruptcy court. Under the circumstances of this case, the court concludes that allowing the Claim would not adversely impact Inacom.

The final *O'Brien* Factor is whether allowance of the claim would open the floodgates to other future claims. The Bankruptcy Court determined that allowing Pro-Tec's Claim might subject Inacom to a large number of additional claims:

> I will observe that given the massive number of claims filed in this case and the equally massive number of objections that were filed with numerous exhibits attached to the objection, I really think that to allow this claim would potentially open the floodgates to hundreds of these

applications being filed. And I think that
would be a mistake at this very late stage
of this case.

Tr. at 35:22-36:3. The court cannot agree. There is no
evidence in the record that allowing the Claim would
cause a "flood" of motions. Although Inacom argues
that it is inconceivable that at least a fraction of the
creditors would not file motions for reconsideration if
the appeal was granted, Inacom has not asserted that
any other creditor whose claim was eliminated by
default has [*20] filed a motion for reconsideration.

Considering all of the _O'Brien_ factors, the court
determines that Inacom would not be prejudiced by
reconsidering Pro-Tec's Claim. Inacom was not
surprised by, or unaware of, the Claim. Inacom is still
litigating the value of many of its claims, and still
litigating claims objections. Moreover, Inacom has not
shown through evidence in the record that it will be
adversely impacted if Pro-Tec's claim is reconsidered.
Finally, Inacom has not alleged that any other creditor
whose motion was denied by default has filed a motion
for reconsideration. The court, therefore, finds that
there is no prejudice to Inacom.

## 2. Length of Delay and Potential Impact on Judicial Proceedings

The court next considers the length of the delay and its
impact on the judicial proceedings. The Bankruptcy
Court found that "it would be a mistake" to allow the
Claim because the case was at "a very late stage."
While the Bankruptcy Court considered the delay's
effect on the judicial proceedings, it did not "consider
the length of the delay in absolute terms." _O'Brien,_ 188
F.3d at 130. In the present case, Inacom filed the
Objection on June 13, 2001. Pro-Tec [*21] did not
respond. The Order disallowing the Claim issued on
July 13, 2001. Pro-Tec still had not responded,
Inacom's Twenty-Ninth Amendment was filed on July
22, 2002. Pro-Tec did not respond. n5 Inacom's Plan
was confirmed on May 23, 2003, and, as of that time,
there was still no response from Pro-Tec. Pro-Tec did
not respond until February 2004, after it did not
receive its expected distribution under the Plan. On
April 2, 2004, Pro-Tec then filed its motion for
reconsideration. Pro-Tec's motion was filed almost two
years and ten months after the Objection, almost two
years and nine months after the Order was served, and
nine months after the Plan was confirmed. Pro-Tec
argues that the length of the delay has no impact on the
implementation of the Plan. Specifically, Pro-Tec
asserts that Inacom is still litigating claims subject to
the Objection and that creditors have been advised that
distributions under the Plan are dependent on the
claims resolution process. Pro-Tec also asserts that

distributions to unsecured creditors are expected to
occur between June 2003 and June 2008, and will be
adjusted depending on Inacom's progress in resolving
the claims. Lastly, Pro-Tec argues that [*22] Inacom
is partly responsible for the delay because of the time it
took for Inacom to move through the confirmation
process. Inacom's Plan was confirmed almost three
years after Inacom filed its petitions.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n5 Pro-Tec alleges that the Twenty-Ninth
Amendment was not served on its counsel.

- - - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

Inacom argues that Pro-Tec's counsel's failure to
respond, in and of itself, weighs in favor of denying
the appeal. Inacom further argues that Pro-Tec's failure
to respond after the Order warrants denying the appeal.
In addition, Inacom argues that Pro-Tec should have
attempted to contact Inacom to inquire about the
Claim. Lastly, Inacom contends that the fact that it is
still litigating and negotiating claims indicates that
reconsidering Pro-Tec's Claim will delay closure of the
case. The court agrees with Pro-Tec and finds Inacom's
arguments unpersuasive. Nowhere in _Pioneer_ or
_O'Brien,_ do the Supreme Court or the Third Circuit
find that failure to respond, in and of itself, weighs in
favor of denying the Claim. Additionally, [*23] there
is no finding that the creditor must attempt to make
contact with the debtor. When considering the delay's
effect on the judicial proceedings in absolute terms, as
_O'Brien_ instructs, the court concludes that this _Pioneer_
factor weighs in favor of Pro-Tec because Inacom is
still litigating disputed claims and distributions to
creditors are based on Inacom's progress in resolving
the claims.

## C. The Reason for the Delay

The Bankruptcy Court determined that the cause of the
delay was in Pro-Tec's control, because it is undisputed
that Pro-Tec's counsel received the Objection and read
it, but missed the objection to Pro-Tec's Claim. The
Bankruptcy Court found that Pro-Tec's neglect did not
fall within the _Pioneer_ standard for excusable neglect:

In looking at this document, I think it
would probably take maybe 15 or 20
minutes for an informed person to review
the document to find out if any of its
clients were affected by the objection. And
as I pointed out, your client's name and
your name and address with the law firm is
first item on Page 11, it's the first Exhibit E

in the batch. And I don't see how you could miss it. But apparently you did miss it - I don't [*24] say you, someone in your office did, or they didn't even look at the document. And so I don't think that that falls within the *Pioneer* standard for excusable neglect. Presumably it is neglect. Indeed, there's no basis for knowing what the young associate did, including the possibility that he lost the document before he ever looked at it or he just put it in a circular file and didn't look at it. Or that he was otherwise plain remiss in performing his duties.

Tr. at 35:3-17. It is clear in this case, that the delay was due to Pro-Tec's lack of care. However, [HN7]the concept of excusable neglect clearly anticipates neglect on the part of the party seeking to be excused. *See Pioneer, 507 U.S. at 388; O'Brien, 188 F.3d at 128.* The court, therefore, must decide whether Pro-Tec's delay was excusable.

Pro-Tec urges the court to follow *Pioneer* and *O'Brien,* in which the Supreme Court and the Third Circuit held that the debtors' inadequate notice contributed to the creditors' delay. Pro-Tec argues that its delay in responding to the Objection was due in part to inadequate notice provided by Inacom. Pro-Tec asserts that Inacom's Objection contested [*25] approximately 412 claims spread over 96 pages plus exhibits A through H. Pro-Tec further asserts that the exhibits contained multiple lists, some of which were not in alphabetical order. Pro-Tec argues that this type of notice is ambiguous and that even though its counsel failed to find the objection to its Claim, Inacom is partly responsible, like the debtors in *Pioneer* and *O'Brien.* Inacom argues that Pro-Tec's comparison of the present case to the facts in *Pioneer* and *O'Brien* "misses the mark." The Bankruptcy Court recognized that there are multiple schedules within the various exhibits attached to the Objection, some of which were not in alphabetical order, but determined that Inacom's notice was adequate, noting that "your ['Pro-Tec's counsel's] client's name and your name and address with the law firm is [the] first item on page 11, it is the first Exhibit E in the batch. And I don't see how you could miss it." Tr. at 35:6-9. The court agrees with the Bankruptcy Court and Inacom.

