THE INTELLISOURCE GROUP, INC., Plaintiff, v. RICHARD B. WILLIAMS and RICHARD B. WILLIAMS FAMILY, LLC, Defendants.

C.A. No. 98-57-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1999 U.S. Dist. LEXIS 12446

August 11, 1999, Decided

**NOTICE:**
**PUB-STATUS:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION-1:** Defendants' motion to enforce settlement agreement denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant stock holder moved to enforce settlement agreement requiring plaintiff corporation to repurchase stock and to enter a final judgment against plaintiff corporation.

**OVERVIEW:** Plaintiff corporation sued defendant share holder and his limited partnership and sought, among other things, return of defendant's stock interest in plaintiff. Defendants filed a counterclaim. The parties negotiated a settlement mail. Plaintiff accepted an offer by defendant as to the amount it would pay to reacquire its stock. Defendant's letter acknowledging the acceptance stated there was no deal until they agreed on the language of the settlement agreement. Problems arose as to the payment terms and defendant moved to enforce the settlement agreement. The court ruled that in light of the amount of money at stake and the complexity of repurchasing company stock, a reasonable person would conclude that the method of payment was an essential term of the purported contract. Since defendant failed to demonstrate that the parties reached agreement as to the payment schedule, an essential term of the transaction, there was no binding agreement to be enforced.

**OUTCOME:** Defendant's motion to enforce settlement agreement was denied as the court found that method of payment constituted an essential term of the transaction and since there was no agreement on this term, there was no binding agreement.

**CORE TERMS:** settlement, settlement agreement, per share, stock, lump-sum, settle, payment schedule, purported, purchase money, essential term, cash payment, dollar, restrictive covenant, employment agreement, proposed settlement, correspondence, negotiations, outright, compete, reasonable person, manifestation, binding, assent, standard of review, confidential information, documentation, outsourcing, transferred, resignation, assurances

**LexisNexis(TM) Headnotes**

*Civil Procedure > Settlements > Settlement Agreements*

[HN1]A district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it.

*Civil Procedure > Settlements > Settlement Agreements*

[HN2]Because motions for the enforcement of settlement agreements resemble motions for summary judgment, the court must employ a similar standard of review.

*Civil Procedure > Settlements > Settlement Agreements*

[HN3]The court must treat all the non-movant's assertions as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN4]Summary judgment is appropriate only if there is no genuine issue as to any material fact and he moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Settlements > Settlement Agreements*

[HN5]Courts should not summarily enforce purported settlement agreements, in the absence of an evidentiary hearing, where material facts concerning the existence or terms of an agreement to settle are in dispute.

*Contracts Law > Contract Interpretation > Interpretation Generally*

[HN6]Under Delaware law, a contract comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the

surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms.

*Contracts Law > Contract Interpretation > Interpretation Generally*

[HN7]If the parties reached a definite agreement on all essential terms, a valid contract exists. Conversely, there can be no contract when an essential term is missing.

*Contracts Law > Contract Interpretation > Interpretation Generally*

[HN8]The court must look to the parties' antecedent expressions, their past action and custom, and other circumstances to determine if the parties regarded a lump-sum cash payment as essential to their agreement.

*Contracts Law > Contract Interpretation > Interpretation Generally*

[HN9]The phrase "purchase money" is defined as the actual money paid in cash or check initially for the property while the balance may be secured by a mortgage and note calling for periodic payments.

*Contracts Law > Contract Interpretation > Interpretation Generally*

[HN10]If either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

**COUNSEL:** For plaintiff: Charles Gruver, III, Esquire, Taylor, Gruver & McNew, Greenville, Delaware.

For plaintiff: James J. Rohn, Esquire, John A. Guernsey, Esquire, Gabriel Holdsman, Esquire, Of counsel, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, Pennsylvania.

For defendants: Edward M. McNally, Esquire, John T. Meli, Jr., Esquire, Morris, James, Hitchens & Williams, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION: MEMORANDUM OPINION**

Dated: August 11, 1999
Wilmington, Delaware

**Robinson, District Judge**

**I. INTRODUCTION**

Currently before the court is a motion filed by defendants Richard B. Williams ("Williams") and the Richard B. Williams Family, LLC ("the Williams LLC") to enforce a settlement agreement allegedly accepted by plaintiff The Intellisource Group, Inc. (D.I. 19) In the same motion, defendants also move the court to enter final judgment. Plaintiff is incorporated under the laws of Delaware and has its principal place of business in Fairfield, Connecticut. (D.I. 1, P 1) Both defendants are citizens [*2] of the State of Illinois. (D.I. 1, PP 2-3) Because there is complete diversity between the parties and more than $ 75,000 in controversy, the court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Defendants have consented to venue in this district. Because defendants have not demonstrated that the parties reached a binding settlement agreement on or about September 3, 1998, the court shall deny defendants' motion.

