# Attachment "1"

# Unreported Cases

LEXSEE 2005 US DIST LEXIS 2810

IN RE: ARMSTRONG WORLD INDUSTRIES, INC., ET AL., Debtors.

Chapter 11, No. 00-4471

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2005 U.S. Dist. LEXIS 2810; 44 Bankr. Ct. Dec. 94*

February 23, 2005, Decided

**PRIOR HISTORY:** *In re Armstrong World Indus., 106 Fed. Appx. 785, 2004 U.S. App. LEXIS 15011 (2004)*

**DISPOSITION:** Confirmation of Debtors' Fourth Amended Plan of Reorganization, including any technical modifications denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Facing significant asbestos liabilities, debtor and two of its subsidiaries voluntarily commenced a Chapter 11 proceeding in the U.S. District Court for the District of Delaware. Acting upon debtor's fourth amended plan of reorganization, the bankruptcy court issued its proposed findings of fact and conclusions of law, along with a proposed confirmation order. The unsecured creditors then filed objections to the proposals with the district court.

**OVERVIEW:** The plan created 11 classes of claims and one class of equity interests. Under the plan, the unsecured creditors had claims amounting to approximately $ 1.651 billion, and would have received about 59.5 percent of their claims. The equity interest holders would have been issued new warrants, i.e., new common stock pursuant to a warrant agreement, valued at approximately $ 35 million to $ 40 million. The district court concluded that the distribution of the new warrants to the class of equity interest holders over the objection of the class of unsecured creditors violated the "fair and equitable" requirement of *11 U.S.C.S. § 1129*(b)(2)(B)(ii), a codification of the absolute priority rule. The equity interest holders held a claim junior to that of the unsecured creditors. Under the plan, the equity interest holders would have received property of debtor by way of the new warrants because of their ownership interest in debtor. The unsecured creditors' allowed claims would not have been satisfied in full. Accordingly, the distribution of the new warrants to the equity interest holders under the plan violated §

1129(b)(2)(B)(ii). The plan, therefore, could not be confirmed.

**OUTCOME:** The district court denied confirmation of the fourth amended plan of reorganization.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Armstrong World Industries, Inc., Debtor: Deborah E. Spivack, Mark D. Collins, Rebecca L. Booth, Richards, Layton & Finger, Wilmington, DE; Joanne Bianco Wills, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE; Rebecca Lee Scalio; Sharon M Zieg, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Wells Fargo Bank Minnesota, N.A., as Indenture Trustee, Trustee: Kevin Gross, Rosenthal Monhait Gross & Goddess, Wilmington, DE.

Frank J. Perch III, U.S. Trustee, Office of the U.S. Trustee, Wilmington, DE.

For Unofficial Committee of Select Asbestos Claimants, Creditor Committee: Noel C. Burnham, Montgomery McCracken Walker & Rhoads LLp, Wilmington, DE.

For Official Committee of Asbestos-Related Property Damage Claimants, Creditor Committee: Denise Seastone Kraft, Edwards & Angell LLP, Wilmington, DE; Joanne Bianco Wills, Stephanie Ann Fox, Steven K. Kortanek, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE.

For Official Committee of Asbestos Claimants, Creditor Committee: Aileen F. Maguire, Campbell & Levine, Wilmington, DE.

**JUDGES:** EDUARDO C. ROBRENO, J.

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

**OPINIONBY:** Eduardo C. Robreno

**OPINION:**

MEMORANDUM

EDUARDO C. ROBRENO, J. n1

> n1 The Honorable Eduardo C. Robreno is a judge of the United States District Court for the Eastern District of Pennsylvania. On June 16, 2004, Chief Judge Anthony J. Scirica of the United States Court of Appeals for the Third Circuit designated Judge Robreno to sit on the United States District Court for the District of Delaware in the instant matter (doc. no. 6939).

[*2]

This case involves the Chapter 11 bankruptcy of Armstrong World Industries, Inc. and two of its subsidiaries. The Court must determine whether the Fourth Amended Plan of Reorganization, which the Bankruptcy Court endorsed in its Proposed Findings of Fact and Conclusions of Law, should be confirmed.

As the Third Circuit recognized in *In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004)*, "for some time now, mounting asbestos liabilities have pushed otherwise viable companies into bankruptcy." *Id. at 201.* The instant case exemplifies this trend. Facing significant asbestos liabilities, Armstrong World Industries, Inc. and two of its wholly owned subsidiaries n2 ("AWI") voluntarily commenced a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. Upon filing the petition, AWI became a debtor-in-possession ("Debtor"). To facilitate the administration of the case, the United States Trustee for the District of Delaware, pursuant to *11 U.S.C. § 1102(a)*, n3 appointed: (1) the Official Committee of Unsecured Creditors (the "Unsecured Creditors") (doc. no. 90); (2) the Official Committee [*3] of Asbestos Personal Injury Claimants ("Asbestos PI Claimants") (doc. no. 91); and (3) the Official Committee of Asbestos Property Damage Claimants (the "Asbestos PD Committee") (doc. no. 1075). n4 Upon application of the Debtor, the Bankruptcy Court appointed Dean M. Trafelet as the Future Claimants' Representative (doc. no. 2096).

> n2 Nitram Liquidators, Inc. and Desseaux Corporation of North America, AWI's subsidiaries, also filed for bankruptcy.

> n3 In part, *Section 1102 (a)* states:

> (1) Except as provided in paragraph (3), as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

> (3) On request of a party in interest in a case in which the debtor is a small business and for cause, the court may order that a committee of creditors not be appointed.

> *11 U.S.C. § 1102 (a).*

[*4]

> n4 Following the Global Asbestos Property Damage Settlement, which the Bankruptcy Court approved on August 25, 2003, the Asbestos PD Committee disbanded (doc. no. 5464).

After extensive negotiations with the Committees and other interested parties, Debtor filed its Fourth Amended Plan of Reorganization (the "Fourth Amended Plan" or the "Plan") (doc. no. 4802) and Amended Disclosure Statement (doc. no. 4801). Under the Plan, eleven classes of claims and one class of equity interests were created. n5 The proposed distributions of Debtor's property to three of these classes -- the Unsecured Creditors, the Asbestos PI Claimants, and the Equity Interest Holders -- are particularly relevant to the issues before the Court. Debtor estimates that the Unsecured Creditors, Class 6, have claims amounting to approximately $ 1.651 billion. Amended Disclosure

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

Statement, Pt. V.A.8, at 46 (doc. no. 4801). Under the Plan, the Unsecured Creditors would recover about 59.5% of their claims. Id. The Asbestos PI Claimants, Class 7, have claims estimated at $ 3.146 billion and would recover approximately 20% of [*5] their claims under the Plan. Joint Response of Armstrong World Indus., Inc., the Asbestos PI Claimants' Comm., and the Future Claimants' Representative to the Objections of the Official Comm. of Unsecured Creditors to the Proposed Findings of Fact and Conclusions of Law ("Joint Response to Objections") PP 85, 87, 97 (doc. no. 6493). The Equity Interest Holders, Class 12, would be issued New Warrants n6 valued at approximately $ 35 million to $ 40 million. Amended Disclosure Statement, Pt. X, at 102 (doc. no. 4801).

n5 The classes are:

Class 1: Priority Claims;

Class 2: Secured Claims;

Class 3: Convenience Claims;

Class 4: Asbestos Property Damage ("PD") Claims;

Class 5: COLI Claims;

Class 6: Unsecured Claims Other Than Convenience Claims;

Class 7: Asbestos Personal Injury ("PI") Claims;

Class 8: Environmental Claims;

Class 9: Affiliate Claims;

Class 10: Subsidiary Debt Guarantee Claims;

Class 11: Employee Benefit Claims; and

Class 12: Armstrong Worldwide Inc.'s Equity Interests in Armstrong World Industries.

Fourth Amended Plan of Reorganization ("Fourth Amended Plan"), Art. III, at 19-20 (doc. no. 4802).

[*6]

n6 According to the Amended Disclosure Statement, New Warrants are:

Warrants to purchase the New Common Stock pursuant to a warrant agreement substantially in the form of Exhibit 1.91 to the Plan on terms and conditions determined in a manner agreed to by Lazard and the financial consultants for the Asbestos PI Claimants' Committee, the Future Claimants'

Representative, and the Unsecured Creditors' Committee; provided, however, that such New Warrants (a) shall comprise 5% of the New Common Stock on a fully diluted basis determined as of the Effective Date, (b) shall have an exercise price equal to 125% of the Equity Value, and [(c)] shall have a term of seven years from the Effective Date.

Amended Disclosure Statement, Ex. A-13 (emphasis in original) (doc. no. 4801).

A key to the Plan lies in the consent by the class of Asbestos PI Claimants to share a portion of its proposed distribution with the Equity Interest Holders. Under Articles 3.2(1) n7 and 10.1(b) n8 of the Plan, in pari material, if the Unsecured Creditors reject the Plan, the Asbestos PI Claimants will [*7] receive the New Warrants, but then will automatically waive the distribution, causing the Equity Interest Holders to secure the New Warrants. Fourth Amended Plan, Arts. 3.2(1) & 10.1(b), at 26, 45 (doc. no. 4802). The net result of the Asbestos PI Claimants' waiver is that the Equity Interest Holders (i.e., the old AWI shareholders) receive Debtor's property (i.e., the New Warrants) on account of their equity interests, although a senior class (i.e., the Unsecured Creditors) would not have full satisfaction of its allowed claims. It is the lawfulness of this arrangement that forms the central issue in the case.

Case 1:05-cv-00209-JJF    Document 15-2    Filed 08/23/2005    Page 5 of 26

Page 4

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

n7 In part, Article 3.2(1) of the Fourth Amended Reorganization Plan states:

> On or as soon as practicable after the Effective Date, Reorganized AWI shall issue the New Warrants in respect of the Equity Interests in AWI as provided in section 7.24 hereof; provided, however, that, if Class 6 votes to reject the Plan, no distribution shall be made under the Plan from AWI's estate in respect of the Equity Interests in AWI but, in such event, Reorganized AWI shall issue the New Warrants as provided in section 7.24 hereof in respect of the Asbestos Personal Injury Claims and in accordance with section 10.1(b) hereof.

Fourth Amended Plan, Art. 3.2(1), at 26 (emphasis in original) (doc. no. 4802).

[*8]

n8 On its face, Article 3.2(1) states that it must be read in conjunction with Article 10.1(b). In relevant part, Article 10.1 (b) provides:

> In addition, if Class 6 has voted to reject the Plan, the New Warrants shall be issued by Reorganized AWI on account of the Asbestos Personal Injury Claims; however, such claimants have waived on behalf of themselves and the Asbestos PI Trust any right to the New Warrants. The New Warrants shall be issued by Reorganized AWI to AWWD (or to Holdings as the successor to AWWD under the Holdings Plan of Liquidation), consistent with section 7.24 hereof (and shall never be issued or delivered to the Asbestos PI Trust), without any action being required of, or any direction by, the Asbestos PI Trust or the Asbestos PI Trustees in such regard.

Fourth Amended Plan, Art. 10.1(b), at 45 (doc. no. 4802).

The Court concludes that the distribution of New Warrants to the class of Equity Interest Holders over the objection of the class of Unsecured Creditors violates the "fair and equitable" requirement of *11 U.S.C. § 1129 (b) (2) (B) (ii)* [*9] , a codification of the absolute priority rule. Thus, the Court must deny confirmation of the Plan.

