IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| NORTHWESTERN CORPORATION, | ) Chapter 11 |
| | ) |
| Reorganized Debtor. | ) Case No. 03-12872 (JLP) |
| | ) |
| ———————————————— | ) |
| | ) |
| MAGTEN ASSET MANAGEMENT | ) |
| CORPORATION AND LAW DEBENTURE | ) |
| TRUST COMPANY OF NEW YORK | ) |
| | ) |
| Appellant, | ) |
| | ) Civil Action No. 05-209-JJF |
| v. | ) |
| | ) |
| NORTHWESTERN CORPORATION, et al. | ) |
| | ) |
| Appellees. | ) |
| | ) |

APPENDIX OF EXHIBITS IN SUPPORT OF
BRIEF OF APPELLEE, THE PLAN COMMITTEE

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Alan W. Kornberg
Margaret A. Phillips
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York
Telephone: (212) 373-3000

Dated: August 23, 2005
　　　　New York, New York

**THE BAYARD FIRM**
Neil B. Glassman (No. 2087)
Charlene Davis (No. 2336)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
Telephone: (212) 655-5000

**Attorneys for the Plan Committee**

# TABLE OF CONTENTS

Transcript of Proceedings Held August 10, 2005 (10:30 a.m.)
Before the Honorable John L. Peterson
United States Bankruptcy Judge.............................................................Exhibit A

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                           .    Case No. 03-12872 (JLP)
                                 .
NORTHWESTERN CORPORATION,.    824 Market Street
                                 .    Wilmington, Delaware 19801
                                 .
        Debtor.              .    August 10, 2005
.  .  .  .  .  .  .  .  .  .  ..    10:30 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Greenberg Traurig , LLP
                         By:  WILLIAM E. CHIPMAN, JR., ESQ.
                         The Brandywine Building
                         1000 West Street
                         Suite 1540
                         Wilmington, DE  19801

                         Paul, Hastings, Janofsky &
                           Walker, LLP
                         By:  KERI C. CHAYAVADHANANGKUR, ESQ.
                         600 Peachtree Street, N.E.
                         Atlanta, GA  30308
                         (Telephonic Appearance)

                         Roberts, Mlotkowski & Hobbes, PC
                         By:  CAROLINE D. DENNISON, ESQ.
                         8270 Greensboro Drive
                         Suite 850
                         McLean, VA  22102

Audio Operator:          Jason Smith

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

2

APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Debtor: | Womble, Carlyle, Sandridge & Rice<br>By:  WILLIAM CAPP, ESQ.<br>One Atlantic Center<br>1201 West Peachtree Street<br>Suite 3500<br>Atlanta, GA  30309<br><br>By:  THOMAS KNAPP, ESQ. |
| For AT&T: | Lowenstein Sandler, PC<br>By:  GEORGE E. PATTERSON, JR., ESQ.<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>(Telephonic Appearance)<br><br>Elzufon Austin Reardon Tarlov<br>  & Mondell, P.A.<br>By:  CHARLES J. BROWN, III, ESQ.<br>300 Delaware Avenue<br>Suite 1700<br>P.O. Box 1630<br>Wilmington, DE  19899 |
| For U.S. State Dept.: | U.S. Department of Justice<br>By:  MATTHEW J. TROY, ESQ.<br>(Telephonic Appearance) |
| For Milbank, Tweed,<br>Hadley & McCloy, LLP: | Milbank Tweed Hadley & McCloy,<br>  LLP<br>By:  RYAN DeFORD, ESQ.<br>375 Park Avenue<br>Suite 3601<br>New York, NY  10152<br>(Telephonic Appearance) |
| For Magten: | Fried, Frank, Harris, Shriver<br>  & Jacobson, LLP<br>By:  GARY L. KAPLAN, ESQ..<br>One New York Plaza<br>New York, NY  10004 |
| For Law Debenture: | Nixon Peabody, LLP<br>By:  JOHN V. SNELLINGS, ESQ.<br>100 Summer Street<br>Boston, MA  02110<br>(Telephonic Appearance) |

**J&J COURT TRANSCRIBERS, INC.**

3

APPEARANCES (Cont'd.):

For Richard Hylland:          Stevens & Lee
                             By:  JOHN D. DEMMY, ESQ.
                             1105 North Market Street
                             7th Floor
                             Wilmington, DE  19801

For Merle Lewis:             Fox Rothschild LLP
                             By:  NEAL J. LEVITSKY, ESQ.
                             Citizens Bank Center
                             919 North Market Street
                             Suite 1400, 14th Floor
                             Wilmington, DE  19801

For National Union           White and Williams LLP
Fire Insurance Company       By:  MARC S. CASARINO, ESQ.
of Pittsburgh, PA:           824 North Market Street
                             Suite 902
                             Wilmington, DE  19801

For First Interstate         Werb & Sullivan
Bank:                        By:  AMY D. BROWN, ESQ.
                             Tenth Floor
                             300 Delaware Avenue
                             P.O. Box 25046
                             Wilmington, DE  19899

For the Plan Committee:      The Bayard Firm
                             By:  ERIC M. SUTTY, ESQ.
                             222 Delaware Avenue
                             Suite 900
                             P.O. Box 25130
                             Wilmington, DE  19899

For James Murphy:            Eckert Seamans Cherin & Mellott, LLC
                             By: RONALD S. GELLERT, ESQ.
                             4 East 8th Street, Suite 200
                             Wilmington, Delaware 19801

For the Official             Paul, Weiss, Rifkind, Wharton
Committee of Unsecured          & Garrison LLP
Creditors:                   By:  MARGARET A. PHILLIPS, ESQ.
                                  EPHRAIM I. DIAMOND, ESQ.
                             1285 Avenue of the Americas
                             New York, NY 10019
                             (Telephonic Appearance)

J&J COURT TRANSCRIBERS, INC.

4

APPEARANCES (Cont'd.):

For Plaintiffs,            Lyons, Doughty & Veldhuis, PC
Agenda Item 15:            By:  HILLARY VELDHUIS, ESQ.
                           1288 Route 73, Suite 310
                           Mount Laurel, NJ  08054

J&J COURT TRANSCRIBERS, INC.

5

# I N D E X

**WITNESSES FOR THE DEBTOR**                                    **PAGE**

RORY SULLIVAN
  Direct Examination by Ms. Dennison              29
  Cross Examination by Mr. Snellings              39
  Redirect Examination by Ms. Dennison            43

ROGER SHRUM
  Direct Examination by Ms. Dennison              58
  Cross Examination by Mr. Coleman                79

| **EXHIBITS** | | **IDENT.** | **EVID.** |
|---|---|---|---|
| A | Affidavit of Mr. Sullivan | 32 | |
| Debtor-1 | Proof of Claim | 59 | 60 |
| Debtor-2 | Response | 60 | 60 |
| Debtor-3 | Report, 6/17/03 | 69 | 83 |
| Debtor-4 | Bonus Calculations | 76 | 83 |

6

1    THE COURT:  The number of persons that I think are on
2 the telephone appearances; Margaret Phillips, from Paul Weiss
3 and Ephraim Diamond; Paul Weiss.  Are they present?
4    MS. PHILLIPS:  Yes, Your Honor.
5    MR. DIAMOND:  Yes, Your Honor.
6    THE COURT:  All right.  George Patterson, from
7 Lowenstein Sandler, AT&T?
8    MR. PATTERSON:  Yes, Your Honor.
9    THE COURT:  Matthew Troy, from the U.S. State
10 Department -- or Department of Justice?
11    MR. TROY:  Yes, Your Honor.
12    THE COURT:  Ryan deFord, from Milbank, Tweed?
13    MR. DeFORD:  Yes, Your Honor.
14    THE COURT:  And counsel for NorthWestern, Paul
15 Hastings?
16    MS. CHAYAVADHANANGKUR:  Yes, Your Honor.
17    THE COURT:  Patrick Coleman?
18    MR. COLEMAN:  Yes, Your Honor.
19    THE COURT:  Let's have the appearances, then, for
20 counsel in Wilmington.
21    MR. CHIPMAN:  Good morning, Your Honor.  William
22 Chipman; Greenberg Traurig, for the debtor.
23    MR. KAPLAN:  Good morning, Your Honor.  Gary Kaplan,
24 from Fried, Frank, on behalf of Magten.
25    MR. DEMMY:  Your Honor, John Demmy, of Stevens and

J&J COURT TRANSCRIBERS, INC.

1  Lee, for Richard Hylland.

2          MR. LEVITSKY:  Good morning, Your Honor.  Neal

3  Levitsky, from Fox Rothschild, for Merle Lewis.

4          MR. CASARINO:  Good morning, Your Honor.  Marc

5  Casarino, from White and Williams, LLP, for National Union Fire

6  Insurance Company of Pittsburgh, PA.

7          MS. BROWN:  Good morning, Your Honor.  Amy Brown;

8  Werb and Sullivan, on behalf of First Interstate Bank and

9  Mazula (phonetic) Parking Commission.

10          THE COURT:  Very well.

11          MR. SUTTY:  Good morning, Your Honor.  Eric Sutty, of

12  the Bayard Firm, on behalf of the Plan Committee.

13          MR. BROWN:  Good morning, Your Honor.  Charles Brown,

14  from Elzufon Austin, on behalf of AT&T.

15          MR. GELLERT:  Good morning, Your Honor.  Ronald

16  Gellert, from Eckert Seamans, on behalf of James Murphy.

17          THE COURT:  Counsel, here on --

18          MS. DENNISON:  Good morning, Your Honor.  Carol

19  Dennison, on behalf of the debtor.

20          MR. CAPP:  Good morning, Your Honor.  William Capp

21  (phonetic), for NorthWestern.

22          MR. KNAPP:  Thomas Knapp (phonetic), on behalf of

23  NorthWestern.

24          THE COURT:  Anyone else?  I'll take up the matter

25  dealing with the notice of emergency motion to extend time to

**J&J COURT TRANSCRIBERS, INC.**

8

1  present a claim of Patrick Coleman, filed by Patrick Coleman on
2  August the 8th of '05.  Coleman contends that he did not get
3  timely notice of this proceeding, although I notice that the
4  proof of mailing that was made by the debtor's counsel shows
5  that he was on the telecopies that were mailed out on August
6  the 1st, '05.  What's the position of the debtor?

7       MS. DENNISON:  Good morning, Your Honor.  Carol
8  Dennison, on behalf of the debtor.  It is, in fact, the
9  debtor's position that Mr. Coleman was properly served with the
10 agenda at the place of address noticed on his claim form,
11 consistent with what's reflected on the agenda.  When he
12 advised me -- when I spoke with him -- we also sent him another
13 copy, at his request.  But he was served when everyone else was
14 served.

15      THE COURT:  Mr. Coleman?

16      MR. COLEMAN:  Your Honor, I was not served.  And this
17 is not the first time that I was not served by counsel, for
18 various hearings.

19      THE COURT:  Now, what do you want the continuance to
20 do?

21      MR. COLEMAN:  To have witnesses available and to
22 subpoena records, in order to be available for the hearing,
23 regarding the claim.

