1 | headcount?

2 | A    Off the top of my head, it's my understanding it was more

3 | than 1,000 individuals were severed from the company in the

4 | fourth quarter of 2001, into the first quarter of 2002.

5 | Q    So in connection with the Expanets, there would have been

6 | other soft cost reductions as well, correct?

7 | A    Absolutely.

8 | Q    And that's just a difference between taking a projection,

9 | and then looking at the actual cost at the end of the year, and

10 | attributing that portion that would have happened, regardless

11 | of whether or not there had been any activity by the

12 | procurement department?

13 | A    That is correct.

14 | Q    I'd ask you now to tell us, based on your analysis -- and

15 | we'll go back to Mr. Coleman's objection in just a second --

16 | but based on your analysis, comparing his objection to the

17 | Behring Point information, did you draw any conclusions about

18 | -- if we were to run a calculation, would Mr. Coleman be

19 | entitled to a bonus?

20 | A    Based upon the analysis of Behring Point's information --

21 | which again, establishes both hard and soft dollar analysis --

22 | and then based upon the formulas that were put together within

23 | his offer letter, that included the elimination of external, as

24 | well as internal procurement costs, there would be no savings

25 | eligible for a bonus payment.

1  Q    Can you tell the Court what the hard dollar savings were

2  for 2002?

3  A    Based upon the Behring Point report, the hard dollar

4  savings were $4,698,800.

5  Q    And what were the external costs?

6  A    Based on internal reports, the external costs were $4.3

7  million.  There were some additional -- as I indicated, I've

8  also included internal costs, including Mr. Coleman's salary,

9  as well as his staff's salary.  And that was roughly $500,000.

10  One other elimination from this $4,698,800 number was it

11  already had developed a procurement item, that Expanets had

12  already done before Mr. Coleman's group started their

13  activities.  And that was an annual savings of $273,200, which

14  should also be reduced from this hard dollar savings number.

15  Q    So in terms of doing your analysis and coming to the

16  conclusion that Mr. Coleman is not entitled to a bonus, you

17  took the hard dollar savings of $4,698,800?

18  A    That is correct.

19  Q    And then you reduced external costs -- the costs

20  attributed to Expanets -- for the result of procurement

21  reductions, that had nothing to do with Mr. Coleman.  And then,

22  you reduced internal costs by 500,000?

23  A    That is correct.

24  Q    Do you know whether, from your review of Mr. Coleman's

25  claim objection, he agrees with any of those numbers?

Shrum - Direct/Dennison                    73

1  A    I -- based on his claim request, I do not believe he

2  agrees with those.

3  Q    And did you calculate out, after reducing out those

4  reductions, whether or not there was any number?

5  A    No.  It's actually a negative number.

6  Q    And how much is it a negative number?

7  A    $374,400.

8  Q    So based on the information available to NorthWestern, in

9  its books and records, there is no bonus due under Mr.

10 Coleman's offer letter?

11 A    That is correct.

12 Q    Okay.  I'd like for you to turn now to Exhibit 2, which is

13 Mr. Coleman's claim -- response to the debtor's objection.

14 A    Okay.

15 Q    And move into the back, following the offer letter.  You

16 will see a document that's titled; "Procurement Opportunities."

17 It's the document that follows right after his offer letter.

18 A    Yes.

19 Q    Have you seen that document -- is that document in

20 NorthWestern's books and records?

21 A    Yes, it is.

22 Q    Okay.  And what is it?

23 A    I'll be honest with you.  It is -- I'm not sure what it

24 is.

25 Q    Okay.  But you did see it in the files?

Shrum - Direct/Dennison                    74

1    A    Yes, I did.

2    Q    Does it accurately reflect the information that Behring

3    Point gathered, in connection with its review?

4    A    It neither reflects Behring Point's or the internal

5    documents that were done by Mr. Coleman's department.

6    Q    Thank you.  With regard to the overall initiative score

7    cards, which is two pages beyond that document -- it looks like

8    a PowerPoint slide presentation.

9    A    Yes.

10   Q    Are these documents in NorthWestern's books and records?

11   A    Yes, they are.

12   Q    And what are they?

13   A    It is my understanding, this is the annual review of

14   overall initiative score cards, related to the procurement

15   activities of Mr. Coleman's group in 2002.

16   Q    And is this document consistent with the information

17   gathered by Behring Point?

