UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                         .    Case No. 03-12872 (JLP)
                               .
NORTHWESTERN CORPORATION,.    824 Market Street
                               .    Wilmington, Delaware 19801
                               .
          Debtor.             .    August 10, 2005
. . . . . . . . . . . . . ..    10:30 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:                Greenberg Traurig , LLP
                               By:  WILLIAM E. CHIPMAN, JR., ESQ.
                               The Brandywine Building
                               1000 West Street
                               Suite 1540
                               Wilmington, DE  19801

                               Paul, Hastings, Janofsky &
                                 Walker, LLP
                               By:  KERI C. CHAYAVADHANANGKUR, ESQ.
                               600 Peachtree Street, N.E.
                               Atlanta, GA  30308
                               (Telephonic Appearance)

                               Roberts, Mlotkowski & Hobbes, PC
                               By:  CAROLINE D. DENNISON, ESQ.
                               8270 Greensboro Drive
                               Suite 850
                               McLean, VA  22102


Audio Operator:                Jason Smith


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For the Debtor:             Womble, Carlyle, Sandridge & Rice
                            By:  WILLIAM CAPP, ESQ.
                            One Atlantic Center
                            1201 West Peachtree Street
                            Suite 3500
                            Atlanta, GA  30309

                            By:  THOMAS KNAPP, ESQ.

For AT&T:                   Lowenstein Sandler, PC
                            By:  GEORGE E. PATTERSON, JR., ESQ.
                            65 Livingston Avenue
                            Roseland, NJ 07068
                            (Telephonic Appearance)

                            Elzufon Austin Reardon Tarlov
                              & Mondell, P.A.
                            By:  CHARLES J. BROWN, III, ESQ.
                            300 Delaware Avenue
                            Suite 1700
                            P.O. Box 1630
                            Wilmington, DE  19899

For U.S. State Dept.:       U.S. Department of Justice
                            By:  MATTHEW J. TROY, ESQ.
                            (Telephonic Appearance)

For Milbank, Tweed,         Milbank Tweed Hadley & McCloy,
Hadley & McCloy, LLP:         LLP
                            By:  RYAN DeFORD, ESQ.
                            375 Park Avenue
                            Suite 3601
                            New York, NY  10152
                            (Telephonic Appearance)

For Magten:                 Fried, Frank, Harris, Shriver
                              & Jacobson, LLP
                            By:  GARY L. KAPLAN, ESQ..
                            One New York Plaza
                            New York, NY  10004

For Law Debenture:          Nixon Peabody, LLP
                            By:  JOHN V. SNELLINGS, ESQ.
                            100 Summer Street
                            Boston, MA  02110
                            (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Richard Hylland:        Stevens & Lee
                            By:  JOHN D. DEMMY, ESQ.
                            1105 North Market Street
                            7th Floor
                            Wilmington, DE  19801

For Merle Lewis:            Fox Rothschild LLP
                            By:  NEAL J. LEVITSKY, ESQ.
                            Citizens Bank Center
                            919 North Market Street
                            Suite 1400, 14th Floor
                            Wilmington, DE  19801

For National Union         White and Williams LLP
Fire Insurance Company     By:  MARC S. CASARINO, ESQ.
of Pittsburgh, PA:         824 North Market Street
                            Suite 902
                            Wilmington, DE  19801

For First Interstate        Werb & Sullivan
Bank:                       By:  AMY D. BROWN, ESQ.
                            Tenth Floor
                            300 Delaware Avenue
                            P.O. Box 25046
                            Wilmington, DE  19899

For the Plan Committee:     The Bayard Firm
                            By:  ERIC M. SUTTY, ESQ.
                            222 Delaware Avenue
                            Suite 900
                            P.O. Box 25130
                            Wilmington, DE  19899

For James Murphy:           Eckert Seamans Cherin & Mellott, LLC
                            By: RONALD S. GELLERT, ESQ.
                            4 East 8th Street, Suite 200
                            Wilmington, Delaware 19801

For the Official            Paul, Weiss, Rifkind, Wharton
Committee of Unsecured       & Garrison LLP
Creditors:                  By:  MARGARET A. PHILLIPS, ESQ.
                                 EPHRAIM I. DIAMOND, ESQ.
                            1285 Avenue of the Americas
                            New York, NY 10019
                            (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

```
For Plaintiffs,              Lyons, Doughty & Veldhuis, PC
Agenda Item 15:              By:  HILLARY VELDHUIS, ESQ.
                             1288 Route 73, Suite 310
                             Mount Laurel, NJ  08054
```

# I N D E X

| WITNESSES FOR THE DEBTOR | PAGE |
|---|---|
| RORY SULLIVAN | |
| Direct Examination by Ms. Dennison | 29 |
| Cross Examination by Mr. Snellings | 39 |
| Redirect Examination by Ms. Dennison | 43 |
| | |
| ROGER SHRUM | |
| Direct Examination by Ms. Dennison | 58 |
| Cross Examination by Mr. Coleman | 79 |

| EXHIBITS | | IDENT. | EVID. |
|---|---|---|---|
| A | Affidavit of Mr. Sullivan | 32 | |
| Debtor-1 | Proof of Claim | 59 | 60 |
| Debtor-2 | Response | 60 | 60 |
| Debtor-3 | Report, 6/17/03 | 69 | 83 |
| Debtor-4 | Bonus Calculations | 76 | 83 |

**J&J COURT TRANSCRIBERS, INC.**

1         THE COURT:  The number of persons that I think are on

2   the telephone appearances; Margaret Phillips, from Paul Weiss

3   and Ephraim Diamond; Paul Weiss.  Are they present?

4         MS. PHILLIPS:  Yes, Your Honor.

5         MR. DIAMOND:  Yes, Your Honor.

6         THE COURT:  All right.  George Patterson, from

7   Lowenstein Sandler, AT&T?

8         MR. PATTERSON:  Yes, Your Honor.

9         THE COURT:  Matthew Troy, from the U.S. State

10  Department -- or Department of Justice?

11        MR. TROY:  Yes, Your Honor.

12        THE COURT:  Ryan deFord, from Milbank, Tweed?

13        MR. DeFORD:  Yes, Your Honor.

14        THE COURT:  And counsel for NorthWestern, Paul

15  Hastings?

16        MS. CHAYAVADHANANGKUR:  Yes, Your Honor.

17        THE COURT:  Patrick Coleman?

18        MR. COLEMAN:  Yes, Your Honor.

19        THE COURT:  Let's have the appearances, then, for

20  counsel in Wilmington.

21        MR. CHIPMAN:  Good morning, Your Honor.  William

22  Chipman; Greenberg Traurig, for the debtor.

23        MR. KAPLAN:  Good morning, Your Honor.  Gary Kaplan,

24  from Fried, Frank, on behalf of Magten.

25        MR. DEMMY:  Your Honor, John Demmy, of Stevens and

**J&J COURT TRANSCRIBERS, INC.**

1 Lee, for Richard Hylland.

2          MR. LEVITSKY:  Good morning, Your Honor.  Neal
3 Levitsky, from Fox Rothschild, for Merle Lewis.

4          MR. CASARINO:  Good morning, Your Honor.  Marc
5 Casarino, from White and Williams, LLP, for National Union Fire
6 Insurance Company of Pittsburgh, PA.

7          MS. BROWN:  Good morning, Your Honor.  Amy Brown;
8 Werb and Sullivan, on behalf of First Interstate Bank and
9 Mazula (phonetic) Parking Commission.