The notice that Inacom provided Pro-Tec is distinguishable from the notice provided by the debtors in both *Pioneer* and *O'Brien.* In *Pioneer,* the Supreme Court held that [*26] the debtor's notice was inadequate because the bar date was placed in a notice regarding a creditors' meeting "without any indication of the significance of the bar date." *Pioneer, 507 U.S. at 398.* In *O'Brien,* the debtor gave notice in an application that was twelve pages long, consisting of twenty-four paragraphs. The three important paragraphs, which would provide notice to the contracting parties, were buried in the middle of the document and did not list the relevant contracting parties' names or claims. *O'Brien, 188 F.3d at 129.* The present case is distinguishable from *Pioneer* and *O'Brien* because Inacom's notice was not inconspicuous. Inacom provided notice in its Fifth Omnibus Objection to Claims. Unlike *Pioneer,* in which the bar date appeared in a notice of a creditors' meeting, the title of Inacom's document, which included the word "objection," should have alerted Pro-Tec that its Claim may be affected. Furthermore, unlike *O'Brien,* in which the contracting parties' names and claims were not provided in the relevant document, Pro-Tec's name and address and its counsel's name and address is the first item on Page 11 of the [*27] first Exhibit E. The court agrees with the Bankruptcy Court that "it would probably take maybe 15 or 20 minutes for an informed person to review the document to find out if any of its clients were affected by the objection." n6 Tr. at 35:4-6. The court finds that this *Pioneer* factor weighs in favor of Inacom.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n6 The court is not in accord, however, with the Bankruptcy Court's view that if the notice of objection to Pro-Tec's Claim had been on the second or third Exhibit E list, instead of the first, then it "might be excusable." Tr. at 26:3-6. This seems to suggest that Pro-Tec would have less responsibility for the delay if it had been in the middle of Exhibit E. However, as the Bankruptcy Court noted, "it would probably take maybe 15 to 20 minutes for an informed person to review the document to find out if any of its clients were affected by the objection." Tr. at 35:4-6. Thus, the court cannot see how Pro-Tec's inadvertence would be any more excusable if the notice had been on the second or third Exhibit E list.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*28]

## 4. Good Faith

The Bankruptcy court did not make any determination on the issue of whether Pro-Tec acted in good faith

because Inacom acknowledged Pro-Tec's good faith at the April 20, 2004 hearing. In view of the agreement of the parties, the court finds that Pro-Tec and its counsel acted in good faith.

## V. CONCLUSION

In the present case, the court cannot say that the Bankruptcy Court failed to apply the *Pioneer* factors. In light of the Bankruptcy Court's consideration and weighing of the facts, the court concludes that the Bankruptcy Court engaged in a proper analysis under *Pioneer*. However, considering the *Pioneer* factors, the facts of the this case, and the equitable nature of excusable neglect, the court concludes that the Bankruptcy Court abused its discretion when it determined that Pro-Tec was not entitled to reconsideration of its Claim based upon excusable neglect. As the court in *Pioneer* observed, "the lack of any prejudice to the debtor or to the interests of efficient judicial administration, combined with . . . good faith . . . [of the appellant and its counsel], weigh strongly in favor of permitting the tardy claim." *Pioneer, 507 U.S. at 398.* **[*29]**  In the present case, Pro-Tec has shown that there will be no prejudice to Inacom if its Claim is reconsidered, the delay's effect on judicial proceedings in absolute terms will not prejudice Inacom, and Pro-Tec has acted in good faith. The only *Pioneer* factor that weighs against Pro-Tec is the reason for the delay, for which Pro-Tec was fully responsible.

The court, therefore, will reverse the Bankruptcy Court's ruling denying Pro-Tec reconsideration of its Claim and remand this case to the Bankruptcy Court for proceedings consistent with this opinion.

Dated: October 4, 2004

Gregory M. Sleet
UNITED STATES DISTRICT JUDGE

## ORDER

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. The April 20, 2004 decision of the Bankruptcy Court for the District of Delaware is REVERSED and REMANDED.

Dated: October 4, 2004

Gregory M. Sleet
UNITED STATES DISTRICT JUDGE

DAVID A. LOPPERT, Plaintiff, v. WINDSORTECH, INC., a Delaware corporation, Defendant.

Civil Action No. 441-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

865 A.2d 1282; 2004 Del. Ch. LEXIS 121

June 11, 2004, Submitted
June 25, 2004, Decided

**SUBSEQUENT HISTORY:** Stay denied by Loppert v. WindsorTech, Inc., 2004 Del. Ch. LEXIS 201 (Del. Ch., Sept. 21, 2004)

Judgment entered by Loppert v. WindsorTech, Inc., 2004 Del. Ch. LEXIS 180 (Del. Ch., Nov. 29, 2004)

Affirmed by WindsorTech, Inc. v. Loppert, 867 A.2d 903, 2005 Del. LEXIS 53 (Del., Jan. 31, 2005)

**DISPOSITION-1:**   [**1]   Motion for summary judgment granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff stockholder sued defendant corporation to enforce an agreement (1) to settle their dispute over issues related to his services to the corporation, and (2) to resolve his separate Del. Code Ann. tit. 8, § 220 action to inspect the corporation's books and records. The stockholder moved for summary judgment.

**OVERVIEW:** The court summarized the negotiations. The final essential term that was resolved by the parties was that the corporation was to award the stockholder with 1.1 million options. In the conversation that settled on that award, the stockholder told the corporation's lawyer that they had a "deal" at 1.1 million options at a set strike price, and the corporation's lawyer told the stockholder's lawyer that was "good and that he would let the company know." The court decided that the settlement agreement was enforceable as it contained agreement (through the eyes of a reasonable negotiator) on all of the essential terms, including the payment of attorney fees in the event of a breach of the agreement. The agreement was not contingent upon the corporation's board's approval, based upon the presumption that an attorney had that authority and based upon no statement by the corporation's attorney to the contrary. There was no evidence that the parties agreed only to be bound after execution of a formal written document. Even though the parties resolved their dispute, they still had to comply with § 220 procedural requirements to resolve that suit as agreed.

**OUTCOME:** The court granted the stockholder's summary judgment motion, allowed specific enforcement of the settlement agreement, and required the corporation to pay the stockholder's costs as provided under the agreement.

**CORE TERMS:** settlement agreement, settlement, negotiation, manifestation, scheduling, e-mail, settlement proposal, summary judgment, prepare, assent, specific performance, counterproposal, memorialization, expiration, negotiator, replied, Delaware Rule of Evidence, summary judgment motion, subjective intent, prevailing party, memorializing, reimbursement, implementing, enforceable, positively, customary, responded, promptly, briefing, presumed

**LexisNexis(TM) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]The Delaware Court of Chancery may grant a motion for summary judgment if there is no genuine dispute as to the material facts and the moving party is entitled to judgment as a matter of law. Del. Ch. Ct. R. 56(c).