**II. BACKGROUND**

The court gleans the following facts from plaintiff's complaint (D.I. 1) and the briefs submitted by the parties. Plaintiff provides technical staffing and other "outsourcing" services to various Fortune 1000 companies throughout the United States. Plaintiff was founded by Charles Gibbons ("Gibbons") who, until May 1995, was plaintiff's sole shareholder. In May of 1995, Williams offered to assist Gibbons in attracting investors and improving plaintiff's outsourcing business. In return for this assistance, Williams requested 50% ownership of plaintiff and a "key" position with the company. In July 1995, through Williams' efforts, plaintiff entered discussions with Safeguard Scientifics, Inc. ("Safeguard"), [*3] a prospective investor. Williams requested that he receive his shares of plaintiff's stock prior to Safeguard's anticipated investment of capital. Gibbons agreed and transferred 50% (or 175,000 shares) of plaintiff's outstanding stock to Williams. Of those 175,000 shares, plaintiff issued 90,000 shares to the Williams LLC. Pursuant to an Option Shares Escrow Agreement, 51,250 shares were transferred to an escrow account held by plaintiff. Gibbons also appointed Williams to plaintiff's board of directors. (D.I. 1, PP 6-16)

On September 1, 1995, Safeguard made a substantial investment in plaintiff. In order to protect its investment, Safeguard required plaintiff's key employees, including Williams, to execute employment agreements. (D.I. 1, P 18) Williams

signed a two year employment contract that imposed a variety of restrictions upon him, including a duty:

. not to solicit (for one year following his employment with plaintiff) any customer or potential customer of plaintiff's and not to compete with, or encourage or assist others to compete with, plaintiff during the term of the agreement and for one year after the termination of the agreement anywhere in the United States; and

. [*4] not to disclose any of plaintiff's confidential information.

(D.I. 1, Ex. A at P 7) Less than a year after the Safeguard transaction, Gibbons became increasingly disappointed with Williams' performance and his alleged lack of contribution to plaintiff's development. Gibbons expressed this disappointment to Williams, who offered to resign effective July 31, 1996. Prior to Williams' resignation, Williams and Gibbons agreed that Williams would abide by the restrictive covenants in his employment agreement and that, in return for the right to remain a shareholder in the company, Williams would deposit an additional 10,000 shares in escrow in accordance with an Option Shares Escrow Agreement. (D.I. 1, PP 25-28)

Following his resignation, Williams began employment with Alternative Resources Corporation ("ARC"), a competitor of plaintiff's. On or about February 24, 1997, Williams was elected president and Chief Operating Officer of ARC. Plaintiff then filed suit against defendants alleging breach of contract, breach of duty of good faith and fair dealing, breach of fiduciary duty, and misappropriation of trade secrets. (D.I. 1, PP 37-60) According to plaintiff, Williams violated his [*5] employment agreement with plaintiff by disclosing or disseminating plaintiff's confidential information to ARC and by competing with, and/or encouraging or assisting others to compete with, plaintiff. (D.I. 1, PP 29-33) Plaintiff sought, among other things, return of all stock interest in plaintiff and a permanent injunction restraining Williams from violating the noncompetition clause of his employment agreement. Defendants denied these allegations and filed a counterclaim alleging bad faith and seeking attorneys fees and expenses under 6 Del. C. § 2004.

The parties initiated settlement in mid-1998. As part of these settlement negotiations, Williams resigned from ARC. On August 11, 1998, plaintiff's counsel made the following settlement offer in a letter to defendants' counsel:
We have entered into good faith discussions in order to facilitate the settlement of the above-referenced lawsuit.

> To that end, we have made a bona fide offer of $ .70 per share for all escrowed option shares and $ 1.00 per share for all other shares Mr. Williams or his family own in the Intellisource Group, Inc., representing a total sum of $ 626,500.00

. . .

> Please be advised that [*6] this offer will be withdrawn on August 18, 1998, if no response has been received.

(D.I. 23, Ex. B) Defendants rejected this offer and made a counteroffer in an August 17, 1998 letter. That letter stated, in pertinent part, that:
Mr. Williams . . . is prepared to settle this litigation and sell his stock to Intellisource. He will do so upon payment of $ 4.00 per share for each of the 455,000 shares of Intellisource stock he and the Family, LLC own outright, and an additional $ .70 for the shares subject to an option.
(D.I. 23, Ex. C) Plaintiff accepted this offer on September 3, 1998 with the following letter:
The Intellisource Group, Inc. accepts the Williams' offer set forth in your letter of August 17, 1998 for the settlement of the litigation and sale of all stock to Intellisource. The amount to be paid is $ 4.00 per share for each of the shares of Intellisource stock which Williams and the Family, LLC own outright and $ .70 per share for each of the shares subject to the option. According to our calculations, the number of unrestricted shares is 455,000 and the number of shares subject to the option is 245,000.