## I. PROCEDURAL HISTORY

The procedural history of this case is tortuous, even for a large Chapter 11 proceeding. The docket contains over 7,800 entries reflecting the complexity of the issues, the high stakes involved, the diligence of counsel, the efforts at a general settlement, the replacement of the presiding district court judge in the midst of the case, and, last but not least, the shifting political winds buffeting the parties. For perspective, the Court will rehearse some of the salient events of the case.

As previously noted, AWI voluntarily commenced a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware on December 6, 2000 (doc. no. 1). Shortly thereafter, the United States Trustee for the District of Delaware appointed the Unsecured Creditors Committee, the Asbestos PI Claimants Committee, and the Asbestos PD Committee, which was later disbanded. Additionally, upon application of the Debtor, the Bankruptcy Court appointed Dean M. Trafelet as the Future Claimants' Representative.

On November 27, 2001, The Honorable Edward R. [*10] Becker, then Chief Judge of the United States Court of Appeals for the Third Circuit, assigned AWI's Chapter 11 proceeding, along with four related asbestos cases, to The Honorable Alfred M. Wolin of the United States District Court for the District of New Jersey to streamline the management of these cases (doc. no. 1617). In the order, then Chief Judge Becker reasoned that:

> These bankruptcy cases, which carry with them tens of thousands [of] asbestos claims, need to be consolidated before a single judge so that a coordinated plan for management can be developed and implemented. It is contemplated that Judge Wolin will assign a portion of these cases to various bankruptcy judges sitting in the District of Delaware so they may assist in moving these matters forward.

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

(doc. no. 1617). Judge Wolin referred the AWI case to The Honorable Randall J. Newsome of the United States Bankruptcy Court for the Northern District of California, who was sitting by designation (doc. no. 1658).

On May 23, 2003, after extensive negotiations with the various creditors and several attempts at drafting an unobjectionable reorganization plan and disclosure statement, Debtor filed its Fourth [*11] Amended Plan of Reorganization and Amended Disclosure Statement, both of which were supported, at least initially, by the Unsecured Creditors and the other major players. n9 Thereafter, the Bankruptcy Court approved the Amended Disclosure Statement and established notice, voting, and objections procedures for confirmation of the Plan (doc. nos. 4564 & 4885).

> n9 The original Plan of Reorganization (doc. no. 3313) was filed on November 4, 2002, followed by the filing of a Disclosure Statement (doc. no. 3688) on December 20, 2002. Debtor filed its First Amended Plan of Reorganization (doc. no. 4241) and Amended Disclosure Statement (doc. no. 4240) on March 14, 2003. Shortly thereafter, Debtor filed its Second Amended Plan of Reorganization (doc. no. 4414) on April 3, 2003. A Third Amended Plan of Reorganization (doc. no. 4636) and Amended Disclosure Statement (doc. no. 4635) were filed on May 1, 2003.

After the [Bankruptcy Court established the voting deadline, the Unsecured Creditors began to have reservations [*12] about the Plan. In 2003, the United States Senate Judiciary Committee approved the Fairness in Asbestos Injury Resolution Act (the "FAIR Act"), designed to provide an "exclusive administrative forum for addressing asbestos claims." Patrick M. Hanlon, Asbestos Litigation in the 21st Century/Asbestos Legislation: Federal and State, SJ031 A.L. I.-A.B.A. 549, 557 (2003). The FAIR Act "would create a no-fault, administrative compensation system for asbestos claims that would replace civil litigation in the state and federal courts. A claims process under the supervision of the United States Court of Federal Claims would determine eligibility for compensation, and eligible claimants would be paid from a Fund financed by contributions from insurers and from defendant companies." Id. at 556.

The Unsecured Creditors apparently believed that passage of the FAIR Act would benefit both Debtor and the Unsecured Creditors. Consequently, the Unsecured Creditors solicited Debtor to agree to extend the voting deadline and to adjourn the Confirmation Hearing, in deference to the legislative process. At Debtor's request, n10 the Bankruptcy Court extended the final voting deadline to October 31, 2003, but [*13] ordered that all other court-imposed deadlines, including the Confirmation Hearing date, remain unchanged (doc. nos. 5688 & 5797). To date, the FAIR Act has not been enacted. While both the parties' perceptions of whether legislation would help or hinder their respective positions and of the likelihood that the legislation would be enacted may have influenced their decision to support or oppose the Plan, these political calculations have no bearing on the legal issues before the Court.

> n10 Initially, the Unsecured Creditors asked Debtor to consent to a voting extension and an adjournment of the Confirmation Hearing. Debtor agreed only to the voting deadline extension and, accordingly, moved the Bankruptcy Court for that extension (doc nos. 5409 & 5779).

On September 22, 2003, having changed their minds as to the bona fides of the Plan and based on their calculus that the FAIR Act would be passed, the Unsecured Creditors filed timely objections (the "Conditional Objections") to the Plan (doc. no. 5630). In their [*14] objections, the Unsecured Creditors argued that (1) the Plan should not be confirmed until Congress determined the fate of the FAIR Act, and (2) Debtor could meet neither the "cramdown" requirements of Section 1129 (b) nor the "best interests" test under Section 1129 (a) (7). n11

> n11 Besides the Unsecured Creditors, sixteen other parties filed objections to the Plan by the deadline. These objections were later withdrawn.

By the October 31, 2003 voting deadline, all the impaired classes -- the Convenience Claims (Class 3), the Unsecured Claims Other Than Convenience Claims (Class 6), the Asbestos PI Claims (Class 7), and the Equity Interests (Class 12) n12 -- voted on the Plan. n13 Classes, 3 and 7 accepted the Plan while Class 6, the Unsecured Creditors, rejected the Plan. n14 Although Class 12, the Equity Interest Holders, voted to accept the Plan, a provision of the Plan rescinds Class 12's acceptance if Class 6 rejects the Plan. Fourth Amended Plan, Art. 3.2(1)(iii), at 26 (doc. no. 4802). n15

> n12 The Equity Interest Holders (Class 12) are junior to the Unsecured Creditors (Class 6)

Case 1:05-cv-00209-JJF    Document 15-2    Filed 08/23/2005    Page 7 of 26

Page 6
2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

and the Asbestos PI Claimants (Class 7), both of which hold the same priority.

[*15]

n13 As *Section 1126 (c)* prescribes,

[a] class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

*11 U.S.C. § 1126(c).*

n14 The impaired classes voted as follows.

. Class 3: A majority of the Class 3 claim holders in number (98.68%) voted to accept the Plan. More than two-thirds in amount of the Class 3 claims (98.24%) voted to accept the Plan.

. Class 6: Although a majority of the Class 6 claim holders in number (88.03%) voted to accept the Plan, less than two-thirds in amount of the Class 6 claims (23.21%) voted to accept the Plan.

. Class 7: A majority of the Class 7 claim holders in number (98.23%) voted to accept the Plan. More than two-thirds in amount of the Class 7 claims (98.31%) voted to accept the Plan.

. Class 12: Class 12 consists of one shareholder. The Class 12 claim holder accepted the Plan, although this acceptance was rescinded under Article 3.2(1) (iii) of the Plan.

Supplemental Certification of Daniel McSwigan of Trumbull Assocs., LLC with Respect to the Tabulation of Votes on the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc. (doc. no. 6013).

[*16]

n15 On November 12, 2003, the Unsecured Creditors filed a Memorandum of Law in Opposition to Confirmation of the Fourth Amended Plan of Reorganization (doc. no. 6027), as a supplement to their previously filed Conditional Objections. This supplemental memorandum, inter alia, spelled out in greater detail the Unsecured Creditors' *Section 1129(b)* objections to the Plan. Debtor moved to strike the Unsecured Creditors' memorandum as untimely (doc. no. 6056). The Bankruptcy Court granted the motion on untimeliness grounds, but further noted that the objections in the memorandum had no merit (doc. no. 6360).

This Court need not determine whether the Bankruptcy Court's striking of the supplemental memorandum has legal significance. The Unsecured Creditors' objections to the Plan based on the absolute priority rule were preserved in their Conditional Objections. Moreover, at the Confirmation Hearing, the Bankruptcy Court considered evidence and the parties' legal arguments concerning the absolute priority rule, and then ruled on the issue.

Two other parties also objected to the Plan after the court-imposed deadline. One of the parties withdrew its objection; the Bankruptcy Court disposed of the other party's objection at the Confirmation Hearing.

[*17]

Before the Confirmation Hearing, the Unsecured Creditors asked both the District Court and Bankruptcy Court, on several occasions, to stay the Confirmation Hearing for numerous reasons. Each request was unsuccessful. n16 Despite the Unsecured Creditors' resistance, the Bankruptcy Court presided over the Confirmation Hearing on November 17 and 18, 2003.

n16 First, during an Omnibus Hearing on October 31, 2003, the Unsecured Creditors asked the Bankruptcy Court to postpone the Confirmation Hearing pending the passage of the

Case 1:05-cv-00209-JJF    Document 15-2    Filed 08/23/2005    Page 8 of 26

Page 7

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

FAIR Act (doc. no. 5985). The Bankruptcy Court denied this request.

Then, on November 5, 2003, due to a motion to recuse District Court Judge Wolin that was filed by creditors in another asbestos bankruptcy case, Judge Wolin adjourned any hearing or other proceeding before him. (doc. no. 5975). Judge Wolin stated "that this Order shall not effect any proceeding scheduled to go forward before the Bankruptcy Court except to the extent this Court was scheduled to sit jointly with the Bankruptcy Judge on any matter." (doc. no. 5975). Apparently, all parties in the instant case had agreed that the District Court and Bankruptcy Court should sit jointly at the Confirmation Hearing, in part because the District Court would need to evaluate, i.e., "issue or affirm," the channeling injunction set forth in the Plan, as prescribed by *11 U.S.C. § 524 (g) (3) (A)*. Although no order from either the District Court or Bankruptcy Court was issued stating that a joint proceeding must be held, the parties contend that both Courts consented to this procedure.

Also on November 5, 2003, the Unsecured Creditors requested the Bankruptcy Court, during a conference call, to adjourn the Confirmation Hearing in light of Judge Wolin's order, which they believed stayed the Confirmation Hearing. The Bankruptcy Court denied the request. Then, on November 7, 2003, the Unsecured Creditors requested Judge Wolin to issue an order for Debtor and all interested parties to show cause why the Confirmation Hearing should not be adjourned (doc. no. 5999). Judge Wolin never ruled on this motion.

On November 10, 2003, the Unsecured Creditors moved the Bankruptcy Court to continue the Confirmation Hearing, arguing that they, along with their expert, had insufficient time between the voting and the Confirmation Hearing to prepare objections and evidence regarding the asbestos liability estimation analysis (doc. no. 6007). The Bankruptcy Court denied this motion (doc. no. 6026).

Finally, at the commencement of the Confirmation Hearing on November 17, 2003, the Unsecured Creditors once again requested the Bankruptcy Court to continue the Confirmation Hearing. Confirmation Hr'g, Nov. 17, 2003, Tr. 55 (doc. no. 6165). The Bankruptcy Court denied this request. Id.