24      THE COURT:  Any objection --

25      MS. DENNISON:  If I could be heard, Your Honor?

9

1        THE COURT:  Go ahead.

2        MS. DENNISON:  This claim objection was filed, Your
3  Honor, in February -- on February 1st.  And there was an
4  objection deadline, that was shortly thereafter, in March.
5  This claimant has had almost seven months to conduct discovery,
6  to the extent that discovery was necessary.  The agenda has
7  carried this from month to month, with the hope that a
8  settlement could be reached.  A settlement offer was made last
9  week.

10        We also note, for the record, that we're prepared to
11  proceed today.  We have Mr. Roger Shrum in the courtroom, who
12  can testify as to NorthWestern's position on why this claim
13  should be disallowed or substantially reduced.  We also believe
14  that the request for 120 day continuance is absurd, in light of
15  the fact that this has been a pending matter, where there's
16  clearly a dispute since March.  And there's been no effort by
17  the claimant to seek to do discovery, whether on an informal or
18  a formal basis.

19        And we'd note for the Court, as the Court is aware,
20  that this debtor has conducted informal discovery in most
21  cases, in connection with the claim resolution process.  This
22  is the first that anybody has been advised that this plaintiff
23  wishes to do discovery.  And we don't believe that were the
24  Court to consider continuing this matter, that a 120 days is
25  appropriate.

1    Lastly, we would note for the Court that none of the

2  individuals identified in Mr. Coleman's emergency request for a

3  continuance are current employees of NorthWestern.

4  NorthWestern does not have control over and, indeed, cannot

5  produce any of those individuals.  And we'd note for the record

6  that were that the case, we did make inquiry, to see if there

7  was some way that we can, perhaps, expedite it.  But none of

8  these witnesses that Mr. Coleman says that he wants to do

9  discovery on are NorthWestern witnesses.

10    So with that, Your Honor, we think that their request

11  is untimely.  We think that this claimant is a -- based on his

12  communications with us and the Court -- it's clear that he is a

13  sophisticated businessperson and understands this process, and

14  that had he desired to take discovery, that he should have done

15  so after his objection was filed, rather than sitting on his

16  rights, letting them lapse until this claim came on for

17  hearing.

18    So we would ask the Court to deny his motion, in the

19  first place.  But in the second place, we would say that if the

20  Court is going to consider it, that it be a 30 day extension,

21  because this claim determination should not be delayed any

22  further.

23    THE COURT:  All right.  Mr. Coleman, how about your

24  response?

25    MR. COLEMAN:  I have, through the process of this --

11

1  with former officers of NorthWestern -- made dozens of calls
2  regarding the process of this claim.  And I, as of last August
3  -- with Mr. Chipman -- had e-mailed him regarding what the
4  process was regarding the settlement, and was told that I would
5  be notified in due time as to the process regarding settlement
6  conferences.

7       So I have made dozens of calls to counsel to
8  NorthWestern throughout this process, and would have been happy
9  if I had been told you may prepare for today, to be exactly
10  prepared.  I have been waiting for almost two years to have had
11  an opportunity to be available to present, and being notified
12  five or six days before a hearing that's to take place in
13  Butte, Montana.  It's simply not reasonable.

14       And while it may not need to be 120 days, it would
15  need to be a minimum of 60 days, in order to gather the
16  witnesses together to be present.  And in terms of what Ms.
17  Dennison said about settlement, no one from legal counsel on
18  the debtor's side has called me regarding this matter, until
19  last Thursday -- ever.

20       THE COURT:  What have you been doing to get these
21  witnesses deposed, since you filed your claim?  What do you
22  think -- you're supposed to assert yourself into this process.
23  And you've got the right to ask for the depositions.  You can
24  notice them up.  It's a contested case.  You can utilize the
25  Federal Rules of Civil Procedure.  You haven't done any of

12

1 that.

2        MR. COLEMAN:  I was under the impression that a time
3 frame for settlement would happen, and that we would be sitting
4 down -- that they would ask to sit down with us.  We would talk
5 about what was to be stipulated or not stipulated, and at that
6 point, go through a discovery process.  And that's why I had
7 asked them Monday if they were going to respond in writing, so
8 I would know what parts of my claim they had the most concerns
9 with.  At this point, I have no idea -- with regard to the
10 claims -- what their concerns are.

11        THE COURT:  It looks like they're concerned with the
12 whole claim.  I'm going to deny your motion to extend the time.
13 And we'll get to the hearing on it later this morning.

14        The following items on the agenda on claims are
15 vacated, as the claims have been withdrawn on August the 9th,
16 2005.  Item Number 9, the claim of the Internal Revenue
17 Service, Claim 1066; Item Number 10, the claim of Nebraska
18 Department of Revenue, Claim 1001; Item Number 13, the
19 objection to the claim of Westchester Fire Insurance Company
20 and other insurance companies, Claims Number 630 and 885; and
21 Item Number 22, claims of Valerie Bergen, Numbers 549 and 959.

22        Before we get into the rest of the agenda, I am
23 prepared to rule on the Magten's omnibus objection to the
24 NorthWestern's motions to settle various claims, pursuant to
25 Federal Rule of Bankruptcy Procedure 9019.  The Plan Committee

13

1  has filed a reply, resisting NorWest motion -- West objection

2  -- as has the debtor, NorthWestern.  And the Court has read the

3  replies, and also, Magten's omnibus objection.

4       The omnibus objection of Magten involves the disputed

5  claims on motions, which are docketed in Numbers 3162, 3163,

6  3164, 3217, 3219, 3224, 3196, 3197, 3198, 3199, 3208, and 3197.

7  Added to this -- the agenda calendar -- were the claims

8  involving Murphy, Hylland, Lewis -- no, Murphy, Lewis and

9  Charter -- and objections have been filed by Magten to the

10 latter two claims; Charter and Lewis.

11      This Court has previously stated its position at the

12 June hearing, relative to Magten's objection.  And let me just

13 refresh that, for the record.  On June the 30th, 2005, Magten

14 objected -- at that time -- objected to certain NorWest

15 motions, pursuant to -- filed -- pursuant to 9019.  The Court

16 found no merit in Magten's argument, and approved the June 9019

17 motions at a hearing held on July the 12th, 2005.  Magten, once

18 again, has reviewed the -- renewed -- the same basis for the

19 objection in the pending motions, with one exception, which

20 I'll get to later.

21      The Plan Committee is charged with protecting the

22 interests of NorthWestern's unsecured creditors, during the

23 final stages of this Chapter 11 case.  The primary purpose of

24 the Plan Committee is to oversee the claims reconciliation and

25 settlement process.  One of those key interests is to ensure

14

1  that all unsecured creditors receive their rightful recoveries

2  in a timely manner.  The Plan Committee asserts that in filing

3  its objections -- and this is joined in by NorthWestern --

4  Magten seeks to prevent both the allowance of the proposed

5  allowed claims, as well as further distributions from the

6  disputed claims reserve; matters which fall within the Plan

7  Committee's review.

8          For example, on June 30th, 2005, the debtor filed

9  personal injury 9019 motions, seeking this Court's approval of

10 various settlement agreements, between NorWest -- NorthWestern

11 -- and the claimants, involving personal injury and wrongful

12 death claims.  On June 21 and 22, 2005, subsequent motions were

13 filed under Rule 9019 -- which are now set for hearing -- for

14 approval of various settlements between the claimants and this

15 disputed claim, involving litigation matters, legal fees, and

16 employee benefits, as well as a multitude of claims asserted by

17 former directors and officers.  Subsequent to the motion,

18 additional claims were filed on -- for settlement -- on behalf

19 of Murphy, Rourke (phonetic), Charter and Lewis.

20         Each of the 9019 motions provide that upon entry of

21 an order approving such motion, the claimant shall be deemed to

22 have an allowed claim in the amount set forth in the letter

23 agreements executed by the claimant's counsel, and would

24 receive a pro rata share of new common stock on the disputed

25 claims reserves.

J&J COURT TRANSCRIBERS, INC.

15

1        By the objections from Magten, Magten states to --

2   objects to -- the allowance of the proposed allowed claims

3   filed, on its allegations that the disputed claim reserve was

4   not sufficiently funded.  Magten seeks a stay of the claims

5   resolution process, and asserts that neither allowance of the

6   disputed Class 9 claims, nor distribution from the claims

7   reserve may occur until after its complaint -- filed under

8   Section 1144 of the Code -- has been fully and finally

9   resolved.  That action has been stayed by prior order of this

10  Court.

11       In its objections, Magten further argues that the

12  filing of that complaint under 1144 -- along with

13  NorthWestern's alleged admissions, respecting the inadequacy of

14  the disputed claims reserve -- Magten's mischaracterization to

15  this Court's decision denying the QUIP's 9019 motion should

16  effectively halt the reorganized debtor's ongoing efforts to

17  consensually resolve outstanding claims.  But contrary to what

18  Magten contends, the Plan Committee and NorthWestern properly

19  assert that a halt to the claims process would be inequitable.

20       In laying the foundation for its argument, Magten

21  relies on what it characterizes as this Court's prior finding

22  on the disputed claims reserve is insufficient.  A review of

23  the record, however, and my review of the order, reveals that

24  that reliance is misplaced.  First, Magten wholly misconstrues

25  the Court's decision denying the QUIP's 9019 motion, as lay in

**J&J COURT TRANSCRIBERS, INC.**

16

1   support to its argument of being -- the reserve -- being

2   underfunded.  In denying the Court's 9019 motion, the Court

3   found that the terms of the alleged settlement expressly

4   violated the terms of the plan, and that Magten's ultimate

5   proposal raised  -- for the first time, I might add, on oral

6   argument -- to dip into the disputed claims reserve was an

7   untenable solution.

8           Second, the arguments put forth that the hearing on

9   the QUIP's 9019 motion did not address the sufficiency of the

10  claim reserve, per se, and it hasn't been addressed to this

11  date.  Rather, they address NorthWestern's ability to evade the

12  claims reserve, to afford Magten the economic equivalent of a

13  quick settlement, to the detriment of the Class 7 creditors.

14          It seems to me to be totally inconsistent for Magten

15  to say it's okay for it to invade the claims reserve, but

16  doesn't allow that right to go to the other end -- secure the

17  claims of the other unsecured creditors.  The fact of the

18  matter is that the disputed claims should be resolved on the

19  merits, at least to the proposed settlements, under the

20  standards set forth in <u>Coram Healthcare Corporation</u>, 315 BR

21  321.

22          I hold that Magten's unsupported allegations, found

23  in the 1144 complaint, are insufficient to halt NorWest claims

24  resolution and settlement process.  And I might add that that

25  process has been successful in settling numerous contested

1  claims, well below the amount that the claimants had asserted
2  were due to them.  It is clear that the claim should and must
3  be settled, to determine whether the disputed claims reserve is
4  unfunded.  To date, there is no such find.