18   A    There is differential, in terms of the total amounts, for

19   both a combination of hard and soft.  The one thing I'll point

20   out in this report is there is no breakout between hard dollar

21   savings and soft dollar savings.

22   Q    So the soft dollar savings have been included?

23   A    That is correct.

24   Q    And once again, those would be the savings that would have

25   happened, whether or not you had a procurement department or

J&J COURT TRANSCRIBERS, INC.

1  not?

2  A    And again, I would point for the specific area of travel,

3  where most of the savings were determined in this report -- the

4  $14.7 million that they put into savings.  Travel was more than

5  8.9 million, which was -- the Behring Point report points out

6  to be soft dollars, in terms of possible savings.

7  Q    That's right.  And that was, again, because of the

8  reduction of force at Expanets, correct?

9  A    Reduction of force and change in business practices for

10  travel.

11  Q    Okay.  I'd ask you to move through -- you're on Exhibit

12  Number 2 -- to the January 31, 2003 letter, on NorthWestern

13  letterhead, to Patrick Coleman.  Are you familiar with that

14  document?

15  A    I'm sorry.  Could you tell me that again?

16  Q    It's right behind the end of the --

17  A    Oh, I'm sorry.

18  Q    I believe there's a separation page, that marks this as

19  Exhibit 3, to Mr. Coleman's response to the claim objection.

20  A    You're referring to the separation agreement?

21  Q    Yes.  The letter that goes with it.

22  A    Okay.

23  Q    Are you familiar with that document?

24  A    I am familiar with it.

25  Q    And was that document in NorthWestern's books and records?

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                          76

1 A    Yes, it was.

2 Q    Okay.  And Mr. Coleman was -- was Mr. Coleman provided

3 this letter in person, in a meeting?

4 A    Yes, he was.

5 Q    And this was a meeting to basically advise him of what?

6 A    This meeting was to advise him that he was being severed

7 from the company, and that we were offering him a severance

8 agreement package.

9 Q    And did he ever accept the severance agreement package?

10 A    No, he did not.

11 Q    In connection with the prior exhibit, which were the

12 calculations that -- on the, I guess the reductions -- who

13 prepared those, if you know?

14 A    Those were prepared by Mr. Coleman's department.

15 Q    Were those prepared by Mr. Coleman, or people working at

16 his direction?

17 A    I believe it was people working under Mr. Coleman's

18 direction, but reviewed by Mr. Coleman.

19 Q    Now, was Mr. Coleman in a supervisory authority in the

20 procurement department?

21 A    Yes, he was.

22 Q    And did he -- he had, I guess, supervisory control over

23 those individuals working for him?

24 A    That is correct.

25 Q    Bonus calculations, which is Exhibit 4 to Mr. Coleman's

**J&J COURT TRANSCRIBERS, INC.**

1 claim -- response to claim objection -- it follows the

2 severance letter.

3 A    Yes.

4 Q    Based on your review of the information available at

5 NorthWestern, including the Behring Point report, do you agree

6 with these projected bonus calculations?

7 A    No, I do not.

8 Q    Okay. And is the primary differential here the soft costs

9 and the failure to reduce those other costs, such as the

10 external costs, the Expanets, and the other internal costs?

11 A    That is a primary driver for the year 2002. But then, the

12 expected savings in '03, '04, and '05 are inconsistent with

13 what the business was at NorthWestern at that point.  We no

14 longer had Expanets, Blue Dot, Cornerstone, or those

15 businesses.  So there's no savings associated with those, in

16 those subsequent years.

17 Q    And Mr. Coleman was no longer employed by NorthWestern, in

18 connection with those subsequent years, correct?

19 A    That is correct.

20 Q    In fact, his -- he was separated -- as shown by the letter

21 of separation -- in January of 2003, with a last employment

22 date of February 28th?

23 A    That is correct.

24 Q    And that's also consistent with the other books and

25 records, including this payroll information?

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                          78

1  A    That is correct.

2  Q    And I believe we've already discussed NorthWestern's

3  response to the relocation expenses, and I will not take you

4  back through that. As you sit here today, is it NorthWestern's

5  position that Mr. Coleman is entitled to any amount of allowed

6  claim?

7  A    The only potential allowed claim would be with regards to

8  the relocation expenses that -- again, we did not have that on

9  file -- any books and records of those, until this file claim

10 -- when this claim was filed.