10          THE COURT:  Very well.

11          MR. SUTTY:  Good morning, Your Honor.  Eric Sutty, of
12 the Bayard Firm, on behalf of the Plan Committee.

13          MR. BROWN:  Good morning, Your Honor.  Charles Brown,
14 from Elzufon Austin, on behalf of AT&T.

15          MR. GELLERT:  Good morning, Your Honor.  Ronald
16 Gellert, from Eckert Seamans, on behalf of James Murphy.

17          THE COURT:  Counsel, here on --

18          MS. DENNISON:  Good morning, Your Honor.  Carol
19 Dennison, on behalf of the debtor.

20          MR. CAPP:  Good morning, Your Honor.  William Capp
21 (phonetic), for NorthWestern.

22          MR. KNAPP:  Thomas Knapp (phonetic), on behalf of
23 NorthWestern.

24          THE COURT:  Anyone else?  I'll take up the matter
25 dealing with the notice of emergency motion to extend time to

**J&J COURT TRANSCRIBERS, INC.**

1  present a claim of Patrick Coleman, filed by Patrick Coleman on

2  August the 8th of '05.  Coleman contends that he did not get

3  timely notice of this proceeding, although I notice that the

4  proof of mailing that was made by the debtor's counsel shows

5  that he was on the telecopies that were mailed out on August

6  the 1st, '05.  What's the position of the debtor?

7         MS. DENNISON:  Good morning, Your Honor.  Carol

8  Dennison, on behalf of the debtor.  It is, in fact, the

9  debtor's position that Mr. Coleman was properly served with the

10 agenda at the place of address noticed on his claim form,

11 consistent with what's reflected on the agenda.  When he

12 advised me -- when I spoke with him -- we also sent him another

13 copy, at his request.  But he was served when everyone else was

14 served.

15         THE COURT:  Mr. Coleman?

16         MR. COLEMAN:  Your Honor, I was not served.  And this

17 is not the first time that I was not served by counsel, for

18 various hearings.

19         THE COURT:  Now, what do you want the continuance to

20 do?

21         MR. COLEMAN:  To have witnesses available and to

22 subpoena records, in order to be available for the hearing,

23 regarding the claim.

24         THE COURT:  Any objection --

25         MS. DENNISON:  If I could be heard, Your Honor?

1          THE COURT:  Go ahead.

2          MS. DENNISON:  This claim objection was filed, Your
3  Honor, in February -- on February 1st.  And there was an
4  objection deadline, that was shortly thereafter, in March.
5  This claimant has had almost seven months to conduct discovery,
6  to the extent that discovery was necessary.  The agenda has
7  carried this from month to month, with the hope that a
8  settlement could be reached.  A settlement offer was made last
9  week.

10          We also note, for the record, that we're prepared to
11  proceed today.  We have Mr. Roger Shrum in the courtroom, who
12  can testify as to NorthWestern's position on why this claim
13  should be disallowed or substantially reduced.  We also believe
14  that the request for 120 day continuance is absurd, in light of
15  the fact that this has been a pending matter, where there's
16  clearly a dispute since March.  And there's been no effort by
17  the claimant to seek to do discovery, whether on an informal or
18  a formal basis.

19          And we'd note for the Court, as the Court is aware,
20  that this debtor has conducted informal discovery in most
21  cases, in connection with the claim resolution process.  This
22  is the first that anybody has been advised that this plaintiff
23  wishes to do discovery.  And we don't believe that were the
24  Court to consider continuing this matter, that a 120 days is
25  appropriate.

**J&J COURT TRANSCRIBERS, INC.**

1      Lastly, we would note for the Court that none of the
2  individuals identified in Mr. Coleman's emergency request for a
3  continuance are current employees of NorthWestern.
4  NorthWestern does not have control over and, indeed, cannot
5  produce any of those individuals.  And we'd note for the record
6  that were that the case, we did make inquiry, to see if there
7  was some way that we can, perhaps, expedite it.  But none of
8  these witnesses that Mr. Coleman says that he wants to do
9  discovery on are NorthWestern witnesses.

10      So with that, Your Honor, we think that their request
11  is untimely.  We think that this claimant is a -- based on his
12  communications with us and the Court -- it's clear that he is a
13  sophisticated businessperson and understands this process, and
14  that had he desired to take discovery, that he should have done
15  so after his objection was filed, rather than sitting on his
16  rights, letting them lapse until this claim came on for
17  hearing.

18      So we would ask the Court to deny his motion, in the
19  first place.  But in the second place, we would say that if the
20  Court is going to consider it, that it be a 30 day extension,
21  because this claim determination should not be delayed any
22  further.

23      THE COURT:  All right.  Mr. Coleman, how about your
24  response?

25      MR. COLEMAN:  I have, through the process of this --

J&J COURT TRANSCRIBERS, INC.

1  with former officers of NorthWestern -- made dozens of calls
2  regarding the process of this claim.  And I, as of last August
3  -- with Mr. Chipman -- had e-mailed him regarding what the
4  process was regarding the settlement, and was told that I would
5  be notified in due time as to the process regarding settlement
6  conferences.

7        So I have made dozens of calls to counsel to
8  NorthWestern throughout this process, and would have been happy
9  if I had been told you may prepare for today, to be exactly
10 prepared.  I have been waiting for almost two years to have had
11 an opportunity to be available to present, and being notified
12 five or six days before a hearing that's to take place in
13 Butte, Montana.  It's simply not reasonable.

14       And while it may not need to be 120 days, it would
15 need to be a minimum of 60 days, in order to gather the
16 witnesses together to be present.  And in terms of what Ms.
17 Dennison said about settlement, no one from legal counsel on
18 the debtor's side has called me regarding this matter, until
19 last Thursday -- ever.

20       THE COURT:  What have you been doing to get these
21 witnesses deposed, since you filed your claim?  What do you
22 think -- you're supposed to assert yourself into this process.
23 And you've got the right to ask for the depositions.  You can
24 notice them up.  It's a contested case.  You can utilize the
25 Federal Rules of Civil Procedure.  You haven't done any of

1 that.

2        MR. COLEMAN:  I was under the impression that a time
3 frame for settlement would happen, and that we would be sitting
4 down -- that they would ask to sit down with us.  We would talk
5 about what was to be stipulated or not stipulated, and at that
6 point, go through a discovery process.  And that's why I had
7 asked them Monday if they were going to respond in writing, so
8 I would know what parts of my claim they had the most concerns
9 with.  At this point, I have no idea -- with regard to the
10 claims -- what their concerns are.

11        THE COURT:  It looks like they're concerned with the
12 whole claim.  I'm going to deny your motion to extend the time.
13 And we'll get to the hearing on it later this morning.

14        The following items on the agenda on claims are
15 vacated, as the claims have been withdrawn on August the 9th,
16 2005.  Item Number 9, the claim of the Internal Revenue
17 Service, Claim 1066; Item Number 10, the claim of Nebraska
18 Department of Revenue, Claim 1001; Item Number 13, the
19 objection to the claim of Westchester Fire Insurance Company
20 and other insurance companies, Claims Number 630 and 885; and
21 Item Number 22, claims of Valerie Bergen, Numbers 549 and 959.

22        Before we get into the rest of the agenda, I am
23 prepared to rule on the Magten's omnibus objection to the
24 NorthWestern's motions to settle various claims, pursuant to
25 Federal Rule of Bankruptcy Procedure 9019.  The Plan Committee

13

1 has filed a reply, resisting NorWest motion -- West objection

2 -- as has the debtor, NorthWestern.  And the Court has read the

3 replies, and also, Magten's omnibus objection.