*Civil Procedure > Settlements > Settlement Agreements*

*Contracts Law > Types of Contracts > Bilateral Contracts*

[HN2]A settlement agreement is enforceable as a contract. To determine whether a contract is formed, the parties' overt manifestation of assent--not subjective intent--controls the result. The inquiry is framed as follows: whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached has constituted agreement on all of the terms that the parties themselves have regarded as essential and thus that that agreement has concluded the negotiations.

*Civil Procedure > Settlements > Settlement Agreements*

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN3]The test applied to determine if a party is entitled to summary judgment on a settlement agreement is objective, based on "overt manifestations," and views those overt manifestations through the eyes of a "reasonable negotiator."

*Civil Procedure > Settlements > Settlement Agreements*

*Evidence > Relevance > Compromise & Settlement Negotiations*

[HN4]Del. R. Evid. 408 does not allow litigants to prove liability for a claim or its amount with evidence of conduct or statements made in compromise negotiations regarding that claim. Rule 408 does allow parties to introduce such evidence for another purpose for example, where a plaintiff is not offering evidence of settlement negotiations to prove that a defendant is liable, but is proffering evidence of compromise to prove the compromise itself. One permissible use of compromise evidence that is universally acknowledged both in the case law and by treatise writers occurs in situations in which the compromise is itself the subject of the present action. Delaware case law reflects this view. Also, the underlying purpose of Rule 408, encouraging settlements, is furthered by admitting evidence of alleged settlement agreements.

*Contracts Law > Formation > Formation Generally*

[HN5]Delaware law is straightforward that where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it has been the understanding that the contract should be formally drawn up and put in writing, does not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed. As such, the question is whether the parties positively agree that there will be no binding contract until the formal document is executed.

*Civil Procedure > Settlements > Settlement Agreements*

*Business & Corporate Entities > Corporations > Governance > Records & Inspection Rights*

[HN6]Before a stipulation of dismissal is filed and granted by a court, parties are bound to adhere to court orders. Simply put, the fact that the parties have "settled" the dispute underlying action underlying the Del. Code Ann. tit. 8. § 220 action as a matter of

contract law does not automatically terminate that action or nullify the scheduling order.

*Contracts Law > Formation > Formation Generally*

[HN7]The fact that the parties manifest an intention to prepare and adopt a written memorial will not prevent contract formation if the evidence reveals manifestations of assent that are in themselves sufficient to conclude a contract.

*Civil Procedure > Settlements > Settlement Agreements*

*Business & Corporate Entities > Agency > Authority to Act > Agent Authority*

[HN8]Where an attorney of record in a pending action acknowledges that a compromise has been reached, he or she is presumed to have the lawful authority to do so. The authority of attorneys to bind a corporation is precisely the same as in the case of natural persons.

*Civil Procedure > Settlements > Settlement Agreements*

[HN9]A settlement agreement is enforceable if it contains all essential terms, even though it expressly leaves other matters for future negotiation.

*Contracts Law > Remedies > Election of Remedies*

[HN10]An express provision for one remedy in case of breach is not operative as a waiver of other remedies.

*Civil Procedure > Settlements > Settlement Agreements*

*Contracts Law > Remedies > Specific Performance*

[HN11]Release from liability, especially future liability, cannot be compensated for easily by money damages.

*Contracts Law > Remedies > Specific Performance*

[HN12]Mutual non-disparagement, a unique provision, cannot be readily compensated for by money damages.

*Contracts Law > Remedies > Specific Performance*

*Civil Procedure > Jury Trials > Actions in Equity*

[HN13]Equity respects the freedom to contract, and dictates that both parties to a contract should receive the benefit of their bargain through specific performance.

*Civil Procedure > Settlements > Settlement Agreements*

[HN14]Delaware law favors the voluntary settlement of contested disputes.

*Civil Procedure > Summary Judgment > Time Limitations*

[HN15]Del. Ch. Ct. R. 56(a) allows a plaintiff to move for summary judgment at any time after the expiration of 20 days from the commencement of the action. Rule 56(a) does not prevent a Delaware Court of Chancery from granting plaintiff's motion. Rule 56(a) does not, without exception, prohibit a plaintiff from moving for summary judgment before the expiration of 20 days from the commencement of an action. The court may truncate the 20-day period when it is the opinion of the court that doing so aids judicial efficiency without prejudicing the defendant. This power stems from the inherent authority of the court to control its own docket.

COUNSEL: J. Travis Laster, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware, Attorneys for Plaintiff.

Vernon R. Proctor and Patricia L. Enerio, of THE BAYARD FIRM, Wilmington, Delaware; OF COUNSEL: Alan Burger and Andrew Trailor, of BURER TRAILOR & FARMER, West Palm Beach, Florida, Attorneys for Defendant.

JUDGES: CHANDLER, Chancellor.

OPINIONBY: CHANDLER

OPINION: [*1284] MEMORANDUM OPINION

CHANDLER, Chancellor

Plaintiff David Loppert moves for summary judgment. Loppert seeks to enforce a settlement agreement reached between him and defendant WindsorTech, Inc. For the reasons set forth below, I grant the motion.

I. STANDARD

[HN1]This Court may grant a motion for summary judgment if there is no genuine dispute as to the material facts and the moving party is entitled to judgment as a matter of law. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Ch. Ct. R. 56(c); Gilbert v. El Paso Co., 575 A.2d 1131, 1142 (Del. 1990).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

II. MATERIAL FACTS WITHOUT GENUINE DISPUTE

Loppert and WindsorTech are parties to an action in this [**2] Court brought by Loppert under 8 Del. C. § 220(d), captioned Loppert v. WindsorTech, Inc., C.A. No. 394-N (the "220 Action"). Besides the 220 Action,

the parties disagree on other issues related to Loppert's services on behalf of WindsorTech.

On Wednesday, May 5, 2004, Loppert's counsel, J. Travis Laster, sent WindsorTech's counsel, Alan Burger, a letter proposing terms for a potential settlement. n2 The letter contained fourteen points and stated: "We are not willing to put the [220 Action] on hold while we discuss settlement. Any discussions will need to proceed in parallel with the litigation." n3 Laster's May 5 letter also stated: "The settlement agreement will contain other customary and ordinary terms and provisions." n4 On May 6, the next day, Burger responded with several proposed changes. n5 Later that day, Laster replied and integrated many of Burger's proposed changes. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 Affidavit of J. Travis Laster ("Laster Aff.") Ex. 1. The letter was sent by e-mail as was all other correspondence referred to in this Opinion. WindsorTech does not dispute the accuracy of the correspondence documenting the settlement negotiations. In fact, in its brief, "WindsorTech . . . adopts the Laster Affidavit pertaining to the exhibits as well as the exhibits themselves." Def.'s Answering Br. in Opp'n to Pls. Mot. for Summ. J. ("AB") at 8 n.5. In defendant's brief, there is a sole reference to a phone conversation, but the brief reveals no details about the conversation. AB at 10 & n.7.