> I will prepare a Settlement Agreement [*7] And Release and a Stock Repurchase Agreement for your consideration. I am advised that the purchase money can be available by October 15, 1998. By that date we should have agreed on the language of the documents and secured the parties' signatures on them.

(D.I. 23, Ex. D) The following day, defendants' counsel confirmed plaintiff's acceptance. In this September 4, 1998 letter, defendants' counsel stated that:
Mr. Williams accepts the considerations set forth in your September 3, 1998 letter. Of course, we do not have a deal until we agree on the language of the Settlement Agreement and Release, and such other documentation as you might request.

> Mr. Williams is also willing to accept the October 15, 1998 settlement date, but I

would want "good funds" on that date so he can invest the money immediately.

(D.I. 23, Ex. E) Defendants contend that, in stating "of course, we do not have a deal until we agree on the language of the Settlement Agreement," counsel was referring to the customary papers to settle a lawsuit, specifically a stipulation of dismissal and mutual release papers. (D.I. 21, P 9)

According to defendants, on October 12, 1998, plaintiff's counsel [*8] advised defendants' counsel that plaintiff might not have the settlement money by October 15, 1998. In an October 12th letter confirming this conversation, defendants' counsel wrote the following:

As we discussed in our telephone conversation this morning, Mr. Williams needs to know whether a settlement is going to occur as scheduled this Thursday, October 15, 1998. You have advised that there is a "financial glitch" so that your client may not have the money by this Thursday. Of course, there was no financial contingency in our agreement to settle. Accordingly, this letter is to demand assurances from your client that a settlement will occur this Thursday. . . . Mr. Williams reserves all of his rights to enforce the settlement agreement or take such other actions as may be appropriate under the circumstances.

(D.I. 21, Ex. F) Plaintiff responded in a letter dated October 12, 1998, stating:

Your letter of October 12, 1998 is inconsistent with your letter of September 4, 1998. The parties have not agreed on the language of the Settlement Agreement and Release and related documents. Until that occurs, neither party can give assurances to any closing taking place [*9] on October 15, 1998.

(D.I. 23, Ex. F) In this October 12th letter, plaintiff enclosed proposed settlement documents. These documents proposed an installment payment of the settlement sum, constituting Ninety-one Thousand Five Hundred dollars ($ 91,500) in certified check upon execution, and a promissory note in the amount of One Million Nine Hundred Thousand dollars ($ 1,900,000), bearing no interest and payable in equal annual installments of One Hundred Ninety Thousand dollars ($ 190,000) commencing on October 15, 1999 and continuing until October 15, 2008; provided, however, that in the event of an initial public offering of [Intellisource] stock, that the then remaining balance of the note then due becomes immediately due and payable.

(D.I. 21, Ex. G at P 5) Plaintiff's proposed settlement agreement also would have prevented Williams from soliciting business from plaintiff's customers (identified in an attached list) for a one year period following settlement. (D.I. 21, Ex. G at P 6)

On October 15, 1998, defendants' counsel advised plaintiff that the proposed settlement agreement did not reflect the agreement allegedly accepted by plaintiff in its September 3, 1998 letter. [*10] (D.I. 21, Ex. H) Defendants thereafter ended settlement negotiations and filed the present motion to enforce. Specifically, defendants seek enforcement of a purported agreement to pay the settlement figure in a lump-sum, cash payment.

### III. STANDARD OF REVIEW

[HN1]A district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it. See Hobbs & Co. v. American Investors Management, Inc., 576 F.2d 29, 33 & n.7 (3d Cir. 1978). [HN2]Because motions for the enforcement of settlement agreements resemble motions for summary judgment, the court must employ a similar standard of review. See Tiernan v. Devoe, 923 F.2d 1024, 1031-32 (3d Cir. 1991). Accordingly, [HN3]the court must treat all the non-movant's assertions as true, and "when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." Id. at 1032 (internal quotation and citation omitted). [HN4]Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). [HN5]Courts should not summarily enforce [*11] purported settlement agreements, in the absence of an evidentiary hearing, where material facts concerning the existence or terms of an agreement to settle are in dispute. See id. at 1031 (quoting Garabedian v. Allstates Eng'g Co., 811 F.2d 802, 803 (3d Cir. 1987)).