[*18]

At the outset of the Confirmation Hearing, the Bankruptcy Court identified the issues before it: (1) whether the Plan unfairly discriminates against the Unsecured Creditors because of inflated present and future asbestos personal injury liabilities, resulting in a greater recovery for the Asbestos PI Claimants than for the Unsecured Creditors, and (2) whether the issuance of New Warrants to the Asbestos PI Claimants, who waive this distribution under the Plan, is a violation of *Section 1145* and/or *Section 1129(b) (2) (B) (ii) of the Bankruptcy Code*. Confirmation Hr'g, Nov. 17, 2003, Tr. 44-45 (doc. no. 6165). During the Confirmation Hearing, the parties offered evidence and argument on these, as well as other, issues. n17

n17 Although the Court denies confirmation of the Plan based solely on *11 U.S.C. § 1129(b) (2) (B) (ii)*, some troubling issues should be mentioned.

First, the Bankruptcy Court, sitting alone, conducted the Confirmation Hearing. See supra note 16. This appears to be contrary to the agreement of the parties and, ostensibly, the initial consent of both the District Court and Bankruptcy Court. However, neither Court entered an order requiring a joint proceeding. After creditors from another asbestos bankruptcy case filed a motion to recuse Judge Wolin, see supra note 16, Judge Wolin stayed all proceedings before the District Court, but allowed "any proceeding scheduled to go forward before the Bankruptcy Court [to proceed] except to the extent [Judge Wolin] was scheduled to silt jointly with the Bankruptcy Judge on any matter." (doc. 5975). Given these circumstances, it is unclear whether the Bankruptcy Court should have held the Confirmation Hearing without authorization from the District Court.

Second, the Bankruptcy Court struck the rebuttal report of the Unsecured Creditors' expert, who was to provide testimony at the Confirmation Hearing about asbestos liability valuation in support of the Unsecured Creditors' "unfair discrimination" arguments under *11 U.S.C. § 1129(b)*.

To the extent that the rebuttal report was stricken as untimely, the Bankruptcy Court did not apply the factors articulated by the Third Circuit in the seminal case of *Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)*, overruled on other grounds, *Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir. 1985))*, for determining

Case 1:05-cv-00209-JJF    Document 15-2    Filed 08/23/2005    Page 9 of 26

Page 8

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

whether a witness's proposed testimony should be excluded due to a party's noncompliance with discovery time frames. See Confirmation Hr'g, Nov. 17, 2003, Tr. 45-52 (doc. no. 6165).

To the extent that the rebuttal report was stricken as "totally unhelpful," partly due to the expert's qualifications, see Confirmation Hr'g, Nov. 17, 2003, Tr. 52 (doc. no. 6165), the Bankruptcy Court may have deprived the Unsecured Creditors of "sufficient process for defending their evidentiary submissions" by not holding an in limine hearing in accordance with *Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, before deciding to exclude the rebuttal report. *Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417-18 (3d Cir. 1999)*.

Although no provision in the scheduling order seemed to allow for the filing of this type of rebuttal report, the Bankruptcy Court may have abused its discretion in excluding the testimony proffered in the rebuttal report, given the apparent lack of compliance with Pennypack and Padillas.

Third, the Unsecured Creditors moved the Bankruptcy Court for a continuance of the Confirmation Hearing until December 12, 2003 or a later date, stating that they had insufficient time between their rejection of the Plan and the Confirmation Hearing to prepare objections and evidence regarding the asbestos liability estimation analysis (doc. no. 6007). The Bankruptcy Court denied the motion without explaining its reasoning (doc. no. 6026). Although the decision to grant or deny a continuance is properly left to the sound discretion of the trial court, *Sutherland Paper Co. v. Grant Paper Box Co., 183 F.2d 926, 931 (3d Cir. 1950)*, it appears that the Bankruptcy Court did not exercise any discretion (or at least did not state the basis for its exercise of discretion) in denying the Unsecured Creditors' motion.

Fourth, the Bankruptcy Court expressly stated at the outset of the Confirmation Hearing that only two questions of fact would be considered: (1) whether the Plan unfairly discriminates against the Unsecured Creditors because of inflated present and future asbestos personal injury liabilities, resulting in a greater recovery for the Asbestos PI Claimants than for the Unsecured Creditors, and (2) whether the issuance of New Warrants to the Asbestos PI Claimants, who waive this distribution under the

Plan, is a violation of *Section 1145* and/or *Section 1129(b) (2) (B) (ii) of the Bankruptcy Code.* Confirmation Hr'g, Nov. 17, 2003, Tr. 44-45 (doc. no. 6165). However, testimony at the Confirmation Hearing ranged far beyond these two issues. For example, testimony that the Bankruptcy Court had expressly excluded before the Confirmation Hearing, e.g., testimony regarding the FAIR Act, made its way into the hearing. Confirmation Hr'g, Nov. 18, 2003, Tr. 16-36 (doc. no. 6166). Moreover, while the rebuttal report of the Unsecured Creditors' proposed expert witness was precluded, nonetheless, she was allowed to take the stand as a rebuttal witness, but not allowed to testify as to all matters contained in her rebuttal report. Confirmation Hr'g, Nov. 17, 2003, Tr. 45-52 (doc. no. 6165); Nov. 18, 2003, Tr. 16-36 (doc. no. 6166).

In light of the Court's ruling in the instant matter, the Court need not decide now whether any of these confusing circumstances, alone or in combination, denied due process to the Unsecured Creditors.

[*19]

On December 19, 2003, the Bankruptcy Court issued its Proposed Findings of Fact and Conclusions of Law (doc. no. 6255), along with the Proposed Confirmation Order (doc. no. 6256). In response, the Unsecured Creditors filed objections to the proposals with the District Court (doc. no. 6290). Thereafter, Debtor, the Asbestos PI Claimants, and the Future Claimants' Representative filed a joint response to the Unsecured Creditors' objections (doc. no. 6493). On December 15, 2004, this Court held a hearing on the objections (doc. no. 7666).

Now, this Court must decide whether to affirm the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law.

II. STANDARD OF REVIEW

Whether the New Warrants can be distributed to the Equity Interest Holders under *Section 1129(b)(2)(B)(ii)* is a pure question of law. *Steelcase Inc. v. Johnston (In re Johnston), 21 F.3d 323, 328-29 (9th Cir. 1994)* (recognizing a bankruptcy court's decision that a reorganization plan did not violate the absolute priority rule is a conclusion of law that must be reviewed de novo). There being no relevant facts in dispute, n18 the Court will conduct a de novo review. n19 Because the Plan violates the requirements of [*20] *Section 1129 (b)*

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

*(2) (B) (ii)* and unequivocally fails on that basis alone, the Court need not review other aspects of the Plan.

n18 At the Objections Hearing, which was held on December 15, 2004, the parties conceded that no facts are in dispute involving whether the Plan violates the absolute priority rule. Objections Hr'g, Dec. 15, 2004, Tr. 89, 113-14 (doc. no. 7666).

n19 Whether a bankruptcy court engaged in a "core" or "non-core" proceeding is determinative of the standard of review a district court must undertake. District courts have appellate jurisdiction over a bankruptcy court's final orders in "core proceedings." *28 U.S.C. § § 157 (b) (1), 158 (a)*. Confirmation of a plan is a "core proceeding." *28 U.S.C. § 157 (b) (2) (L)*. In core proceedings, the district court serves as the appellate court, reviewing the bankruptcy court's findings of fact for clear error and conclusions of law de novo. *Fed. R. Bankr. P. 8013*; see also *In re Anes, 195 F.3d 177, 180 (3d Cir. 1999)* ("In core matters, the District Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo.").

Alternatively, under *Rule 9033(d) of the Federal Rules of Bankruptcy Procedure*, a district court must review de novo the bankruptcy court's proposed findings of fact and conclusions of law in "non-core proceedings." *Fed. Rule. of Bankr. P. 9033(d)*; see also *28 U.S.C. § 157 (c) (1)* ("In such [a non-core] proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.").

In the instant matter, the parties have agreed that the Court must engage in a de novo review to determine whether the Plan complies with *Section 1129 (b) (2) (B) (ii)*. Unsecured Creditors' Objections to Proposed Findings of Fact and Conclusions of Law P 16 (doc. no. 6290); Joint Response to Objections P 11 (doc. no. 6493).

[*21]

## III. CONFIRMATION OF A REORGANIZATION PLAN UNDER *11 U.S.C. § 1129*

Confirmation of a reorganization plan breathes new life into a debtor. This significant step affords the debtor a "fresh start" by relieving the debtor of certain pre-petition obligations and altering its financial and legal relationships with its creditors. Given the substantial consequences these rearrangements will have on the debtor, the creditors, and other parties in interest, Congress -- not surprisingly -- has provided explicit requirements that a proposed plan must meet for confirmation. The congressional calculus embodied in the Bankruptcy Code for confirmation of a Chapter 11 reorganization plan is the product of long experience with reorganization legislation and hard-fought battles over policy judgments. Therefore, unless these congressionally mandated requirements are satisfied, a court may not place its imprimatur on a reorganization plan.

A plan may be confirmed under either of two scenarios. One is consensually, provided all classes have accepted the plan or are not impaired. *11 U.S.C. § 1129(a)*. The other is non-consensually, over the non-acceptance [*22] of an impaired class if all the requirements of *11 U.S.C. § 1129(a)*, except *paragraph (8)*, have been met and the plan "does not discriminate unfairly" and is "fair and equitable." *11 U.S.C. § 1129(b)*. This latter approach, typically referred to as a "cramdown," is sometimes necessary in order to allow the debtor to override certain objections under appropriate circumstances, which might otherwise allow a small minority to prevent confirmation of the plan. See generally Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, *53 Am. Bankr. L.J. 133 (1979)*.

In the present case, there is little doubt that the Plan satisfies all the requirements of *Section 1129 (a)*, except *paragraph (8)*. n20 Therefore, because there is at least one dissenting class and the Plan fails to meet the requirements of *Section 1129 (b) (2) (B) (ii)*, the Court must deny confirmation of the Plan.

n20 Although the Unsecured Creditors have objected, pro forma, to some of the *Section 1129 (a)* requirements, the gist-of the instant litigation revolves around whether the Plan satisfies *11 U.S.C. § 1129 (b) (2) (B) (ii)*. Hence, for purposes of deciding the instant matter, the Court will assume that the *Section 1129 (a)* requirements, except for paragraph (8), are met, in any event.

[*23]

Case 1:05-cv-00209-JJF    Document 15-2    Filed 08/23/2005    Page 11 of 26

Page 10

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

IV. *SECTION 1129 (b) (2) (B) (ii)* IS ROOTED IN THE JUDICIALLY CRAFTED ABSOLUTE PRIORITY RULE

A. Origins of the Absolute Priority Rule

The principles underpinning *Section 1129 (b)*'s "fair and equitable" requirement are rooted in the judicially created absolute priority rule. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 444, 143 L. Ed. 2d 607, 119 S. Ct. 1411 (1999)* (stating that the absolute priority rule is a "creature [] of law antedating the current Bankruptcy Code"); *Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 437 n.2, 32 L. Ed. 2d 195, 92 S. Ct. 1678 (1972)* (Douglas, J., dissenting) (discussing the history of the absolute priority rule). The Supreme Court first articulated and applied the absolute priority rule, originally referred to as the "fixed principle," in *Northern Pacific Railway v. Boyd, 228 U.S. 482, 57 L. Ed. 931, 33 S. Ct. 554 (1913)*, which involved a corporate reorganization in an equity receivership. n21 *Id. at 507.* In Boyd, a general unsecured creditor in a railway company's reorganization was not fully compensated, but the "old" stockholders received property in the reorganized entity. *Id. at 501.* The [*24] Supreme Court stated:

> If purposely or unintentionally a single creditor was not paid, or provided for in the reorganization, [that creditor] could assert [its] superior rights against the subordinate interests of the old stockholders in the property transferred to the new company. . . . Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor, [is] invalid.