5      Magten asserts that unless NorthWestern agrees to
6  segregate sufficient common stock from the disputed claims
7  reserve, to satisfy the full amount of the non-accepting QUIP's
8  holder's claim, the proposed claims that are now subject to
9  allowance must not be taken up.  I think, significantly, that
10 Magten demands are contrary to the terms of the stipulation and
11 order establishing the disputed claims reserve between
12 Northwest and the QUIP indentured trustee, Law Debenture, which
13 provides that NorWest has no obligation to replenish the
14 disputed claims reserve.

15      In the absence of unsupported relief, Magten demands
16 this Court halt the number of claims that share in that
17 reserve.  I will not do so.  Contrary to Magten's assertions,
18 it would be inequitable to halt the claims resolution process,
19 pending a resolution of the 1144 proceeding.  The Court's stay
20 of that order makes it clear that the resolution of that
21 complaint is not right for immediate resolution.  It would
22 severely and inequitably hold up the entire post-confirmation
23 administration of this estate; a situation clearly created by
24 Magten's appeal of the order of confirmation of the plan.
25      The plan provides for a clear mechanism for resolving

J&J COURT TRANSCRIBERS, INC.

18

1  these disputed claims, under Section 7.4 and 7.6.  Once
2  resolved, the plans require NorthWest to make a distribution on
3  account of such allowed claims, as soon as practical, following
4  its allowance.  Magten's request would indefinitely prohibit
5  compliance with the confirmed plan.

6        The orders approving the settlements of the former
7  directors and officers and other personal injury actions at the
8  -- after the July hearing -- were final and -- or have not been
9  appealed by Magten.  It's clear to me that once I had held that
10 the -- basically, at the July hearing -- that Magten's delaying
11 tactics were not meritable -- had no merit -- that now it is
12 apparent -- and no appeal having been made -- under the law of
13 the case doctrine, once an issue has been decided, the parties
14 may not re-litigate that issue in the same case.

15       So I am going to overrule the omnibus objection of
16 Magten, to the continuance of this hearing, relative to the
17 settlement of the number of security claims which we have
18 before the Court today.

19       I might further state that Magten's latest objection
20 -- filed yesterday -- objects to the hearing of the Lewis and
21 Charter claims, due to the lack of the 20 day notice.  But it
22 concedes that the Court can cause -- may shorten the time.  I
23 think the cause exists to conclude those litigation matters, as
24 well, as they have been pending for months.  And certainly,
25 Magten had got an opportunity to determine the merits of the

19

1 litigation during the period of time.

2          I have to reiterate that compromise is generally
3 favored in bankruptcy. A consensual resolution of claims
4 minimizes litigation and expedites the administration of the
5 bankruptcy estate. Under Rule 9019 of the Federal Rules of
6 Bankruptcy Procedures, the approval of a compromised settlement
7 is well within the sound discretion of the Court. In approving
8 the settlement, the Court should not have to be content with
9 the settlement as the best possible compromise. Rather, the
10 Court must only conclude that the compromise of settlement
11 falls within the reasonable range of litigation possibilities.
12 Restated, that is, the settlement need only be above the lowest
13 point of a range of reasonableness.

14          In determining whether to approve the settlement, the
15 bankruptcy court should consider the probability of success of
16 a litigation -- underlying litigation -- the complexity of the
17 extents and delay involved, the possibility of possible
18 difficulties in administrating the estate in the paramount
19 interest of the creditors. Additionally, the Court should
20 defer to the debtor's judgment, so long as there are legitimate
21 business justifications to the action. And I must also defer
22 and give credit to the position taken by the Plan Committee,
23 relative to the settlement on the merits of each of these
24 claims.

25          And therefore, we're going to proceed to hear the

20

1 calendar, relative to these 9019 motions, and decide them in an

2 appropriate manner.

3      MR. KAPLAN: Your Honor, can I be heard? It's Gary

4 Kaplan, from Fried Frank, on behalf of Magten.

5      THE COURT: You may, sir.

6      MR. KAPLAN: Thank you, Your Honor. Your Honor, I'm

7 not going to reargue points that -- I understand Your Honor's

8 decision fairly clearly. But, you know, I do think that there

9 is a simple way to avoid Magten being required to continue

10 objecting -- to continue to raise its point -- so that we don't

11 get to a point, at the end of the day, when our claim is

12 ultimately allowed and everybody turns around and says, sorry.

13 There's no stop left for you guys, because the reserve has been

14 totally wiped out. And then somebody looks at us and says,

15 well, where were you when all these claims were being allowed

16 in the process?

17      And I think, very simply, Your Honor, what we would

18 be looking for would be both the debtor and the Plan Committee

19 -- who I understand Your Honor is giving significant deference

20 to -- what we would like from them is a representation;

21 whenever they are seeking this Court's allowance of claims,

22 that they represent to the Court that the disputed claims

23 reserve is sufficiently funded, so that it ultimately, all

24 disputed claims are allowed; that they will receive the full

25 distribution to which they're entitled to under the plan,

J&J COURT TRANSCRIBERS, INC.

1 approximately 63 percent recovery.

2       If they cannot stand up today, Your Honor, and say
3 that it is indeed funded; that all other claimants are not
4 being harmed by allowance of these claims -- I don't
5 understand; (1) how we can be giving any deference to what the
6 Plan Committee is saying, if they haven't investigated that and
7 they can't say, then, that they are looking out for the
8 interest of all of the disputed claimants.  And that's a
9 fundamental thing.  And it should be very easy for them to
10 stand up and say -- and likewise, for the debtor to be allowing
11 claims, but not have conducted the analysis -- to be able to
12 stand up here today and to affirmatively represent that there
13 is sufficient stock.

14       And once they do that, Your Honor, I think much of
15 our future objections and our need for future objections will
16 go away, if we get those representations.  And so, I would ask
17 that Your Honor request -- from both of those parties -- that
18 they do make the representation, so when the Court looks at the
19 settlements; looks at not only what is its impact on Magten,
20 but what is the impact on all of the other unsecured creditors
21 with disputed claims?

22       Because if right now, the debtor can't say all the
23 other claimants out there with disputed claims will receive the
24 same recovery as those people who are being allowed today, then
25 there's a serious problem.  And it does need to be looked at.

22

1  And I think the Plan Committee and the debtor need to explain

2  to this Court how it is that they are seeking to allow claims,

3  without being able to make that representation.

4          THE COURT:  Would you accept a quid pro quo for that?

5  If, in fact, in the future, relative to these disputed claims,

6  in order to avoid your objection and misrepresentation is made,

7  would you then withdraw your 1144 complaint?

8          MR. KAPLAN:  We -- I'd have to confer with the

9  client.  But we will -- if we get a representation that we are

10  comfortable with, I would have to talk to the client.  But

11  that's a possibility.  But I can't say that, without talking to

12  the client.

13          THE COURT:  All right.  Then I'll take your

14  suggestion under advisement.  And you can consult with your

15  client.  And NorthWest and the Plan Committee can consult among

16  themselves, relative to your proposal.  Thank you, counsel.

17          MR. KAPLAN:  Thank you, Your Honor.

18          THE DEPUTY:  Excuse me, Judge.  This is Nancy.  Is

19  there anyone who could adjust your camera?  We can't see you,

20  at all, here.

21          THE COURT:  You can't see me?

22          THE DEPUTY:  We can't see you.  We can see Ms.

23  Dennison.  We see the top of your head, but that's all.

24          THE COURT:  That's enough.

25          THE DEPUTY:  No, it's not.

23

1        THE COURT:  Hold on.  We're going to get it adjusted
2  right now, Nancy.

3        THE DEPUTY:  Thank you.

4        THE COURT:  Now do you see that handsome face?

5        THE DEPUTY:  Not yet.

6        THE COURT:  All right.

7        THE DEPUTY:  Still waiting.  Now we see nobody.
8  There you go.  Thank you.

9        THE COURT:  All right.  Counsel, you may proceed with
10  the agenda, Ms. --

11        MS. DENNISON:  Thank you, Your Honor.  Let's turn to
12  agenda Item Number 1.  This is the motion for order declaring
13  the automatic stay to be inapplicable with the modification of
14  automatic stay, to permit prosecution and payment of Worker's
15  Compensation claim filed by Herman Gonzalez, et al.  I'd ask
16  the Court if we could also address Item Number 15 at the same
17  time, because this is the motion to approve the settlement,
18  with what the debtor has been referring to as the Gonzalez
19  claimants.

20        This settlement -- this matter Number 15 - is the
21  motion to approve the stipulation between NorthWestern
22  Corporation and the Gonzalez claimants.  It has been on file
23  since June 29th.  And the settlement itself, will resolve Items
24  1, 2, and 5 on this agenda.  There were no responses received
25  to the settlement stipulation and the 9019 motion.  Just for

24

1  the Court's edification, a quick review of this settlement
2  involves the settlement of Worker's Compensation claims by the
3  use of applicable insurance policies and is the result of a
4  fairly lengthy settlement process, during which discovery was
5  taken.  And the parties spent a fairly significant amount of
6  time negotiating the terms of the sitpulation that we seek
7  approval of here today.

8         THE COURT:  All right.  We'll take up Item 15, no
9  objections having been filed and no responses to the order.
10 The Court will enter an order, pursuant to Rule 9019, approving
11 the stipulation between NorthWestern Corporation and Herman
12 Gonzalez, Ron Lyon (phonetic), Ken Lagato (phonetic), and other
13 similarly situated putative class action claims.

14        MS. DENNISON:  Thank you, Your Honor.  If the Court
15 would prefer, given the number of orders that we would like to
16 submit today, if I could hand them up at the end of the
17 hearing?

18        THE COURT:  Hand them up at the -- all at the end.
19        MS. DENNISON:  Thank you, Your Honor.  And I think
20 there is counsel at the podium in Delaware.

21        MS. VELDHUIS:  Just in case the Judge had any
22 questions.  This is Hillary Veldhuis; Lyons, Doughty and
23 Veldhuis, counsel for the plaintiffs on Number 15.

24        MS. DENNISON:  Okay.  With that, Your Honor, I
25 believe that disposes of items on the agenda, Number 1, Number

25

1   2, Number 5, and Number 15.

2           THE COURT:  All right.

3           MS. DENNISON:  Turning to Item Number 3, this is the

4   motion to approve the memorandum of understanding.  This

5   involves the McGreevey (phonetic) litigation and related

6   matter, through Touch America.  The debtor is seeking to

7   continue this to the next omnibus hearing.

8           THE COURT:  On the -- is that on the Milbank Tweed

9   settlement?

10          MS. DENNISON:  No, Your Honor.  This is with the --

11  this is with Goldman Sachs and Milbank Tweed.  But the Milbank

12  Tweed settlement, we'll settle out --

13          THE COURT:  All right.  That will be rescheduled.

14          MS. DENNISON:  Thank you, Your Honor.  Item Number 4

15  is the omnibus motion for court approval to assume certain

16  executory contracts.  We are seeking to continue this, just as

17  a status report, Your Honor.  The SAP parties are exchanging

18  signature pages to an assumption and assignment agreement.  And

19  that matter should be resolved shortly, as to Veritas.  And

20  Veritas are marking up -- are working on -- identifying all of

21  the contracts to be assumed.