11 Q    And -- thank you. And even though that he has identified

12 certain categories as of the date of this hearing, you've not

13 received any independent evidence, establishing amounts due for

14 any category of moving expenses, is that correct?

15 A    That is correct.

16       MS. DENNISON: Your Honor, I have no further

17 questions of this witness.

18       THE COURT: Mr. Coleman? Mr. Coleman? Are you

19 there, Mr. Coleman?

20       MR. COLEMAN: Yes, sir. Yes, Your Honor.

21       THE COURT: All right. You may ask -- do you have

22 any questions of this witness?

23       MR. COLEMAN: My first question is of the Court. I

24 have not seen Exhibit 3. Is there a way in which I can be

25 given Exhibit 3, and have time to review that?

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Cross/Coleman                    79

1    THE COURT:  Has he been provided a copy of this

2    exhibit?

3              MS. DENNISON:  No, Your Honor.

4              THE COURT:  All right.  We'll get you a copy.  What

5    else?

6              MR. COLEMAN:  Well, I'd also like to renew my request

7    to have witnesses available, to respond to Mr. Shrum's

8    testimony and to request a reconsideration for an extension.

9              THE COURT:  Do you have any questions of this

10   witness?

11             MR. COLEMAN:  I will, once I have the available --

12   the exhibit.

13                       CROSS EXAMINATION

14   BY MR. COLEMAN:

15   Q    I can ask him if he is aware that the methodology

16   developed for the calculation of the savings was developed by a

17   third party, and not by either myself or my team.  Is that

18   true, Roger?

19   A    Could you restate that again, please, in the form of a

20   question.  I didn't understand that as a question.

21   Q    Yeah.  Are you aware that the actual calculation of the

22   operational excellence, the savings methodology was not

23   developed by myself, but was developed by a third party?

24   A    I'm not aware of that.

25   Q    Were you aware that the CEOs of all the individual

                    J&J COURT TRANSCRIBERS, INC.

Shrum - Cross/Coleman                     80

1  entities had approved the calculation and methodology of the

2  savings?

3  A    I'm not aware of that.

4  Q    Were you aware that the CEOs had been reviewing them

5  savings (sic) on a monthly basis, as part of the operational

6  excellence meeting and had -- through June through December of

7  the year in question -- reviewed and approved those savings

8  calculations each and every month?

9  A    I'm not aware that they -- I know that there was reviews

10  that were done.  I'm not aware that they approved those

11  findings.  I'm not aware of any approvals, no.  There's nothing

12  in the books and records to reflect any approval of those

13  savings, I should say.

14  Q    Did you review the e-mails, between my team and the CEOs

15  of the individual entities for the time period in question?

16  A    No, I did not.

17         MR. COLEMAN:  Your Honor, I believe I would have

18  further questions for this witness, but not until after I've

19  had an opportunity to review the exhibit that's been prepared

20  and referred to as developed by Behring Point.

21         THE COURT:  All right.  There's no further questions.

22  Any redirect?

23         MS. DENNISON:  No, Your Honor.

24         THE COURT:  You're excused, sir.  Any other

25  witnesses?

81

1          MS. DENNISON:  No, Your Honor.

2          THE COURT:  All right.  Let the record show that the

3    debtor has completed its evidence on the objection to the claim

4    of Patrick Coleman, and that Mr. Coleman has requested

5    additional time, in which to submit documentation in support of

6    his claim.  The Court is convinced, however, based upon the

7    exhibits which he has submitted, that there's no basis for any

8    of the claim which he has submitted.  Through the letter,

9    February 5, 2002, he was to be given an annual performance

10   bonus -- contingent upon annual procurement of sales -- of

11   savings, and it would be one percent of the first $10 million.

12   The witness has testified that there was no savings.

13          The severance letter was issued to Mr. Coleman on

14   January the 31st, 2003, in which he was eligible for severance

15   pay of twelve weeks -- which he did not take -- which would

16   have been paid on March 7, 2003.  The IRS requires that that be

17   paid on a bonus of 27 percent withholding.  He was also to be

18   paid for any unused vacation -- hours of vacation -- and his

19   healthcare coverage would end on February 28th.