4        The omnibus objection of Magten involves the disputed

5 claims on motions, which are docketed in Numbers 3162, 3163,

6 3164, 3217, 3219, 3224, 3196, 3197, 3198, 3199, 3208, and 3197.

7 Added to this -- the agenda calendar -- were the claims

8 involving Murphy, Hylland, Lewis -- no, Murphy, Lewis and

9 Charter -- and objections have been filed by Magten to the

10 latter two claims; Charter and Lewis.

11        This Court has previously stated its position at the

12 June hearing, relative to Magten's objection.  And let me just

13 refresh that, for the record.  On June the 30th, 2005, Magten

14 objected -- at that time -- objected to certain NorWest

15 motions, pursuant to -- filed -- pursuant to 9019.  The Court

16 found no merit in Magten's argument, and approved the June 9019

17 motions at a hearing held on July the 12th, 2005.  Magten, once

18 again, has reviewed the -- renewed -- the same basis for the

19 objection in the pending motions, with one exception, which

20 I'll get to later.

21        The Plan Committee is charged with protecting the

22 interests of NorthWestern's unsecured creditors, during the

23 final stages of this Chapter 11 case.  The primary purpose of

24 the Plan Committee is to oversee the claims reconciliation and

25 settlement process.  One of those key interests is to ensure

14

1 that all unsecured creditors receive their rightful recoveries

2 in a timely manner.  The Plan Committee asserts that in filing

3 its objections -- and this is joined in by NorthWestern --

4 Magten seeks to prevent both the allowance of the proposed

5 allowed claims, as well as further distributions from the

6 disputed claims reserve; matters which fall within the Plan

7 Committee's review.

8           For example, on June 30th, 2005, the debtor filed

9 personal injury 9019 motions, seeking this Court's approval of

10 various settlement agreements, between NorWest -- NorthWestern

11 -- and the claimants, involving personal injury and wrongful

12 death claims.  On June 21 and 22, 2005, subsequent motions were

13 filed under Rule 9019 -- which are now set for hearing -- for

14 approval of various settlements between the claimants and this

15 disputed claim, involving litigation matters, legal fees, and

16 employee benefits, as well as a multitude of claims asserted by

17 former directors and officers.  Subsequent to the motion,

18 additional claims were filed on -- for settlement -- on behalf

19 of Murphy, Rourke (phonetic), Charter and Lewis.

20           Each of the 9019 motions provide that upon entry of

21 an order approving such motion, the claimant shall be deemed to

22 have an allowed claim in the amount set forth in the letter

23 agreements executed by the claimant's counsel, and would

24 receive a pro rata share of new common stock on the disputed

25 claims reserves.

**J&J COURT TRANSCRIBERS, INC.**

 1          By the objections from Magten, Magten states to --
 2  objects to -- the allowance of the proposed allowed claims
 3  filed, on its allegations that the disputed claim reserve was
 4  not sufficiently funded.  Magten seeks a stay of the claims
 5  resolution process, and asserts that neither allowance of the
 6  disputed Class 9 claims, nor distribution from the claims
 7  reserve may occur until after its complaint -- filed under
 8  Section 1144 of the Code -- has been fully and finally
 9  resolved.  That action has been stayed by prior order of this
10  Court.

11          In its objections, Magten further argues that the
12  filing of that complaint under 1144 -- along with
13  NorthWestern's alleged admissions, respecting the inadequacy of
14  the disputed claims reserve -- Magten's mischaracterization to
15  this Court's decision denying the QUIP's 9019 motion should
16  effectively halt the reorganized debtor's ongoing efforts to
17  consensually resolve outstanding claims.  But contrary to what
18  Magten contends, the Plan Committee and NorthWestern properly
19  assert that a halt to the claims process would be inequitable.

20          In laying the foundation for its argument, Magten
21  relies on what it characterizes as this Court's prior finding
22  on the disputed claims reserve is insufficient.  A review of
23  the record, however, and my review of the order, reveals that
24  that reliance is misplaced.  First, Magten wholly misconstrues
25  the Court's decision denying the QUIP's 9019 motion, as lay in

16

1  support to its argument of being -- the reserve -- being
2  underfunded.  In denying the Court's 9019 motion, the Court
3  found that the terms of the alleged settlement expressly
4  violated the terms of the plan, and that Magten's ultimate
5  proposal raised  -- for the first time, I might add, on oral
6  argument -- to dip into the disputed claims reserve was an
7  untenable solution.

8        Second, the arguments put forth that the hearing on
9  the QUIP's 9019 motion did not address the sufficiency of the
10 claim reserve, per se, and it hasn't been addressed to this
11 date.  Rather, they address NorthWestern's ability to evade the
12 claims reserve, to afford Magten the economic equivalent of a
13 quick settlement, to the detriment of the Class 7 creditors.

14       It seems to me to be totally inconsistent for Magten
15 to say it's okay for it to invade the claims reserve, but
16 doesn't allow that right to go to the other end -- secure the
17 claims of the other unsecured creditors.  The fact of the
18 matter is that the disputed claims should be resolved on the
19 merits, at least to the proposed settlements, under the
20 standards set forth in Coram Healthcare Corporation, 315 BR
21 321.

22       I hold that Magten's unsupported allegations, found
23 in the 1144 complaint, are insufficient to halt NorWest claims
24 resolution and settlement process.  And I might add that that
25 process has been successful in settling numerous contested

1  claims, well below the amount that the claimants had asserted
2  were due to them.  It is clear that the claim should and must
3  be settled, to determine whether the disputed claims reserve is
4  unfunded.  To date, there is no such find.

5          Magten asserts that unless NorthWestern agrees to
6  segregate sufficient common stock from the disputed claims
7  reserve, to satisfy the full amount of the non-accepting QUIP's
8  holder's claim, the proposed claims that are now subject to
9  allowance must not be taken up.  I think, significantly, that
10 Magten demands are contrary to the terms of the stipulation and
11 order establishing the disputed claims reserve between
12 Northwest and the QUIP indentured trustee, Law Debenture, which
13 provides that NorWest has no obligation to replenish the
14 disputed claims reserve.

15         In the absence of unsupported relief, Magten demands
16 this Court halt the number of claims that share in that
17 reserve.  I will not do so.  Contrary to Magten's assertions,
18 it would be inequitable to halt the claims resolution process,
19 pending a resolution of the 1144 proceeding.  The Court's stay
20 of that order makes it clear that the resolution of that
21 complaint is not right for immediate resolution.  It would
22 severely and inequitably hold up the entire post-confirmation
23 administration of this estate; a situation clearly created by
24 Magten's appeal of the order of confirmation of the plan.
25         The plan provides for a clear mechanism for resolving

18

1  these disputed claims, under Section 7.4 and 7.6.  Once
2  resolved, the plans require NorthWest to make a distribution on
3  account of such allowed claims, as soon as practical, following
4  its allowance.  Magten's request would indefinitely prohibit
5  compliance with the confirmed plan.

6       The orders approving the settlements of the former
7  directors and officers and other personal injury actions at the
8  -- after the July hearing -- were final and -- or have not been
9  appealed by Magten.  It's clear to me that once I had held that
10 the -- basically, at the July hearing -- that Magten's delaying
11 tactics were not meritable -- had no merit -- that now it is
12 apparent -- and no appeal having been made -- under the law of
13 the case doctrine, once an issue has been decided, the parties
14 may not re-litigate that issue in the same case.