[**3]

n3 Laster Aff. Ex. 1.

n4 Id.

n5 Id. Ex. 2.

n6 Id. Ex. 3.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On the afternoon of Friday, May 7, Burger responded to Laster's proposal from the previous day. n7 Burger raised a handful of issues. n8 Laster replied that WindsorTech's positions were "acceptable except on item 4," which referred to the number of WindsorTech options Loppert [*1285] wanted. n9 After this exchange, the only issue between the parties was the number of options Loppert would receive.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 *Id.* Ex. 7. Earlier on May 7, Loppert and WindsorTech agreed to a scheduling stipulation in the 220 Action, which was filed with the Court. *Id.* Ex. 4. WindsorTech agreed to "answer, move or otherwise respond to the complaint by May 11, 2004." *Id.* The stipulation was entered by the Court on the afternoon of May 7. *Id.* Ex. 6.

n8 *Id.* Ex. 7.

n9 *Id.* Ex. 8.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Burger stated that WindsorTech would provide Loppert with 1.1 million **[\*\*4]** options. n10 Laster attempted to increase that number, but was unsuccessful. n11 Laster ultimately informed Burger: "We have a deal at 1.1 million options at a strike price of $ 1.10. We will do the first draft of implementing documents." n12 Burger replied: "good -- I'll let the company know -- have a good weekend." n13 The next communication between the parties was on Monday, May 10, 2004, when Laster sent Burger a draft settlement agreement memorializing their negotiations. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 *Id.* Ex. 9.

n11 *Id.* Ex. 10.

n12 Laster Aff. Ex. 10.

n13 *Id.*

n14 *Id.* Ex. 11.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On Tuesday, May 11, Laster sent Burger draft exhibits for the settlement agreement and stated: "Since we have not yet signed up the deal, we will be expecting your answer [in the 220 Action] today." n15 Burger responded: "if I have to prepare a response, deal is off." n16 Laster replied: "We said from day one that settlement moved in parallel with litigation. It's in my letter. You agreed." n17 Burger ended the discussion **[\*\*5]** by stating: "deal is off . . . response will be served today." n18 The instant litigation, seeking enforcement of the settlement agreement, ensued a few days later.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n15 *Id.* Ex. 12.

n16 *Id.* Ex. 13.

n17 *Id.*

n18 *Id.* Ex. 14.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## III. ANALYSIS

[HN2]"[A] settlement agreement is enforceable as a contract." n19 To determine whether a contract was formed, the parties' "overt manifestation of assent -- not subjective intent -- controls" the result. n20 The inquiry is framed as follows:

> Whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations . . ." n21

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n19 *Heiman Aber & Goldlust v. Ingram,* 1998 Del. Super. LEXIS 251, 1998 WL 442691, at \*2 (Del. Super. May 14, 1998).

**[\*\*6]**

n20 *Indus. Am., Inc. v. Fulton Indus., Inc.,* 285 A.2d 412, 415 (Del. 1971) (citations omitted). *See also Diamond Elec., Inc. v. Delaware Solid Waste Auth.,* 1999 Del. Ch. LEXIS 45, 1999 WL 160161, at \*3 (Del. Ch. Mar. 5, 1999) ("the test for whether a contract has been formed is an objective one"); *Leeds v. First Allied Conn. Corp.,* 521 A.2d 1095, 1097 (Del. Ch. 1986) (same).

n21 *Leeds,* 521 A.2d at 1097.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

After a series of e-mail exchanges devoted to the sole remaining issue, the number of options Loppert would receive, Laster informed Burger that "we have a deal at 1.1 million options." n22 Burger's response was "good -- I'll let the company know." n23 In my opinion, any

reasonable negotiator would have concluded that when the parties reached agreement on the number of [*1286] options, the negotiation of the settlement agreement was concluded. n24

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n22 Laster Aff. Ex. 10.

n23 *Id.* Exhibit 10 is a "string" e-mail memorializing the give and take resulting in a manifestation of assent on the only outstanding issue, the number of options.

[**7]

n24 This finding is buttressed by evidence that on two occasions following the May 7 exchange, Burger referred to the parties as having a "deal." *See* Laster Aff. Ex. 13 ("if I have to prepare a response, deal is off"); *id.* Ex. 14 ("Didn't hear from you -- deal is off").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Despite the objective facts recited above demonstrating that a contract was formed, WindsorTech has interposed a series of arguments in an effort to avoid enforcement of the contract that Burger negotiated on its behalf. I will address each argument individually. n25

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n25 Although at times framed as disputes over material facts, defendant's arguments are really attempts to interpret the facts differently than does plaintiff, especially through affidavits containing self-serving revelations of subjective intent. Such argumentation will not prevent summary judgment where, as here, [HN3]the test applied to determine if plaintiff is entitled to judgment is objective, based on "overt manifestations," and views those overt manifestations through the eyes of a "reasonable negotiator."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**8]

A. *Delaware Rule of Evidence 408*

Defendant argues that plaintiff cannot rely on the evidence cited herein because doing so would violate Delaware Rule of Evidence 408. Rule 408 [HN4]does not allow litigants "to prove liability" for a claim or its amount with "evidence of conduct or statements made in compromise negotiations" regarding that claim. Rule 408 does allow parties to introduce such evidence "for another purpose." Here, plaintiff is not offering evidence of settlement negotiations to prove that defendant is liable in the 220 Action. Instead, plaintiff is proffering evidence of compromise to prove the compromise itself.

"One permissible use of compromise evidence that is universally acknowledged both in the case law and by treatise writers occurs in situations in which the compromise is itself the subject of the present action." n26 Delaware case law reflects this view. n27 Also, the underlying purpose of Rule 408, encouraging settlements, is furthered by admitting evidence of alleged settlement agreements. WindsorTech's position would allow lawyers to negotiate and reach agreement on settlements, violate them at will, and then exclude all evidence of the negotiations (effectively [**9] what is happening here). Permitting such an approach "would flout the policy of promoting compromises under the Rule." n28

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n26 DAVID P. LEONARD, THE NEW WIGMORE -- A TREATISE ON EVIDENCE § 3.8.1 at 406-07 (2002).

n27 *See, e.g., Williams Natural Gas Co. v. Amoco Prod. Co.*, 1991 Del. Super. LEXIS 418, 1991 WL 236919, at **1-2 (Del. Super. Nov. 8, 1991) (plaintiff brought suit regarding a settlement agreement and Rule 408 did not preclude evidence concerning the negotiations).