### IV. DISCUSSION

The court must determine whether plaintiff's September 3, 1998 "acceptance" letter created an enforceable agreement to settle the litigation for a lump-sum cash payment to defendants. Specifically at issue is whether, viewed objectively, a lump-sum cash payment was an "essential term" of the purported settlement agreement. n1 Neither party disputes that Delaware law governs the action at bar.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 Plaintiff's draft settlement proposal also included a restrictive covenant. The parties never discussed a restrictive covenant in their correspondence. Because the court finds that the parties did not enter a binding settlement agreement on September 3, 1998, the court declines to

discuss whether a restrictive covenant was material or essential to the parties' settlement agreement.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*12] [HN6]

Under Delaware law, a contract "comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms." Telephone & Data Sys., Inc. v. Eastex Cellular L.P., 1993 Del. Ch. LEXIS 182, Civ.A.No. 12888, 1993 WL 344770, at *10 (Del. Ch. Aug. 27, 1993) (emphasis added); see also Industrial America, Inc. v. Fulton Indus., Inc., 285 A.2d 412, 415 (Del. 1971) (explaining that "overt manifestation of assent -- not subjective intent -- controls the formation of a contract"). [HN7]If the parties reached a definite agreement on all essential terms, a valid contract exists. See Telephone & Data Sys., 1993 WL 344770, at *11 n.19. Conversely, there can be no contract when an essential term is missing. See Pantzer v. Shields Dev. Corp., 660 F. Supp. 56, 59 (D. Del. 1986). [HN8]The court must look to the parties' "antecedent expressions, their past action and custom, and other circumstances" to determine if the parties regarded a lump-sum cash payment as essential to their agreement. See 1 Corbin on Contracts [*13] § 29, at 88 (1963).

Although defendants contend that "all essential terms of the settlement were agreed to in writing," there is no evidence that both parties agreed on a payment schedule. In light of the amount of money at stake and the complexity of repurchasing company stock, the court finds that a reasonable person would conclude that the method of payment would be an essential term in the purported contract at bar. Defendants argue that a lump-sum payment was implicit in their agreement (D.I. 20 at 11), but the court cannot find any evidence in the parties' correspondence to support this claim. In their August 17, 1998 letter, defendants made no mention of the method of payment. Defendants merely offered to settle the litigation for "$ 4.00 per share for each of the 455,000 shares of Intellisource stock [Williams] and the Family, LLC own outright, and an additional $ .70 for the shares subject to an option." (D.I. 23, Ex. C) Similarly, in its September 3, 1998 acceptance letter, plaintiff confirmed the per share settlement price, but never discussed a payment schedule. In accepting the per share settlement price offered by defendants, plaintiff further suggested that "the [*14] purchase money" could be available by October 15, 1998 and that the settlement documents should be agreed to and executed by that date. n2 Defendants responded, first, by declaring that there is no "deal" until final documentation and, second, by further requiring "good funds" on the settlement date. The parties' next round of communications included plaintiff's observation that it might not have "the settlement money" by October 15, 1998. Still without mentioning a specific dollar figure, defendants demanded settlement on the 15th regardless of plaintiff's financial condition.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 The court notes that neither party discussed a specific payment schedule on, or prior to, plaintiff's September 3rd "acceptance" of the settlement agreement. Because it is defendants' burden of proof, the court need not assume that the phrase "purchase money" meant the entire purchase price. Indeed, [HN9]the phrase "purchase money" is defined as "the actual money paid in cash or check initially for the property while the balance may be secured by a mortgage and note calling for periodic payments." Black's Law Dictionary 1111 (5th ed. 1979). Only in an October 8, 1998 facsimile transmission of wire transfer instructions did defendants specifically mention a lump-sum payment. (D.I. 21, Ex. E) At the time of the purported September 3rd agreement, however, the objective evidence of record does not indicate what payment schedule was contemplated by the parties.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*15]

It is a well established principle of contract law that [HN10]
> if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

Restatement (Second) of Contracts § 27 cmt. b (1981). In the present case, defendants have failed to demonstrate that the parties reached agreement as to a payment schedule, an essential term of the transaction. The parties' correspondence further demonstrates that neither party regarded the agreement to settle as

complete until formal settlement and stock repurchase agreements had been signed. As such, the court cannot conclude that plaintiff's September 3, 1998 "acceptance" letter created a binding agreement to pay a lump-sum cash settlement to defendants. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 Because the court concludes that no binding contract arose between the parties, the court need not address whether plaintiff's attorney had the authority to bind plaintiff to a settlement agreement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*16]

## V. CONCLUSION

For the aforementioned reasons, defendants' motion to enforce the settlement agreement is denied. An appropriate order shall issue.

Westlaw.

Not Reported in A.2d
1980 WL 6367 (Del.Ch.)
(Cite as: 1980 WL 6367 (Del.Ch.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
CITY OF NEWARK, a municipal corporation of the State of Delaware, Plaintiff,
v.
NVF COMPANY, a corporation of the State of Delaware, Defendant and Third-Party Plaintiff,
v.
NEW CASTLE COUNTY, Third-Party Defendant.
**CIVIL ACTION No. 5176.**

Submitted Dec. 31, 1979.
Decided Jan. 10, 1980.
Thomas G. Hughes, Wilmington, for plaintiff.

Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, for defendant and third-party plaintiff.

Richard C. Kiger, Esquire, Assistant County Attorney, Wilmington, for third-party defendant.