*Id. at 504.*

n21 The Supreme Court acknowledged that the rulings in two preceding cases, *Railroad Co. v. Howard, 74 U.S. (7 Wall.) 392, 19 L. Ed. 117 (1868)*, and *Louisville Trust Co. v. Louisville, N.A. & C. Ry., 174 U.S. 674, 43 L. Ed. 1130, 19 S. Ct. 827 (1899)*, reflected a "fixed principle" rationale, without formally announcing the rule. *Boyd, 228 U.S. at 505.*

In what would lead to the coining of the expression "fixed principle," the Supreme Court wrote: "In cases like this, the question must be decided according to [*25]

a fixed principle, not leaving the rights of the creditors to depend upon the balancing of evidence as to whether, on the day of sale, the property was insufficient to pay prior encumbrances." *Id. at 507* (emphasis added). And with that, the "fixed principle" -- now known as the absolute priority rule -- was established. Through the early 1900s, the Supreme Court continued to apply this principle in equity receivership cases. See *Kan. City Terminal Ry. v. Cent. Union Trust Co., 271 U.S. 445, 453-55, 70 L. Ed. 1028, 46 S. Ct. 549 (1926); Kan. City S. Ry. v. Guardian Trust Co., 240 U.S. 166, 172, 60 L. Ed. 579, 36 S. Ct. 334 (1916)*. Moreover, the Supreme Court reinforced the importance of the "fixed principle," recognizing that this basic tenet should be strictly applied. *Kan. City Terminal Ry., 271 U.S. at 454* ("The fixed principle' . . . declares [that] the character of reorganization agreements must be determined, and to it there should be rigid adherence.").

B. Bankruptcy Act of 1898

In 1934, Congress enacted Section 77B of the Bankruptcy Act of 1898, which governed bankruptcy reorganizations. Section 77B(f) introduced the words "fair and equitable" [*26] to bankruptcy nomenclature. See *Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 114-15, 84 L. Ed. 110, 60 S. Ct. 1 (1939)*. In part, Section 77B(f) stated that "after hearing such objections as may be made to the [reorganization] plan, the judge shall confirm the plan if satisfied that (1) it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders and is feasible." n22 Bankruptcy Act of 1898 § 77B(f) (1) (repealed 1938), Act of June 7, 1934, ch. 424, Pub. L. 296, 48 Stat. 911, 919 (1934); see also 7 Collier on Bankruptcy P 1129LH at 186 n.33 (15th ed. rev. 2002). "The reason for such a limitation was the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners." *203 N. LaSalle St. P'ship, 526 U.S. at 444.*

n22 The successor to Section 77B, *Chapter X of the Chandler Act*, was enacted in 1938. See *203 N. LaSalle St. P'ship, 526 U.S. at 444.*

[*27]

The relationship between the judicially created "fixed principle" doctrine and Section 77B(f)'s "fair and equitable" standard was enunciated by the Supreme Court in *Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 84 L. Ed. 110, 60 S. Ct. 1 (1939)*. There, the Supreme Court held that the "fixed principle" doctrine is "firmly imbedded in [Section] 77B," thereby determining that a "fair and equitable" reorganization plan must meet the requirements of the "fixed principle," i.e., the

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

absolute priority rule. *Id. at 118-19*; cf. *203 N. LaSalle St. P'ship, 526 U.S. at 448* ("Any argument from drafting history has to account for the fact that the Code does not codify any authoritative pre-Code version of the absolute priority rule.").

C. Bankruptcy Code of 1978 n23

> n23 "The [absolute priority] rule had its genesis in judicial construction of the undefined requirement of the early bankruptcy statute that reorganization plans be fair and equitable.' The rule has since gained express statutory force, and was incorporated into Chapter 11 of the Bankruptcy Code adopted in 1978. Under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections (absent certain conditions not relevant here) if it fails to comply with the absolute priority rule." *Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202, 99 L. Ed. 2d 169, 108 S. Ct. 963 (1988)* (internal citations omitted).

[*28]

In an effort to modernize bankruptcy law, Congress enacted the Bankruptcy Code of 1978. *United States v. Ron Pair Enters., 489 U.S. 235, 240-41, 103 L. Ed. 2d 290, 109 S. Ct. 1026 (1989)*. Under *11 U.S.C. § 1129 (b) (2) (B) (ii)*, Congress codified a modified version of the absolute priority rule. Richard Maloy, A Primer on Cramdown -- How and Why It Works, *16 St. Thomas L. Rev. 1, 34 (2003)* ("Congress did not codify the Absolute Priority Rule in the form it had developed, which would prohibit any favoritism of claims and interests of higher priority, but rather an Absolute Priority Rule which would apply only if a prior, but impaired, class objected to the plan and a claim junior to that of the objecting party receives property under the plan. It would not be applied if all classes accepted it.") (footnotes omitted); cf. *In re PWS Holding Corp., 228 F.3d 224, 237 (3d Cir. 2000)* ("This provision, [*11 U.S.C. § 1129 (b) (2) (B) (ii)* ], is the absolute priority rule.'"). For a reorganization plan to be considered "fair and equitable" to a class of dissenting unsecured creditors, "the holder of any claim or interest [*29] that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." *11 U.S.C. § 1129(b) (2) (B) (ii)*. Whether the Plan complies with this specific provision in the Bankruptcy Code is at issue in this case.

V. THE FOURTH AMENDED PLAN OF REORGANIZATION VIOLATES THE PROVISIONS OF *11 U.S.C. § 1129(b)(2)(B)(ii)*

The Court must determine whether distribution to the Equity Interest Holders of New Warrants -- a distribution that the Asbestos PI Claimants would allegedly receive under the Plan, but to which they have agreed to surrender to the Equity Interest Holders -- violates *11 U.S.C. § 1129 (b) (2) (B) (ii)* when the higher-priority class of Unsecured Creditors objects to the distribution n24 and its allowed claims have not been paid in full under the Plan.

> n24 The Bankruptcy Court approved the New Warrants distribution under the Plan, in part by finding that the Unsecured Creditors waived their right to oppose the arrangement. In its Proposed Conclusions of Law, the Bankruptcy Court stated:
>
> > The Unsecured Creditors' Committee made a knowing waiver of a known right to object to [the New Warrants] arrangement when they entered into a consensual plan encompassing it. One cannot simply agree to provisions that might otherwise be suspect and then assert that they are illegal.
>
> Proposed Findings of Fact and Conclusions of Law at P 72 (doc. no. 6255) (emphasis added). This Court disagrees. By participating in negotiations with Debtor and other interested parties to create a workable reorganization plan, the Unsecured Creditors did not explicitly or implicitly waive their right to object to the Plan at a later time. Even if the Unsecured Creditors changed their minds based on political calculus that the FAIR Act would be passed, this was their prerogative. In the absence of bad faith, which was not alleged here, and particularly in light of the changed circumstances, until a party consents and the consent is final, that party may walk away from the table for a good or bad reason or no reason at all. "To hold that an interested party . . . waives its right to object to a plan by its participation in matters preliminary to the confirmation process would severely limit the flexibility of counsel in representing a client during the Chapter 11 process." *In re Huckabee Auto Co., 33 B.R. 141, 149 (Bankr. M.D. Ga. 1981)*.

[*30]

A. The Plain Meaning Rule

"It is well settled that the first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *United States v. Cooper, 396 F.3d 308, 310 (3d Cir. 2005)* (internal quotations and citations omitted). "Where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'" *Ron Pair Enters., 489 U.S. at 241* (quoting *Caminetti v. United States, 242 U.S. 470, 485, 61 L. Ed. 442, 37 S. Ct. 192 (1917))*; see also *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 10, 147 L. Ed. 2d 1, 120 S. Ct. 1942 (2000)* ("Where the meaning of the Bankruptcy Code's text is itself clear . . . its operation is unimpeded by contrary . . . prior practice.") (quoting *BFP v. Resolution Trust Corp., 511 U.S. 531, 546, 128 L. Ed. 2d 556, 114 S. Ct. 1757 (1994)*); *In re Fegeley, 118 F.3d 979, 983 (3d Cir. 1997)* ("We must interpret provisions of the Bankruptcy Code according to the plain meaning of [the] individual provision as long as the provision's language is unambiguous.") (internal quotation and [*31] citation omitted).

The plain meaning rule has even greater force when applied to the text of the Bankruptcy Code:

> Initially, it is worth recalling that Congress worked on the formulation of the Code for nearly a decade. It was intended to modernize the bankruptcy laws, and as a result made significant changes in both the substantive and procedural laws of bankruptcy . . . In such a substantial overhaul of the system, it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute. The task of resolving the dispute over the meaning [of a statute] begins where all such inquiries must begin: with the language of the statute itself.

*Ron Pair Enters., 489 U.S. at 240-41* (internal citations omitted) (emphasis added).

In part, *Section 1129 (b)* provides:

> (1) The court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and [*32] equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

> * * *

> (B) With respect to a class of unsecured claims --

> * * *

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

*11 U.S.C. § 1129(b).*

Therefore, a plan is not "fair and equitable" if a class of creditors that is junior to the class of unsecured creditors receives debtor's property because of its ownership interest in the debtor while the allowed claims of the class of unsecured creditors have not been paid in full. Applying these plain requirements to the instant case, it is clear that (1) the Equity Interest Holders hold a claim junior to the Unsecured Creditors; (2) under the Plan, the Equity Interest Holders will receive property of Debtor (by way of New Warrants) because of their ownership interest in Debtor; and (3) the Unsecured Creditors' [*33] allowed claims will not be satisfied in full. Under these circumstances, the Plan violates *11 U.S.C. § 1129 (b) (2) (B) (ii)* and is not "fair and equitable" with respect to the Unsecured Creditors.

B. Legislative Intent

Even if the plain meaning of *Section 1129 (b) (2) (B) (ii)* were not evident, the available legislative history demonstrates that Congress did not intend for the Bankruptcy Code to allow a senior class to sacrifice its distribution to a junior class when a dissenting intervening class had not been fully compensated. Congress anticipated, but ultimately rejected, this possibility.