22          We would ask this matter be continued one final time,

23  to the next omnibus hearing, and if not resolved at that time,

24  to take it up for a hearing.

25          THE COURT:  Very well.  Motion is granted.


J&J COURT TRANSCRIBERS, INC.

26

1       MS. DENNISON:  Thank you, Your Honor.  Item Number 5

2  has been addressed.  That is the Gonzalez matter.  Number 6 is

3  the thirteen omnibus objections to certain Expanet's claims,

4  pursuant to 11 U.S.C. 502(b).  These are claims that involve

5  certain shareholders of Expanet's, that filed a claim in the

6  NorthWestern case.  And we would ask that that matter be

7  continued to the next omnibus hearing.  This matter is the

8  subject of settlement discussions and is going to require

9  coordination, as to the settlement between the NorthWestern, in

10 that exit case.

11      THE COURT:  Motion is granted, and it be settled.

12      MS. DENNISON:  Thank you, Your Honor.  The next item

13 is matter Number -- is the debtor's protective objection to

14 Claim Number 707.  This is a security class action claim, that

15 is the subject of a settlement.  The reason we are carrying

16 this is it's pending the appeal of the memorandum of

17 understanding order, and would ask that this be continued.

18      THE COURT:  Granted.

19      MS. DENNISON:  Thank you, Your Honor.  Matter Number

20 8 is the objection to Claims Number 571 and 1083, filed by

21 Touch America.  This involves certain claims, filed by Touch

22 America, the debtors -- in the debtor's case.  We are in the

23 process of tight working with Touch America regarding claim

24 resolution, and would ask that this be continued --

25      THE COURT:  It will be continued.

J&J COURT TRANSCRIBERS, INC.

27

1        MS. DENNISON:  -- to the next omnibus hearing.  Thank

2   you.  I didn't hear that.  Item Numbers 9 and 10 have been

3   vacated.  Number 11 is the objection to Claim Number 312, of

4   Milbank, Tweed, Hadley and McCoy's claim.  The objection has

5   been resolved, pursuant to the settlement.  And the settlement

6   motion is reflected as Item Number 28, Your Honor.  And if we

7   could take Matter Number 28 up at this time?

8        THE COURT:  You may proceed with Item 28.

9        MS. DENNISON:  Thank you, Your Honor.  The debtor's

10  motion for -- this is the debtor's motion for order, pursuant

11  to Bankruptcy Rule 9019, approving the settlement agreement

12  between NorthWestern Corporation and Milbank Tweed.  This was a

13  claim that was filed by Milbank Tweed, for the delivery of

14  certain legal services.  And it was the subject of the dispute,

15  both as to the -- to which party the services were delivered.

16  After negotiation between the parties, it was agreed to settle

17  the claim for $55,493.97 in allowed claim.  The only objection

18  has been overruled, and that was the objection filed by Magten.

19  And the debtor would request approval of the settlement at this

20  time.

21        THE COURT:  No objection to the merits of the

22  settlement, having been presented.  The debtor's motion for an

23  order approving the 9019 settlement with Milbank, Tweed,

24  Hadley, and McCoy is granted.

25        MS. DENNISON:  Thank you, Your Honor.  Matter Number

J&J COURT TRANSCRIBERS, INC.

1 12, Your Honor, is the objection to Claim 20, of Hartford Life.

2 And they have withdrawn that claim. And I believe that will

3 hit the docket shortly, Your Honor.

4           THE COURT: Very well.

5           MS. DENNISON: Matter Number 13 is the -- is a matter

6 that has been vacated by the Court, based on a plan withdrawal.

7 And Matter Number 14, Your Honor, is the motion to compel

8 master ballot agents to comply with the order granting debtor's

9 motion for order compelling master ballot agents to identify

10 holders of Classes 7, 8(a) and 8(b), in claims that voted

11 against releases and disclosed beneficial holders of Class

12 8(b).

13          Your Honor, there have been no objections filed to

14 this.  But so that our record is clear, I would like to call

15 Lori Sullivan, to provide brief testimony as to what has been

16 done to try to avoid the necessity of seeking a contempt order

17 and to make clear that the parties involved in the case have

18 heard what the debtor has done to address the need for

19 additional information on the beneficial holders.

20          THE COURT: You may proceed.

21          MS. DENNISON: Thank you, Your Honor.  At this time,

22 I call Rory Sullivan.

23          MR. SNELLINGS: Your Honor, this is John Snellings,

24 of Nixon Peabody.  I represent Law Debenture, the Trustee --

25 the indenture trustee to the QUIPs.  After this testimony, if I

**J&J COURT TRANSCRIBERS, INC.**

1 could just have a moment, with regard to this particular

2 motion?  I would appreciate it.

3          THE COURT:  No problem, counsel.

4          MR. SNELLINGS:  Thank you, very much.

5          THE COURT:  If you have any questions of the witness,

6 you may examine the witness and then make your statement.

7          MR. SNELLINGS:  Thank you, Your Honor.

8          THE COURT:  All right.

9          MS. DENNISON:  Please state your name for -- do we

10 want to swear the witness, Your Honor?

11          THE COURT:  Please raise your right hand.

12          RORY SULLIVAN, DEBTOR'S WITNESS, SWORN

13          THE COURT:  State your name, address, business or

14 profession or occupation.

15          THE WITNESS:  My name is Rory Sullivan.  I'm with

16 Bonds Holder Communications Group.  I am currently a vice

17 president.

18                    DIRECT EXAMINATION

19 BY MS. DENNISON:

20 Q    Mr. Sullivan, can you tell me what your role is, or

21 describe your job at Bondholder Communications?

22 A    Bonds Holder Communications Group is a tabulation and

23 information agent, which assists debtors and plan committees or

24 any -- in any way that we might be needed.

25 Q    Okay.  And in what ways?  Can you just give the Court a

1  specific description of the kind of work that you do for --

2  A    Sure.  We do collection of votes, regarding bankruptcies,

3  such as this one.  We identify beneficial bonds holders.  We

4  also act as an exchange or tender agent, in those types of

5  transactions.

6  Q    And does that involve communications with the Depository

7  Trust Company?

8  A    Yes.  It involves frequent communications.

9  Q    Which we refer to as DTC?

10  A    Correct.

11  Q    How did BCG -- well, first of all, let me strike that.

12  How long have you worked for BCG?

13  A    Since June, 2003.

14  Q    All right.  And when did BCG first become involved in the

15  NorthWestern case?

16  A    In August, 2004.  Kurtzman Carson Consultants engaged

17  Bonds Holder Communication Group.

18  Q    In connection with what activity?

19  A    With the re-solicitation for NorthWestern.

20  Q    And that would be in connection with the second amended

21  plan of disclosure statement?

22  A    Correct.

23  Q    And what was -- what, specifically, was BCG asked to do?

24  A    We were asked to tabulate the votes of the master ballot

25  agents.

Sullivan - Direct/Dennison                    31

1  Q    And where did that information go, once you had tabulated

2  the master ballot agent -- master -- yes, master ballot agent

3  vote?

4  A    It was certified by us, and presented to the Court, I

5  believe.

6  Q    Okay.  And that went up through KCC or Kurtzman Carson's

7  certification, correct?

8  A    Correct.

9  Q    In connection with this motion that we're here on today,

10 what has been BCG's involvement?

11 A    BCG, in early 2005, was involved in input into the motion

12 for the order to the Court, to have master ballot agents

13 release beneficial holder information, as requested by Law

14 Debenture.

15 Q    Okay.  There was also a request for the debtor, was there

16 not?

17 A    Yes, there was.

18 Q    And what was the debtor's request?

19 A    To go to the master ballot agents and attempt to identify

20 the beneficial owners of those parties who did not release the

21 company.

22 Q    Okay.  And what process or what information was requested?

23 A    The account number of the beneficial owner, the beneficial

24 owner's name, address, and share amount, and whether or not

25 they held, as of October 20th, 2004.

J&J COURT TRANSCRIBERS, INC.

Sullivan - Direct/Dennison                    32

1  Q    Thank you.

2         MS. DENNISON:  Your Honor, if I could approach the

3  witness?  I'd like to mark, as Exhibit A, the affidavit that

4  Mr. Sullivan submitted in support of this motion, so that he

5  can have that information to testify from.

6         THE COURT:  All right.  You may proceed.

7         MS. DENNISON:  Thank you.

8         THE COURT:  That was on --

9         MS. DENNISON:  Yes.

10 Q    Mr. Sullivan, can you tell me what document I've just

11 handed you?

12 A    You've handed me an affidavit, signed by myself, to -- in

13 support of a motion to compel; (a) master ballot agents to

14 comply with order granting debtor's motion for order compelling

15 master ballot agents to; (1) identify holders of Classes 7,

16 8(a) and 8(b) claims, and whether such holder elected Option 1

17 or Option 2, and (b) seeking attorney's fees and costs.

18 Q    With regard to the activity by BCG, in connection with the

19 information provided in this affidavit -- well, first of all,

20 can you tell me, is that your signature at the end of the

21 exhibit, on Page 5?

22 A    Yes, it is.

23 Q    With regard to the information collected, what did

24 Bondholder Communications actually do to gather the information

25 that you provide in this affidavit?

J&J COURT TRANSCRIBERS, INC.

1 A    We initially served each master ballot agent with a copy
2 of the motion.  That was to -- and, I guess, to provide a
3 sufficient time for any master ballot agent to object to the
4 motion.  Upon confirmation of the order, it was once again
5 served to them.  And just to backtrack, we -- in each
6 circumstance, when the motion was filed -- when the motion was
7 supplied to the master ballot agents, Bonds Holder
8 Communications Group reached out by phone, to confirm receipt
9 of that motion to each master ballot agent.
10 Q    Okay.  So in connection with the filing of the initial
11 motion, seeking the additional information that both Law
12 Debenture and the debtor requested, you contacted the master
13 ballot agents?
14 A    Correct.
15 Q    Okay.  In connection with when the order was entered,
16 which was on April 5th, 2005, did you again communicate with
17 the master ballot agents?
18 A    Yes, we did.
19 Q    Okay.  And then, when -- what went on, after the initial
20 order was entered?
21 A    We were in frequent communication with the master ballot
22 agents to, you know, discuss the format of them submitting the
23 information that was requested by the Court and to answer any
24 questions, or anything like that that they may have had.
25 Q    And what level of compliance did you receive?

**J&J COURT TRANSCRIBERS, INC.**

Sullivan - Direct/Dennison                    34

1  A    Upon the initial order, that was granted by the Court in
2  April, we've had approximately -- I would say two-thirds of the
3  master balloting agents provided the information requested.
4  Q    And that was after BCG making phone calls, answering
5  questions, and communicating with those non-complying master
6  ballot agents?
7  A    That's correct.
8  Q    In June, a motion to compel was filed. And that's the
9  motion we're here on today. Are you familiar with that motion?
10 A    Yes, I am.
11 Q    Okay. In connection with preparation for this hearing on
12 contempt of the Court's order, what activities did BCG
13 undertake?
14 A    BCG, once again, contacted any of the non-complying master
15 ballot agents. And basically, we emphasized the urgency of
16 this, and explained to them, you know, that they would be held
17 accountable for failure to provide this information. And in
18 addition to contacting the clerks of -- which are in the
19 reorganization departments of these master ballot agents, who
20 would provide us information -- in certain cases, we also
21 contacted the legal counsel's office of these non-complying
22 master ballot agents.
23 Q    And did someone from BCG -- you, or one of the people you
24 supervise -- contact every non-complying master ballot agent,
25 clerk, and general counsel's office?