20          The documents that have been submitted by Mr. Coleman

21   to support a claim in excess of $4 million, are based upon

22   years 2003, 2004, and 2005, that far -- that exceeds any

23   reasonable estimates, but not only that; are beyond the date of

24   his severance.  And so therefore, he could not be performing

25   those services for the debtor in that year.

82

1          I further reject the performance savings of twelve

2  thirty one two thousand two, based upon the testimony of Mr.

3  Shrum.  If there is any amount of money due Mr. Coleman, based

4  upon the severance agreement, he was eligible for twelve weeks

5  of severance pay.  And the claim will be disallowed, in the

6  amount of -- will be allowed only in that amount.  And all

7  balance of the claim will be rejected.

8          Next matter?

9          MS. DENNISON:  Thank you, Your Honor.  The last

10 matter --

11         MR. COLEMAN:  Wait.  Your --

12         MS. DENNISON:  -- is Item Number --

13         MR. COLEMAN:  Your Honor?

14         THE COURT:  Yes.

15         MR. COLEMAN:  Do I have to --

16         THE COURT:  There will be an order issued by the

17 Court, Mr. Coleman.  And you will have an opportunity to review

18 that order and take whatever steps you wish, to protect your

19 rights from that order.

20         MR. COLEMAN:  Okay.  All right.  Thank you, Your

21 Honor.

22         MS. DENNISON:  Your Honor, just as a --

23         THE COURT:  Thank you.

24         MS. DENNISON:  -- matter of closing of the evidence,

25 I want to just be sure the evidence was admitted, in connection

83

1  with the --

2          THE COURT:  They're all admitted.

3          MS. DENNISON:  Thank you, Your Honor.  As a clean up

4  matter, with regard to the motion to compel, also just request

5  that all of those exhibits be deemed as admitted.

6          THE COURT:  Right.  You make the computation of the

7  severance, and submit the order with that.

8          MS. DENNISON:  Thank you, Your Honor.  With regard to

9  Matter Number 24, this is a motion to approve settlement

10 agreement between Keith Kovak (phonetic), as personal

11 representative for the estate of Donald Kovak, et al.  Your

12 Honor, this matter is -- only one objection was received.  And

13 that was in connection with the Magten.

14         For the record, this is a piece of litigation that

15 was filed in the Montana State District Court, involving injury

16 and wrongful death.  The settlement includes a (sic) allowed

17 claim of $50,000.  And that is based on the allegations set

18 forth in the claim, and the fact that this matter is the

19 subject of an appeal to the Montana Supreme Court.  And the

20 debtor believes this is a reasonable settlement, and would ask

21 for approval at this time.

22         THE COURT:  The motion is granted.

23         MS. DENNISON:  Thank you, Your Honor.  With regard to

24 Matter Number 25, this is the motion to approve settlement

25 agreement between NorthWestern Corporation, Douglas Fisher

**J&J COURT TRANSCRIBERS, INC.**

84

1  (phonetic) and Sheila Fisher. I would note for the Court that

2  the only objection received was Magten's. There are no other

3  objecting parties, and the Plan Committee has indicated its

4  support for this settlement.

5      This settlement is for $190,000 allowed claim, plus

6  the right to pursue any policy proceeds that may be available

7  under the Associated Electric and Gas Insurance Services

8  Limited policy, that's identified in the motion. NorthWestern

9  believes that this is a reasonable settlement, particularly, in

10  light that it results in a significant cap in NorthWestern's

11  self-insured retention amount, and would ask for approval of

12  this settlement at this time. And note for the record that the

13  claim amount is well in excess of $2 million.

14      THE COURT: The motion is granted.

15      MS. DENNISON: Thank you, Your Honor. Moving on to

16  Matter Number 26. This is the motion to approve the settlement

17  agreement between NorthWestern Corporation and Rebecca Meyer

18  (phonetic), as personal representative for the estate of

19  Orville Meyer. We received an objection from Magten, which the

20  Court has noted. And we've also received an objection from

21  National Union. The order has been revised to, we understand,

22  National Union's consent, saying that the -- in connection

23  with, they don't have an objection to the settlement, itself,

24  but wanted additional language in the order.

25      For the record here, Your Honor, this involves a

J&J COURT TRANSCRIBERS, INC.