15      So I am going to overrule the omnibus objection of
16 Magten, to the continuance of this hearing, relative to the
17 settlement of the number of security claims which we have
18 before the Court today.

19      I might further state that Magten's latest objection
20 -- filed yesterday -- objects to the hearing of the Lewis and
21 Charter claims, due to the lack of the 20 day notice.  But it
22 concedes that the Court can cause -- may shorten the time.  I
23 think the cause exists to conclude those litigation matters, as
24 well, as they have been pending for months.  And certainly,
25 Magten had got an opportunity to determine the merits of the

**J&J COURT TRANSCRIBERS, INC.**

1 litigation during the period of time.

2        I have to reiterate that compromise is generally
3 favored in bankruptcy. A consensual resolution of claims
4 minimizes litigation and expedites the administration of the
5 bankruptcy estate. Under Rule 9019 of the Federal Rules of
6 Bankruptcy Procedures, the approval of a compromised settlement
7 is well within the sound discretion of the Court. In approving
8 the settlement, the Court should not have to be content with
9 the settlement as the best possible compromise. Rather, the
10 Court must only conclude that the compromise of settlement
11 falls within the reasonable range of litigation possibilities.
12 Restated, that is, the settlement need only be above the lowest
13 point of a range of reasonableness.

14        In determining whether to approve the settlement, the
15 bankruptcy court should consider the probability of success of
16 a litigation -- underlying litigation -- the complexity of the
17 extents and delay involved, the possibility of possible
18 difficulties in administrating the estate in the paramount
19 interest of the creditors. Additionally, the Court should
20 defer to the debtor's judgment, so long as there are legitimate
21 business justifications to the action. And I must also defer
22 and give credit to the position taken by the Plan Committee,
23 relative to the settlement on the merits of each of these
24 claims.

25        And therefore, we're going to proceed to hear the

**J&J COURT TRANSCRIBERS, INC.**

20

1  calendar, relative to these 9019 motions, and decide them in an
2  appropriate manner.

3          MR. KAPLAN:  Your Honor, can I be heard?  It's Gary
4  Kaplan, from Fried Frank, on behalf of Magten.

5          THE COURT:  You may, sir.

6          MR. KAPLAN:  Thank you, Your Honor.  Your Honor, I'm
7  not going to reargue points that -- I understand Your Honor's
8  decision fairly clearly.  But, you know, I do think that there
9  is a simple way to avoid Magten being required to continue
10 objecting -- to continue to raise its point -- so that we don't
11 get to a point, at the end of the day, when our claim is
12 ultimately allowed and everybody turns around and says, sorry.
13 There's no stop left for you guys, because the reserve has been
14 totally wiped out.  And then somebody looks at us and says,
15 well, where were you when all these claims were being allowed
16 in the process?

17         And I think, very simply, Your Honor, what we would
18 be looking for would be both the debtor and the Plan Committee
19 -- who I understand Your Honor is giving significant deference
20 to -- what we would like from them is a representation;
21 whenever they are seeking this Court's allowance of claims,
22 that they represent to the Court that the disputed claims
23 reserve is sufficiently funded, so that it ultimately, all
24 disputed claims are allowed; that they will receive the full
25 distribution to which they're entitled to under the plan,

1  approximately 63 percent recovery.

2          If they cannot stand up today, Your Honor, and say
3  that it is indeed funded; that all other claimants are not
4  being harmed by allowance of these claims -- I don't
5  understand; (1) how we can be giving any deference to what the
6  Plan Committee is saying, if they haven't investigated that and
7  they can't say, then, that they are looking out for the
8  interest of all of the disputed claimants.  And that's a
9  fundamental thing.  And it should be very easy for them to
10 stand up and say -- and likewise, for the debtor to be allowing
11 claims, but not have conducted the analysis -- to be able to
12 stand up here today and to affirmatively represent that there
13 is sufficient stock.

14         And once they do that, Your Honor, I think much of
15 our future objections and our need for future objections will
16 go away, if we get those representations.  And so, I would ask
17 that Your Honor request -- from both of those parties -- that
18 they do make the representation, so when the Court looks at the
19 settlements; looks at not only what is its impact on Magten,
20 but what is the impact on all of the other unsecured creditors
21 with disputed claims?

22         Because if right now, the debtor can't say all the
23 other claimants out there with disputed claims will receive the
24 same recovery as those people who are being allowed today, then
25 there's a serious problem.  And it does need to be looked at.

**J&J COURT TRANSCRIBERS, INC.**

1 And I think the Plan Committee and the debtor need to explain

2 to this Court how it is that they are seeking to allow claims,

3 without being able to make that representation.

4       THE COURT:  Would you accept a quid pro quo for that?

5 If, in fact, in the future, relative to these disputed claims,

6 in order to avoid your objection and misrepresentation is made,

7 would you then withdraw your 1144 complaint?

8       MR. KAPLAN:  We -- I'd have to confer with the

9 client.  But we will -- if we get a representation that we are

10 comfortable with, I would have to talk to the client.  But

11 that's a possibility.  But I can't say that, without talking to

12 the client.

13       THE COURT:  All right.  Then I'll take your

14 suggestion under advisement.  And you can consult with your

15 client.  And NorthWest and the Plan Committee can consult among

16 themselves, relative to your proposal.  Thank you, counsel.

17       MR. KAPLAN:  Thank you, Your Honor.

18       THE DEPUTY:  Excuse me, Judge.  This is Nancy.  Is

19 there anyone who could adjust your camera?  We can't see you,

20 at all, here.

21       THE COURT:  You can't see me?

22       THE DEPUTY:  We can't see you.  We can see Ms.

23 Dennison.  We see the top of your head, but that's all.

24       THE COURT:  That's enough.

25       THE DEPUTY:  No, it's not.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Hold on.  We're going to get it adjusted

2  right now, Nancy.

3           THE DEPUTY:  Thank you.

4           THE COURT:  Now do you see that handsome face?

5           THE DEPUTY:  Not yet.

6           THE COURT:  All right.

7           THE DEPUTY:  Still waiting.  Now we see nobody.

8  There you go.  Thank you.

9           THE COURT:  All right.  Counsel, you may proceed with

10  the agenda, Ms. --

11           MS. DENNISON:  Thank you, Your Honor.  Let's turn to

12  agenda Item Number 1.  This is the motion for order declaring

13  the automatic stay to be inapplicable with the modification of

14  automatic stay, to permit prosecution and payment of Worker's

15  Compensation claim filed by Herman Gonzalez, et al.  I'd ask

16  the Court if we could also address Item Number 15 at the same

17  time, because this is the motion to approve the settlement,

18  with what the debtor has been referring to as the Gonzalez

19  claimants.

20           This settlement -- this matter Number 15 - is the

21  motion to approve the stipulation between NorthWestern

22  Corporation and the Gonzalez claimants.  It has been on file

23  since June 29th.  And the settlement itself, will resolve Items

24  1, 2, and 5 on this agenda.  There were no responses received

25  to the settlement stipulation and the 9019 motion.  Just for

1 the Court's edification, a quick review of this settlement

2 involves the settlement of Worker's Compensation claims by the

3 use of applicable insurance policies and is the result of a

4 fairly lengthy settlement process, during which discovery was

5 taken.  And the parties spent a fairly significant amount of

6 time negotiating the terms of the sitpulation that we seek

7 approval of here today.

8        THE COURT:  All right.  We'll take up Item 15, no

9 objections having been filed and no responses to the order.