n28 *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 294 (2d Cir. 1999). *See also Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir. 1987) (reasoning that admission of evidence of settlement negotiations to prove the terms of a settlement agreement supports the public policy favoring compromise). Delaware Rule of Evidence 408 tracks Federal Rule of Evidence 408.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

B. *Memorialization of the Agreement*

Defendant argues that the parties intended for only a signed writing to bind [**10] the parties. Specifically, defendant points to Laster's original letter of May 5,

outlining the terms of the proposed settlement, and Laster's e-mail of May 11, attaching the exhibits to the formal agreement. The May 5 letter states: "We are not willing to put the Delaware litigation on hold while we discuss settlement. Any discussions will need to proceed in parallel with the **[*1287]** litigation." n29 The May 11 e-mail states: "Since we have not yet signed up the deal, we will also be expecting your answer today." n30 Defendant contends that these two statements demonstrate plaintiff's intention to not be bound before a formal written agreement was drafted and signed. Defendant is incorrect.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n29 Laster Aff. Ex. 1.

n30 *Id.* Ex. 12.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN5]The law in Delaware on this issue is straightforward:

> Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, **[**11]** did not leave the transaction incomplete and without binding force, in the absence of a *positive agreement* that it should not be binding until so reduced to writing and formally executed. n31

As such, "the question is whether the parties positively agree that there will be no binding contract until the formal document is executed." n32 Here, there is no evidence that the parties "positively" n33 agreed to be bound only by a formal document.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n31 *Universal Products Co. v. Emerson, 36 Del. 553, 6 W.W. Harr. 553, 179 A. 387, 394 (Del. 1935)* (citation and internal punctuation omitted) (emphasis added).

n32 *Anchor Motor Freight v. Ciabattoni, 716 A.2d 154, 156 (Del. 1998).*

n33 "Positive" is defined as follows: "Laid down, enacted, or prescribed. Express or affirmative. Direct, absolute, explicit." *Id.* BLACK'S LAW DICTIONARY 1324 (4th

ed. 1968). The fact that *Universal Products Co., 179 A. at 394,* and *Anchor Motor Freight, 716 A.2d at 156,* use the term "positive" is not lost on the Court.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

**[**12]**

Plaintiff's request for continued adherence to this Court's scheduling order in the 220 Action is not evidence that the parties positively agreed to be bound by a signed writing. Until a dismissal, stay, or new scheduling order was submitted to *and granted* by this Court, plaintiff had every right to expect defendant to adhere to the existing scheduling order that required defendant's answer on May 11. n34 Included in the materials e-mailed by Laster to Burger on May 11 was a stipulation of dismissal. Once the stipulation of dismissal was filed and granted by the Court, progress of the 220 Action could cease. [HN6]Before such time, however, the parties are bound to adhere to court orders. Simply put, the fact that the parties had "settled" the dispute underlying the 220 Action as a matter of contract law did not *automatically* terminate that action or nullify the scheduling order. n35 As such, Laster's expectation that defendant would file an answer on May 11 because the paperwork necessary to dismiss or stay the action had not been prepared by either party only reflected a procedural reality--not evidence of an intent to be bound only by a signed writing. n36

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n34 WindsorTech agreed on May 7, the same day the essential terms of the settlement were agreed upon, to answer the complaint in the 220 Action on May 11. Laster Aff. Exs. 4, 5, & 6.

**[**13]**

n35 The jurisprudence of other states reflects this notion. *See Patel v. Orma, 190 A.D.2d 782, 593 N.Y.S.2d 851, 852 (N.Y. App. Div. 1993)* ("an action is not automatically terminated merely because a settlement has been reached"); *Cameron v. Great Atlantic & Pac. Tea Co., 439 Pa. 374, 266 A.2d 715, 716-18 (Pa. 1970)* (suit still pending until pertinent court order is issued).

n36 Burger's affidavit, Affidavit of Alan Burger ("Burger Aff.") P14, suggests that he requested a stay of the proceedings

when he e-mailed Laster stating: "if I have to prepare a response, deal is off." Laster Aff. Ex. 13. This is revisionist history. A reasonable negotiator would interpret Burger's e-mail as demanding a stay in exchange for his non-repudiation of the agreement, *i.e.*, the "deal," reached on May 7, something Burger had no right to do.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*1288] Defendant's argument is really nothing more that an observation that the parties manifested an intention that the settlement agreement would be memorialized in writing--an observation that I share with defendant. Laster's May 5 settlement proposal stated that the [**14] ultimate settlement agreement would contain "customary and ordinary terms," indicating that Laster intended any agreement on the essential terms would eventually be reduce to writing and accompanied by the necessary implementation clauses. n37 This intention was borne out on May 7 when Laster informed Burger he would draft the "implementing documents"--documents sent promptly to Burger on May 10 and 11. But [HN7]"the fact that the parties . . . manifest an intention to prepare and adopt a written memorial" will not prevent contract formation if the evidence reveals "manifestations of assent that are in themselves sufficient to conclude a contract." n38

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n37 Plaintiff's revised proposal of May 6 simply stated: "These terms will be memorialized in a settlement agreement." Laster Aff. Ex. 3.

n38 RESTATEMENT (SECOND) OF CONTRACTS § 27 (1981).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. Board Approval

Defendant argues that it is not bound by the agreement reached on May 7 because the WindsorTech board never formally [**15] adopted the agreement. In support of this argument defendant points to (1) two clauses in the implementing documents sent by Laster to Burger on May 10 that refer to WindsorTech board approval n39 and (2) the affidavits of Burger and WindsorTech's president, Marc Sherman. n40 This evidence, however, does not create an issue of fact or allow WindsorTech to avoid the consequences of

Laster and Burger's manifestation of assent to the settlement agreement on May 7.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n39 Laster Aff. Ex. 11 at §§ 3.2(b), (f).

n40 The affidavits indicate that Burger and Sherman held the subjective belief, not relevant under Delaware law, *see supra* note 20 and accompanying text, that the settlement agreement would be reduced to writing, approved by the board, and executed by an officer of the company. Burger Aff. P6; Affidavit of Marc Sherman ("Sherman Aff.") P6.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The clauses in the formal document memorializing the May 7 agreement do not provide that board approval is a condition to the settlement that require satisfaction, but [**16] are stated as a representation that board approval already occurred. This is consistent with the legal principle that [HN8]where "an attorney of record in a pending action acknowledges that a compromise has been reached, he or she is presumed to have the lawful authority to do so." n41 Quite simply, Burger was presumed to be acting under the authority of his client. This principle does not change because Burger's client is a corporation. "The authority of attorneys to bind a corporation is precisely the same as in the case of natural persons." n42 Sherman's affidavit states that he was aware that Burger was conducting negotiations on [*1289] WindsorTech's behalf. n43 And Burger's statements to Laster, such as "1.1 [million options] is all I have," n44 are objective evidence that he was preauthorized to commit WindsorTech to the essential terms reached on May 7. n45

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n41 *Rowe v. Rowe*, 2002 Del. Ch. LEXIS 63, 2002 WL 1271679, *3 (Del. Ch. May 28, 2002). See also *Shields v. Keystone Cogeneration Systems, Inc.*, 620 A.2d 1331, 1335 (Del. Super. 1992), *aff'd sub nom. Zencey v. Keystone Congeneration Sys., Inc.*, 1992 Del. LEXIS 515, 1992 WL 696966 (Del. Apr. 10, 1992) (attorney engaging in settlement discussions presumed to have actual authority to conclude an agreement).