UNREPORTED OPINION

BROWN, Vice Chancellor.

*1 This is, hopefully, the final segment of this suit between the City of Newark, NVF Company ("NVF") and New Castle County ("the County") concerning the charges for sewerage service to be paid by NVF. Summary judgment has previously been entered as to the opposing claims of Newark and NVF. At the present stage of the proceedings, NVF seeks summary judgment against the County as a third party defendant.

The facts applicable to this motion are set forth in some detail in the prior decision of January 10, 1979, and I shall not repeat them here. The essential elements are, however, as follows. In 1951 the County desired to extend a County sewer line into an area near Newark. As part of that project it sought financial assistance from various industries in the area. One of these industries was NVF, and it was considered as a potential industrial user of the proposed sewer line. NVF is located within the corporate limits of Newark. As a result of negotiation, NVF issued the County a letter of intent during October 1951 by which it agreed to enter into a contract with the County under the terms of which NVF would contribute $20,000 to the County toward the construction of the interceptor sewer line and, in addition, would install and maintain its own lines running from its industrial site to the point of connection with the interceptor line. It was part of the understanding that in the event that Newark thereafter might be placed in charge of that portion of the line lying within its corporate limits, NVF would nonetheless be charged no more for the use of the sewer line than Newark would be required to pay the County for use of the line. In other words, presumably, NVF did not choose to assist the County financially in the construction of the line and thereafter be required to pay Newark a profit for use of the line in the event that the County should give Newark authority to charge for sewer service for that portion of the interceptor lying within its corporate limits.

Subsequent to this letter of intent, the County, in November 1951, entered into a written agreement with Newark concerning the interceptor. Under this agreement, Newark was to be charged a rate by the County for its use of the County sewer facilities. This rate was lower than the normal rates charged by the County, however, in recognition of the fact that Newark would bill and collect from its own customers and handle other administrative matters as to its citizens. This 1951 agreement also contained a specific reference to certain industrial users, including NVF, which were located within Newark but which had contributed to the County's construction costs for the line. In essence, the 1951 agreement provided that at no time would Newark charge NVF more than the "usual County sewer service charge" as fixed for similar users by the County.

Several months thereafter, in May 1952, the County entered into a written agreement with NVF pursuant to their previous negotiations and NVF's October 1951 letter of intent. This 1952 agreement provided that in the event that the County transferred any part of the interceptor line to Newark such transfer would be subject "to all rights of [NVF] as herein provided," and thereafter NVF would be excused from any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

further annual sewer charges to the County and would be required to pay Newark its usual sewer service charge provided, however, that [NVF] "shall not be required to pay to Newark an annual sewer service charge on a schedule having charges greater than that paid by Newark to [the County]."

**\*2** That portion of the line to which NVF was connected was thereafter transferred to Newark, and from 1952 through 1972 Newark billed NVF for sewer service and NVF paid Newark. During this period, because a step-rate gallonage schedule was employed by the County in billing Newark, the rate paid by NVF to Newark never exceeded the rate which Newark paid the County. All was well. Eventually, however, the County went to a flat rate schedule and this, in turn, caused Newark to up its rates to its customers in order to keep pace. It was not until 1975 that NVF discovered that for a short time it had been paying a higher rate to Newark than Newark was paying to the County. As matters continued, the rate charged NVF by Newark exceeded the rate that the County was charging to its own industrial users, such as NVF.

NVF objected to paying any rate higher than that called for by its 1952 contract with the County. Newark brought this suit in 19. NVF counterclaimed against Newark to recover what it viewed to have been excessive charges by Newark. In 1977, NVF joined the County as a third party defendant. While there is no particular theory of liability alleged in the third party complaint, NVF's arguments make it clear that NVF is claiming damages for breach of contract against the County to the extent that the County may have permitted Newark to charge NVF more than the limitation set forth in NVF's 1952 contract with the County. At least I so view it.

Thereafter the third party action against the County was stayed pending the outcome of the primary dispute between Newark and NVF. As to that aspect of the matter it was the Court's opinion, as set forth in the aforesaid January 10, 1979 decision, that the 1951 agreement between Newark and the County was valid and enforceable, that NVF was a third party beneficiary to it and that as a result Newark could charge NVF no more than the usual industrial rate being charged by the County to its industrial users. However, I rejected NVF's argument that under its 1952 contract with the County, it could be charged no more by Newark than Newark was being charged by the County. This was for the simple reason that the 1951 agreement between Newark and the County predated NVF's 1952 agreement with the County, and, since Newark was not a party to the 1952 agreement, its rights as to charging NVF a separate rate were controlled by the 1951 agreement which fixed the limitation at the usual rate charged industrial customers by the County and not at the rate charged Newark by the County as was understood by NVF when it gave its letter of intent. This brings us to the present issue.