Case 1:05-cv-00209-JJF    Document 15-2    Filed 08/23/2005    Page 14 of 26

Page 13

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

The Senate Report written prior to the Bankruptcy Code's enactment proposed that a senior creditor be permitted to alter its distribution for the benefit of stockholders under the "fair and equitable" doctrine. n25 S. Rep. No. 95-989, at 127 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913. Later, Representative Don Edwards and Senator Dennis DeConcini -- key legislators of the Bankruptcy Code -- explicitly rejected this example. Both Representative Edwards and Senator DeConcini stated that "contrary to the example contained in the Senate report, a senior [*34] class will not be able to give up value to a junior class over the dissent of an intervening class unless the intervening class receives the full amount, as opposed to value, of its claims or interests." 124 Cong. Rec. S. 34007 (Oct. 5, 1978) (remarks of Sen. DeConcini); 124 Cong. Rec. H. 32408 (Sept. 28, 1978) (remarks of Rep. Edwards).

n25 The Senate Report stated:

Under paragraph (9)(A), if a class of claims or interests has not accepted the plan, the court will confirm the plan if, for the dissenting class and any class of equal rank, the negotiated plan provides in value no less than under a plan that is fair and equitable. Such review and determination are not required for any other classes that accepted the plan. Paragraph (9) (A) would permit a senior creditor to adjust his participation for the benefit of stockholders. In such a case, junior creditors, who have not been satisfied in full, may not object if, absent the "give up," they are receiving all that a fair and equitable plan would give them.

S. Rep. No. 95-989, at 127 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913.

[*35]

Reliance upon statements made by Representative Edwards and Senator DeConcini for a determination of congressional intent is particularly appropriate given the recognition by the Supreme Court that "because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we have treated [Representative Edwards's and Senator DeConcini's] floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent." *Begier v. I.R.S., 496 U.S. 53, 64 n.5, 110 L. Ed. 2d 46, 110 S. Ct. 2258 (1990)*.

C. Cases That Do Not Strictly Apply *Section 1129 (b) (2) (B) (ii)* Are Distinguishable or Wrongly Decided

Debtor contends that, notwithstanding the text of *Section 1129 (b) (2) (B) (ii)*, the Asbestos PI Claimants may share their proposed distribution with the Equity Interest Holders without violating the absolute priority rule. To support this contention, Debtor relies on *Official, Unsecured Creditors' Committee v. Stern (In re SPM Manufacturing Corp.), 984 F.2d 1305 (1st Cir. 1993)*. Because SPM and its progeny have been misread, n26 a full recitation of SPM's facts and the First Circuit's [*36] rationale is in order.

n26 Some courts have read SPM to apply as well to the question of "unfair discrimination." *In re Exide Techs., 303 B.R. 48, 77 (Bankr. D. Del. 2003)* ("Although SPM was not decided in the context of a chapter 11 plan, courts subsequently have approved chapter 11 plans that included such reallocations.") (emphasis in original); see, e.g., *In re Genesis Health Ventures, Inc., 266 B.R. 591, 612 (Bankr. D. Del. 2001)* (citing to SPM in support of its "unfair discrimination" analysis).

In SPM, a secured lender entered into a "sharing agreement" with general unsecured creditors to share in the proceeds that would result from a debtor's reorganization. *Id. at 1308*. The apparent purpose of the agreement was to obtain the cooperation of, the unsecured creditors in the debtor's reorganization which, given that the secured lender had a perfected, first security interest in the debtor's assets, n27 would not have inured to the benefit of the unsecured [*37] creditors. *Id. at 1307-08*. The reorganization did not work. *Id. at 1308-09*. Instead, the case was converted to a Chapter 7 proceeding, and the debtor's assets were liquidated. Id.

n27 The secured lender held a perfected, first security interest with the exception of certain real estate, which is not relevant to this discussion. *SPM, 984 F.2d at 1307*.

The secured lender and the unsecured creditors then sought to compel the Chapter 7 trustee to distribute

Case 1:05-cv-00209-JJF    Document 15-2    Filed 08/23/2005    Page 15 of 26

Page 14

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

proceeds from the sale of debtor's assets in accordance with the sharing agreement. *Id. at 1309*. The sharing agreement provided for the distribution of proceeds from the sale of the debtor's assets to the unsecured creditors, ahead of the priority tax creditors in apparent contravention of the Bankruptcy Code's statutory scheme for distribution. *Id. at 1309-12*. The bankruptcy court disagreed and, relying upon its equitable powers under *11 U.S.C. § 105(a)*, ordered the trustee [*38] to distribute the portion of the proceeds due to the unsecured creditors under the sharing agreement in accordance with the distribution scheme embodied by the Bankruptcy Code, i.e., priority tax creditors should be paid ahead of the unsecured creditors. *SPM, 984 F.2d at 1309-10*. After the district court affirmed the bankruptcy court's decision, the Court of Appeals reversed. *Id. at 1310-15*.

The question before the First Circuit, which is relevant here, was "whether an order compelling [the secured lender] to pay [to the trustee] from monies realized under its secured interest the amount required by the [Sharing] Agreement to be paid to [the unsecured creditors] is within the equitable powers of the bankruptcy court." *Id. at 1311*. The Court answered this question in the negative. *Id. at 1312-15*.

First, the Court recognized that the secured lender was entitled to the entire proceeds of the debtor's assets under its lien, whether or not there was a sharing agreement. *Id. at 1312*. "Because [the secured lender's] claim absorbed all of [the company's] assets, there was nothing left for any [*39] other creditor in this case." Id. "The syphoning' of the money to general, unsecured creditors came entirely from the [distribution] belonging to the [secured lender], to which no one else had any claim of right under the Bankruptcy Code." Id.

Second, the secured lender only shared its proceeds after the estate property had been distributed. Id. Hence, the sharing agreement had no effect on distributions to other creditors. Id. Even without the agreement between the secured lender and the unsecured creditors, the secured lender would have received the entire allotted distribution under the reorganization plan while the tax creditors would have received nothing. *Id. at 1312-13*. "While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors [from property of the estate], creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors." *Id. at 1313* (internal citation omitted).

*SPM* is inapposite to the instant case for several reasons. First, the distribution in SPM occurred in a Chapter 7 proceeding, [*40] where the sweep of *11 U.S.C. § 1129 (b) (2) (B) (ii)* does not reach. Moreover,

the unsecured creditors in SPM, rather than being deprived of a distribution, were receiving a distribution ahead of priority. Therefore, the teachings of the absolute priority rule -- which prevents a junior class from receiving a distribution ahead of the unsecured creditor class -- are not applicable.

Second, the secured lender in SPM held a perfected, first security interest in all of the debtor's assets, with the exception of certain real estate. Although the agreement between the secured lender and the unsecured creditors implicated property of the estate, n28 the property was not subject to distribution under the Bankruptcy Code's priority scheme. n29 *In re Darnell, 834 F.2d 1263, 1265 (6th Cir. 1987)* (Chapter 7 proceeding) ("In bankruptcy, a debtor's assets in the hands of the trustee are subject to all liens and encumbrances existing at the date of the bankruptcy (and which are not otherwise invalidated by law). . . . Accordingly, as a general rule, if a lien is perfected, it must be satisfied out of the asset (s) it encumbers before any proceeds [*41] of the asset (s) are available to unsecured claimants, including those having priority. . . ."); see also *SPM, 984 F.2d at 1312* (citing *In re Darnell, 834 F.2d at 1265*). In fact, as the First Circuit recognized, the distribution scheme under the Bankruptcy Code, *11 U.S.C. § 726*, is not implicated "until all valid liens on the property are satisfied." *SPM, 984 F.2d at 1312*.

n28 Under *11 U.S.C. § 541*, property of the estate is defined as, inter alia, "all legal or equitable interests of the debtor in property as of the commencement of the case." *11 U.S.C. § 541(a)(1)*; *United States v. Whiting Pools, Inc., 462 U.S. 198, 203, 76 L. Ed. 2d 515, 103 S. Ct. 2309 (1983)*.

n29 *Section 726 of the Bankruptcy Code* prescribes the priorities for distribution of a debtor's property. *11 U.S.C. § 726*.

Third, rather than viewing a distribution of the debtor's property [*42] in contravention to the Bankruptcy Code's distribution scheme, the sharing agreement approved in SPM may be more properly construed as an ordinary "carve out," n30 i.e., "an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others [to secure their cooperation or to compensate priorities as part of cash collateral agreements]." *In re White Glove, Inc., 1998 Bankr. LEXIS 1303, Nos. 98-12493, 98-12494, 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998)*. Unlike the Debtor in the instant case, the secured lender in SPM had a substantive right to dispose of its property,

Case 1:05-cv-00209-JJF     Document 15-2     Filed 08/23/2005     Page 16 of 26

Page 15

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

including the right to share the proceeds subject to its lien with other classes.

N30 In addition to a "carve out," the Bankruptcy Code permits distribution of the debtor's property contrary to the priority scheme of *Section 726* when a holder of a particular claim or interest agrees to less favorable treatment under a reorganization plan. *11 U.S.C. § 1123(a)(4)*. Under this section, a reorganization plan shall "provide the same, treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Id.

Additionally, a "surcharge" of property subject to a creditor's lien is permitted under certain circumstances. See, e.g. *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.), 255 F.3d 1061, 1067 (9th Cir. 2001)*. A "surcharge" allows the trustee to recover "administrative expenses from the collateral of a secured creditor if: (i) the expenses are necessary' to preserve or dispose of the collateral, (ii) they are reasonable' and (iii) the incurrence of expenses provided a benefit' to the secured creditor.'" *In re Nuclear Imaging Sys., Inc., 270 B.R. 365, 371 (Bankr. E.D. Pa. 2001)* (quoting, in part, L. King, 4 Collier on Bankruptcy, P 506.05 at 506-122).

Neither of these scenarios is implicated in the instant matter.

[*43]

Debtor also points to *In re WorldCom, Inc., No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003)*, a case where the bankruptcy court approved voluntary distributions from one class of creditors to another under a reorganization plan. *Id. at *179-80*. Unlike the instant case, In re WorldCom did not involve the distribution of the debtor's property to any class of interests junior to the unsecured creditors on account of the junior creditors' equity interests in the debtor. *Id. at *180* ("No Class of Claims or Equity Interests that is junior to WorldCom General Unsecured Claims and MCI Pre-merger Claims will receive any property under the Plan on account of such Claims or Equity Interests."). Therefore, the absolute priority was not implicated. Id.

Also distinguishable on the facts is *In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001)*, where apparently a distribution to management (on account of its equity interest) was "carved out"

voluntarily from the senior lender's liens. *Id. at 616-18*. Although the bankruptcy court recognized that this aspect of the plan "might indeed be violative [*44] of the absolute priority rule," *Id. at 617*, to the extent that the distribution to the junior class involved debtor's property subject to the senior lenders' liens, the principles underpinning the absolute priority rule were not offended. *Id. at 617-18*.

Nor is *In re MCorp Fin., Inc., 160. B.R. 941 (S.D. Tex. 1993)* factually apposite. In that case, the district court approved a plan that provided for the use of proceeds from the distribution to senior creditors -- and with the consent of the senior creditors -- to fund settlement of pre-petition litigation between the debtor and a third party. *Id. at 948, 960*. The instant case, of course, does not involve settlement of pre-petition litigation between the Asbestos PI Claimants and the Equity Interest Holders.