1  A    Yes.  They were either left a message or in some way, they
2  were tried to be contacted on a number of occasions.
3  Q    Okay.  With regard to the first component -- the identity
4  of the beneficial holder information, requested by Law
5  Debenture -- what is the status of compliance today?
6  A    There is only one master ballot agent who has not provided
7  the information requested.
8  Q    And who is that, or what entity is that?
9  A    It's DTC -- it's Number 976, Mercantile Safe Deposit and
10  Trust.
11  Q    Okay.  And did you prepare a report, summarizing the
12  information requested -- in terms of the beneficial holder
13  identification -- by account number?
14  A    Yes, we did.
15  Q    Okay.  And has that been prepared in a form that it can be
16  provided to Law Debenture?
17  A    Yes, it has.
18  Q    Okay.  And you have that both in electronic format and
19  hard copy?
20  A    Yes, I -- we do.
21  Q    Okay.  And has any further contact -- has anybody heard
22  anything from Mercantile Safe Deposit and Trust since the last
23  communications you made, prior to this hearing?
24  A    To my knowledge, no.
25  Q    With regard to the compliance with information requested

Sullivan - Direct/Dennison                    36

1  by the debtor, the identity of the non-releasing parties for
2  Classes 7, 8(a) and 8(b), what is the status of non-compliance
3  at this time?
4  A    There are still a number of master ballot agents who were
5  unable to provide us with the beneficial -- or did not provide
6  us with the beneficial information.
7  Q    And those master ballot agents are identified on Page 4 of
8  your affidavit?
9  A    Yes, they are.
10 Q    Okay.  And for the record, would that be UBS Paine Webber?
11 A    Correct.
12 Q    Scott Trade?
13 A    Yes.
14 Q    Wells Fargo?
15 A    Yes.
16 Q    American Enterprise Investment?
17 A    Yes.
18 Q    Persian (phonetic) Securities?
19 A    Yes.
20 Q    J.P. Morgan?
21 A    Yes.
22 Q    Bank of New York?
23 A    Yes.
24 Q    Mercantile Safe and Deposit Trust?
25 A    Yes.

1  Q     And Bear Sterns?

2  A     Yes.

3  Q     Okay.  And aside from that, you have compliance from all

4  of the other master ballot agents?

5  A     Yes, we do.

6  Q     Okay.  As you sit here today, is there any reason why

7  distribution could not immediately take place to the 8(b)

8  Option 1 QUIP holders?

9  A     No.

10 Q     When was the earliest that distribution could have taken

11 place to the 8(b) Option 1 QUIP holders?

12 A     Upon certification of our tabulation report.

13 Q     And when was that report certified?

14 A     I believe it was October, 2004.

15 Q     Okay.  And in connection with that report, how would that

16 distribution have worked?

17 A     In connection with the report, the shares would have been

18 delivered to the Depository Trust Company -- DTC.  And DTC

19 would have then taken the instructions from the tabulation

20 report and distributed it to the master balloting agents.  And

21 from there, the master balloting agents would hold the

22 responsibility of distributing the shares to its underlying

23 beneficial holders.

24 Q     So the identity of the beneficial holders, in terms of

25 actually getting the distribution into the right hands, would

Sullivan - Direct/Dennison                    38

1  have been done by whom?

2  A    It would have been done by the master balloting agents.

3  Q    And they have the responsibility for knowing who

4  beneficial holders are?

5  A    Yes, they do.  They would be their clients.

6  Q    One last question, Mr. Sullivan.  Who is paying the

7  expenses -- BCG's expenses?

8  A    The debtor, NorthWestern.

9  Q    Thank you.

10       MS. DENNISON:  Your Honor, at this time, I would ask

11  for a contempt order as to those individuals that are

12  identified in Mr. Sullivan's affidavit that have not complied

13  -- the one non-complying master ballot agent on 8(b) Option 1,

14  for beneficial holders, which is Mercantile -- and then the

15  remaining list, for the non-releasing parties.  And we would

16  continue to work with -- upon receipt of that order -- continue

17  to work with BCG, to obtain the additional information.

18       THE COURT:  How much expense have you incurred to get

19  to these occupying agents?

20       THE WITNESS:  How much expenses?

21       THE COURT:  How much expense have you incurred, with

22  respect to the non-complying agents?

23       THE WITNESS:  I would say between -- it's hard for me

24  to give an estimate.  I would say maybe between $20 and

25  $50,000.

Sullivan - Cross/Snellings

1      THE COURT:  How much?

2      THE WITNESS:  Between $20 and $50,000.

3      THE COURT:  Any other questions?

4      MS. DENNISON:  No, Your Honor.  I have no further

5  questions.

6      THE COURT:  Okay.  You may step down.

7      THE WITNESS:  Okay.  Thank you.

8      MR. SNELLINGS:  Your Honor, John Snellings.  I just

9  have a few questions.

10     THE COURT:  You have a question?  All right.  Let me

11 get out of your way.

12     MR. SNELLINGS:  Thank you.

13     THE COURT:  Go ahead, sir.

14                    CROSS EXAMINATION

15 BY MR. SNELLINGS:

16 Q   Mr. Sullivan, my name is John Snellings.  I represent Law

17 Debenture.  And you know, I just want to state first that Law

18 Debenture certainly supports everything that Bondholders

19 Communication Group has been doing to assist Law Debenture and

20 the debtor, in attempting to identify the present holders of --

21 those who chose Option 1 under the plan.  I guess I'm a little

22 confused by your last statements in your testimony, is that you

23 had stated that a distribution could have been made back on

24 October 24th, 2004.  If that is so, what has changed between

25 October 24th and today, that wouldn't allow such a distribution

Sullivan - Cross/Snellings                           40

1  to be made, under the process that you described in your

2  testimony?

3  A    The only difference between October 24th, 2004 and today

4  is that the -- those people who submitted a vote to their

5  master balloting agent -- instead of knowing the account

6  number, we know their name, address and, you know, their

7  personal information.

8  Q    Okay.  So the -- so you're saying that the information

9  that the master ballot agent should have had on October 24th,

10 you now have?  And this is the process that we've been going

11 through for the last several months?

12 A    Correct.

13 Q    Okay.  Now, the voting on the plan occurred on May 26th,

14 2004, correct?

15 A    Uh-hum.

16        MS. DENNISON:  Your Honor, I have to object.  That's

17 not correct.  The voting on the plan didn't occur in May.

18        THE COURT:  All right.  We'll correct that date.

19        MR. SNELLINGS:  Okay.

20        THE COURT:  Go ahead, counsel.

21 Q    And with regard to the distribution record dates, that was

22 October 20th, 2004, is that correct?

23 A    Yes, it is.

24 Q    Okay.  And in the period of time between the voting for

25 the plan and the distribution record date, could individual

J&J COURT TRANSCRIBERS, INC.

Sullivan - Cross/Snellings                    41

1  holders, who voted for Option 1, continue to trade on their
2  QUIPs, do you know?
3  A    I'm assuming that they could.  I -- that would depend on
4  their brokerage firm, whether or not they would allow such
5  trading to occur.
6  Q    And do you know -- or do you have any knowledge of how
7  many QUIPs were traded during that period?
8  A    No, I do no.
9  Q    Do you know how many people, who chose Option 1 in their
10 vote, possibly traded their QUIP shared during that period?
11 A    No, I do not.
12 Q    Do you know if there is any mechanism, whatsoever, set up
13 by the debtor, pursuant to the plan and -- that would require
14 the master ballot agents to track who was holding as of the
15 voting date and to whom they sold it to?
16 A    No, I do not.
17 Q    Okay.  So if there are holders out there with QUIPs, who
18 voted for Option 1 and then sold their shares at some later
19 date before October 20th, how can we be assured that the person
20 who is now holding the QUIP share -- as of October 20th --
21 actually voted for the plan, and that they have knowledge as to
22 who their previous owner -- what they had voted for the plan?
23 A    It's common practice, within the industry, that the master
24 ballot agents are to sort that out.  It's shares typically
25 delivered to the Depository Trust Company.  And from there, as

J&J COURT TRANSCRIBERS, INC.

Sullivan - Cross/Snellings                    42

1  to how people vote and the trading, that responsibility all

2  falls upon the shoulders of the master balloting agents.

3  Q    Do you have a general number of how many QUIPs Option 1

4  holders have been identified in your reports?

5  A    Do I have a general number?

6  Q    Yes.  Or even a specific number.

7  A    I know that the -- I mean, except for that one firm -- the

8  majority of the beneficial holders have been identified.

9  Q    If I recall, in the certification of voting, there was

10 631,622 QUIP shares that chose Option 1.  Is that number

11 correct, if you recall?

12 A    I would have to see a copy of the certification.  I mean,

13 I can't recall that off the top of my head.

14 Q    Okay.  So with regard to this report that you provided us,

15 how many holders -- how many shares, in the hands of holders

16 who took Option 1, have been identified to date?

17 A    118,000 shares and change can be distributed as of today.

18 Q    And that's how much can be -- new stock to be distributed.

19 I was interested in how many shares of -- how many QUIP shares

20 have been identified, out of the 631,000 that voted in favor of

21 the plan.

22 A    I don't have a total number in front of me right now.

23 Based on the count numbers that were listed on the master

24 ballots and upon receipt of the information requested by the

25 Court, we were able to match up virtually all of the beneficial

J&J COURT TRANSCRIBERS, INC.

1  holders and the share amounts.

2  Q    In the report that was provided to Law Debenture, it

3  indicated that there are 440,000 shares that have been

4  identified, about 70 percent of the outstanding total that

5  voted for the plan.  Does that sound correct to you?

6  A    I mean, once again, these numbers -- I mean, I don't have

7  it in front of me.  I cannot give -- you know, confirm or deny

8  that that is the number.  I just know what's in our report is

9  accurate.

10  Q    Okay.

11       MR. SNELLINGS:  I have no further questions, Your

12  Honor.

13       MS. DENNISON:  Your Honor, I have one question on

14  redirect.

15       THE COURT:  You may.

16                    REDIRECT EXAMINATION

17  BY MS. DENNISON:

18  Q    Mr. Sullivan, in connection with the -- you testified as

19  to, I guess, the ordinary course for the master ballot agents.

20  A    Yes.

21  Q    In terms of the questions that Mr. Snellings was asking

22  you, about the identification of the beneficial holders --

23  A    Uh-hum.

24  Q    -- based on your work in the industry for Bondholder

25  Communication --

Sullivan - Redirect/Dennison                           44

1  A    Yes.

2  Q    -- are all of those things something the master ballot

3  agent would have the responsibility for determining?