1  piece of litigation in the Montana Second Judicial District,
2  involving personal injury and death, with damages claimed in
3  excess of $5 million.  The settlement amount is $100,000
4  allowed claim, plus the ability to pursue certain insurance
5  proceeds on a policy held by National Fire Insurance Company.
6  The debtor would note that this is also a cap to the
7  self-insured retention amount.  And the debtor believes that
8  the $100,000 allowed claim is in the best interest of the
9  estate.  And I note that counsel for National Union is now at
10  the podium.

11          MR. CASARINO:  Good afternoon, now, Your Honor.

12          THE COURT:  (Inaudible) matter with the amendment to
13  reserve the rights to National Union?

14          MS. DENNISON:  That's correct.

15          MR. CASARINO:  Your Honor, Marc Casarino, on behalf
16  of National Union.  With the revisions to the order, that
17  debtor's counsel has agreed to, we withdraw our objection.

18          THE COURT:  All right.  Thank you, very much.

19          MR. CASARINO:  Your Honor, that being the only matter
20  I have before you, may I be excused?

21          THE COURT:  You may.

22          MR. CASARINO:  Thank you, Your Honor.

23          THE COURT:  Number 27?

24          MS. DENNISON:  Thank you, Your Honor.  Did we get --
25  was Number 26 approved, Your Honor?  Was it granted?

1        THE COURT:  Yes.

2        MS. DENNISON:  Thank you, Your Honor.  Matter Number

3 27 is the debtor's motion for order, pursuant to Bankruptcy

4 Rule 9019, approving settlement between NorthWestern

5 Corporation and Dan Newell (phonetic).  The only objection to

6 this was Magten's, Your Honor.  And at this point, based on the

7 papers the debtor has provided, we'd ask for the Court to

8 approve the allowed claim of $850,000 for Mr. Newell.

9        THE COURT:  That preserves his right to the 92,203,

10 which has been previously granted, correct?

11       MS. DENNISON:  That's correct, Your Honor.

12       THE COURT:  All right.  The motion is granted.

13       MS. DENNISON:  Thank you.  Matter Number 28 has

14 already been disposed of, Your Honor.  That was the Milbank

15 settlement.  Matter Number 29 is the motion for order, pursuant

16 to Bankruptcy Rule 9019, approving settlement agreement between

17 NorthWestern Corporation and First Interstate Bank and Mazula

18 Parking Commission.  This settlement, Your Honor, is for a

19 $330,000 allowed claim.  It's a claim that was in excess of

20 $500,000.  It -- or $500 million, excuse me.  And it involves

21 environmental CIRCLA and other claims.

22       The debtor has a dispute -- or had a significant

23 dispute -- in connection with how the Uniform Purchase

24 Agreement should be interpreted, and believes that this amount

25 is a reasonable settlement.  And the Plan Committee is in

87

1  support thereof.  And at this time, we would ask the Court

2  approve a $330,000 allowed claim.

3          THE COURT:  One of the objections, that was voiced by

4  Magten on this claim ,is that it's a late filed claim.  What is

5  your answer?

6          MS. DENNISON:  Your Honor, the claim was not properly

7  scheduled.  And notice wasn't given.  So, the debtor had two

8  choices; to amend the schedules and put the claim in, and

9  provide these individuals with an opportunity to object.

10 Either way, we would have still ended up with a claim, because

11 the debtor didn't properly schedule it and notice was not

12 given.

13         THE COURT:  All right.  The motion will be granted.

14         MS. DENNISON:  Thank you, Your Honor.  Matter Number

15 30 is the motion for order, pursuant to Bankruptcy Rule 9019,

16 approving stipulation by and between -- or between and among --

17 NorthWestern Corporation and Richard R. Hylland.  The only

18 objection received is Magten.

19         Mr. Hylland's claim was in excess of $30 million.

20 This settlement is the result of months of negotiation, and

21 disposes of -- with certain limited exceptions -- all of the

22 Hylland claims in the NorthWestern bankruptcy, for an allowed

23 claim of $2,928,630.  And at this point, we would ask that this

24 settlement be approved.  And I note that Mr. Demmy is at the

25 podium.

88

1        THE COURT:  The motion to approve the Hylland claim

2   is granted.

3        MS. DENNISON:  Thank you, Your Honor.

4        MR. DEMMY:  Thank you.  Your Honor, may I inquire --

5   well first, I should note that the order has been revised, from

6   when it was originally filed.  And we have agreement on the

7   form of order.  I just would like to confirm with Ms. Dennison

8   that that is the case.  And the order that I saw yesterday

9   afternoon would be presented to the Court.