10 The Court will enter an order, pursuant to Rule 9019, approving

11 the stipulation between NorthWestern Corporation and Herman

12 Gonzalez, Ron Lyon (phonetic), Ken Lagato (phonetic), and other

13 similarly situated putative class action claims.

14        MS. DENNISON:  Thank you, Your Honor.  If the Court

15 would prefer, given the number of orders that we would like to

16 submit today, if I could hand them up at the end of the

17 hearing?

18        THE COURT:  Hand them up at the -- all at the end.

19        MS. DENNISON:  Thank you, Your Honor.  And I think

20 there is counsel at the podium in Delaware.

21        MS. VELDHUIS:  Just in case the Judge had any

22 questions.  This is Hillary Veldhuis; Lyons, Doughty and

23 Veldhuis, counsel for the plaintiffs on Number 15.

24        MS. DENNISON:  Okay.  With that, Your Honor, I

25 believe that disposes of items on the agenda, Number 1, Number

1  2, Number 5, and Number 15.

2                THE COURT:  All right.

3                MS. DENNISON:  Turning to Item Number 3, this is the

4  motion to approve the memorandum of understanding.  This

5  involves the McGreevey (phonetic) litigation and related

6  matter, through Touch America.  The debtor is seeking to

7  continue this to the next omnibus hearing.

8                THE COURT:  On the -- is that on the Milbank Tweed

9  settlement?

10                MS. DENNISON:  No, Your Honor.  This is with the --

11  this is with Goldman Sachs and Milbank Tweed.  But the Milbank

12  Tweed settlement, we'll settle out --

13                THE COURT:  All right.  That will be rescheduled.

14                MS. DENNISON:  Thank you, Your Honor.  Item Number 4

15  is the omnibus motion for court approval to assume certain

16  executory contracts.  We are seeking to continue this, just as

17  a status report, Your Honor.  The SAP parties are exchanging

18  signature pages to an assumption and assignment agreement.  And

19  that matter should be resolved shortly, as to Veritas.  And

20  Veritas are marking up -- are working on -- identifying all of

21  the contracts to be assumed.

22                We would ask this matter be continued one final time,

23  to the next omnibus hearing, and if not resolved at that time,

24  to take it up for a hearing.

25                THE COURT:  Very well.  Motion is granted.


                    **J&J COURT TRANSCRIBERS, INC.**

26

1    MS. DENNISON:  Thank you, Your Honor.  Item Number 5

2  has been addressed.  That is the Gonzalez matter.  Number 6 is

3  the thirteen omnibus objections to certain Expanet's claims,

4  pursuant to 11 U.S.C. 502(b).  These are claims that involve

5  certain shareholders of Expanet's, that filed a claim in the

6  NorthWestern case.  And we would ask that that matter be

7  continued to the next omnibus hearing.  This matter is the

8  subject of settlement discussions and is going to require

9  coordination, as to the settlement between the NorthWestern, in

10  that exit case.

11    THE COURT:  Motion is granted, and it be settled.

12    MS. DENNISON:  Thank you, Your Honor.  The next item

13  is matter Number -- is the debtor's protective objection to

14  Claim Number 707.  This is a security class action claim, that

15  is the subject of a settlement.  The reason we are carrying

16  this is it's pending the appeal of the memorandum of

17  understanding order, and would ask that this be continued.

18    THE COURT:  Granted.

19    MS. DENNISON:  Thank you, Your Honor.  Matter Number

20  8 is the objection to Claims Number 571 and 1083, filed by

21  Touch America.  This involves certain claims, filed by Touch

22  America, the debtors -- in the debtor's case.  We are in the

23  process of tight working with Touch America regarding claim

24  resolution, and would ask that this be continued --

25    THE COURT:  It will be continued.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. DENNISON:  -- to the next omnibus hearing.  Thank

2   you.  I didn't hear that.  Item Numbers 9 and 10 have been

3   vacated.  Number 11 is the objection to Claim Number 312, of

4   Milbank, Tweed, Hadley and McCoy's claim.  The objection has

5   been resolved, pursuant to the settlement.  And the settlement

6   motion is reflected as Item Number 28, Your Honor.  And if we

7   could take Matter Number 28 up at this time?

8          THE COURT:  You may proceed with Item 28.

9          MS. DENNISON:  Thank you, Your Honor.  The debtor's

10  motion for -- this is the debtor's motion for order, pursuant

11  to Bankruptcy Rule 9019, approving the settlement agreement

12  between NorthWestern Corporation and Milbank Tweed.  This was a

13  claim that was filed by Milbank Tweed, for the delivery of

14  certain legal services.  And it was the subject of the dispute,

15  both as to the -- to which party the services were delivered.

16  After negotiation between the parties, it was agreed to settle

17  the claim for $55,493.97 in allowed claim.  The only objection

18  has been overruled, and that was the objection filed by Magten.

19  And the debtor would request approval of the settlement at this

20  time.

21          THE COURT:  No objection to the merits of the

22  settlement, having been presented.  The debtor's motion for an

23  order approving the 9019 settlement with Milbank, Tweed,

24  Hadley, and McCoy is granted.

25          MS. DENNISON:  Thank you, Your Honor.  Matter Number

**J&J COURT TRANSCRIBERS, INC.**

28
1  12, Your Honor, is the objection to Claim 20, of Hartford Life.
2  And they have withdrawn that claim.  And I believe that will
3  hit the docket shortly, Your Honor.

4           THE COURT:  Very well.

5           MS. DENNISON:  Matter Number 13 is the -- is a matter
6  that has been vacated by the Court, based on a plan withdrawal.
7  And Matter Number 14, Your Honor, is the motion to compel
8  master ballot agents to comply with the order granting debtor's
9  motion for order compelling master ballot agents to identify
10 holders of Classes 7, 8(a) and 8(b), in claims that voted
11 against releases and disclosed beneficial holders of Class
12 8(b).

13          Your Honor, there have been no objections filed to
14 this.  But so that our record is clear, I would like to call
15 Lori Sullivan, to provide brief testimony as to what has been
16 done to try to avoid the necessity of seeking a contempt order
17 and to make clear that the parties involved in the case have
18 heard what the debtor has done to address the need for
19 additional information on the beneficial holders.

20          THE COURT:  You may proceed.

21          MS. DENNISON:  Thank you, Your Honor.  At this time,
22 I call Rory Sullivan.

23          MR. SNELLINGS:  Your Honor, this is John Snellings,
24 of Nixon Peabody.  I represent Law Debenture, the Trustee --
25 the indenture trustee to the QUIPs.  After this testimony, if I

 1  could just have a moment, with regard to this particular

 2  motion?  I would appreciate it.

 3              THE COURT:  No problem, counsel.

 4              MR. SNELLINGS:  Thank you, very much.

 5              THE COURT:  If you have any questions of the witness,

 6  you may examine the witness and then make your statement.

 7              MR. SNELLINGS:  Thank you, Your Honor.

 8              THE COURT:  All right.

 9              MS. DENNISON:  Please state your name for -- do we

10  want to swear the witness, Your Honor?

11              THE COURT:  Please raise your right hand.

12              RORY SULLIVAN, DEBTOR'S WITNESS, SWORN

13              THE COURT:  State your name, address, business or

14  profession or occupation.

15              THE WITNESS:  My name is Rory Sullivan.  I'm with

16  Bonds Holder Communications Group.  I am currently a vice

17  president.