[**17]

n42 FLETCHER CYCLOPEDIA CORPORATIONS § 483, at 517 (1998).

n43 Sherman Aff. P3.

n44 Laster Aff. Ex. 10.

n45 Also, the reference to board approval in the May 10 memorialization is the type of "customary and ordinary" clause referenced in plaintiff's May 5 settlement proposal.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

### D. Counterproposal

Although defendant does not raise this argument in its briefing, Burger and Sherman's affidavits state that Laster's May 10 e-mail, attaching the formal settlement agreement, contained different and additional terms to those discussed before the May 7 manifestation of assent on the essential terms. n46 The suggestion is that the May 10 draft agreement was actually a counterproposal. Obviously, the formal document was going to have additional, boilerplate terms, but there is no evidence that those terms were "essential." Moreover, there is no evidence that the essential terms agreed to on May 7 were contradicted by the May 10 memorialization. n47 [HN9]A settlement agreement is enforceable if it contains all essential terms, even though it expressly leaves other matters for future negotiation. [**18] n48 Also, on May 11, Burger's objective rationale for repudiating the settlement agreement was not that it contained differing terms, but rather that WindsorTech was expected to adhere to the Court's scheduling order requiring the submission of an answer. n49 Burger's contemporaneous conduct eviscerates his affidavit that suggests a new, subjective reason why he repudiated the settlement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n46 Burger Aff. P13; Sherman Aff. P4.

n47 And even if the memorialization did differ from the essential terms it would not have been a "counterproposal" because Laster and Burger had already agreed to those terms.

n48 *Asten, Inc. v. Wangner Systems Corp.,* 1999 Del. Ch. LEXIS 195, 1999 WL 803965, at **2-3 (Del. Ch. Sept. 23, 1999); RESTATEMENT (SECOND) OF CONTRACTS § 33(2) & cmt. a (1981). This Court has enforced settlement agreements for division of land where the dividing line was not specified. *Hendry v. Hendry,* 1998 Del. Ch. LEXIS 83, 1998 WL 294009, at **2-3 (Del. Ch. June 3, 1998).

n49 Laster Aff. Ex. 13 ("if I have to prepare a response, deal is off").

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**19]

### E. Specific Performance

Defendant argues that Loppert is not entitled to specific performance because (1) he has an adequate remedy at law through continued litigation in the 220 Action and (2) the terms of Laster's May 5 settlement proposal contained a provision that provided an exclusive legal remedy. As to the latter contention, defendant refers to paragraph eleven of the May 5 settlement proposal:

In the event of a default of the settlement agreement, all monetary sums due and owning [sic] under the agreement will become immediately due. A notice of breach will be required to be faxed to the non-breaching party and that party's counsel, and there would be a 10-day cure period prior to acceleration. n50

The provision undoubtedly provides a remedy in the event of default, but [HN10]"an express provision for one remedy in case of breach is not operative as a 'waiver' of other remedies." n51 Also, any suggestion that Loppert should provide WindsorTech with a 10-day notice letter is quixotic-- [*1290] defendant is presently contesting the validity of the agreement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n50 Laster Aff. Ex. 1.

[**20]

n51 CORBIN ON CONTRACTS § 1227 at 530 & n.90 (1993).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Defendant's argument that continued litigation in the 220 Action provides Loppert with an adequate legal remedy misses the mark. The settlement reached by the parties is "global" and includes potential claims outside the narrow scope of a 220 Action, *i.e.,* continuing on with the 220 Action can only provide an incomplete and uncertain remedy. [HN11]Release from liability, especially future liability, cannot be compensated for easily by money damages. The settlement agreement

865 A.2d 1282; 2004 Del. Ch. LEXIS 121

also provides for [HN12]"mutual non-disparagement," a unique provision that also cannot be readily compensated for by money damages. n52 [HN13]"Equity respects the freedom to contract, and dictates that both [parties to the settlement] should receive the benefit of their bargain through specific performance." n53

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n52 Laster Aff. Ex. 1. The settlement agreement also contains other benefits for Loppert, including a new substantial equity position in WindsorTech, which are not susceptible to monetary relief. *Id.*

[**21]

n53 *Asten, Inc.*, 1999 Del. Ch. LEXIS 195, 1999 WL 803965, at *6. [HN14]"Delaware law favors the voluntary settlement of contested disputes." *Clark v. Ryan*, 1992 Del. Ch. LEXIS 145, 1992 WL 163443, at *5 (Del. Ch. June 17, 1992). This public policy counsels in favor of granting specific performance.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

### F. Timeliness of Plaintiff's Motion

Defendant argues that plaintiff's summary judgment motion is premature and fails to comply with Court of Chancery Rule 56(a). Rule 56(a) [HN15]allows a plaintiff to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action." Although Loppert moved for summary judgment before the expiration of 20 days, in the circumstances of this case, Rule 56(a) does not prevent the Court from granting plaintiff's motion. Rule 56(a) does not, without exception, prohibit a plaintiff from moving for summary judgment before the expiration of 20 days from the commencement of an action. The Court may truncate the 20-day period when it is the opinion of the Court that doing so aids judicial efficiency without prejudicing the defendant. n54

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n54 This power stems from the inherent authority of the Court of Chancery to control its own docket. *See Belfint, Lyons & Shuman, P.A. v. Pevar*, 2004 Del. LEXIS 127, at *7 (Del. Mar. 10, 2004) (acknowledging the inherent power of the

trial court to control its docket); *Taylor v. LSI Logic*, 715 A.2d 837, 842 (Del. 1998) (same).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[**22]

The Court made the determination to shorten the 20-day period at a pretrial scheduling conference held on May 27, 2004. n55 At that time, two factors compelled the Court to allow plaintiff to proceed with its motion despite the fact that it was premature under Rule 56(a). First, WindsorTech would endure no prejudice in its defense. The material facts were both limited and personally known by defendant's counsel--the evidence consisted of e-mail exchanges between opposing counsel over the course of only a few days. n56 Second, the 220 Action was proceeding at an expeditious pace because actions under 8 Del. C. § 220 are summary in nature. This Court stayed the 220 Action, which [*1291] was scheduled to go to trial in July, to allow the parties to promptly brief and the Court to promptly decide plaintiff's summary judgment motion. Prompt briefing and decision on the summary judgment motion was, in the Court's view, the most efficient and economical manner to attempt to resolve *both* the 220 Action and the instant proceeding.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n55 Despite the conference being held before the expiration of 20 days, defendant had already secured counsel at that time-- the same counsel representing defendant in the 220 Action.