It is not disputed by the parties that the 1952 agreement between NVF and the County is valid. It was made within the contemplation of a statutory grant of authority to the County to enter into contracts "with any industrial establishment" for the provision and operation of a sewerage system so as to reduce pollution caused by the discharge of industrial waste. 9 Del.C. § 2202. Since NVF was not within the territory being governed by the County at the time, there is also a basis for holding the agreement valid as being a proprietary contract even in the absence of the authorizing statute. *New Castle County v. Mayor, Etc.,* Del.Supr., 372 A.2d 188 (1977).

**\*3** If Newark had been required to observe the rate limitation set forth in the 1952 contract between NVF and the County, NVF would have been charged $58,081.37 for the period from December 27, 1971 to April 1, 1975, employing the maximum quantity rate applicable to Newark. Actually, NVF paid Newark $78,041.63 for this period, or an overcharge of $19,960.26. If the minimum County rate to Newark was the applicable standard, the overcharge for this period under the 1952 contract rate limitation would have been $14,809.01.

In 1975 the County changed its rates, and as a result Newark was charged the same rate as other County customers. Thus, there was no overcharge when measured against the 1952 agreement until July 1976 when the County again gave Newark a different rate. As a result, from July 1, 1976 to June 30, 1978 NVF was charged by Newark $39,453.00 more than permitted by the County rate to Newark as contemplated by the 1952 agreement. On July 1, 1978 the County rate was again changed and, as a consequence, from this date through June 30, 1979 Newark charged NVF $29,930.00 more than the County charged Newark.

In summary, from December 27, 1971 through June 30, 1979, NVF has paid Newark for sewerage service at least $84,192.01 more than it would have been required to pay if Newark had billed NVF during that

period at the same rate that the County had charged Newark. Since NVF contracted with the County in 1952 to contribute to the construction cost of the sewer line in return for the commitment that it would not be required to pay to Newark thereafter any rate higher than Newark might be required to pay the County for the use of the line, NVF takes the position that the County, by not protecting this limitation when it contracted with Newark in 1951, and by not taking any steps thereafter to live up to its part of the bargain in any of its subsequent rate adjustments with Newark, has breached, and is continuing to breach, its obligation under its 1952 agreement with NVF, as a direct result of which NVF has suffered at least $84,192.01 in damages through June 30, 1979.

The County's defense to NVF's motion for summary judgment is twofold. First, it argues that NVF has failed to state a claim for breach of contract under the aforesaid undisputed facts. Secondly, it says that any claim that NVF might have is now barred by laches and the Statute of Limitations. I analyze these defenses as follows.

As to the former, the County relies on the decision rendered on January 10, 1979 as to that portion of the dispute between NVF and Newark. The County points to the finding in that decision that Newark was not limited by the 1952 agreement between NVF and the County because it was not a party to it and because its 1951 agreement with the County thus governed the limitation on its right to charge NVF for sewer service. In other words, the County is arguing that the Court has already found that by virtue of its 1951 agreement with Newark the County could not deliver the consideration it offered in its 1952 agreement with NVF, and that as a consequence NVF has failed to state a cause of action against the County in its third party complaint.

*4 As best I can tell from this, the County seems to be arguing that it cannot be liable to NVF under the 1952 contract due to an impossibility of performance existing at the time of its execution by virtue of its 1951 contract with Newark. But such a position is untenable. If an impossibility of performance did exist as of the consummation of its agreement with NVF, it was due to the County's own act in binding itself to Newark in 1951 to something different than was offered to and accepted by NVF under the 1952 agreement. Mere inability to perform a contract will not alone relieve the defaulting party. *Safe Harbor Fishing Club v. Safe Harbor Realty Co.,* Del.Ch., 107 A.2d 635 (1953). Moreover, the impossibility of performance or frustration of purpose which will discharge a contractual obligation must be created by a fortuitous event and not by the voluntary act of the promisor. *Martin v. Star Publishing Company,* Del.Supr., 126 A.2d 238 (1956). Here, the County is attempting to rely upon its own voluntary act occurring between its negotiations with NVF and NVF's 1951 letter of intent, and its 1952 agreement with NVF, as excusing it from its performance of what it promised NVF in the event that control of the interceptor used by NVF was transferred to Newark. The fact that the written agreement fails to make any reference to the damages the County could be compelled to pay in the event of a default on its part likewise provides no defense to an action for breach of the contract on its part.

As to its secondary line of defense, the County seems to rely on the Statute of Limitations. As I perceive the argument, reliance is placed on 10 Del.C. § 8106 on the theory that the only action on an instrument under seal which is not barred by the three-year statute is an action to recover on a debt evidenced by an instrument under seal, and here the third party action is not a debt action even though the 1952 agreement between NVF and the County was an agreement under seal.