In any event, to the extent that *In re WorldCom, In re Genesis Health Ventures*, and *In re MCorp Financial* read SPM to stand for the unconditional proposition that "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the plan by other creditors [*45] are not impacted," *In re WorldCom, 2003 Bankr. LEXIS 1401, at *179*, without adherence to the strictures of *11 U.S.C. § 1129(b) (2) (B) (ii)*, that contention is flatly rejected here. See generally Kenneth N. Klee, Adjusting Chapter 11: Fine Tuning the Plan Process, *69 Am. Bankr. L.J. 551, 570-71 (1995)* ("[A] plan should not be permitted to be crammed down where a senior class gives up value to a junior class while skipping over an intermediate or co-equal class. Although the argument can be and has been made that senior creditors should be entitled to do what they want with their property, the lessons of history should suffice to impose a per se rule that precludes senior creditors from collaborating with junior creditors or equity owners at the expense of intervening classes.") (footnotes omitted); *In re Snyders Drug Stores, Inc., 307 B.R. 889, 896 n.11 (Bankr. N.D. Ohio 2004)* (discussing unfair discrimination under *Section 1129 (b)*) ("The agreement at issue [in SPM] was not proposed as part of the plan of reorganization, but was instead in the nature of a partial assignment or subordination agreement [*46] that was not subject to the Code's confirmation requirements. Also, the property to be distributed was not property of the estate."); *In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850, 865 (Bankr. S.D. Tex. 2001)* (discussing unfair discrimination under *Section 1129(b)*) ("To accept [the secured lender's] argument that [it] can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to reject the historical foundation of equity receiverships

Page 16

2005 U.S. Dist. LEXIS 2810, *; 44 Bankr. Ct. Dec. 94

and to read the *§ 1129(b)* requirements out of the Code. . . . To accept that argument is simply to start down a slippery slope that does great violence to history and to positive law.").

Bluntly put, no amount of legal creativity or counsel's incantation to general notions of equity n31 or to any supposed policy favoring reorganizations over liquidation supports judicial rewriting of the Bankruptcy Code. Accordingly, the New Warrants distribution to the Equity Interest Holders under the Fourth Amended Reorganization Plan violates *11 U.S.C. § 1129 (b) (2) (B) (ii)*. The Plan, therefore, cannot be confirmed.

> n31 Although under *Section 105 (a) of the Bankruptcy Code* a bankruptcy court may exercise equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," this power is not unfettered. *11 U.S.C. § 105 (a)*. As the Third Circuit recently reminded us in *In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004)*, "the equitable powers authorized by *§ 105 (a)* are not without limitation, and courts have cautioned that this section does not authorize the bankruptcy courts

to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Id. at 236* (internal quotations and citation omitted).

[*47]

## VI. CONCLUSION

For the reasons set forth above, the Court denies confirmation of the Fourth Amended Plan of Reorganization.

### ORDER

**AND NOW**, this **23rd** day of **February, 2005**, it is hereby **ORDERED** that confirmation of Debtors' Fourth Amended Plan of Reorganization (doc. no. 4802), including any technical modifications made thereto, is **DENIED.**

**IT IS FURTHER ORDERED** that counsel for Debtors shall serve a copy of this Order and the accompanying Memorandum on all interested parties.

**AND IT IS SO ORDERED.**

**EDUARDO C. ROBRENO, J.**

1994 U.S. Dist. LEXIS 20531

IN RE: CONTINENTAL AIRLINES, et al., Debtors. AD HOC COMMITTEE OF CTA BONDHOLDERS, Appellant, v. CONTINENTAL AIRLINES, INC., et al., Appellees.

C.A. No. 93-252-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1994 U.S. Dist. LEXIS 20531

June 8, 1994, Decided

**SUBSEQUENT HISTORY:** Appeal dismissed by, in part, Appeal denied by, in part Ad Hoc Comm. of CTA Bondholders v. Continental Airlines, Inc. (In re Continental Airlines), 1995 U.S. Dist. LEXIS 22119 (D. Del., Mar. 16, 1995)

**PRIOR HISTORY:** [*1] Bankruptcy Nos. 90-932 through 90-984.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant, an ad hoc committee of the bankruptcy, sought approval of a settlement proposal. The debtors, which consisted of a bankrupt airline and related companies, had already obtained confirmation of their bankruptcy plan. Appellee settlement opponents resisted the agreement, which would require a class of creditors to relinquish their rights to certain funds being distributed under the reorganization plan.

**OVERVIEW:** The settlement opponents disagreed with a settlement proposal made by the ad hoc creditors' committee. The settlement proposal came after the debtors' Chapter 11 bankruptcy plan had already been confirmed. The court decided to deny the approval of the settlement. There had already been initial distributions made to the debtors' general unsecured creditors. The settlement opponents were creditors placed in one of the plan's classes. Settlement money would have been funded by using the money allocated, under the plan, to the settlement opponents' class of creditors. The court found that the debtors were bound by the plan, and that the proposed settlement would have modified the plan. There was no request made by the debtors to modify the plan, there was no legal basis for the modification, and there was no authority for judicial approval of the proposed settlement agreement. The debtors' failure to obtain proper plan modification permitting a redistribution contemplated by the proposed settlement agreement was the problem.

**OUTCOME:** The court denied the ad hoc committee's request for approval of the settlement proposal.

**CORE TERMS:** settlement, proposed settlement, modification, settlement agreement, reallocation, stock, pool, consummation, disputed claims, common stock, distributed, finance, approve, holder, modified, confirmed, entity, modify, oral argument, consolidation, confirmation, reorganized, consummated, approving, allocated, settle, immaterial, plan of reorganization, reserve fund, post-confirmation

## LexisNexis(TM) Headnotes

*Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation > Consensual & Nonconsensual Confirmation*

*Bankruptcy Law > Chapter 11 (Reorganization) > Plan Process Before Confirmation > Classification*

*Bankruptcy Law > Chapter 11 (Reorganization) > Plan Process Before Confirmation > Plan Contents*

[HN1]The United States Bankruptcy Code contains specific provisions governing debtor modifications of a confirmed plan of reorganization. In particular, the Bankruptcy Code provides the following substantive and procedural limitations on plan modifications: The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of 11 U.S.C.S. §§ 1122, 1123. Such plan as modified becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 11 U.S.C.S. § 1129. 11 U.S.C.S. § 1127(a).

**COUNSEL:** R. Stokes Nolte, Esquire, of Bailey & Wetzel, P.A., Wilmington, Delaware; Lewis S. Rosenbloom, Esquire, and Dean C. Gramlich, Esquire, of McDermott, Will & Emery, Chicago, Illinois; attorneys for appellant.

Laura Davis Jones, Esquire, and Robert S. Brady, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; and Richard P. Schifter,

Esquire, and Brian P. Leitch, Esquire, of Arnold & Porter, Washington, D.C.; attorneys for appellees.

Neil B. Glassman, Esquire, and Dale R. Dube, Esquire, of Bayard, Handelman & Murdoch, Wilmington, Delaware; Robert J. Rosenberg, Esquire, and Bennett J. Murphy, Esquire, of Latham & Watkins, New York, New York; attorneys for the Post-Effective Date Committee of Unsecured Creditors of Continental Airlines, Inc. et al. (successor to the Official Committee of Unsecured Creditors of Continental Airlines, Inc., et al.).

Henry E. Gallagher, Jr., Esquire, and Arthur S. Connolly, III, Esquire, of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Thomas D. Goldberg, Esquire, of Day, Berry & Howard, Stamford, Connecticut; attorneys for IBM Credit Corporation.

Norman L. Pernick, Esquire, [*2] of Prickett, Jones, Elliot, Kristol & Schnee, Wilmington Delaware; attorneys for the Pension Benefit Guaranty Corporation.

Adam C. Harris, Esquire, of O'Melveny & Myers, New York, New York; attorneys for the Estate of Eastern Air Lines, Inc.

**JUDGES:** Sue L. Robinson, District Judge

**OPINIONBY:** Sue L. Robinson

**OPINION: MEMORANDUM OPINION**

Dated: June 8, 1994

Wilmington, Delaware

Sue L. Robinson, District Judge

This matter is before the Court for disposition of the motion for approval of settlement filed by appellees, Continental Airlines, Inc. and 52 affiliated companies which, in late 1990, filed Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware. n1 This motion comes approximately one year after confirmation of Debtors' Chapter 11 plan of reorganization, and several months after substantial consummation of same. The motion is opposed, inter alia, by various members of a class of creditors who, under the terms of the settlement agreement, would be required to relinquish their right to certain funds being distributed under Debtors' reorganization plan. n2 These funds are to be paid to appellant, the Ad Hoc Committee of CTA Bondholders [*3]  ("Ad Hoc Committee"), in exchange for appellant's agreement to abandon this and other related litigation. For reasons that follow, the motion will be denied.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n1 Appellees are collectively referred to herein as "Debtors."

n2 These opposing creditor parties are: IBM Credit Corporation ("IBM Credit"); the Pension Benefit Guaranty Corporation ("PBGC"); and the Chapter 11 Estate of Eastern Air Lines, Inc. In addition, the Post-Effective Date Committee of Unsecured Creditors of Continental Airlines, Inc., et al. (successor to the Official Committee of Unsecured Creditors of Continental Airlines, Inc., et al.) (the "Post-Effective Date Committee"), which represents Debtors' unsecured creditors, also has appeared in opposition to this motion. These four parties are collectively referred to herein as the "Settlement Opponents."

- - - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

## I.    FACTUAL    AND    PROCEDURAL BACKGROUND

Debtors filed their Chapter 11 petitions for reorganization on December 3, 1990. The Bankruptcy Court, following an eight day trial, [*4] entered the Confirmation Order approving the Debtors' Joint Plan of Reorganization (the "Plan"). n3 Under the Plan, Air Canada, Air Partners and other entities (the "Investors") agreed to infuse a $ 450 million investment into the reorganized Debtors ("NewCal") in exchange for approximately two-thirds of NewCal's common stock and other valuable consideration. The remaining one-third fraction of NewCal common stock and some cash assets are to be made available to satisfy the allowed claims of various unsecured creditors of the Debtors.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n3 The term "Confirmation Order" refers to the Bankruptcy Court's April 16, 1993 "Findings of Fact, Conclusions of Law and Order Confirming the Debtors' Revised Second Amended Joint Plan of Reorganization, as Modified, Under Chapter 11 of the United States

Bankruptcy Code, and Granting Related Relief."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Plan creates, pursuant to what has been referred to as the "Pooling Settlement," four "pools" constituted by groups of closely-related Debtors and their respective assets and [*5] liabilities. Each pool contributes all of its assets to NewCal, the reorganized Debtor. Additionally, each of the four pools receives a portion of the stock and cash allocated for payment of unsecured creditors. The apportionment of that stock and cash to the four pools is determined, under the terms of the Plan, according to the relative value of the assets contributed by each pool. Therefore, classes made up of Continental Debtors which had lesser relative debtloads and greater relative assets received greater relative apportionments of stock and cash under the Plan. It appears, for example, that Class 16 creditors realized a recovery of nearly $ .50 on-the-dollar of their claims while Class 14 creditors realized only about $ .05.

The record indicates the Pooling Settlement was necessitated by several factors, chief among them being the need to consolidate the Debtors into a single corporate entity and to satisfy or discharge the claims of unsecured creditors of the Debtors' estates into one type of common stock, as required by the Investors. The Pooling Settlement resolved disputes regarding, inter alia, the following: (1) the proper valuation of the assets and liabilities [*6] of each Debtor company; and (2) various prepetition and postpetition intercompany claims. In the proceedings below and in this appeal, the Ad Hoc Committee challenged the Pooling Settlement as legally impermissible, arguing the law does not permit complete consolidation of assets into one entity without consolidating all creditors/liabilities in the same fashion. That is, the Ad Hoc Committee challenged the Plan's creation of the four creditor pools and the "disparate" allocation of value to those pools.