4  A    Yes.

5  Q    In connection with -- and specifically, in connection with

6  any trading that took place in between the entry of the

7  confirmation order and the record date?

8  A    Yes.

9  Q    That was something that the master ballot agents are

10 required to track?

11 A    Yes.

12 Q    And with regard to any trading that took place after the

13 record date, that again is something the master ballot agents

14 are required to -- or in the ordinary course -- track?

15 A    Yes.

16 Q    Have you ever seen a circumstance, since you've been at

17 Bondholder Communications, where the master ballots agents

18 didn't conform with or comply with this industry standard?

19 A    No.

20        MS. DENNISON:  Thank you, Your Honor.  I have no

21 further questions.

22        THE COURT:  Mr. Snellings, do you have any other

23 comments?

24        MR. SNELLINGS:  Yes, Your Honor.  You can certainly

25 excuse this witness.  He doesn't have to sit there while I

45

1  talk.

2           THE COURT:  Mr. Sullivan?

3           THE WITNESS:  Okay.  Thank you.

4           THE COURT:  Go ahead, sir.

5           MR. SNELLINGS:  Thank you, Your Honor.  Again, Law

6  Debenture certainly supports the debtor's efforts to identify

7  the Option 1 and Option 2 holders, in order to enable us --

8  whether it be Law Debenture, DTC, or the debtor -- to

9  distribute to Option 1 holders the common shares warrants, that

10 the debtor has provided for under the plan.

11          We informed the debtor, in the first week of January,

12 that Law Debenture was prepared to transfer the stock and

13 warrants received under the plan -- for the benefit of Option 1

14 -- back to the debtor, after reserving for the charging lien,

15 in order to effectuate a distribution to the Option 1 holders.

16 We remain prepared to transfer the stock and warrants since

17 that date.

18          In January, we requested information necessary to

19 make the transfer.  It was a simple request.  Who are the

20 QUIP's holders, who are entitled to the recovery set forth

21 under Option 1 of the plan?  We wanted the names, addresses,

22 and Social Security numbers.

23          We have only one holder listed on our register, and

24 that's DTC.  However, there are 71 financial institutions who

25 hold the QUIPs, according to the records of the GTC.  These

**J&J COURT TRANSCRIBERS, INC.**

46

1  financial institutions; each, in turn, hold for individuals,
2  trusts, corporations, and the like, through brokerage accounts
3  at their various institutions.  We refer to these individuals
4  and trusts as the beneficial holders.  The number of beneficial
5  holders represented by one financial institution ranges from
6  one to hundreds.  Therefore, there are thousands of beneficial
7  holders.

8       The parties in this proceeding are aware of the
9  objections that Law Debenture raised to the plan at the time of
10 the disclosure statement and plan confirmation, regarding the
11 mechanisms that were or were not put in place, with regard to
12 keep (sic) the information regarding the identity of the QUIP's
13 holders who were given the choice of Option 1 or 2.  We raised
14 the objection that the debtor had not put in place proper
15 procedures for tracking the ownership of the QUIPs, based on
16 the votes cast by the holders.  We advocated that a claims
17 register be put in place, that would require holders to
18 identify themselves, turn in their securities, and vote their
19 claim as -- and recorded that on the claims register.  Any
20 further trading of the QUIPs would have been reflected by the
21 transfer of the claims on that register.

22      Other options available to the debtor might have
23 included requiring the DTC and its participant financial
24 institutions to each put such a register in place; putting the
25 burden on them of tracking and recording votes and requiring

1  that a legend be placed on all the securities, recording the
2  vote of its owner, so any subsequent owners would know where
3  they stand, with regard to Option 1 and Option 2.  None of
4  these procedures were put in place by the debtor.  And that's
5  why we're here today.

6          As I stated before, you know, the voting record was
7  -- of the plan -- was in, I believe, May 26th.  It seems like
8  there's another date.  The distribution record was October
9  20th.  The problem lies in the fact that many holders cast
10  their vote and then sold their shares, or bought more shares on
11  the open market.  Those shares, in the hands of a new owner,
12  have no notation or legend on them, to denote whether the vote
13  cast was for Option 1 or Option 2.

14          In June, the debtor provided us with the preliminary
15  results of Bondholders Communication Group, with regard to the
16  identity of Option 1 holders to date.  We spent hours poring
17  over this information provided by the debtor.  Some of our
18  worst fears have been realized.  Out of the 79 financial
19  institutions, all but four have responded to the request for
20  information.  And now -- from the testimony -- it seems like
21  all but one, which is a good step forward.

22          Of the 79, however, 20 financial institutions -- in
23  the report that we have received -- still have not provided no
24  information regarding whether their holders voted for Option 1
25  or Option 2.  Some of these 20 represent the largest QUIP's

J&J COURT TRANSCRIBERS, INC.

48

1   holdings.  In addition, it is apparent that thousands of shares
2   changed hands.  Many institutions reported large swings in
3   holdings, between the voting record date and the distribution
4   record date.  But of course, none of the institutions have
5   provided any explanation or any information as to the trading
6   of the shares, because they were never asked to track that
7   information.  It has been testified here today that that is
8   usually a procedure of these institutions.  But since they have
9   not provided that information, I'm not quite sure whether or
10  not that is an industry standard.

11        We have grave reservations about whether complete
12  information will ever be available.  Our goal, though, is to
13  commence a distribution as quickly as possible to those Option
14  1 holders who have been identified.  And as I stated before,
15  out of the 631,000 QUIP shares attributed to Option 1, right
16  now, 442,000 have been identified.  And we believe that a
17  distribution could be made to them, of the available shares and
18  warrants.

19        We want this process to continue.  We support this
20  motion.  However, we want to be on the record that we do not
21  believe -- even once we have all that information, contrary to
22  what Bondholders Communication Group says and the debtor --
23  that we might have to return to this court, in order to seek
24  certification and some level of comfort; that, in fact, the
25  information received is accurate and that which we can rely

49

1  upon in making a distribution.

2       But otherwise, we support this motion and the
3  continuing efforts of Bondholders Communication Group and the
4  debtor.  Thank you, Your Honor.

5       THE COURT:  Thank you.  Would you like to respond, as
6  to whether or not this mechanism that's in place is going to
7  get the shares to the right people?

8       MS. DENNISON:  Yes, Your Honor.  Briefly, number one,
9  first and foremost, the plan solicitation procedures were set
10  up to use Depository Trust Company as the distribution agent,
11  based on the industry standard; that the distribution would be
12  made to DTC, who would then make the distribution to its
13  participants.  That's another name for master ballot agents.
14  That procedure is prepared -- is totally available to Law
15  Debenture, if they want to use that procedure.  They simply
16  need to instruct DTC to issue a certain number of shares to the
17  master ballot agents.  And the master ballot agents have
18  demonstrated, by complying -- those that have complied, except
19  for the one -- that they have that information available to
20  them, in terms of who the Option 1 holders are.

21       So I understand Mr. Snellings' concern about wanting
22  detail.  But the simple way this industry works, bizarre as it
23  is, distributions are made through DTC to the master ballot
24  agents.  And the master ballot agents have the responsibility
25  for maintaining the books and records, to know who the holders

50

1   -- the beneficial holders -- are.  That's the way the industry

2   works.  That's the way the plan was designed.

3          Based on Law Debenture's concerns, though, the debtor

4   has cooperated with them through that process, to get whatever

5   additional information can be had.  That information has been

6   provided, with the exception of the one master ballot agent, as

7   to the 8(b) shares.

8          I close, by saying that I think that the information

9   has been certified a number of times in this Court,

10  particularly in connection with confirmation.  It was certified

11  in the voting tabulation report.  Those documents were properly

12  filed.  There's never been any question.  No one has called

13  into question DTC's ability to perform the service it provides

14  for not only this debtor, but any other debtor or company

15  issuing shares through the DTC system.

16         We'd ask for the contempt order.  We'd also ask that

17  we be able to reserve the rights to come back to this Court, to

18  seek attorney's fees and costs -- as may be appropriate -- once

19  this process is complete.

20         And then lastly, I would note for the Court that the

21  debtor distributed our issued instructions to its transfer

22  agent, LaSalle (phonetic), on December 23rd, to issue the

23  shares to Law Debenture, as the indenture trustee for the 8(b)

24  Option 1 QUIP holders.  The debtor has done everything that it

25  can, in the ordinary course.  It has complied with the plan.

J&J COURT TRANSCRIBERS, INC.

51

1  And, you know, we'll continue to coordinate and assist Law

2  Debenture with however it chooses to make the distribution.

3  But the debtor believes it's in full compliance.

4          THE COURT: All right. The motion will be granted.

5          MS. DENNISON: Thank you, Your Honor. We will submit

6  an order, consistent with Mr. Sullivan's affidavit. We now

7  turn to -- matter Number 15 has been addressed. That's the

8  Gonzalez settlement. Matter Number 16 is the motion to

9  determine the allowed amounts of the claims of Skadden Arps,

10 Kurt Weitzel (phonetic), and Syndet Mobility (phonetic).

11          The debtor filed a notice allowed claim, because the

12 claim amount matched the amount on the schedules. Magten filed

13 an objection when the debtor filed a follow-up of its notice of

14 intent to distribute. The debtor has then filed a motion to

15 allow these claims, in the amounts reflected in its motion.

16 And there have been no other objections, other than that of

17 Magten. And we would ask, at this time, that the order be

18 entered.

19          THE COURT: Motion will be granted.

20          MS. DENNISON: Thank you, Your Honor. Matter Number

21 17 is the motion seeking disallowance and expungement of the

22 claims of a number of individuals. These are individuals, a

23 number of which are involved in the Montana Power; former

24 officers and directors. As to those individuals that have

25 filed an objection, the debtor has requested that that matter

52

1  be continued.  As to the individuals listed here on the agenda

2  at Matter Number 17, no response was filed in connection with

3  the debtor's objection and motion to expunge the claims,

4  because they did not respond to the debtor's objection.  So we

5  would seek an order, at this time, based on the failure of

6  these individuals to file any responsive pleadings to the

7  debtor's claim objection; that an order disallowing and

8  expunging the identified claims be entered.

9          THE COURT:  Motion will be granted.

10          MS. DENNISON:  Thank you, Your Honor.  Matter Number

11  18 is the motion seeking disallowance and expungements of the

12  claims of Keith Atler (phonetic), Mary Jepson (phonetic), Abber

13  Dickle (phonetic) and et al.  Again, we have received no

14  response or -- to the debtor's objection.  And we would ask

15  that the order be entered at this time.

16          THE COURT:  Motion will be granted.

17          MS. DENNISON:  Thank you, Your Honor.  Matter Number

18  19 is the objection to Claim Number 1087 of the Matsen

19  (phonetic) plaintiffs.  This matter was set to move forward

20  today.  Some negotiations have been active.  And the parties

21  can report that a settlement has been reached, subject to

22  documentation.  We expect to present that to the Plan Committee

23  and to file the papers shortly.  We'd ask that that be

24  continued to the next omnibus hearing, so that the settlement

25  can be finalized.