10       MS. DENNISON:  Yes, Mr. Demmy.  Your order will be

11  submitted under certification of counsel, since it did change.

12  And I don't have it with me, but we will submit it later today.

13  So that you will -- once submitted -- and can confirm that it

14  is the revised order.

15       MR. DEMMY:  Thank you.  And --

16       THE COURT:  Have you seen the revised order?

17       MS. DENNISON:  I have seen the language for the

18  revised order, Your Honor.  I do not have the hard copy with

19  me.

20       THE COURT:  All right.  Submit it to counsel, before

21  you give it to me, so I know --

22       MS. DENNISON:  Yes, yes.  That's --

23       THE COURT:  -- you've come to an agreement.

24       MS. DENNISON:  We would submit it under a

25  certification of counsel this afternoon.

1    MR. DEMMY:  And in that regard -- I appreciate that.

2  In that regard, may I inquire of the Court; if we submit it on

3  certification, is it likely that the order would get entered

4  today?  You know, timing is a material term in all of these

5  agreements with claimants.  And we'd like to see the order

6  entered as quickly as possible.

7    THE COURT:  As soon as I get the order, I'll fax it

8  back out to -- for docketing.

9    MR. DEMMY:  Thank you very much, Your Honor.

10    THE COURT:  If that's given to me today, it will be

11  sent out today.

12    MR. DEMMY:  Thank you.

13    THE COURT:  All right.

14    MS. DENNISON:  Your Honor, the next matter is the

15  motion for order, pursuant to Bankruptcy Rule 9019, approving

16  settlement agreement between NorthWestern Corporation, Reiser

17  War (phonetic) and Carol War.  The only objection on file was

18  that of Magten.  The Plan Committee is in support of the

19  settlement.  This is a settlement of $200,000 of allowed claim,

20  plus insurance proceeds, to the insurance policy identified in

21  the motion, which is with Associated Electric and Gas Insurance

22  Services.

23    The claim amount was north of $11 million.  And

24  through this settlement the debtor has reduced its self-insured

25  retention amount, and risks thereon for a much greater

90

1 settlement.  At this point, the debtor would ask for approval
2 of the War settlement.

3        THE COURT:  The motion is granted.

4        MS. DENNISON:  Thank you, Your Honor.  Matter Number
5 32 is the motion to approve the settlement between NorthWestern
6 Corporation and James J. Murphy.  This is following up on the
7 Court's instruction for the debtor, to determine the allowed
8 claim.  We have reached agreement with Mr. Murphy, that that
9 allowed claim should be $267,000 -- $267,460.  And I understand
10 that the order has been worked out, as between Mr. Gellert and
11 my office in Atlanta.  And we propose that the form of order be
12 submitted under certification of counsel this afternoon.

13        THE COURT:  Very well.  The motion for a settlement
14 will be granted.

15        MS. DENNISON:  Thank you, Your Honor.

16        MR. GELLERT:  Your Honor, this is Ronald Gellert.  I
17 just have a -- I guess, a housekeeping question -- with respect
18 to the entry of that order.  There has been a notice of appeal
19 filed in that matter.  And --

20        THE COURT:  I found that out.  There is an appeal.
21 And my position on that is it does not dev-est me of
22 jurisdiction, because this matter is not included with any of
23 the issues that could have been raised on appeal, pursuant to
24 the order.

25        MR. GELLERT:  Okay.


                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right?

2          MR. GELLERT:  Thank you, Your Honor.

3          THE COURT:  All right.

4          MS. DENNISON:  Matter Number 33, Your Honor, is the

5   debtor's motion for order, pursuant to Bankruptcy Rule 9019,

6   approving settlement between NorthWestern Corporation and Merle

7   Lewis.  This results in a settlement of -- providing for an

8   allowed claim of $6,500,000 in allowed claim.  The debtor filed

9   a motion to shorten time.  And I note, for the record, the

10  debtor is cognizant of the transfer of the matter  -- for

11  discovery purposes -- to Judge Baxter.  But the debtor is

12  hoping that this Court would be willing to consider this

13  settlement, so it could proceed, to effectuate the settlement

14  with Mr. Lewis.