18                       DIRECT EXAMINATION

19  BY MS. DENNISON:

20  Q    Mr. Sullivan, can you tell me what your role is, or

21  describe your job at Bondholder Communications?

22  A    Bonds Holder Communications Group is a tabulation and

23  information agent, which assists debtors and plan committees or

24  any -- in any way that we might be needed.

25  Q    Okay.  And in what ways?  Can you just give the Court a

**J&J COURT TRANSCRIBERS, INC.**

1 specific description of the kind of work that you do for --

2 A    Sure.  We do collection of votes, regarding bankruptcies,

3 such as this one.  We identify beneficial bonds holders.  We

4 also act as an exchange or tender agent, in those types of

5 transactions.

6 Q    And does that involve communications with the Depository

7 Trust Company?

8 A    Yes.  It involves frequent communications.

9 Q    Which we refer to as DTC?

10 A    Correct.

11 Q    How did BCG -- well, first of all, let me strike that.

12 How long have you worked for BCG?

13 A    Since June, 2003.

14 Q    All right.  And when did BCG first become involved in the

15 NorthWestern case?

16 A    In August, 2004.  Kurtzman Carson Consultants engaged

17 Bonds Holder Communication Group.

18 Q    In connection with what activity?

19 A    With the re-solicitation for NorthWestern.

20 Q    And that would be in connection with the second amended

21 plan of disclosure statement?

22 A    Correct.

23 Q    And what was -- what, specifically, was BCG asked to do?

24 A    We were asked to tabulate the votes of the master ballot

25 agents.

Sullivan - Direct/Dennison                31

1  Q    And where did that information go, once you had tabulated
2  the master ballot agent -- master -- yes, master ballot agent
3  vote?
4  A    It was certified by us, and presented to the Court, I
5  believe.
6  Q    Okay.  And that went up through KCC or Kurtzman Carson's
7  certification, correct?
8  A    Correct.
9  Q    In connection with this motion that we're here on today,
10 what has been BCG's involvement?
11 A    BCG, in early 2005, was involved in input into the motion
12 for the order to the Court, to have master ballot agents
13 release beneficial holder information, as requested by Law
14 Debenture.
15 Q    Okay.  There was also a request for the debtor, was there
16 not?
17 A    Yes, there was.
18 Q    And what was the debtor's request?
19 A    To go to the master ballot agents and attempt to identify
20 the beneficial owners of those parties who did not release the
21 company.
22 Q    Okay.  And what process or what information was requested?
23 A    The account number of the beneficial owner, the beneficial
24 owner's name, address, and share amount, and whether or not
25 they held, as of October 20th, 2004.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Thank you.

2       MS. DENNISON:  Your Honor, if I could approach the
3  witness?  I'd like to mark, as Exhibit A, the affidavit that
4  Mr. Sullivan submitted in support of this motion, so that he
5  can have that information to testify from.

6       THE COURT:  All right.  You may proceed.

7       MS. DENNISON:  Thank you.

8       THE COURT:  That was on --

9       MS. DENNISON:  Yes.

10 Q    Mr. Sullivan, can you tell me what document I've just
11 handed you?

12 A    You've handed me an affidavit, signed by myself, to -- in
13 support of a motion to compel; (a) master ballot agents to
14 comply with order granting debtor's motion for order compelling
15 master ballot agents to; (1) identify holders of Classes 7,
16 8(a) and 8(b) claims, and whether such holder elected Option 1
17 or Option 2, and (b) seeking attorney's fees and costs.

18 Q    With regard to the activity by BCG, in connection with the
19 information provided in this affidavit -- well, first of all,
20 can you tell me, is that your signature at the end of the
21 exhibit, on Page 5?

22 A    Yes, it is.

23 Q    With regard to the information collected, what did
24 Bondholder Communications actually do to gather the information
25 that you provide in this affidavit?

**J&J COURT TRANSCRIBERS, INC.**

1  A    We initially served each master ballot agent with a copy

2  of the motion.  That was to -- and, I guess, to provide a

3  sufficient time for any master ballot agent to object to the

4  motion.  Upon confirmation of the order, it was once again

5  served to them.  And just to backtrack, we -- in each

6  circumstance, when the motion was filed -- when the motion was

7  supplied to the master ballot agents, Bonds Holder

8  Communications Group reached out by phone, to confirm receipt

9  of that motion to each master ballot agent.

10 Q    Okay.  So in connection with the filing of the initial

11 motion, seeking the additional information that both Law

12 Debenture and the debtor requested, you contacted the master

13 ballot agents?

14 A    Correct.

15 Q    Okay.  In connection with when the order was entered,

16 which was on April 5th, 2005, did you again communicate with

17 the master ballot agents?

18 A    Yes, we did.

19 Q    Okay.  And then, when -- what went on, after the initial

20 order was entered?

21 A    We were in frequent communication with the master ballot

22 agents to, you know, discuss the format of them submitting the

23 information that was requested by the Court and to answer any

24 questions, or anything like that that they may have had.

25 Q    And what level of compliance did you receive?

Sullivan - Direct/Dennison                34

1  A    Upon the initial order, that was granted by the Court in

2  April, we've had approximately -- I would say two-thirds of the

3  master balloting agents provided the information requested.

4  Q    And that was after BCG making phone calls, answering

5  questions, and communicating with those non-complying master

6  ballot agents?

7  A    That's correct.

8  Q    In June, a motion to compel was filed.  And that's the

9  motion we're here on today.  Are you familiar with that motion?

10 A    Yes, I am.

11 Q    Okay.  In connection with preparation for this hearing on

12 contempt of the Court's order, what activities did BCG

13 undertake?

14 A    BCG, once again, contacted any of the non-complying master

15 ballot agents.  And basically, we emphasized the urgency of

16 this, and explained to them, you know, that they would be held

17 accountable for failure to provide this information.  And in

18 addition to contacting the clerks of -- which are in the

19 reorganization departments of these master ballot agents, who

20 would provide us information -- in certain cases, we also

21 contacted the legal counsel's office of these non-complying

22 master ballot agents.

23 Q    And did someone from BCG -- you, or one of the people you

24 supervise -- contact every non-complying master ballot agent,

25 clerk, and general counsel's office?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.  They were either left a message or in some way, they
2  were tried to be contacted on a number of occasions.
3  Q    Okay.  With regard to the first component -- the identity
4  of the beneficial holder information, requested by Law
5  Debenture -- what is the status of compliance today?
6  A    There is only one master ballot agent who has not provided
7  the information requested.
8  Q    And who is that, or what entity is that?
9  A    It's DTC -- it's Number 976, Mercantile Safe Deposit and
10 Trust.
11 Q    Okay.  And did you prepare a report, summarizing the
12 information requested -- in terms of the beneficial holder
13 identification -- by account number?
14 A    Yes, we did.
15 Q    Okay.  And has that been prepared in a form that it can be
16 provided to Law Debenture?
17 A    Yes, it has.
18 Q    Okay.  And you have that both in electronic format and
19 hard copy?
20 A    Yes, I -- we do.
21 Q    Okay.  And has any further contact -- has anybody heard
22 anything from Mercantile Safe Deposit and Trust since the last
23 communications you made, prior to this hearing?
24 A    To my knowledge, no.
25 Q    With regard to the compliance with information requested

**J&J COURT TRANSCRIBERS, INC.**

1  by the debtor, the identity of the non-releasing parties for

2  Classes 7, 8(a) and 8(b), what is the status of non-compliance

3  at this time?

4  A    There are still a number of master ballot agents who were

5  unable to provide us with the beneficial -- or did not provide

6  us with the beneficial information.