[**23]

n56 The limited factual issues are also due, in part, to the legal test for contract formation which relies on objective evidence rather than evidence of subjective intent. As such, unless defendant raised some factual dispute as to the objective evidence, no depositions were required. And ultimately, as described herein, the objective evidence was without material dispute.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

I remain committed to the decision made at the May 27 scheduling conference. Defendant has had "a reasonable opportunity to present all facts pertinent to the motion." n57

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n57 *Mann v. Oppenheimer & Co., 517 A.2d 1056, 1060 (Del. 1986).* Defendant did not argue in its answering brief, filed over two weeks after plaintiff's motion was submitted, that it was in any way prejudiced by the accelerated briefing schedule. I opine on this issue because it was raised in a sur-reply letter filed by defendant (without the Court's permission).

- - - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

## [**24] IV. ATTORNEYS' FEES

The settlement proposal Laster sent to Burger on May 5 provides: "The prevailing party will be entitled to costs (including attorneys' fees) for the enforcement of the settlement." n58 Burger's response to the May 5 proposal was "all acceptable except as follows . . . ." n59 Although Burger objected, among other things, to the provision reimbursing Loppert for his fees and expenses incurred in the 220 Action, he made no mention of the separate provision relating to reimbursement of fees and expenses to enforce the settlement agreement related to the 220 Action. n60 Plaintiff's revised settlement proposal of May 6 retained the provision entitling Loppert to reimbursement of fees and expenses to enforce the settlement agreement. n61 Burger again made a handful of counterproposals, but none related to reimbursement of fees and expenses to enforce the settlement agreement. n62 As described earlier, the negotiations were eventually narrowed to a single issue, the number of options. All other essential terms were agreed upon. Once the final piece of the puzzle was the subject of mutual assent, a contract was formed. One of the essential terms of that contract is [**25] as follows: "The prevailing party will be entitled to costs (including attorneys' fees) for the enforcement of the settlement." n63

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n58 Laster Aff. Ex. 1.

n59 *Id.* Ex. 2.

n60 *Id.* Burger referred to specific paragraph numbers, making it clear which provisions were and were not acceptable. *Id.*

n61 *Id.* Ex. 3.

n62 *Id.* Ex. 7. Again, Burger referred to specific paragraph numbers. *Id.*

n63 Laster Aff. Exs. 1 (original proposal), 2 (revised proposal), & 10 (manifestation of mutual assent to all essential terms).

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

Defendant has one "simple answer" to counter the above conclusion: "no contract was formed." n64 Unfortunately, the simple answer is not always correct. A contract was formed *and* it includes a provision entitling the prevailing party, in this case Loppert, to costs (including attorneys' fees) for the enforcement of the settlement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n64 AB at 26.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[**26]

## V. CONCLUSION

The communications between the parties establish a binding and enforceable settlement agreement as a matter of law. The parties mutually assented to the essential terms of the settlement agreement on May [*1292] 7, 2004. Further, because a breach of the settlement agreement is not readily remedied by monetary damages, Loppert is entitled to specific enforcement of the agreement's essential terms. Plaintiff shall submit an affidavit detailing his costs for the enforcement of the settlement within ten days from the date of this Opinion.

IT IS SO ORDERED.

Westlaw.

Not Reported in A.2d                                                                                          Page 1
2002 WL 1271679 (Del.Ch.)
**(Cite as: 2002 WL 1271679 (Del.Ch.))**

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Leo R. ROWE, Plaintiff,
v.
Richard F. ROWE, Jr., as Executor of the Estate of
Florence Rowe, and Shipley
Rowe, L.P., Defendants.
**No. CIV.A. 16119.**

Submitted: March 26, 2002.
Decided: May 28, 2002.
Janet Z. Charlton, Esquire, Young, Conaway,
Stargatt & Taylor, LLP, Wilmington, Delaware,
Attorney for Plaintiff.

Charles M. Oberly, III, Esquire, Oberly Jennings &
Rhodunda, P.A., Wilmington, Delaware, Attorney for
Defendants.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

**\*1** Plaintiff seeks to enforce an oral agreement to
settle the action he brought to establish his right of
ownership in a particular 3-acre portion of a 12-acre
parcel then held of record by his mother. For the
reasons that follow plaintiff's motion is granted.

I.
On December 31, 1997, plaintiff Leo R. Rowe sued
his mother, Florence Rowe, seeking declaratory and
injunctive relief. At issue is 3 acres of a 12-acre tract
of real property located on Shipley Road in the
Brandywine Hundred section of New Castle County,
Delaware. At the time suit was filed, Mrs. Rowe held
sole legal title to the 12 acres. She and her late
husband, Richard Sr., owned this land as tenants by
the entireties until his death in 1985.

Leo's complaint alleges that he is the equitable
owner of the 3-acre parcel as the result of an
agreement he made with his father in or about 1983.
Leo alleges that he and his father walked the land at
that time and agreed on boundaries for a 3-acre parcel
that was to be subdivided and deeded to Leo. Leo

built a house on this parcel and has lived there with
his family since 1985. He has also paid one-half of
the New Castle County property taxes assessed
against the entire 12-acre tract since 1985.

Richard Sr. died in 1985, before the land was
subdivided. Thereafter, Leo and his mother never
agreed on a plan of subdivision. Eventually, Leo
obtained a property survey dated August 28, 1996
(the "1996 Survey") that delineates the boundaries of
what he contends is the 3-acre parcel his father
agreed to deed to him from an area marked "Other
Lands of Richard F. Rowe and Florence M. Rowe ."
[FN1]

FN1. Pl.Ex. A.

In 1997, Mrs. Rowe decided to move from her home,
that was situated on the 12- acre tract in question. As
a result of discussions she was having with a real
estate developer around the time of her move, Mrs.
Rowe told Leo that she intended to sell 10.5 acres of
the 12-acre parcel. Since this plan necessarily
entailed a sale of a portion of the land Leo claims is
his, Leo brought suit in December of 1997. Leo's
complaint seeks to enjoin the sale of that portion of
land he views as belonging to him and to specifically
enforce the transfer of the title from Mrs. Rowe to
him. The 1996 Survey is attached to Leo's complaint.

In February 1998, Mrs. Rowe met with Leo, her son
Richard Jr. and her daughter Florence (Paul, the forth
child, was not present). At that meeting, Mrs. Rowe
agreed to give Leo the property he claims in order to
"stop the lawsuit."  [FN2] As Florence testified in
reference to that meeting:

FN2. Dep. Florence Ramey, pp. 26-7 (Ex.
A).

Q.... I was called down to my brother's, Richard's,
house. Mother was there. Leo came in. And we
were trying to talk Leo out of proceeding with the
lawsuit. And then mother said--mother was
embarrassed by it, because she--she said--she felt
like it was a family shame for one to sue another.
And then, finally, she said, "Well, we'll gave [sic]
Leo what he wants if he'll stop the lawsuit.
Q. And you heard her say that?
**\*2** A. Yeah.