This approach, however, seems belied by the case of *Garber v. Whittaker,* Del.Ch., 2 A.2d 87 (1938), in which it was held that an obligation which arises out of a sealed instrument has been left to the common law insofar as statutorily prescribed periods of limitations are concerned, and that at common law the expiration of twenty years does not constitute an absolute bar to a suit based on an instrument under seal, but rather gives rise only to presumption of performance on the part of the party sought to be charged. See also, *DiBiase v. A & D, Inc.,* Del.Super., 351 A.2d 865 (1976); *Leiter v. Carpenter,* Del.Ch., 22 A.2d 393 (1941). Here, the undisputed fact that NVF has been compelled to pay Newark in excess of $84,000 more than it would have been compelled to pay under the 1952 contract on which it brings its third party complaint dispels any presumption that the County has lived up to its part of the bargain wherein it agreed that NVF would never have to pay Newark more than Newark would be required to pay the County for use of the County sewer facilities.

*5 To the extent that the County relies on laches as a defense to a portion of NVF's claim, I find its argument unpersuasive. NVF has paid Newark for sewer service since 1952. In so doing it has acted on what it considered to be its rights and obligation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

under its 1952 contract with the County. The language of that 1952 contract provided that NVF would pay Newark no more than Newark was required to pay the County under rate schedules established by the County. The undisputed evidence indicates that NVF did not discover that it was being charged more by Newark than Newark was being charged by the County until 1975. From July 1975 through June 1976 this higher rate charged NVF by Newark was the same as the usual rate charged to industrial users by the County. This is the rate ceiling that I have previously found that Newark was entitled to charge NVF under the language of Newark's 1951 agreement with the County, as to which agreement NVF was specifically made a third party beneficiary. Thus NVF is seeking no damages from the County as to this one-year period.

The affirmative defense of the County asserts that laches is a defense to any claims of NVF arising prior to January 1, 1977. Thus, as I see it, the County is asserting laches as a defense to two segments of NVF's overall claim, first, as to the damages claimed by NVF from 1972 to 1975 as to which NVF had no knowledge until 1975, and, second, the damages claimed by NVF for the six-month period from July 1976 through January 1, 1977. It is the County's position that NVF's delay in bringing the County into the suit as a third party defendant from 1975, when NVF first discovered its problem, until mid-1977 worked a disadvantage to the County to such an extent that it would now be inequitable to permit NVF to recover any pre-1977 claims against the County even if such claims might otherwise be justified. The County relies on the principle that laches derives from an unreasonable delay in asserting alleged rights where such delay works an injury or disadvantage to another. *Bovay v. H.M. Byllesby & Co.,* Del.Ch., 2 A.2d 178 (1940); *Federal United Corporation v. Havender,* Del.Supr., 11 A.2d 331 (1940).

The problem I have with this is that the County can point to no real injury on its part which is attributable to NVF's delay in making the County a party to the suit. It offers no facts in support of this defense. It simply argues in its brief that had it known promptly, presumably in 1975 as to the pre-1975 claims, and presumably in July 1976 as to the other portion, that NVF was looking to the County for damages for breach of its 1952 contract with NVF, the County could have taken steps to put such claims in its various annual budgets so as to assess the taxpayers in an orderly fashion the sums which it might be found to owe to NVF. By the delay in adding the County as a party, it is contended that the County would now have to assess the taxpayers a larger amount all in one year, thus creating an unwarranted hardship on those who must eventually bear the expense.

*6 However, when it is considered that the total damages claimed for the period against which the laches defense is asserted is less than $30,000, at most, and when it is further considered that there is nothing of which I am aware to indicate that the County has taken such protective steps to cover any damage claims for the post-1977 period even after it was named as a party, then it seems that the laches defense is clearly one without substance. It is simply an argument that because it was not sued sooner, the County was enticed into delaying to create a fund to cover its damages in case it lost the suit. I do not feel this to be the change of position contemplated by the defense of laches, particularly when the claim is a relatively small one in comparison with the size and governmental responsibility of the political subdivision being sued.

Accordingly, for the foregoing reasons, I conclude that NVF is entitled to summary judgment against the County on its third party complaint. In so doing, I have dealt only with the arguments and authorities advanced by the parties. Mr. McNally is asked to submit an appropriate form of order.

1980 WL 6367 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                     Page 1
2000 WL 33654061 (Del.Com.Pl.)
(Cite as: 2000 WL 33654061 (Del.Com.Pl.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Common Pleas of Delaware.
BELL ATLANTIC DIRECTORY SERVICES, INC., A Delaware Corporation, Plaintiff,
v.
DELAWARE LAW CENTER, INC., a Delaware Corporation, Defendant.
No. CRIM.A.1997-07-083.

Submitted Nov. 30, 2000.
Decided Dec. 14, 2000.

Edward T. Ciconte, Esquire, Ciconte, Roseman & Wasserman, Wilmington, DE, for plaintiff.