The Plan also provides for the release of certain claims against various non-debtor individuals and entities, including officers and directors of the Debtors, the official committees and their members, and the Debtors' professional advisors. In addition, these same entities and individuals receive the benefit of an indemnity provision under the Plan, with Debtors serving as the indemnitor. In the Bankruptcy Court proceedings and in this appeal, the Ad Hoc Committee challenged the Plan's release provision, contending the mandatory, non-consensual release of claims against non-debtor parties is legally impermissible.

On January 8, 1993, the Bankruptcy Court issued an order approving [*7] the Debtors' Disclosure Statement describing, inter alia, the Pooling Settlement. Thereafter, majorities of each class of unsecured creditors, as well as ninety-six of one-hundred classes of secured creditors, voted to accept the Plan. The Ad Hoc Committee, a group of Continental Airlines Holdings, Inc. bondholders collectively owning approximately $ 9 million in bonds, filed various objections to the Plan. n4 On April 16, 1993, the Bankruptcy Court overruled those and other objections and entered the Confirmation Order approving the Plan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n4 It is undisputed that most of the bonds held by the Ad Hoc Committee's members were purchased at deep discounts after Debtors filed their Chapter 11 petitions.

- - - - - - - - - - - - End Footnotes- - - - - - - -

On April 20, 1993, the Ad Hoc Committee brought this appeal to challenge, inter alia, the Bankruptcy Court's Confirmation Order. Appellant filed an emergency stay motion with the Bankruptcy Court seeking a stay of distributions under the Plan. The motion was denied. Appellant then filed a stay motion with [*8] this Court. On April 23, 1993, Chief Judge Longobardi denied the motion. Appellant filed a second stay motion in this Court, which Chief Judge Longobardi denied on April 27, 1993. On May 7, 1993, appellant appealed this Court's denial of its stay motion to the United States Court of Appeals for the Third Circuit (Appeal No. 93-7332). n5 The parties successfully obtained a limited remand of the Third Circuit stay appeal to this Court for disposition of the instant motion for approval of settlement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n5 Appellant also filed an Application for a Writ of Mandamus seeking to compel Chief Judge Longobardi to stay all distributions pending the outcome of this appeal. The Third Circuit denied appellants' mandamus application on July 7, 1993.

- - - - - - - - - - - - End Footnotes- - - - - - - -

Consistent with denial of appellant's stay motions and in reliance on the court orders permitting

implementation of the Plan to go forward, Debtors consummated a series of transactions contemplated by the Plan. On June 28, 1993, Debtors moved the Bankruptcy Court for an order approving [*9] initial distributions to Debtors' general unsecured creditors. The Bankruptcy Court granted the motion on July 29, 1993. The Initial Distribution Order permitted a substantial distribution to each of the four classes or pools of unsecured creditors and established a Disputed Claims Reserve for each of the classes.

As of September 15, 1993, nearly 100% of the total stock and cash NewCal was authorized to distribute pursuant to the Initial Distribution Order already had been distributed to unsecured creditors. n6 NewCal stock has been approved for trading on the New York Stock Exchange and, it appears from the record, shares are being traded actively on today's market. n7

- - - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n6 This Court issued an order on September 9, 1993 directing the participants to this appeal to file fact submissions regarding whether the Plan had been substantially consummated and whether the commencement of distribution had occurred. See In re Cantwell, 639 F.2d 1050, 1053 (3d Cir. 1981) (appellate court may receive factual information regarding mootness and record on appeal is properly supplemented with facts arising after appeal is filed since "facts bearing on the issue of mootness can be raised at any time during the judicial proceedings").

[*10]

n7 Because Debtors have emerged from bankruptcy and reorganized into a single new entity, NewCal, the legal status of Debtors and their distinctiveness from NewCal is unclear at best.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

On October 29, 1993, after completion of briefing, the Court scheduled oral argument on this appeal for November 11, 1993. Although the Ad Hoc Committee raised several arguments on appeal, the Court instructed the parties only to "be prepared to address the issue of whether the Bankruptcy Court's confirmation of a reorganization plan containing mandatory, non-consensual releases of non-debtors was erroneous." (D.I. 18)

On or shortly before November 10, 1993, the parties to this appeal informed the Court they had reached a tentative settlement agreement, and jointly moved for continuance of oral argument in order to finalize and obtain Bankruptcy Court approval of the agreement. (D.I. 19) The Court granted the parties' request for continuance. During the following two months, the parties provided status reports indicating they were continuing to seek Bankruptcy Court approval of the settlement agreement. (D.I. [*11] 20; D.I. 21) The latter of these reports informed the Court that several parties filed objections to the motion, and that a previously-scheduled hearing on the matter had been continued, but not rescheduled. Included among the objections to the settlement motion was the assertion that the Bankruptcy Court lacked jurisdiction to authorize Debtors to enter into the settlement due to the pendency of the appeals in this Court and the Third Circuit.

On February 18, 1994, the parties filed the instant motion for approval of settlement. (D.I. 22) In their motion, the parties explained they "believe that the Bankruptcy Court does have...jurisdiction [over this matter]; however, in view of the concurrent jurisdiction in bankruptcy of this Court (of which the Bankruptcy Court is an adjunct), and in order to avoid unnecessary litigation of the jurisdictional issues, Continental is currently circulating a Stipulation dismissing its motion for approval of the settlement from the Bankruptcy Court, and the parties now seek approval of such settlement from this Court." (D.I. 22 at 4-5)

Appended to the settlement motion filed in this Court were various motion papers and objections filed previously [*12] in the Bankruptcy Court. In their motion (D.I. 22 at 5), the parties concluded by requesting "that this Court grant this motion to approve the proposed settlement, and enter as 'so ordered' the accompanying order and stipulation of settlement, in settlement of this litigation." n8 Subsequently, two of the objecting parties filed sur-reply briefs in further opposition to the settlement motion. On May 17, 1994, the Court heard oral argument on the motion to approve settlement. n9 Appearing at argument, in addition to both parties to this appeal (the proponents of the settlement), were settlement opponents the Post-Effective Date Committee, IBM Credit Corp., and the PBGC.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n8 On March 3, 1994, the Court "so ordered" the motion to approve settlement. At that time, because of the unusual procedural circumstances of this case and

by virtue of the unusual presentation of the dispute over the settlement, the nature of this proceeding was unclear. The Court's approval was subsequently withdrawn (D.I. 25 at 2), and no legal significance can be attributed to this aspect of the proceedings.

n9 In the order scheduling oral argument (D.I. 36), the Court addressed the issue of whether the moving parties provided adequate notice of their motion for approval of settlement. (See D.I. 25; D.I. 30; D.I. 31; D.I. 32; D.I. 33; D.I. 34; D.I. 35) The Court concluded that adequate notice was given and, in addition, that "the interests of parties (potentially) affected adversely by approval and implementation of the settlement agreement are adequately represented by the parties which received notice and appeared to oppose the same." (D.I. 36 at 1) In any event, the Court's denial of the motion for approval of settlement would appear to moot the notice issue.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*13]

## II. DISCUSSION

The Settlement Opponents are included among the parties who would be required--under the terms of the settlement agreement itself--to fund the payment of value to members of the Ad Hoc Committee in exchange for the Ad Hoc Committee's agreement to dismiss this appeal and the related Third Circuit stay appeal. n10 Debtors/NewCal have not offered to settle this matter with use of their own funds, but instead sought to finance this settlement with value (in reserves) allocated under the Plan to holders of Class 16 allowed claims. Settlement Opponents are creditors placed in Class 16 under the Plan, a class constituted by creditors of System One Holdings, Inc. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n10 As noted above, the parties to this appeal obtained a limited remand of the Third Circuit stay appeal to this Court for disposition of this settlement matter.

n11 The Post-Effective Date Committee, representing all unsecured creditors of the Debtors, also opposes the settlement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The settlement agreement contemplates [*14] payment of 40,000 shares of NewCal stock to the Ad Hoc Committee. n12 Under the terms of the agreement, the stock distributed to appellant's members would come "from the reserve fund for the payment of disputed claims and allowed claims of Class 16 creditors, and the amounts of such common stock which shall be Class A and Class B common stock, respectively, shall be the product of the percentage each such class bears to the whole of the Class 16 reserve and 40,000." (D.I. 22, settlement agreement at 7) Around the time the settlement motion was filed in the Bankruptcy Court, these 40,000 shares were estimated to have a market value of between $ 800,000 and $ 1,000,000. It was calculated the three creditors opposing the settlement would suffer an approximate reduction in recovery of over $ 500,000, with IBM Credit losing about $ 335,000, PBGC losing about $ 135,000, and the Estate of Eastern Airlines losing at least $ 75,000. At argument, it was estimated the market value of the 40,000 NewCal shares had declined to about $ 600,000, with the value of the reduction in opponents' recoveries diminishing by a proportionate amount.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n12 The agreement provides that "the Debtors shall cause to be distributed, pursuant to instructions provided by the Ad Hoc Committee, a total of forty thousand (40,000) shares of common stock of NewCal...to the individual members of the Ad Hoc Committee." (D.I. 41, settlement agreement at 7)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*15]

In addition to asserting the settlement agreement is neither fair, reasonable, nor warranted, the Settlement Opponents raise several legal arguments in support of their position. The first such argument is that the settlement impermissibly modifies the Plan after confirmation and substantial consummation thereof, and implementation of the agreement would breach Debtors' binding obligations under the Plan.

[HN1]The Bankruptcy Code contains specific provisions governing debtor modifications of a confirmed plan of reorganization. In particular, the

Code provides the following substantive and procedural limitations on plan modifications:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. § 1127(a).

Settlement [*16] Opponents contend, inter alia, that because the confirmed Plan has been substantially consummated, the modification of the Plan resulting from implementation of the proposed settlement agreement is implicitly precluded by section 1127(a). Moreover, as the Settlement Opponents contend, Debtors have not provided for "notice and a hearing" in connection with the proposed plan modification and have not even acknowledged that a plan modification is sought. Settlement Opponents further argue that Debtors are bound by the terms of the confirmed and substantially-consummated Plan and that, accordingly, Debtors are without lawful authority to take actions contrary to the Plan's express terms. See 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor").

In responding to these arguments, Debtors do not dispute Settlement Opponents' assertion that substantial consummation of the Plan has occurred. The Court so finds. n13 Debtors contend, however, that compliance with section 1127(a) is not required here because "the proposed settlement does not result in any modification, material or otherwise, to the Plan." (D.I. 22, Exhibit F at 7) It is clear from the record that [*17] Debtors have not complied with the procedural requirements of section 1127(a); thus, if implementation of the proposed settlement causes the Plan to be materially altered, there is no basis in law for permitting the relief sought by this motion. n14 The critical question, therefore, is whether implementation of the proposed settlement modifies the Plan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 The record at bar provides an ample basis in fact and law for the conclusion that the Plan has been substantially consummated.

n14 Debtors tacitly concede the motion for approval of settlement should be denied if this Court concludes that implementation of the settlement results in a material modification to the Plan.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Notwithstanding Debtors' assertions to the contrary, it is clear the Plan would be modified by implementation of the proposed settlement. As related above, the settlement proposes to transfer 40,000 shares of NewCal stock, valued between $ 600,000 and $ 1 million (depending on the date of calculation), to the Ad Hoc Committee's members. [*18] Under the settlement agreement, the source of these shares would be "the reserve fund for the payment of disputed claims and allowed claims of Class 16 creditors...." The Plan itself, however, expressly provides that each holder of a Class 16 allowed general unsecured claim "will receive...its Pro Rata Share of 614,517 shares of NewCal Class A Common Stock and 1,484,543 shares of NewCal Class B Common Stock." (Plan § 5.16) Because implementation of the proposed settlement would reduce the number of shares available to holders of Class 16 allowed claims by 40,000 shares, the Settlement Opponents argue the settlement agreement impermissibly seeks to modify this provision of the Plan. n15 The Court agrees.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n15 Debtors contend that by making this argument, the Settlement Opponents are "putting the cart before the horse" because such an argument assumes the Ad Hoc Committee would not prevail on its challenge to the allocation of value under the Plan's Pooling Settlement if this appeal were to go forward. The Court is unpersuaded by Debtors' position.