53

1        THE COURT:  All right.  The matter will be vacated to

2  receipt of the settlement documents.

3        MS. DENNISON:  Thank you, Your Honor.  Matter Number

4  20 is the objection to Claim Number 62, filed by Parry Finer

5  Net Technologies (phonetic), Claim Number 193, followed by A&T,

6  Claim Number 1067, followed by Contrarian and Claim Number

7  1080, filed by AT&T.

8        At this time, Your Honor, we also can report that the

9  parties have reached a settlement, that will need to be

10  documented and circulated, both to the Plan Committee and filed

11  with the Court.  We would ask that this matter be continued to

12  the next omnibus.

13        THE COURT:  This matter will be vacated, pending the

14  receipt of the settlement documents.

15        MS. DENNISON:  Thank you, Your Honor.  Matter Number

16  21 is the objection to Claim Number 1040, of Mineral Management

17  Service, pursuant to 11 U.S.C. 502(b) and Federal Bankruptcy

18  Rule of Procedure 2007.  At this time, Your Honor, the debtor

19  would like to proceed.  But we understand -- we have made a

20  settlement proposal to the Mineral Management Service, and are

21  still waiting on a response.  And I think Mr. Troy is in the

22  courtroom, and can speak to that, as well.

23        THE COURT:  Counsel for Mineral Management?

24        MR. TROY:  Good morning, Your Honor.  Thank you.

25  Matthew Troy, Department of Justice, on behalf of the Minerals

J&J COURT TRANSCRIBERS, INC.

54

1  Management Service.  Your Honor, last week, I believe -- I

2  believe it was last week -- the debtor's communicated a

3  counteroffer to a settlement offer that MMS had made.  And I

4  have that offer.  Unfortunately, agency counsel is on vacation

5  this week, will be back Monday, at which point I intend to

6  discuss it with her.  So I would ask for a continuance, to

7  permit the parties to further explore settlement.

8          THE COURT:  Well, what's the prospect of the

9  settlement being accepted?  I'm not going to continue it, if

10  there's no -- just to have it come back and say, well, we

11  didn't get it made.

12          MR. TROY:  Your Honor, I can't say for certain, other

13  than that I can tell you that the debtor started with the

14  belief that the claim was worth zero.  And it has made an offer

15  well in excess of that -- much closer to what MMS thinks it's

16  worth, as asserted in the proof of claim.

17          MS. DENNISON:  Your Honor, the debtor would say that

18  this is a 30 day roll, at most.  We either need to try it or

19  get it done.  We made a good faith settlement proposal.

20  There's been a counter once.  And I think that if we can't wrap

21  it up, it should be set for a contested hearing at the next

22  omnibus.

23          THE COURT:  I'll give the parties 20 days to submit

24  the settlement documents.  Is that all right, counsel?

25          MR. TROY:  That's fine, Your Honor.  And just to

J&J COURT TRANSCRIBERS, INC.

55

1    clarify the record, Your Honor, I think there's some confusion

2    on how the settlement offer progressed here.  An objection was

3    made.  MMS filed a response.  The debtors asked for a

4    settlement offer from MMS as an accommodation, and we made that

5    accommodation.  And it took -- with all due respect to the

6    debtors and Ms. Dennison -- a month, two months, for the

7    debtors to respond to that just this past week.  And frankly --

8            THE COURT:  Just -- all right.  I'm just trying to

9    get this case closed.

10           MR. TROY:  I understand, Your Honor.  But I just want

11   to make clear that if there's any delay here, it's not been at

12   the seat of MMS.

13           THE COURT:  All right.  20 days should be enough to

14   make up your mind.  It's not that big a claim.

15           MR. TROY:  Understood, Your Honor.

16           THE COURT:  Thank you, very much.

17           MR. TROY:  Thank you.

18           THE COURT:  We will vacate the hearing, pending

19   receipt of the settlement documents, if any.

20           MS. DENNISON:  And --

21           THE COURT:  Item 22 has been vacated.

22           MS. DENNISON:  That's correct, Your Honor.  Item

23   Number 23 is the 15 omnibus objection to certain employment

24   related claims.  There are three parties that this matter is

25   going forward to; Linda Lindeman (phonetic), Michael Young, and

J&J COURT TRANSCRIBERS, INC.

56

1    Patrick Coleman.  As to the Lindeman claim, a settlement has
2    been reached.  And we'd like to provide a stipulation of
3    settlement in that claim.  The Plan Committee has reviewed it.
4    And -- I lost my notes.

5         The settlement amount, Your Honor, is $45,000.  And
6    the background on the claim is it arises out of a claim for the
7    reimbursement of medical expenses.  There was a legitimate
8    dispute, as between the debtor and the claimant.  And the
9    45,000 is a reasonable number, in light of the facts, as pled
10   in the complaint.  So we'd like to submit the stipulation, with
11   an order to follow, based on the claim being allowed at 45,000,
12   which is a reduction over the initial claim filed.

13        THE COURT:  Very well.  You may proceed with the
14   settlement.

15        MS. DENNISON:  Thank you, Your Honor.  The next item
16   is Michael Young.  The parties have reached a settlement, as to
17   the monetary amount of the allowed claim.  There is a dispute
18   over the form of order to be submitted.  A counterproposal was
19   received late last night.  And the debtor is going to need some
20   period of time to evaluate the counterproposal.  What we would
21   suggest -- and if we do not have an agreed order by the end of
22   this week -- that this matter be set for a hearing at the next
23   omnibus hearing.

24        THE COURT:  Well, how close are you?  Because I --
25        MS. DENNISON:  How close are we, Your Honor?

**J&J COURT TRANSCRIBERS, INC.**

1    THE COURT:  I'm --

2        MS. DENNISON:  We have resolved the allowed amount of

3   the claim.  There is a request for language in the order, that

4   the debtor cannot accept at this point.  I would think that

5   with further discussion, we should be able to reach acceptable

6   language to both parties, and submit an order on certification.

7   If that cannot be accomplished -- and I am talking about an

8   extremely short term -- by the end of this week, then we will

9   need to proceed with a contested hearing on this claim.

10       THE COURT:  All right.  I'll grant the parties seven

11  days in which to file the settlement documents.

12       MS. DENNISON:  Thank you, Your Honor.  The next

13  matter is the matter of Patrick Coleman.

14       THE COURT:  Mr. Coleman, are you still there?

15       MR. COLEMAN:  Yes, sir -- Your Honor.

16       MS. DENNISON:  The debtor is happy to proceed with

17  the claim objection, Your Honor, recognizing this is, of

18  course, a claimant.  I'm happy to defer the Court, in terms of

19  how the Court might like to proceed.

20       THE COURT:  Do you have a witness?

21       MS. DENNISON:  I do, Your Honor.

22       THE COURT:  Call your witness.

23       MS. DENNISON:  Thank you, Your Honor.  We call Roger

24  Shrum to the stand.

25       THE COURT:  Raise your right hand, sir.

1          ROGER SHRUM, DEBTOR'S WITNESS, SWORN

2          THE COURT:  State your name and address and your

3  business or profession or occupation.

4          THE WITNESS:  My name is Roger Shrum.  I am vice

5  president of Human Resources and Communications for

6  NorthWestern Corporation in Sioux Falls, South Dakota.

7                    DIRECT EXAMINATION

8  BY MS. DENNISON:

9  Q    Mr. Shrum, can you give us a brief overview of what your

10 job involves?

11 A    Yes.  I took my current position in December of 2003, and

12 currently responsible for the company's human resources

13 activities, as well as investor relations and communications.

14 Q    Okay.  And would that include familiarity with the former

15 employees file?

16 A    Yes, it would.

17 Q    And in connection with today's hearing, have you reviewed

18 Mr. Coleman's file?

19 A    Yes, I have.

20 Q    And have you reviewed all the other books and records

21 available to you, about the employment of Mr. Coleman?

22 A    Yes, I have.

23 Q    I want -- Your Honor, I'd like to approach the witness, to

24 hand up Exhibit Number 1, which is Mr. Coleman's proof of

25 claim.  May I approach?

Shrum - Direct/Dennison                                    59

1           THE COURT:  You may.

2           MS. DENNISON:  Thank you, Your Honor.

3   Q    Mr. Shrum, are you familiar with Exhibit Number 1?

4   A    Yes, I am.

5   Q    And what is it?

6   A    It is a proof of claim, from Patrick Coleman.  Do you want

7   me to state the amount?

8   Q    Yes, please.

9   A    For the amount of $4,088,473, plus Schedule A, which is an

10  additional $56,846 for relocation expenses.

11  Q    Okay.  And you reviewed -- you have reviewed this claim,

12  correct?

13  A    Yes, I have.

14  Q    And are you aware that NorthWestern filed an objection to

15  Mr. Coleman's claims, based on books and records?

16  A    Yes, I have -- yes, I know.

17  Q    And in NorthWestern's books and records or any files

18  available to NorthWestern, did you find anything to support Mr.

19  Coleman's claims?

20  A    No, I did not.

21  Q    Okay.  I will talk about the specifics of the claim in

22  just a second.

23          MS. DENNISON:  Your Honor, I'd like to mark, as

24  Exhibit Number 2, claimant Patrick Coleman's response to the

25  objection over the note.

Shrum - Direct/Dennison                                60

1        THE COURT:  Exhibit 2.  Exhibit 1 is admitted.

2  Exhibit 2 is the response?

3        MS. DENNISON:  Yes, Your Honor.

4        THE COURT:  Exhibit 2 is admitted.

5        MS. DENNISON:  Thank you, Your Honor.

6  Q   Mr. Shrum, have you reviewed Patrick Coleman's response to

7  the objections of the debtor?

8  A   Yes, I have.

9  Q   Okay.  What -- if we were to break Mr. Coleman's claim

10  down into two component parts, what would those parts be?

11  A   Essentially, there are two specific request for claim.

12  One is for his incentive compensation plan, that was

13  established.  And then secondly, is for relocation expenses.

14  Q   Okay.  Mr. Coleman, I believe, was employed by

15  NorthWestern in 2002, is that correct?

16  A   That is correct.

17  Q   Did he have an employment -- did you find, when you

18  searched the books and records, any employment contract?

19  A   No, I did not.

20  Q   What did you find for Mr. Coleman?

21  A   I found an employment letter agreement -- not stipulating

22  -- but outlining the hiring of Mr. Coleman.

23  Q   If you look at Exhibit Number 2, which is Mr. Coleman's

24  response to the debtor's objection, can you find a copy of that

25  letter?

J&J COURT TRANSCRIBERS, INC.

Shrum - Direct/Dennison                    61

1          THE COURT:  State the date of that letter.

2          MS. DENNISON:  Thank you, Your Honor.  It's February

3    5th, 2002.  And it's about five pages into --

4          THE COURT:  All right.

5          MS. DENNISON:  -- Mr. Coleman's exhibit.

6    A    I found that letter.

7    Q    Okay.  Was that letter also in the request for his books

8    and records?