15         The Plan Committee is in support of the settlement.

16  This settlement results with a significant reduction of the

17  claim, as filed by Mr. Lewis.  And the debtor believes that

18  it's appropriate for the settlement to be approved at this

19  time, were this Court willing to do so.

20         THE COURT:  The motion is granted.  And the

21  settlement is approved with Charter.

22         MS. DENNISON:  Thank you, Your Honor.

23         MR. LEVITSKY:  Thank you, Your Honor.  Neal Levitsky,

24  for Merle Lewis.  We would also like to see if that order could

25  be docketed today.  We understand Your Honor's very busy.

92

1 Thank you.

2       THE COURT:  I can -- the orders -- I think I have --
3 I've got a copy of that order.

4       MS. DENNISON:  Yes, Your Honor.  There was certain
5 language that --

6       THE COURT:  What did you have to change?

7       MS. DENNISON:  Yes.  There was some language that was
8 changed in that order.  And we will send over the final order
9 this afternoon.  I don't have the final copy.

10       THE COURT:  Well, can you get those to me by noon?

11       MS. DENNISON:  Yes, Your Honor.  We can certainly get
12 them to you by noon.

13       THE COURT:  All right.  We'll get it out today.

14       MR. LEVITSKY:  Thank you, Your Honor.

15       THE COURT:  I don't know when it will be docketed,
16 but it will be signed by me today.

17       MR. LEVITSKY:  I understand.

18       MS. DENNISON:  Thank you, Your Honor.

19       THE COURT:  All right.

20       MS. DENNISON:  With regard to Matter Number 34, this
21 is the motion of NorthWestern Corporation and net (phonetic)  -
22 - this motion has also been filed in the net exit case, Your
23 Honor, seeking to settle claims with John Charters.  Today, we
24 seek approval of settling the NorthWestern Claim Number 559.
25 This claim results in the payment by NorthWestern of $250,000

J&J COURT TRANSCRIBERS, INC.

1 in allowed claim.  The debtor filed a motion short in time.

2 And there have been no objections.  And the Plan Committee has

3 indicated its support for this settlement.

4        This settlement arises out of an employment contract

5 that was made between the claimant and NorthWestern, and

6 results in a significant amount of the claim, if viewed in its

7 totality.  NorthWestern has submitted, in the pleadings, that

8 it's reasonable and the best interest of the debtor, and would

9 request that the Court approve this settlement as to

10 NorthWestern at this time, and that the proposed order be

11 entered.

12        THE COURT:  How did you arrive at the 6.5 million?

13        MS. DENNISON:  For Mr. Lewis' claim?  That's a

14 combination, Your Honor, of amounts that he was owed under

15 certain non-qualified plans, because he was excluded from

16 those.  That would include the TPAP, the traditional pension

17 equalization plan, the SISP, which is -- thank you --

18 Supplemental Income Plan, temporary medical benefits, that the

19 company determined were owed to Mr. Lewis, and a component for

20 fees and costs, that was appropriate, given the level of Mr.

21 Lewis' claim.

22        THE COURT:  Is the order that's submitted on this

23 settlement agreeable to counsel?

24        MS. DENNISON:  No, Your Honor.  The order that was

25 filed on the Lewis matter has had -- has certain language that

1 | was added in earlier this week. It does not affect the amount
2 | of the allowed claim, but it does deal with the carve-out,
3 | based on certain other claims, which would include -- exclude -
4 | - minority shareholder indemnification claims, net exit tax
5 | identification claims, and other items that have been
6 | identified.

7 |        THE COURT: Counsel?

8 |        MR. LEVITSKY: Your Honor, that's correct. Just for
9 | the record, we filed a proof of claim in excess of -- just
10 | under $13 million. Thereafter, we hired an economist and had
11 | some calculations done, using the Federal Reserve discount
12 | rates, which we thought were more appropriate than that which
13 | NorthWestern was using. And the claim amounts we were coming
14 | back for were around eight and a half million. So, this is a
15 | compromise.

16 |        THE COURT: The motion will be granted, and the order
17 | will be entered.

18 |        MR. LEVITSKY: Thank you.

19 |        MS. DENNISON: Should we move to Matter 34, Your
20 | Honor, on John Charters? This is --

21 |        THE COURT: Which one?