7  Q    And those master ballot agents are identified on Page 4 of

8  your affidavit?

9  A    Yes, they are.

10  Q   Okay.  And for the record, would that be UBS Paine Webber?

11  A   Correct.

12  Q   Scott Trade?

13  A   Yes.

14  Q   Wells Fargo?

15  A   Yes.

16  Q   American Enterprise Investment?

17  A   Yes.

18  Q   Persian (phonetic) Securities?

19  A   Yes.

20  Q   J.P. Morgan?

21  A   Yes.

22  Q   Bank of New York?

23  A   Yes.

24  Q   Mercantile Safe and Deposit Trust?

25  A   Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And Bear Sterns?

2  A    Yes.

3  Q    Okay.  And aside from that, you have compliance from all

4  of the other master ballot agents?

5  A    Yes, we do.

6  Q    Okay.  As you sit here today, is there any reason why

7  distribution could not immediately take place to the 8(b)

8  Option 1 QUIP holders?

9  A    No.

10 Q    When was the earliest that distribution could have taken

11 place to the 8(b) Option 1 QUIP holders?

12 A    Upon certification of our tabulation report.

13 Q    And when was that report certified?

14 A    I believe it was October, 2004.

15 Q    Okay.  And in connection with that report, how would that

16 distribution have worked?

17 A     In connection with the report, the shares would have been

18 delivered to the Depository Trust Company -- DTC.  And DTC

19 would have then taken the instructions from the tabulation

20 report and distributed it to the master balloting agents.  And

21 from there, the master balloting agents would hold the

22 responsibility of distributing the shares to its underlying

23 beneficial holders.

24 Q    So the identity of the beneficial holders, in terms of

25 actually getting the distribution into the right hands, would

1  have been done by whom?

2  A    It would have been done by the master balloting agents.

3  Q    And they have the responsibility for knowing who

4  beneficial holders are?

5  A    Yes, they do.  They would be their clients.

6  Q    One last question, Mr. Sullivan.  Who is paying the

7  expenses -- BCG's expenses?

8  A    The debtor, NorthWestern.

9  Q    Thank you.

10         MS. DENNISON:  Your Honor, at this time, I would ask

11 for a contempt order as to those individuals that are

12 identified in Mr. Sullivan's affidavit that have not complied

13 -- the one non-complying master ballot agent on 8(b) Option 1,

14 for beneficial holders, which is Mercantile -- and then the

15 remaining list, for the non-releasing parties.  And we would

16 continue to work with -- upon receipt of that order -- continue

17 to work with BCG, to obtain the additional information.

18         THE COURT:  How much expense have you incurred to get

19 to these occupying agents?

20         THE WITNESS:  How much expenses?

21         THE COURT:  How much expense have you incurred, with

22 respect to the non-complying agents?

23         THE WITNESS:  I would say between -- it's hard for me

24 to give an estimate.  I would say maybe between $20 and

25 $50,000.

1            THE COURT:  How much?

2            THE WITNESS:  Between $20 and $50,000.

3            THE COURT:  Any other questions?

4            MS. DENNISON:  No, Your Honor.  I have no further

5  questions.

6            THE COURT:  Okay.  You may step down.

7            THE WITNESS:  Okay.  Thank you.

8            MR. SNELLINGS:  Your Honor, John Snellings.  I just

9  have a few questions.

10           THE COURT:  You have a question?  All right.  Let me

11 get out of your way.

12           MR. SNELLINGS:  Thank you.

13           THE COURT:  Go ahead, sir.

14                       CROSS EXAMINATION

15 BY MR. SNELLINGS:

16 Q    Mr. Sullivan, my name is John Snellings.  I represent Law

17 Debenture.  And you know, I just want to state first that Law

18 Debenture certainly supports everything that Bondholders

19 Communication Group has been doing to assist Law Debenture and

20 the debtor, in attempting to identify the present holders of --

21 those who chose Option 1 under the plan.  I guess I'm a little

22 confused by your last statements in your testimony, is that you

23 had stated that a distribution could have been made back on

24 October 24th, 2004.  If that is so, what has changed between

25 October 24th and today, that wouldn't allow such a distribution

                **J&J COURT TRANSCRIBERS, INC.**

1  to be made, under the process that you described in your
2  testimony?
3  A    The only difference between October 24th, 2004 and today
4  is that the -- those people who submitted a vote to their
5  master balloting agent -- instead of knowing the account
6  number, we know their name, address and, you know, their
7  personal information.
8  Q    Okay.  So the -- so you're saying that the information
9  that the master ballot agent should have had on October 24th,
10 you now have?  And this is the process that we've been going
11 through for the last several months?
12 A    Correct.
13 Q    Okay.  Now, the voting on the plan occurred on May 26th,
14 2004, correct?
15 A    Uh-hum.
16         MS. DENNISON:  Your Honor, I have to object.  That's
17 not correct.  The voting on the plan didn't occur in May.
18         THE COURT:  All right.  We'll correct that date.
19         MR. SNELLINGS:  Okay.
20         THE COURT:  Go ahead, counsel.
21 Q    And with regard to the distribution record dates, that was
22 October 20th, 2004, is that correct?
23 A    Yes, it is.
24 Q    Okay.  And in the period of time between the voting for
25 the plan and the distribution record date, could individual

**J&J COURT TRANSCRIBERS, INC.**

1 holders, who voted for Option 1, continue to trade on their

2 QUIPs, do you know?

3 A    I'm assuming that they could.  I -- that would depend on

4 their brokerage firm, whether or not they would allow such

5 trading to occur.

6 Q    And do you know -- or do you have any knowledge of how

7 many QUIPs were traded during that period?

8 A    No, I do no.

9 Q    Do you know how many people, who chose Option 1 in their

10 vote, possibly traded their QUIP shared during that period?

11 A    No, I do not.

12 Q    Do you know if there is any mechanism, whatsoever, set up

13 by the debtor, pursuant to the plan and -- that would require

14 the master ballot agents to track who was holding as of the

15 voting date and to whom they sold it to?

16 A    No, I do not.

17 Q    Okay.  So if there are holders out there with QUIPs, who

18 voted for Option 1 and then sold their shares at some later

19 date before October 20th, how can we be assured that the person

20 who is now holding the QUIP share -- as of October 20th --

21 actually voted for the plan, and that they have knowledge as to

22 who their previous owner -- what they had voted for the plan?

23 A    It's common practice, within the industry, that the master

24 ballot agents are to sort that out.  It's shares typically

25 delivered to the Depository Trust Company.  And from there, as

**J&J COURT TRANSCRIBERS, INC.**

Sullivan - Cross/Snellings                    42

1  to how people vote and the trading, that responsibility all

2  falls upon the shoulders of the master balloting agents.

3  Q    Do you have a general number of how many QUIPs Option 1

4  holders have been identified in your reports?

5  A    Do I have a general number?

6  Q    Yes.  Or even a specific number.

7  A    I know that the -- I mean, except for that one firm -- the

8  majority of the beneficial holders have been identified.

9  Q    If I recall, in the certification of voting, there was

10 631,622 QUIP shares that chose Option 1.  Is that number

11 correct, if you recall?

12 A    I would have to see a copy of the certification.  I mean,

13 I can't recall that off the top of my head.

14 Q    Okay.  So with regard to this report that you provided us,

15 how many holders -- how many shares, in the hands of holders

16 who took Option 1, have been identified to date?