\* \* \*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2002 WL 1271679 (Del.Ch.)
(Cite as: 2002 WL 1271679 (Del.Ch.))

Page 3

terms of the Settlement and the parties were engaged in discussions. When the parties stipulated to an extension of the *lis pendens* in December 2000, they wrote: "Plaintiff, Defendant and Shipley Rowe, L.P. have agreed to resolve their differences by conveying to Plaintiff a 3+- acre tract of the Land as is fully delineated in Exhibit A attached hereto." While no Exhibit A was attached to the document, it is readily inferable that the parties intended it to be the 1996 Survey.

Mrs. Rowe died in May of 2001. Leo's brother, Richard, as the executor of her estate, and Shipley Rowe have been substituted as Defendants in this case. The parties continue to be at an impasse as to the division of the parcel. Leo now moves to enforce the Settlement.

## II.

Delaware law favors the voluntary settlement of contested suits. [FN7] When parties agree to settle a lawsuit, a binding contract is deemed to have been created. [FN8] A settlement agreement is construed using the principles of contract interpretation. [FN9] When deciding a contract dispute, the court looks to whether there are writings that reflect the terms of the agreement. [FN10] Where, an attorney of record in a pending action acknowledges that a compromise has been reached, he or she is presumed to have lawful authority to do so. [FN11] Oral settlement agreements reached among the parties to a dispute are binding. [FN12] Finally, this court has enforced settlements regarding the partition of land. [FN13]

> FN7. *Neponsit Investment Company v. Abramson*, 405 A.2d 97 (Del.1979).

> FN8. *Corbesco, Inc. v. Local No. 542, International Union of Operation Engineers*, 620 F.Supp. 1239 (D.Del.1985).

> FN9. *Interspace, Inc. v. Morris*, 650 F.Supp. 107 (S.D.N.Y.1986); *Jones v. First National Building Corporation*, 155 F.2d 815 (10th Cir.1946).

> FN10. *Clark v. Ryan*, 1992 Del. Ch. LEXIS 145 at *13 (Del. Ch.).

> FN11. *Id.* citing *Aiken v. National Fire Safety Counselors*, 127 A .2d 473, 475 (Del. Ch.1956).

> FN12. *Corbesco, Inc. v. Local No. 542, International Union of Oper* ., 620 F.Supp.

1239, 1244 (D.Del.).

> FN13. *See, e.g., Clark v. Ryan, supra; Hendry v. Hendry*, 1998 Del.Ch. LEXIS 83 (1998).

Applying these precedents to the facts of this case, the court is persuaded that there was a binding agreement to settle reached at the February 1998 family meeting when Mrs. Rowe agreed to give Leo what he wanted in order to stop the lawsuit. The substance of this agreement is confirmed by the testimony of Leo and his sister Florence, who were present at the time. Counsel repeatedly confirmed in correspondence with the court the fact that the parties had reached a settlement, and that agreement is specifically referenced in two orders entered by the court. While much of this written confirmation references the need for the actual subdivision to be made, there is no indication that the parties had not reached agreement on the material terms of the settlement. Nor is there any dispute that Leo complied with his end of the bargain--stopping the lawsuit as a result of the agreement he reached with his mother.

**\*4** Sometime afterward, Mrs. Rowe realized that a different configuration of the land would allow for a more profitable development of the remaining property. This fact, however, does not alter the binding nature of the agreement made in February 1998, since there was never a subsequent unconditional agreement with Leo modifying the size and shape of the property to be deeded to him. A unilateral change of heart by a party to a settlement agreement is not ground to set the settlement aside. [FN14]

> FN14. *In re Appraisal of Enstar Corp.*, 593 A.2d 543, 548 (Del. Ch.1991), *reversed on other grounds*, 604 A.2d 404 (Del.1992).

The court notes that this is not a case involving any dishonesty, fraud, deceit or misrepresentation by Leo that might prevent the enforcement of the Settlement. Nor can the Statute of Frauds be raised to undo the Settlement. Once the parties to an oral agreement have acknowledged its material substance, the Statute of Frauds cannot be used as an affirmative defense. [FN15]

> FN15. *Hendry v. Hendry*, 1998 Del.Ch. LEXIS 83 at *2 (1998), *citing Wolf v. Crosby*, 377 A.2d 22, 26 (Del. Ch.1997).

Not Reported in A.2d
2002 WL 1271679 (Del.Ch.)
(Cite as: 2002 WL 1271679 (Del.Ch.))

Page 4

The Settlement reached between Leo and Mrs. Rowe to deed over to him title to the parcel described in the 1996 Survey was a binding contract and will be enforced by this court.

### III.

There remains an issue concerning access that may affect the ability of Shipley Rowe to develop the remainder of its land. The question is whether New Castle County will permit direct access to the remaining land by a new entrance on Shipley Road, or, instead, will require that access to that property be via an existing road cut. In the latter case, access to the remaining land will require the imposition of an easement or right of way across the land Leo is entitled to get as a result of the Settlement.

If the land that Shipley Rowe retains as a result of the Settlement is landlocked and there is no other way to access it, then an easement of necessity will have been created. [FN16] This result is not only supported by precedent but is completely consistent with the obvious intention of Leo's parents that the benefits of ownership of the 12-acre tract should be shared within the Rowe family and that Leo's entitlement to the 3-acre parcel should represent roughly one-quarter of the whole. Certainly no one, including Leo, ever understood that the conveyance to him of 3 of the 12 acres would occur on terms that drastically affected the value of the remaining property to his 3 siblings.

> FN16. *See, e.g., Judge v. Rago,* 570 A.2d 253, 258 (Del.1990) ( "[I]f a landowner landlocks one parcel by conveying another, an easement of necessity will arise across the conveyed land, even if no quasi-easement existed").

For these reasons, in the event that Shipley Rowe's ability to develop the remaining acreage depends on a right of access across Leo's land, Leo will be required to grant an express easement in writing over a portion of his property to Shipley Rowe, and its successors in interest. That grant shall be filed of record. The easement will be situated in such a way as to minimize the intrusion onto Leo's land while permitting reasonable access to the remaining property. The cost of building the roadway and doing related site work shall be borne by Shipley Rowe or its successor(s). The maintenance costs shall be borne by all those entitled to use the easement, including Leo (if he uses the road for access), according to a fair and reasonable formula to be agreed upon by the parties and filed of record as part of the grant of easement.

### IV.

**\*5** For the foregoing reasons, plaintiff's motion to enforce the Settlement is granted. The subdivision of Leo's 3 acres, as delineated in the 1996 Survey, is hereby ordered with an easement for access to the remaining property granted to Shipley Rowe, if necessary. Plaintiff shall present a form of order, on notice, within 10 days of the date of this opinion.

2002 WL 1271679 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.