Arlen Mekler, Esquire, Wilmington, DE, for defendant.

DECISION AFTER TRIAL

ALEX J. SMALLS, Chief Judge.

*1 Bell Atlantic Directory Services, Inc. (hereinafter "Bell") brings this action against Delaware Law Center, Inc. (hereinafter "Law Center") to collect a debt for services rendered totaling $38,270.09 plus cost and interest. On November 30, 2000 trial was held and the Court reserved decision. This is the Court's decision after trial.

At trial, the parties stipulated that the amount of damages due for unpaid bills was $38,270.09. The sole issue at trial was liability.

The facts which led to this dispute indicate that Arlen Mekler, the attorney representing the Delaware Law Center, Inc. (hereinafter "Law Center"), entered into a contract with Bell Atlantic Directory Services, Inc. (hereinafter "Bell") on or about August 2, 1995 (hereinafter "the Contract"). The contract provided for advertisement of Mekler's legal practice in their yellow page directory for 1996. Mekler had in previous years placed advertisements for his legal practice in Bell's directory.

At the time of the contract, Mekler was under investigation by the Delaware Board of Professional Responsibility. Mekler testified that while this investigation was ongoing, at no time did he anticipate he would be suspended from the practice of law. However, on November 1995, the Delaware Supreme Court suspended Mekler for a period of one year commencing January 1, 1996. Mekler testified he spoke with the Bell by contacting them at their billing phone number located in the directory numerous times in December 1995 and the first few months of 1996. He was attempting to have his business phone forwarded to another attorney. He testified at no time did Bell mention his unpaid advertising bill.

As a result of Mekler's inability to practice law in the State of Delaware for 1996, he defends this action against the Law Center on the grounds of impossibility of performance and frustration of purpose. To avail itself of this defense, the Law Center must carry the burden of proving by affirmative evidence that its performance under the contract is rendered impossible by an act of God, law or the other party. 17 Am.Jur. 2nd, "Contracts" § 673. To be released, the party must demonstrate that the obligation under the contract cannot be performed by any means. Martin v. Star Pub. Co ., Del.Supr., 126 A.2d 238 (1956).

Bell responds by stating that the suspension of Mekler was both conceivable at the time of the contract and a result of his own voluntary actions. Further, the Law Center is a corporation that has in the past published legal materials and conducted the Delaware Bar Review course. Mekler at the time of the contract was one of a number of attorneys involved in the corporation. Mekler's testimony confirmed that in 1995 the Law Center was in the process of developing materials to publish books on legal subject matters. He contributed to these publications, but was not the sole author. Therefore, the facts appear to indicate that the Law Center was able to perform some services in 1996, even if not legal services.

*2 Rebecca Lepone, assistant manager for Bell, testified they first realized there was a problem with Mekler's account April 1996. She stated they were informed by Mekler that he had been suspended from the practice of law in Delaware and would be unable to make payments on the advertisement. However, the deadline for determining which advertisement would be placed in the 1996 directory takes place approximately in October 1995, because the book is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

printed and distributed in November and December.

Bell argues that Mekler and the Law Center are not the same party and the suspension of Mekler does not relieve the Law Center of its obligation. Bell attempts to hold Law Center liable for the debt, not Mekler as an individual. In response to Mekler's defense of impossibility and frustration of purpose, Bell argues the business of the Law Center is not rendered impossible, for it continues to function despite Mekler's suspension.

In response, Law Center agrees with Bell's position that it and Mekler are separate parties, and directs the Court's attention to the contract itself. The contract indicate an agreement between Bell and Arlen Mekler, Esquire, for advertisement services in the 1996 edition of the Bell directory (see Plaintiff's Exhibit # 4). The contract makes no mention of the Law Center, nor does the ad refer to the Law Center. The agreement is signed by Mekler, in his individual capacity.

Mekler signed the contract, and there was no indication that he signed as an agent or principal of the Law Center. The standard in this jurisdiction is that courts will give the language of a contract its ordinary meaning. *Phillips Home Builders v. The Travelers Ins. Co.*, Del.Supr., 700 A.2d 127, 129 (1997). Since the Law Center is not a party to nor referred to in the contract between Bell and Mekler, and does not, based upon the evidence, receive any services from the advertisement, there is no basis to hold it liable for the charges. Additionally, there was no evidence introduced that Mekler participated in the formation of the contract on behalf of the Law Center. This conclusion is supported by the language of advertisement (see Plaintiff's Exhibit # 3). The advertisement refers to Mekler's various specialties in the practice of law. The advertisement does not mention the Law Center or its businesses in any aspect. Mekler's involvement in the Law Center does not make the Law Center a party to the contract such that it would impose liability without specific reference.

Accordingly, I find and enter judgment for the Defendant Delaware Law Center, Inc.

SO ORDERED this 14th day of December, 2000.

2000 WL 33654061 (Del.Com.Pl.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.