The issue on appeal is whether the Bankruptcy Court erred in confirming the Plan and overruling the Ad Hoc Committee's objections to the Plan's partial substantive consolidation and pooling scheme; and, if so, what form of effective relief, if any, can be granted at this juncture. Despite Debtors' assertion to the contrary, the issue presently before the Court is very different. Debtors urge this Court to order a post-confirmation, post-substantial consummation modification of the Plan's distribution scheme--not to

remedy any error made below--but to permit Debtors voluntarily to settle appellate litigation through funds dedicated to one class of creditors, as opposed to funds obtained from a universal reallocation of value.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*19]**

The bondholder-members of the Ad Hoc Committee are not holders of allowed Class 16 claims. Accordingly, the express terms of the Plan would be violated by distribution to the Ad Hoc Committee of NewCal shares earmarked solely for pro rata distribution to holders of allowed Class 16 claims. The Court, therefore, concludes that implementation of the proposed settlement would violate the Plan. In the absence of Plan modification, there is no legal basis for such action and, consequently, no authority for judicial approval of the proposed settlement agreement.

Debtors offer several unpersuasive arguments in an effort to salvage the settlement agreement. First, Debtors assert that "no provision of the Proposed Settlement Agreement would change even one word of the Plan." (D.I. 22, Exhibit F at 7) In making this assertion, Debtors miss the point. In the absence of proper modification of the Plan, there is no legal basis for distribution to the Ad Hoc Committee of NewCal shares earmarked solely for pro rata distribution to holders of allowed Class 16 claims. Thus, Debtors' failure to obtain proper Plan modification permitting the redistribution contemplated by the proposed agreement is **[*20]** precisely the problem here.

Debtors's next argument is that the "proposed settlement is functionally equivalent to the compromise of a disputed Class 16 claim because it provides to individual creditors who believe that they are entitled to share in the value allocated to Class 16, a small portion of such value." (Id. at 8) Debtors further contend that the "Plan fully contemplates that disputed claims will be resolved after substantial consummation of the Plan, and indeed a reserve for disputed Class 16 claims has been established in the amount equivalent to almost $ 50 million of Class 16 claims." (Id.)

The Court is unpersuaded by this theory. It is true the Plan contemplates resolution of disputed claims after substantial consummation. The Ad Hoc Committee members' claims, which were placed in Class 14, were allowed by the Bankruptcy Court and these bondholder-claimants have received distributions under the Plan; therefore, their claims are not the subject of this settlement. Rather, this settlement seeks to resolve appeals challenging the Plan itself. Clearly, the substantial reserves established under the Plan were created for resolution of disputed claims, not settlement of **[*21]** post-confirmation appeals. n16

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n16 Debtors (and the Ad Hoc Committee) repeatedly contend that refusal to approve this settlement will make it too difficult for Chapter 11 debtors to settle post-confirmation appellate challenges to a plan of reorganization. The Court disagrees. First, parties such as these Debtors can establish reserves for resolution of such challenges. Second, Debtors are free at any time to settle this matter with their own money--as opposed to the funds of others.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Debtors further contend that the proposed settlement would at most result in an "immaterial plan modification," and that such changes "are permitted at any time, without resolicitation of creditors." (D.I. 22, Exhibit F at 9) In making this argument, Debtors place considerable reliance on In re American Solar King Corp., 90 Bankr. 808 (Bankr. W.D. Tex. 1988). In Solar King, as Debtors themselves report accurately, the court permitted "a preconfirmation modification of a plan where the effect of the modification was to dilute **[*22]** recoveries in one class of claims by approximately one percent." (D.I. 22, Exhibit F at 10)

For several reasons, Debtors' reliance on the Solar King case is misplaced. First, the case at bar involves a postconfirmation, post-substantial consummation plan modification, whereas Solar King involved modification of a plan that had not yet even been confirmed. Second, while the court in Solar King apparently was comfortable presuming that "no previously assenting creditor would be motivated to reconsider their vote because of" the small dilution in recovery proposed by the modification at issue there, the same cannot be presumed here--judging from the vehement creditor opposition generated by the proposed settlement. Finally, irrespective of what the court in Solar King may have held, the diversion of approximately $ 600,000 in NewCal stock from the Class 16 creditors (rightfully entitled to share in that value under the Plan) to the Ad Hoc Committee members is not a "ministerial, administrative or immaterial Plan amendment." (D.I. 22, Exhibit F at 9) Debtors' assertion that the proposed settlement would

1994 U.S. Dist. LEXIS 20531

result in nothing more than an immaterial plan modification must fail. **[*23]** For the reasons stated, the Court concludes the proposed settlement agreement is legally impermissible.

Even were the Court to conclude otherwise as to the legal permissibility of the proposed settlement, it nonetheless is clear the agreement's terms are neither fair nor reasonable, at least from the perspective of the creditors being asked to finance the deal. n17 To justify their contention that the settlement is fair and reasonable to Class 16 creditors, Debtors offer the following reasons: (1) Class 16 creditors are the creditors who would suffer if the Ad Hoc Committee prevailed on its challenge to the Plan's Pooling Settlement; (2) the diminution in Class 16 creditors' recoveries resulting from settlement implementation is less than fluctuations in value resulting from other factors of which the creditors were aware when voting to accept the Plan; (3) the settlement proposes only a "minuscule reallocation" of value (D.I. 39 at 12); and (4) Class 16 creditors, and all other unsecured creditors sharing one-third ownership of NewCal, are the true beneficiaries of the settlement agreement because it preserves the Plan's release provisions. The Courts finds this reasoning unpersuasive. **[*24]**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n17 Debtors concede the fairness issue necessarily focuses on whether the settlement would be fair and reasonable from the perspective of Class 16 creditors. Because Debtors/NewCal are not requiring themselves to finance any of the settlement funds being paid to the Ad Hoc Committee, and because Debtors/NewCal obviously receive substantial benefits from the dismissal of this litigation, preservation of the Plan (particularly its release provisions), and other elements of the settlement agreement, the proposed settlement can be described as fair and reasonable to them. Likewise, creditors outside Class 16 generally stand to benefit from the proposed settlement since they incur no costs as a result of approval and implementation of the agreement, but arguably stand to gain from preservation of the Plan in its present form.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

As to any purported benefit derived by Class 16 creditors from preservation of the Plan's release

provision, Settlement Opponents have explained they are aware of the risks associated with **[*25]** the Ad Hoc Committee's possible victory on appeal on the release issue and that they are willing to take those risks. Consequently, Debtors cannot expect these Class 16 creditors to finance a settlement aimed at curtailing such risks. Furthermore, the benefits, if any, from diminishment of such risks flow to Debtors/NewCal and to all unsecured creditors sharing in ownership of the airline. n18 Under these circumstances, there is no basis whatsoever for requiring Class 16 creditors alone to pay for those benefits.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n18 If the release provisions were found to be invalid as a matter of law and stricken from the Plan, and if lawsuits against individuals protected by the release provisions were then commenced, Debtors/NewCal (and the creditors now sharing in ownership of the airline) may be forced to incur litigation costs (and possibly to pay judgments or settlements) because of their promise of indemnity under the Plan and their obligations to provide discovery responses in connection with any such actions.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Debtors **[*26]** further contend Class 16 creditors are not unfairly burdened by the reallocation of value proposed by this settlement because factors independent of the settlement, such as allowance of once-disputed claims or variations in the market price of NewCal stock, caused fluctuations in the value of Class 16 recoveries which would exceed the change in value resulting from implementation of the settlement's terms, and that such creditors voted to accept the Plan with knowledge that such recovery fluctuations might occur. This contention is unconvincing since, as the Settlement Opponents point out, parties voting in favor of the Plan did so on the assumption that Plan reserves would be used solely for resolution of disputed claims, specifically claims placed in the pool connected with any particular reserve fund. Moreover, while parties agreeing to the Plan may have done so with the understanding that their recoveries could be reduced by any number of factors, Debtors' post-consummation use of Plan reserves to settle appellate litigation was not among those bargained-for risks.

Regarding the size of the proposed settlement payment and its relative impact on Class 16 creditors, Debtors'

characterization [*27] of the settlement as proposing only a "minuscule reallocation" of value is unavailing. Debtors propose to reallocate at least $ 600,000 in value, with the largest Class 16 creditors being asked to suffer losses between $ 50,000 and $ 200,000. These amounts obviously are not "minuscule" and, judging from the reaction of the Settlement Opponents, are not properly viewed as having an insignificant impact on the recoveries of Class 16 creditors.

Finally, while it is true the Ad Hoc Committee sought reallocation of value through this appeal, nowhere in its appellate briefs did the Ad Hoc Committee request that value be taken specifically away from Class 16 and given to its members. The Ad Hoc Committee's only statement of record regarding use of reserves to effect a reallocation came in a fact memorandum filed in response to this Court's September 9, 1993 order. In its submission, appellant stated: "The Ad Hoc Committee believes that the reserves established by the Debtors are sufficient to effect a reallocation pursuant to a complete substantive consolidation, one of the alternative forms of relief available to the Ad Hoc Committee with respect to the issue on appeal of reallocation of [*28] consideration to Unsecured Creditors." (D.I. 15 at P 8) n19 Therefore, it is not true, as Debtors now suggest, that the Ad Hoc Committee sought relief in the form of reallocation of value specifically from Class 16 to members of the Ad Hoc Committee. Rather, the Ad Hoc Committee sought to alter the Plan--completely and fundamentally--by requesting "a complete substantive consolidation" through reallocation of all "reserves established by the Debtors." Thus, the form of relief sought on appeal by the Ad Hoc Committee provides no basis for requiring Class 16 to finance Debtors' settlement of this litigation. Because it is unfair and unreasonable to expect Class 16 singlehandedly to pay for Debtors' settlement plans, the motion to approve settlement must be denied. n20

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n19 See also D.I. 12 at 2 ("Ad Hoc Committee simply requests that the value allocated to unsecured creditors under the Plan, which has not yet been distributed, be distributed in a non-discriminatory manner....").

n20 Debtors' other theories offered as justification for requiring Class 16 to finance this settlement, such as because "that is really where the money is," (D.I. 39 at 13), are without merit and warrant no further discussion.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[*29]

### III. CONCLUSION

For the reasons stated, the Court declines to approve the proposed settlement. An order consistent with this memorandum opinion shall issue forthwith.