9    A    Yes, it is.

10   Q    Okay.  And is this the offer letter that you refer to?

11   A    Yes, it is.

12   Q    Can you tell me what position Mr. Coleman was offered in

13   February of 2002?

14   A    Chief Procurement Officer.

15   Q    And what does a Chief Procurement Officer do?

16   A    It is my understanding that the Chief Procurement Officer

17   was essentially responsible for our purchasing activities for

18   the corporation at that time.

19   Q    Okay.  And how did Mr. Coleman's employment at

20   NorthWestern end?

21   A    He was severed from the company, as part of a

22   reorganization, in 2003 -- early 2003.

23   Q    Would that be a reduction in force?

24   A    Yes, it was.

25   Q    Were the other members of his department also severed at

J&J COURT TRANSCRIBERS, INC.

Shrum - Direct/Dennison                                    62

1 | that time?

2 | A    Yes, they were.

3 | Q    Okay.  And basically, the department was pretty much

4 | eliminated?

5 | A    That is correct.

6 | Q    Is -- do you -- if you know, do you know whether South

7 | Dakota is an at will employment state?

8 | A    Yes, it is.

9 | Q    Thank you.  So the search in the records established this

10 | offer letter, correct?

11 | A    That is correct.

12 | Q    And based on your books and records, you were also able to

13 | establish that Mr. Coleman accepted and was basically employed,

14 | for a period of time?

15 | A    That is correct.

16 | Q    And did you review Mr. Coleman's payroll records?

17 | A    Yes, I did.

18 | Q    And what did those payroll records show?

19 | A    It showed that he was paid for the period of time in which

20 | he worked for the company, normal wages and other

21 | reimbursements.

22 | Q    So that would be consistent with the terms of the offer

23 | letter?

24 | A    That is correct.

25 | Q    What did you find, in connection with the reimbursement of

1  moving expenses?

2  A    There was some reimbursement of relocation expenses.  I

3  don't have the specific amounts in front of me, but there was

4  some relocation expenses that were provided for Mr. Coleman.

5  Q    Do you recall the category?

6  A    I believe that they were for temporary living expenses.

7  Q    Okay.  Did you find any evidence of any reimbursement for

8  any other category of relocation expenses?

9  A    I do not believe I remember any of that.

10 Q    Did you find any requests in Mr. Coleman's file or in the

11 accounting records for reimbursement of specific moving

12 expenses?

13 A    No.  I did not find anything.  And I would also just point

14 out that on his offer letter, he was given a nine month period

15 of time to provide those to the company.

16 Q    So during that period of time and after your search of

17 the records at NorthWestern, you found no requests for

18 reimbursement of living expenses?

19 A    That is correct.

20 Q    Were you surprised to see a request in his claim for the

21 reimbursement of living -- or of relocation expenses?

22 A    Yes, I was.

23 Q    Okay.  I'd ask you to turn back to the claim, which is

24 Exhibit Number 1.  I'd like to take a look at those expenses --

25 A    Okay.

1  Q    -- that have been requested.

2  A    Yes.

3  Q    If you look at the first item, it's realtor commissions.

4  What is the policy your -- at the time Mr. Coleman was, you

5  know, offered this position -- and what was the position at

6  NorthWestern on realtor commissions?

7  A    It was the normal policy of the company to pay for

8  commissions for the sale and purchase of home.

9  Q    And you -- and just consistent with your prior testimony

10 -- you never received or there's no document in the file that

11 shows a specific request for reimbursement of the commission?

12 A    We did not have such a documentation.

13 Q    Same question about loss of sale.

14 A    Again, it is not common for the company to pay for loss of

15 sale of a home.

16 Q    And again, there was no documentation on loss of sale,

17 correct?

18 A    There were no documents supporting that.

19 Q    Thank you.  With regard to moving expenses of 1,400?

20 A    We had no records of such a request.

21 Q    Okay.  But had that -- you had the records -- that would

22 have been consistent with the terms of his offer letter?

23 A    That would have been consistent, in terms of payment, yes.

24 Q    Okay.  With regard to mortgage expenses of 22,066, is it

25 -- or what is the company's position or policy on mortgage

1 expense?

2 A    Again, not quite understanding specifically what is meant

3 here by mortgage expense.  But the company does not normally

4 cover such expense, related to mortgages.

5 Q    And consistent with the other inquiries, did you not find

6 any records at NorthWestern, identifying -- in your request for

7 reimbursement -- that would fall under this category?

8 A    I found no such records.

9 Q    Thank you.  With regard to miscellaneous expenses of

10 1,240?

11 A    There is a normal requirement for payment of certain

12 miscellaneous expenses, up to a certain cap.  And I believe, in

13 looking through the books and records that we had on file --

14 with regards to Mr. Coleman's relocation -- there was a small

15 miscellaneous expense payment, but it had no other records

16 showing this miscellaneous expense request.

17 Q    Had Mr. Coleman submitted, within the nine month period,

18 documentation to support expenses, would they have been -- was

19 it NorthWestern's practice to reimburse?

20 A    We would have reimbursed all eligible expenses, that's

21 correct.

22 Q    Mr. Shrum, are you familiar with the settlement proposal

23 made to Mr. Coleman?

24 A    Yes, I am.

25 Q    And can -- and what was that settlement proposal?

1  A    The settlement proposal was for $15,000 allowed claim, to
2  essentially deal with the relocation expenses that we believe
3  might have been covered, if he would have provided those with
4  those records.

5  Q    And that was a best guess number, wasn't it, since you had
6  their documentation?

7  A    That is correct.

8  Q    Okay.  Let's turn now to the second component of Mr.
9  Coleman's claim.  Can you describe for the Court what you
10  understand that claim component to be?

11  A    It is my understanding that the claim component is in
12  regard to a performance bonus plan that was established within
13  his offer letter, with regards to annual procurement savings of
14  the company.

15  Q    Now, was that bonus plan something that anybody else
16  participated in?

17  A    I'm unable to -- I have not been able to find anyone else
18  within the company that had such an arrangement.

19  Q    So it appears to be a runoff plan for Mr. Coleman?

20  A    That is my belief, yes.

21  Q    Did you find any documentation in the company's books and
22  records, in terms of the calculation about whether any bonus
23  payment might have been owed to Mr. Coleman?

24  A    I can find no specific information related directly to Mr.
25  Coleman, in establishing whether or not he was to receive any

1  bonus payment regarding this annual savings plan.

2  Q    So in his employee file, there is no calculation, showing

3  the determination of any amount being owed under the proposed

4  bonus plan?

5  A    I can find nothing within our books and records.

6  Q    Okay.  If you were to hypothetically assume that a

7  calculation were run, based on the terms in Mr. Coleman's offer

8  letter, can you describe for the Court how you would prepare

9  such a calculation?

10 A    Essentially, what I would do is take calculations

11 established by both internal and third party evaluation of

12 potential savings, and then review those analysis, based upon

13 the annual performance bonus plan that is targeted here.  I

14 would point out that the plan not only is a result of savings,

15 but it's a quantification of actual savings, not speculated

16 savings or future savings.  It is also contingent upon netting

17 out external resource costs and internal procurement department

18 costs.  That's including compensation and benefits for Mr.

19 Coleman and his staff.  And again, I would net those two

20 numbers against each other, to determine whether or not Mr.

21 Coleman was allowed any performance bonus under this plan.

22 Q    Okay.  Let's get to the conclusion first.  Based on your

23 analysis, is Mr. Coleman entitled to any bonus, set forth on

24 the formula in his offer letter?

25 A    No, he is not.

1 Q    Okay. Let me ask you. You mentioned a third party

2 analysis. Can you tell the Court what that third party

3 analysis is?

4 A    With the procurement group at that time, a third party

5 organization, called Behring Point (phonetic), was heavily

6 engaged in the process of this program, which was called

7 operational excellence. They were there to assist, but also,

8 to help quantify any potential savings. And so, we would

9 utilize that third party analysis, as well as internal analysis

10 that was conducted by Mr. Coleman's group.

11 Q    Did Behring Point issue a written report?

12 A    Yes, they did.

13        MS. DENNISON:  Your Honor, I'd like to approach the

14 witness and hand him what -- Exhibit Number 3.

15        THE COURT:  All right.

16        MS. DENNISON:  This is a document entitled;

17 "NorthWestern Corporation's Strategic Sourcing Program Review,"

18 prepared by Behring Point, dated June 17th, 2003.

19        MR. COLEMAN:  I have a question.

20        THE COURT:  I'll get -- you'll get to ask him

21 questions, as soon as he's completed, Mr. Coleman.

22        MR. COLEMAN:  I just wanted to know if I could

23 (inaudible).

24        THE COURT:  You may proceed.

25 Q    Mr. Shrum, can you identify for the Court Exhibit Number

J&J COURT TRANSCRIBERS, INC.

1  3?

2  A    Yes.  It's a report by Behring Point.  It's dated --

3  "NorthWestern Corporation's Strategic Source and Program

4  Review."  And it's dated June 17th, 2003.

5  Q    And is this the report you referred to, in connection with

6  the third party information used to calculate or test whether

7  there was a bonus due to Mr. Coleman?

8  A    Yes, it is.

9  Q    Okay.  Can you explain for the Court how you used this

10  report in your analysis?

11  A    One of the things that we -- the company -- had asked

12  Behring Point to do was to look at the records that were

13  established within the procurement group, as well as Behring

14  Point, themselves, to quantify both the hard dollar or contract

15  dollars that were potential -- were savings within the company

16  in 2002 -- versus soft dollars or consumption savings.  That

17  was established as part of the annual -- the quarterly and

18  annual review.  And specifically, what we wanted to establish

19  was to find out what the actual savings were in 2002, versus

20  projected savings, because of consumption of such things as

21  airline travel or speculated savings.

22  Q    If -- is it fair to characterize the Behring Point report,

23  which is Exhibit Number 3, as a report that tested out certain

24  cost saving initiatives?

25  A    Yes.  I would agree with that.

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                    70

1  Q    Okay.  And why wouldn't soft cost reduction be included?

2  A    Well, I think a good example would be in the area of

3  travel.  Even though there were arrangements made to work to

4  reduce travel expenses for airlines, rental cars, hotels, to

5  get better savings for those type of things, the reason why

6  they're considered soft dollars, because if there was a

7  reduction in travel -- for instance, if the business changed or

8  if a restriction was put in place on travel -- those shouldn't

9  be considered actual savings as a result of this plan, because

10 that was a result of the actual business at that time.

11        And a good example would have been with Expanets,

12 which was the largest travel group of the organization at the

13 time.  And the consumption savings that was expected in 2002

14 was based on a projection of 2001 travel habits.  But in 2002,

15 significant travel was reduced over that period of time.  So

16 they weren't real savings, as a result of their programs that

17 were put in place.  It was savings, as a result of elimination

18 of jobs and changes of business practices.

19 Q    So it's -- those savings, based on Expanets travel -- had

20 nothing to do with the procurement department?

21 A    No.  There was nothing to do with that, because they had

22 no involvement in the reduction of headcount that occurred at

23 Expanets or the -- essentially, the elimination of business

24 travel.

25 Q    Just to put it in perspective, what was the reduction in

J&J COURT TRANSCRIBERS, INC.