22 |        MS. DENNISON: This is the last item on the calendar.
23 | This was when we actually filed the motion short in time on.
24 | It involves a settlement between NorthWestern net exit and John
25 | Charters. And today, we're seeking approval to settle the net

1  exit -- or, excuse me -- the NorthWestern claim, for an allowed
2  claim of $250,000.  The Plan Committee has indicated its
3  support of this settlement.  It arises out of an employment
4  contract, as between Mr. Charters and NorthWestern, and results
5  in a significant reduction of Mr. Charters' overall asserted
6  claim.

7        THE COURT:  All right.  The Charter agreement is
8  approved.

9        MS. DENNISON:  Thank you, Your Honor.  That concludes
10  the agenda.  I will hand out the orders, other than those that
11  will need to be submitted under certification of counsel, which
12  would be Mr. Hylland, Mr. Lewis.  We'll also be sending over
13  the Newell order separately, this afternoon.

14        THE COURT:  I have one question for you.  When I
15  received the agenda plus the books, there were three additional
16  bound volumes that were submitted -- sent to me.  I don't know
17  what for.  But they involved the Magten fee appeal.  And I have
18  no interest in that matter anymore.

19        MS. DENNISON:  I apologize for that, Your Honor.  On
20  that, I would confess it's a mystery to me, as well.  We'd be
21  happy to take those binders off the Court's hands.

22        THE COURT:  Well, why don't you have somebody come up
23  here?  And they can take them back and mail them back.

24        MS. DENNISON:  Thank you, Your Honor.  If that -- if
25  I could approach, as to hand up the orders at this time?  Thank

96

1  you.  Mr. Knapp has just reminded me about inquiry, as to the

2  next omnibus hearing date.

3          THE COURT:  Good question.  I'm going to get together

4  with Nancy and Jennifer.  Nancy, I'll call you when I get back

5  to chambers.  And we'll get something lined out.  There's some

6  other problems coming up.  I'll get to scheduling.  And I've

7  got to talk to her first.  We haven't got anything set yet.

8          MS. DENNISON:  Thank you, Your Honor.

9          THE COURT:  All right.  Court will be adjourned.

10          MS. DENNISON:  Thank you.

11                          * * * * *

12                  C E R T I F I C A T I O N

13          I, Shirley Nenno, court approved transcriber, certify

14  that the foregoing is a correct transcript from the official

15  electronic sound recording of the proceedings in the

16  above-entitled matter, to the best of my ability.

17

18  _Shirley Nenno_____        DATE: August 19, 2005

19  SHIRLEY NENNO

20  J&J COURT TRANSCRIBERS, INC.

21

22

23

24

25

                    J&J COURT TRANSCRIBERS, INC.

## CERTIFICATE OF SERVICE

I, Eric M. Sutty, do hereby certify that on this 23rd day of August, 2005, I caused a true and correct copy of the attached **Appendix of Exhibits in Support of Brief of Appellee, The Plan Committee** to be served upon the following parties in the manner indicated.

### Via Hand Delivery

Scott D. Cousins, Esquire
William E. Chipman, Esquire
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

William J. Burnett, Esquire
Mark J. Packel, Esquire
Elio Batista, Jr., Esquire
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801

Kathleen M. Miller, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Fl.
P.O. Box 410
Wilmington, DE 19899

Mark Kenney, Esquire
Office of the United States Trustee
844 King Street, Room 2313
Wilmington, DE 19801

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center
1201 Orange Street, Ste. 725
Wilmington, DE 19801-1155

Collin J. Seitz, Jr., Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19899

Adam G. Landis
Landis Rath & Cobb LLP
919 Market Street, Ste. 600
P.O. Box 2087
Wilmington, DE 19899

### Via U.S. First Class Mail

Amanda Darwin, Esquire
John V. Snellings, Esquire
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110

Jess H. Austin, III, Esquire
Karol K. Denniston, Esquire
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E. Suite 2400
Atlanta, GA 30308

Bonnie Steingart, Esquire
Gary L. Kaplan, Esquire
Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, NY 10064

Alan W. Kornberg, Esquire
Margaret A. Phillips, Esquire
Ephraim I. Diamond, Esquire
Talia Gil, Esquire
Paul, Weiss, Rifkind, Wharton &
 Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

598831v1

Thomas J. Knapp, VP & General
Counsel
NorthWestern Corporation
125 S. Dakota Avenue
Sioux Falls, SD  57104-6403

Eric M. Sutty (No. 4007)