17 A    118,000 shares and change can be distributed as of today.

18 Q    And that's how much can be -- new stock to be distributed.

19 I was interested in how many shares of -- how many QUIP shares

20 have been identified, out of the 631,000 that voted in favor of

21 the plan.

22 A    I don't have a total number in front of me right now.

23 Based on the count numbers that were listed on the master

24 ballots and upon receipt of the information requested by the

25 Court, we were able to match up virtually all of the beneficial

**J&J COURT TRANSCRIBERS, INC.**

1  holders and the share amounts.

2  Q    In the report that was provided to Law Debenture, it

3  indicated that there are 440,000 shares that have been

4  identified, about 70 percent of the outstanding total that

5  voted for the plan.  Does that sound correct to you?

6  A    I mean, once again, these numbers -- I mean, I don't have

7  it in front of me.  I cannot give -- you know, confirm or deny

8  that that is the number.  I just know what's in our report is

9  accurate.

10 Q    Okay.

11         MR. SNELLINGS:  I have no further questions, Your

12 Honor.

13         MS. DENNISON:  Your Honor, I have one question on

14 redirect.

15         THE COURT:  You may.

16                  REDIRECT EXAMINATION

17 BY MS. DENNISON:

18 Q    Mr. Sullivan, in connection with the -- you testified as

19 to, I guess, the ordinary course for the master ballot agents.

20 A    Yes.

21 Q    In terms of the questions that Mr. Snellings was asking

22 you, about the identification of the beneficial holders --

23 A    Uh-hum.

24 Q    -- based on your work in the industry for Bondholder

25 Communication --

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    -- are all of those things something the master ballot

3  agent would have the responsibility for determining?

4  A    Yes.

5  Q    In connection with -- and specifically, in connection with

6  any trading that took place in between the entry of the

7  confirmation order and the record date?

8  A    Yes.

9  Q    That was something that the master ballot agents are

10  required to track?

11  A    Yes.

12  Q    And with regard to any trading that took place after the

13  record date, that again is something the master ballot agents

14  are required to -- or in the ordinary course -- track?

15  A    Yes.

16  Q    Have you ever seen a circumstance, since you've been at

17  Bondholder Communications, where the master ballots agents

18  didn't conform with or comply with this industry standard?

19  A    No.

20        MS. DENNISON:  Thank you, Your Honor.  I have no

21  further questions.

22        THE COURT:  Mr. Snellings, do you have any other

23  comments?

24        MR. SNELLINGS:  Yes, Your Honor.  You can certainly

25  excuse this witness.  He doesn't have to sit there while I

**J&J COURT TRANSCRIBERS, INC.**

1  talk.

2          THE COURT:  Mr. Sullivan?

3          THE WITNESS:  Okay.  Thank you.

4          THE COURT:  Go ahead, sir.

5          MR. SNELLINGS:  Thank you, Your Honor.  Again, Law

6  Debenture certainly supports the debtor's efforts to identify

7  the Option 1 and Option 2 holders, in order to enable us --

8  whether it be Law Debenture, DTC, or the debtor -- to

9  distribute to Option 1 holders the common shares warrants, that

10  the debtor has provided for under the plan.

11          We informed the debtor, in the first week of January,

12  that Law Debenture was prepared to transfer the stock and

13  warrants received under the plan -- for the benefit of Option 1

14  -- back to the debtor, after reserving for the charging lien,

15  in order to effectuate a distribution to the Option 1 holders.

16  We remain prepared to transfer the stock and warrants since

17  that date.

18          In January, we requested information necessary to

19  make the transfer.  It was a simple request.  Who are the

20  QUIP's holders, who are entitled to the recovery set forth

21  under Option 1 of the plan?  We wanted the names, addresses,

22  and Social Security numbers.

23          We have only one holder listed on our register, and

24  that's DTC.  However, there are 71 financial institutions who

25  hold the QUIPs, according to the records of the GTC.  These

1 financial institutions; each, in turn, hold for individuals,
2 trusts, corporations, and the like, through brokerage accounts
3 at their various institutions.  We refer to these individuals
4 and trusts as the beneficial holders.  The number of beneficial
5 holders represented by one financial institution ranges from
6 one to hundreds.  Therefore, there are thousands of beneficial
7 holders.

8          The parties in this proceeding are aware of the
9 objections that Law Debenture raised to the plan at the time of
10 the disclosure statement and plan confirmation, regarding the
11 mechanisms that were or were not put in place, with regard to
12 keep (sic) the information regarding the identity of the QUIP's
13 holders who were given the choice of Option 1 or 2.  We raised
14 the objection that the debtor had not put in place proper
15 procedures for tracking the ownership of the QUIPs, based on
16 the votes cast by the holders.  We advocated that a claims
17 register be put in place, that would require holders to
18 identify themselves, turn in their securities, and vote their
19 claim as -- and recorded that on the claims register.  Any
20 further trading of the QUIPs would have been reflected by the
21 transfer of the claims on that register.

22          Other options available to the debtor might have
23 included requiring the DTC and its participant financial
24 institutions to each put such a register in place; putting the
25 burden on them of tracking and recording votes and requiring

1  that a legend be placed on all the securities, recording the
2  vote of its owner, so any subsequent owners would know where
3  they stand, with regard to Option 1 and Option 2.  None of
4  these procedures were put in place by the debtor.  And that's
5  why we're here today.

6          As I stated before, you know, the voting record was
7  -- of the plan -- was in, I believe, May 26th.  It seems like
8  there's another date.  The distribution record was October
9  20th.  The problem lies in the fact that many holders cast
10 their vote and then sold their shares, or bought more shares on
11 the open market.  Those shares, in the hands of a new owner,
12 have no notation or legend on them, to denote whether the vote
13 cast was for Option 1 or Option 2.

14         In June, the debtor provided us with the preliminary
15 results of Bondholders Communication Group, with regard to the
16 identity of Option 1 holders to date.  We spent hours poring
17 over this information provided by the debtor.  Some of our
18 worst fears have been realized.  Out of the 79 financial
19 institutions, all but four have responded to the request for
20 information.  And now -- from the testimony -- it seems like
21 all but one, which is a good step forward.

22         Of the 79, however, 20 financial institutions -- in
23 the report that we have received -- still have not provided no
24 information regarding whether their holders voted for Option 1
25 or Option 2.  Some of these 20 represent the largest QUIP's

1 holdings.  In addition, it is apparent that thousands of shares
2 changed hands.  Many institutions reported large swings in
3 holdings, between the voting record date and the distribution
4 record date.  But of course, none of the institutions have
5 provided any explanation or any information as to the trading
6 of the shares, because they were never asked to track that
7 information.  It has been testified here today that that is
8 usually a procedure of these institutions.  But since they have
9 not provided that information, I'm not quite sure whether or
10 not that is an industry standard.

11       We have grave reservations about whether complete
12 information will ever be available.  Our goal, though, is to
13 commence a distribution as quickly as possible to those Option
14 1 holders who have been identified.  And as I stated before,
15 out of the 631,000 QUIP shares attributed to Option 1, right
16 now, 442,000 have been identified.  And we believe that a
17 distribution could be made to them, of the available shares and
18 warrants.

19       We want this process to continue.  We support this
20 motion.  However, we want to be on the record that we do not
21 believe -- even once we have all that information, contrary to
22 what Bondholders Communication Group says and the debtor --
23 that we might have to return to this court, in order to seek
24 certification and some level of comfort; that, in fact, the
25 information received is accurate and that which we can rely

**J&J COURT TRANSCRIBERS, INC.**