1  upon in making a distribution.

 2       But otherwise, we support this motion and the

 3  continuing efforts of Bondholders Communication Group and the

 4  debtor.  Thank you, Your Honor.

 5       THE COURT:  Thank you.  Would you like to respond, as

 6  to whether or not this mechanism that's in place is going to

 7  get the shares to the right people?

 8       MS. DENNISON:  Yes, Your Honor.  Briefly, number one,

 9  first and foremost, the plan solicitation procedures were set

10  up to use Depository Trust Company as the distribution agent,

11  based on the industry standard; that the distribution would be

12  made to DTC, who would then make the distribution to its

13  participants.  That's another name for master ballot agents.

14  That procedure is prepared -- is totally available to Law

15  Debenture, if they want to use that procedure.  They simply

16  need to instruct DTC to issue a certain number of shares to the

17  master ballot agents.  And the master ballot agents have

18  demonstrated, by complying -- those that have complied, except

19  for the one -- that they have that information available to

20  them, in terms of who the Option 1 holders are.

21       So I understand Mr. Snellings' concern about wanting

22  detail.  But the simple way this industry works, bizarre as it

23  is, distributions are made through DTC to the master ballot

24  agents.  And the master ballot agents have the responsibility

25  for maintaining the books and records, to know who the holders

**J&J COURT TRANSCRIBERS, INC.**

50

1  -- the beneficial holders -- are.  That's the way the industry
2  works.  That's the way the plan was designed.

3      Based on Law Debenture's concerns, though, the debtor
4  has cooperated with them through that process, to get whatever
5  additional information can be had.  That information has been
6  provided, with the exception of the one master ballot agent, as
7  to the 8(b) shares.

8      I close, by saying that I think that the information
9  has been certified a number of times in this Court,
10 particularly in connection with confirmation.  It was certified
11 in the voting tabulation report.  Those documents were properly
12 filed.  There's never been any question.  No one has called
13 into question DTC's ability to perform the service it provides
14 for not only this debtor, but any other debtor or company
15 issuing shares through the DTC system.

16     We'd ask for the contempt order.  We'd also ask that
17 we be able to reserve the rights to come back to this Court, to
18 seek attorney's fees and costs -- as may be appropriate -- once
19 this process is complete.

20     And then lastly, I would note for the Court that the
21 debtor distributed our issued instructions to its transfer
22 agent, LaSalle (phonetic), on December 23rd, to issue the
23 shares to Law Debenture, as the indenture trustee for the 8(b)
24 Option 1 QUIP holders.  The debtor has done everything that it
25 can, in the ordinary course.  It has complied with the plan.

**J&J COURT TRANSCRIBERS, INC.**

1 And, you know, we'll continue to coordinate and assist Law

2 Debenture with however it chooses to make the distribution.

3 But the debtor believes it's in full compliance.

4          THE COURT:  All right.  The motion will be granted.

5          MS. DENNISON:  Thank you, Your Honor.  We will submit

6 an order, consistent with Mr. Sullivan's affidavit.  We now

7 turn to -- matter Number 15 has been addressed.  That's the

8 Gonzalez settlement.  Matter Number 16 is the motion to

9 determine the allowed amounts of the claims of Skadden Arps,

10 Kurt Weitzel (phonetic), and Syndet Mobility (phonetic).

11          The debtor filed a notice allowed claim, because the

12 claim amount matched the amount on the schedules.  Magten filed

13 an objection when the debtor filed a follow-up of its notice of

14 intent to distribute.  The debtor has then filed a motion to

15 allow these claims, in the amounts reflected in its motion.

16 And there have been no other objections, other than that of

17 Magten.  And we would ask, at this time, that the order be

18 entered.

19          THE COURT:  Motion will be granted.

20          MS. DENNISON:  Thank you, Your Honor.  Matter Number

21 17 is the motion seeking disallowance and expungement of the

22 claims of a number of individuals.  These are individuals, a

23 number of which are involved in the Montana Power; former

24 officers and directors.  As to those individuals that have

25 filed an objection, the debtor has requested that that matter

1  be continued.  As to the individuals listed here on the agenda

2  at Matter Number 17, no response was filed in connection with

3  the debtor's objection and motion to expunge the claims,

4  because they did not respond to the debtor's objection.  So we

5  would seek an order, at this time, based on the failure of

6  these individuals to file any responsive pleadings to the

7  debtor's claim objection; that an order disallowing and

8  expunging the identified claims be entered.

9           THE COURT:  Motion will be granted.

10          MS. DENNISON:  Thank you, Your Honor.  Matter Number

11  18 is the motion seeking disallowance and expungements of the

12  claims of Keith Atler (phonetic), Mary Jepson (phonetic), Abber

13  Dickle (phonetic) and et al.  Again, we have received no

14  response or -- to the debtor's objection.  And we would ask

15  that the order be entered at this time.

16          THE COURT:  Motion will be granted.

17          MS. DENNISON:  Thank you, Your Honor.  Matter Number

18  19 is the objection to Claim Number 1087 of the Matsen

19  (phonetic) plaintiffs.  This matter was set to move forward

20  today.  Some negotiations have been active.  And the parties

21  can report that a settlement has been reached, subject to

22  documentation.  We expect to present that to the Plan Committee

23  and to file the papers shortly.  We'd ask that that be

24  continued to the next omnibus hearing, so that the settlement

25  can be finalized.

**J&J COURT TRANSCRIBERS, INC.**

1    THE COURT:  All right.  The matter will be vacated to
2 receipt of the settlement documents.

3    MS. DENNISON:  Thank you, Your Honor.  Matter Number
4 20 is the objection to Claim Number 62, filed by Parry Finer
5 Net Technologies (phonetic), Claim Number 193, followed by A&T,
6 Claim Number 1067, followed by Contrarian and Claim Number
7 1080, filed by AT&T.

8    At this time, Your Honor, we also can report that the
9 parties have reached a settlement, that will need to be
10 documented and circulated, both to the Plan Committee and filed
11 with the Court.  We would ask that this matter be continued to
12 the next omnibus.

13    THE COURT:  This matter will be vacated, pending the
14 receipt of the settlement documents.

15    MS. DENNISON:  Thank you, Your Honor.  Matter Number
16 21 is the objection to Claim Number 1040, of Mineral Management
17 Service, pursuant to 11 U.S.C. 502(b) and Federal Bankruptcy
18 Rule of Procedure 2007.  At this time, Your Honor, the debtor
19 would like to proceed.  But we understand -- we have made a
20 settlement proposal to the Mineral Management Service, and are
21 still waiting on a response.  And I think Mr. Troy is in the
22 courtroom, and can speak to that, as well.

23    THE COURT:  Counsel for Mineral Management?

24    MR. TROY:  Good morning, Your Honor.  Thank you.
25 Matthew Troy, Department of Justice, on behalf of the Minerals

1  Management Service.  Your Honor, last week, I believe -- I
2  believe it was last week -- the debtor's communicated a
3  counteroffer to a settlement offer that MMS had made.  And I
4  have that offer.  Unfortunately, agency counsel is on vacation
5  this week, will be back Monday, at which point I intend to
6  discuss it with her.  So I would ask for a continuance, to
7  permit the parties to further explore settlement.

8         THE COURT:  Well, what's the prospect of the
9  settlement being accepted?  I'm not going to continue it, if
10 there's no -- just to have it come back and say, well, we
11 didn't get it made.

12        MR. TROY:  Your Honor, I can't say for certain, other
13 than that I can tell you that the debtor started with the
14 belief that the claim was worth zero.  And it has made an offer
15 well in excess of that -- much closer to what MMS thinks it's
16 worth, as asserted in the proof of claim.

17        MS. DENNISON:  Your Honor, the debtor would say that
18 this is a 30 day roll, at most.  We either need to try it or
19 get it done.  We made a good faith settlement proposal.
20 There's been a counter once.  And I think that if we can't wrap
21 it up, it should be set for a contested hearing at the next
22 omnibus.

23        THE COURT:  I'll give the parties 20 days to submit
24 the settlement documents.  Is that all right, counsel?
25        MR. TROY:  That's fine, Your Honor.  And just to

**J&J COURT TRANSCRIBERS, INC.**

1 clarify the record, Your Honor, I think there's some confusion
2 on how the settlement offer progressed here.  An objection was
3 made.  MMS filed a response.  The debtors asked for a
4 settlement offer from MMS as an accommodation, and we made that
5 accommodation.  And it took -- with all due respect to the
6 debtors and Ms. Dennison -- a month, two months, for the
7 debtors to respond to that just this past week.  And frankly --

8        THE COURT:  Just -- all right.  I'm just trying to
9 get this case closed.

10        MR. TROY:  I understand, Your Honor.  But I just want
11 to make clear that if there's any delay here, it's not been at
12 the seat of MMS.

13        THE COURT:  All right.  20 days should be enough to
14 make up your mind.  It's not that big a claim.

15        MR. TROY:  Understood, Your Honor.

16        THE COURT:  Thank you, very much.

17        MR. TROY:  Thank you.

18        THE COURT:  We will vacate the hearing, pending
19 receipt of the settlement documents, if any.

20        MS. DENNISON:  And --

21        THE COURT:  Item 22 has been vacated.

22        MS. DENNISON:  That's correct, Your Honor.  Item
23 Number 23 is the 15 omnibus objection to certain employment
24 related claims.  There are three parties that this matter is
25 going forward to; Linda Lindeman (phonetic), Michael Young, and

**J&J COURT TRANSCRIBERS, INC.**

1  Patrick Coleman.  As to the Lindeman claim, a settlement has
2  been reached.  And we'd like to provide a stipulation of
3  settlement in that claim.  The Plan Committee has reviewed it.
4  And -- I lost my notes.

5          The settlement amount, Your Honor, is $45,000.  And
6  the background on the claim is it arises out of a claim for the
7  reimbursement of medical expenses.  There was a legitimate
8  dispute, as between the debtor and the claimant.  And the
9  45,000 is a reasonable number, in light of the facts, as pled
10 in the complaint.  So we'd like to submit the stipulation, with
11 an order to follow, based on the claim being allowed at 45,000,
12 which is a reduction over the initial claim filed.

13          THE COURT:  Very well.  You may proceed with the
14 settlement.

15          MS. DENNISON:  Thank you, Your Honor.  The next item
16 is Michael Young.  The parties have reached a settlement, as to
17 the monetary amount of the allowed claim.  There is a dispute
18 over the form of order to be submitted.  A counterproposal was
19 received late last night.  And the debtor is going to need some
20 period of time to evaluate the counterproposal.  What we would
21 suggest -- and if we do not have an agreed order by the end of
22 this week -- that this matter be set for a hearing at the next
23 omnibus hearing.

24          THE COURT:  Well, how close are you?  Because I --
25          MS. DENNISON:  How close are we, Your Honor?

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  I'm --

2           MS. DENNISON:  We have resolved the allowed amount of

3 the claim.  There is a request for language in the order, that

4 the debtor cannot accept at this point.  I would think that

5 with further discussion, we should be able to reach acceptable

6 language to both parties, and submit an order on certification.

7 If that cannot be accomplished -- and I am talking about an

8 extremely short term -- by the end of this week, then we will

9 need to proceed with a contested hearing on this claim.

10          THE COURT:  All right.  I'll grant the parties seven

11 days in which to file the settlement documents.

12          MS. DENNISON:  Thank you, Your Honor.  The next

13 matter is the matter of Patrick Coleman.

14          THE COURT:  Mr. Coleman, are you still there?

15          MR. COLEMAN:  Yes, sir -- Your Honor.

16          MS. DENNISON:  The debtor is happy to proceed with

17 the claim objection, Your Honor, recognizing this is, of

18 course, a claimant.  I'm happy to defer the Court, in terms of

19 how the Court might like to proceed.

20          THE COURT:  Do you have a witness?

21          MS. DENNISON:  I do, Your Honor.

22          THE COURT:  Call your witness.

23          MS. DENNISON:  Thank you, Your Honor.  We call Roger

24 Shrum to the stand.

25          THE COURT:  Raise your right hand, sir.

1            ROGER SHRUM, DEBTOR'S WITNESS, SWORN

2            THE COURT:  State your name and address and your

3  business or profession or occupation.

4            THE WITNESS:  My name is Roger Shrum.  I am vice

5  president of Human Resources and Communications for

6  NorthWestern Corporation in Sioux Falls, South Dakota.

7                     DIRECT EXAMINATION

8  BY MS. DENNISON:

9  Q    Mr. Shrum, can you give us a brief overview of what your

10 job involves?

11 A    Yes.  I took my current position in December of 2003, and

12 currently responsible for the company's human resources

13 activities, as well as investor relations and communications.

14 Q    Okay.  And would that include familiarity with the former

15 employees file?

16 A    Yes, it would.

17 Q    And in connection with today's hearing, have you reviewed

18 Mr. Coleman's file?

19 A    Yes, I have.

20 Q    And have you reviewed all the other books and records

21 available to you, about the employment of Mr. Coleman?

22 A    Yes, I have.

23 Q    I want -- Your Honor, I'd like to approach the witness, to

24 hand up Exhibit Number 1, which is Mr. Coleman's proof of

25 claim.  May I approach?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  You may.

2          MS. DENNISON:  Thank you, Your Honor.

3  Q    Mr. Shrum, are you familiar with Exhibit Number 1?

4  A    Yes, I am.

5  Q    And what is it?

6  A    It is a proof of claim, from Patrick Coleman.  Do you want

7  me to state the amount?

8  Q    Yes, please.

9  A    For the amount of $4,088,473, plus Schedule A, which is an

10 additional $56,846 for relocation expenses.

11 Q    Okay.  And you reviewed -- you have reviewed this claim,

12 correct?

13 A    Yes, I have.

14 Q    And are you aware that NorthWestern filed an objection to

15 Mr. Coleman's claims, based on books and records?

16 A    Yes, I have -- yes, I know.

17 Q    And in NorthWestern's books and records or any files

18 available to NorthWestern, did you find anything to support Mr.

19 Coleman's claims?

20 A    No, I did not.

21 Q    Okay.  I will talk about the specifics of the claim in

22 just a second.

23          MS. DENNISON:  Your Honor, I'd like to mark, as

24 Exhibit Number 2, claimant Patrick Coleman's response to the

25 objection over the note.

1      THE COURT:  Exhibit 2.  Exhibit 1 is admitted.

2  Exhibit 2 is the response?

3      MS. DENNISON:  Yes, Your Honor.

4      THE COURT:  Exhibit 2 is admitted.

5      MS. DENNISON:  Thank you, Your Honor.

6  Q    Mr. Shrum, have you reviewed Patrick Coleman's response to

7  the objections of the debtor?

8  A    Yes, I have.

9  Q    Okay.  What -- if we were to break Mr. Coleman's claim

10  down into two component parts, what would those parts be?

11  A    Essentially, there are two specific request for claim.

12  One is for his incentive compensation plan, that was

13  established.  And then secondly, is for relocation expenses.

14  Q    Okay.  Mr. Coleman, I believe, was employed by

15  NorthWestern in 2002, is that correct?

16  A    That is correct.

17  Q    Did he have an employment -- did you find, when you

18  searched the books and records, any employment contract?

19  A    No, I did not.

20  Q    What did you find for Mr. Coleman?

21  A    I found an employment letter agreement -- not stipulating

22  -- but outlining the hiring of Mr. Coleman.

23  Q    If you look at Exhibit Number 2, which is Mr. Coleman's

24  response to the debtor's objection, can you find a copy of that

25  letter?

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                61

1           THE COURT:  State the date of that letter.

2           MS. DENNISON:  Thank you, Your Honor.  It's February

3   5th, 2002.  And it's about five pages into --

4           THE COURT:  All right.

5           MS. DENNISON:  -- Mr. Coleman's exhibit.

6   A    I found that letter.

7   Q    Okay.  Was that letter also in the request for his books

8   and records?

9   A    Yes, it is.

10  Q    Okay.  And is this the offer letter that you refer to?

11  A    Yes, it is.

12  Q    Can you tell me what position Mr. Coleman was offered in

13  February of 2002?

14  A    Chief Procurement Officer.

15  Q    And what does a Chief Procurement Officer do?

16  A    It is my understanding that the Chief Procurement Officer

17  was essentially responsible for our purchasing activities for

18  the corporation at that time.

19  Q    Okay.  And how did Mr. Coleman's employment at

20  NorthWestern end?

21  A    He was severed from the company, as part of a

22  reorganization, in 2003 -- early 2003.

23  Q    Would that be a reduction in force?

24  A    Yes, it was.

25  Q    Were the other members of his department also severed at

**J&J COURT TRANSCRIBERS, INC.**

 1  that time?

 2  A    Yes, they were.

 3  Q    Okay.  And basically, the department was pretty much

 4  eliminated?

 5  A    That is correct.

 6  Q    Is -- do you -- if you know, do you know whether South

 7  Dakota is an at will employment state?

 8  A    Yes, it is.

 9  Q    Thank you.  So the search in the records established this

10  offer letter, correct?

11  A    That is correct.

12  Q    And based on your books and records, you were also able to

13  establish that Mr. Coleman accepted and was basically employed,

14  for a period of time?

15  A    That is correct.

16  Q    And did you review Mr. Coleman's payroll records?

17  A    Yes, I did.

18  Q    And what did those payroll records show?

19  A    It showed that he was paid for the period of time in which

20  he worked for the company, normal wages and other

21  reimbursements.

22  Q    So that would be consistent with the terms of the offer

23  letter?

24  A    That is correct.

25  Q    What did you find, in connection with the reimbursement of

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                    63

1  moving expenses?

2  A    There was some reimbursement of relocation expenses.  I

3  don't have the specific amounts in front of me, but there was

4  some relocation expenses that were provided for Mr. Coleman.

5  Q    Do you recall the category?

6  A    I believe that they were for temporary living expenses.

7  Q    Okay.  Did you find any evidence of any reimbursement for

8  any other category of relocation expenses?

9  A    I do not believe I remember any of that.

10 Q    Did you find any requests in Mr. Coleman's file or in the

11 accounting records for reimbursement of specific moving

12 expenses?

13 A    No.  I did not find anything.  And I would also just point

14 out that on his offer letter, he was given a nine month period

15 of time to provide those to the company.

16 Q    So during that period of time and after your search of

17 the records at NorthWestern, you found no requests for

18 reimbursement of living expenses?

19 A    That is correct.

20 Q    Were you surprised to see a request in his claim for the

21 reimbursement of living -- or of relocation expenses?

22 A    Yes, I was.

23 Q    Okay.  I'd ask you to turn back to the claim, which is

24 Exhibit Number 1.  I'd like to take a look at those expenses --

25 A    Okay.

J&J COURT TRANSCRIBERS, INC.

1  Q    -- that have been requested.

2  A    Yes.

3  Q    If you look at the first item, it's realtor commissions.

4  What is the policy your -- at the time Mr. Coleman was, you

5  know, offered this position -- and what was the position at

6  NorthWestern on realtor commissions?

7  A    It was the normal policy of the company to pay for

8  commissions for the sale and purchase of home.

9  Q    And you -- and just consistent with your prior testimony

10 -- you never received or there's no document in the file that

11 shows a specific request for reimbursement of the commission?

12 A    We did not have such a documentation.

13 Q    Same question about loss of sale.

14 A    Again, it is not common for the company to pay for loss of

15 sale of a home.

16 Q    And again, there was no documentation on loss of sale,

17 correct?

18 A    There were no documents supporting that.

19 Q    Thank you.  With regard to moving expenses of 1,400?

20 A    We had no records of such a request.

21 Q    Okay.  But had that -- you had the records -- that would

22 have been consistent with the terms of his offer letter?

23 A    That would have been consistent, in terms of payment, yes.

24 Q    Okay.  With regard to mortgage expenses of 22,066, is it

25 -- or what is the company's position or policy on mortgage

1  expense?

2  A    Again, not quite understanding specifically what is meant

3  here by mortgage expense.  But the company does not normally

4  cover such expense, related to mortgages.

5  Q    And consistent with the other inquiries, did you not find

6  any records at NorthWestern, identifying -- in your request for

7  reimbursement -- that would fall under this category?

8  A    I found no such records.

9  Q    Thank you.  With regard to miscellaneous expenses of

10  1,240?

11  A    There is a normal requirement for payment of certain

12  miscellaneous expenses, up to a certain cap.  And I believe, in

13  looking through the books and records that we had on file --

14  with regards to Mr. Coleman's relocation -- there was a small

15  miscellaneous expense payment, but it had no other records

16  showing this miscellaneous expense request.

17  Q    Had Mr. Coleman submitted, within the nine month period,

18  documentation to support expenses, would they have been -- was

19  it NorthWestern's practice to reimburse?

20  A    We would have reimbursed all eligible expenses, that's

21  correct.

22  Q    Mr. Shrum, are you familiar with the settlement proposal

23  made to Mr. Coleman?

24  A    Yes, I am.

25  Q    And can -- and what was that settlement proposal?

**J&J COURT TRANSCRIBERS, INC.**

1  A    The settlement proposal was for $15,000 allowed claim, to
2  essentially deal with the relocation expenses that we believe
3  might have been covered, if he would have provided those with
4  those records.
5  Q    And that was a best guess number, wasn't it, since you had
6  their documentation?
7  A    That is correct.
8  Q    Okay.  Let's turn now to the second component of Mr.
9  Coleman's claim.  Can you describe for the Court what you
10  understand that claim component to be?
11  A    It is my understanding that the claim component is in
12  regard to a performance bonus plan that was established within
13  his offer letter, with regards to annual procurement savings of
14  the company.
15  Q    Now, was that bonus plan something that anybody else
16  participated in?
17  A    I'm unable to -- I have not been able to find anyone else
18  within the company that had such an arrangement.
19  Q    So it appears to be a runoff plan for Mr. Coleman?
20  A    That is my belief, yes.
21  Q    Did you find any documentation in the company's books and
22  records, in terms of the calculation about whether any bonus
23  payment might have been owed to Mr. Coleman?
24  A    I can find no specific information related directly to Mr.
25  Coleman, in establishing whether or not he was to receive any

1  bonus payment regarding this annual savings plan.

2  Q    So in his employee file, there is no calculation, showing

3  the determination of any amount being owed under the proposed

4  bonus plan?

5  A    I can find nothing within our books and records.

6  Q    Okay.  If you were to hypothetically assume that a

7  calculation were run, based on the terms in Mr. Coleman's offer

8  letter, can you describe for the Court how you would prepare

9  such a calculation?

10 A    Essentially, what I would do is take calculations

11 established by both internal and third party evaluation of

12 potential savings, and then review those analysis, based upon

13 the annual performance bonus plan that is targeted here.  I

14 would point out that the plan not only is a result of savings,

15 but it's a quantification of actual savings, not speculated

16 savings or future savings.  It is also contingent upon netting

17 out external resource costs and internal procurement department

18 costs.  That's including compensation and benefits for Mr.

19 Coleman and his staff.  And again, I would net those two

20 numbers against each other, to determine whether or not Mr.

21 Coleman was allowed any performance bonus under this plan.

22 Q    Okay.  Let's get to the conclusion first.  Based on your

23 analysis, is Mr. Coleman entitled to any bonus, set forth on

24 the formula in his offer letter?

25 A    No, he is not.

**J&J COURT TRANSCRIBERS, INC.**

1  Q   Okay.  Let me ask you.  You mentioned a third party

2  analysis.  Can you tell the Court what that third party

3  analysis is?

4  A   With the procurement group at that time, a third party

5  organization, called Behring Point (phonetic), was heavily

6  engaged in the process of this program, which was called

7  operational excellence.  They were there to assist, but also,

8  to help quantify any potential savings.  And so, we would

9  utilize that third party analysis, as well as internal analysis

10 that was conducted by Mr. Coleman's group.

11 Q   Did Behring Point issue a written report?

12 A   Yes, they did.

13         MS. DENNISON:  Your Honor, I'd like to approach the

14 witness and hand him what -- Exhibit Number 3.

15         THE COURT:  All right.

16         MS. DENNISON:  This is a document entitled;

17 "NorthWestern Corporation's Strategic Sourcing Program Review,"

18 prepared by Behring Point, dated June 17th, 2003.

19         MR. COLEMAN:  I have a question.

20         THE COURT:  I'll get -- you'll get to ask him

21 questions, as soon as he's completed, Mr. Coleman.

22         MR. COLEMAN:  I just wanted to know if I could

23 (inaudible).

24         THE COURT:  You may proceed.

25 Q   Mr. Shrum, can you identify for the Court Exhibit Number

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                    69

1  3?

2  A    Yes.  It's a report by Behring Point.  It's dated --

3  "NorthWestern Corporation's Strategic Source and Program

4  Review."  And it's dated June 17th, 2003.

5  Q    And is this the report you referred to, in connection with

6  the third party information used to calculate or test whether

7  there was a bonus due to Mr. Coleman?

8  A    Yes, it is.

9  Q    Okay.  Can you explain for the Court how you used this

10  report in your analysis?

11  A    One of the things that we -- the company -- had asked

12  Behring Point to do was to look at the records that were

13  established within the procurement group, as well as Behring

14  Point, themselves, to quantify both the hard dollar or contract

15  dollars that were potential -- were savings within the company

16  in 2002 -- versus soft dollars or consumption savings.  That

17  was established as part of the annual -- the quarterly and

18  annual review.  And specifically, what we wanted to establish

19  was to find out what the actual savings were in 2002, versus

20  projected savings, because of consumption of such things as

21  airline travel or speculated savings.

22  Q    If -- is it fair to characterize the Behring Point report,

23  which is Exhibit Number 3, as a report that tested out certain

24  cost saving initiatives?

25  A    Yes.  I would agree with that.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  And why wouldn't soft cost reduction be included?

2  A    Well, I think a good example would be in the area of

3  travel.  Even though there were arrangements made to work to

4  reduce travel expenses for airlines, rental cars, hotels, to

5  get better savings for those type of things, the reason why

6  they're considered soft dollars, because if there was a

7  reduction in travel -- for instance, if the business changed or

8  if a restriction was put in place on travel -- those shouldn't

9  be considered actual savings as a result of this plan, because

10 that was a result of the actual business at that time.

11         And a good example would have been with Expanets,

12 which was the largest travel group of the organization at the

13 time.  And the consumption savings that was expected in 2002

14 was based on a projection of 2001 travel habits.  But in 2002,

15 significant travel was reduced over that period of time.  So

16 they weren't real savings, as a result of their programs that

17 were put in place.  It was savings, as a result of elimination

18 of jobs and changes of business practices.

19 Q    So it's -- those savings, based on Expanets travel -- had

20 nothing to do with the procurement department?

21 A    No.  There was nothing to do with that, because they had

22 no involvement in the reduction of headcount that occurred at

23 Expanets or the -- essentially, the elimination of business

24 travel.

25 Q    Just to put it in perspective, what was the reduction in

1 headcount?

2 A    Off the top of my head, it's my understanding it was more

3 than 1,000 individuals were severed from the company in the

4 fourth quarter of 2001, into the first quarter of 2002.

5 Q    So in connection with the Expanets, there would have been

6 other soft cost reductions as well, correct?

7 A    Absolutely.

8 Q    And that's just a difference between taking a projection,

9 and then looking at the actual cost at the end of the year, and

10 attributing that portion that would have happened, regardless

11 of whether or not there had been any activity by the

12 procurement department?

13 A    That is correct.

14 Q    I'd ask you now to tell us, based on your analysis -- and

15 we'll go back to Mr. Coleman's objection in just a second --

16 but based on your analysis, comparing his objection to the

17 Behring Point information, did you draw any conclusions about

18 -- if we were to run a calculation, would Mr. Coleman be

19 entitled to a bonus?

20 A    Based upon the analysis of Behring Point's information --

21 which again, establishes both hard and soft dollar analysis --

22 and then based upon the formulas that were put together within

23 his offer letter, that included the elimination of external, as

24 well as internal procurement costs, there would be no savings

25 eligible for a bonus payment.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Can you tell the Court what the hard dollar savings were
2  for 2002?

3  A    Based upon the Behring Point report, the hard dollar
4  savings were $4,698,800.

5  Q    And what were the external costs?

6  A    Based on internal reports, the external costs were $4.3
7  million.  There were some additional -- as I indicated, I've
8  also included internal costs, including Mr. Coleman's salary,
9  as well as his staff's salary.  And that was roughly $500,000.
10 One other elimination from this $4,698,800 number was it
11 already had developed a procurement item, that Expanets had
12 already done before Mr. Coleman's group started their
13 activities.  And that was an annual savings of $273,200, which
14 should also be reduced from this hard dollar savings number.

15 Q    So in terms of doing your analysis and coming to the
16 conclusion that Mr. Coleman is not entitled to a bonus, you
17 took the hard dollar savings of $4,698,800?

18 A    That is correct.

19 Q    And then you reduced external costs -- the costs
20 attributed to Expanets -- for the result of procurement
21 reductions, that had nothing to do with Mr. Coleman.  And then,
22 you reduced internal costs by 500,000?

23 A    That is correct.

24 Q    Do you know whether, from your review of Mr. Coleman's
25 claim objection, he agrees with any of those numbers?

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                    73

1 A    I -- based on his claim request, I do not believe he

2 agrees with those.

3 Q    And did you calculate out, after reducing out those

4 reductions, whether or not there was any number?

5 A    No.  It's actually a negative number.

6 Q    And how much is it a negative number?

7 A    $374,400.

8 Q    So based on the information available to NorthWestern, in

9 its books and records, there is no bonus due under Mr.

10 Coleman's offer letter?

11 A    That is correct.

12 Q    Okay.  I'd like for you to turn now to Exhibit 2, which is

13 Mr. Coleman's claim -- response to the debtor's objection.

14 A    Okay.

15 Q    And move into the back, following the offer letter.  You

16 will see a document that's titled; "Procurement Opportunities."

17 It's the document that follows right after his offer letter.

18 A    Yes.

19 Q    Have you seen that document -- is that document in

20 NorthWestern's books and records?

21 A    Yes, it is.

22 Q    Okay.  And what is it?

23 A    I'll be honest with you.  It is -- I'm not sure what it

24 is.

25 Q    Okay.  But you did see it in the files?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I did.

2  Q    Does it accurately reflect the information that Behring

3  Point gathered, in connection with its review?

4  A    It neither reflects Behring Point's or the internal

5  documents that were done by Mr. Coleman's department.

6  Q    Thank you.  With regard to the overall initiative score

7  cards, which is two pages beyond that document -- it looks like

8  a PowerPoint slide presentation.

9  A    Yes.

10 Q    Are these documents in NorthWestern's books and records?

11 A    Yes, they are.

12 Q    And what are they?

13 A    It is my understanding, this is the annual review of

14 overall initiative score cards, related to the procurement

15 activities of Mr. Coleman's group in 2002.

16 Q    And is this document consistent with the information

17 gathered by Behring Point?

18 A    There is differential, in terms of the total amounts, for

19 both a combination of hard and soft.  The one thing I'll point

20 out in this report is there is no breakout between hard dollar

21 savings and soft dollar savings.

22 Q    So the soft dollar savings have been included?

23 A    That is correct.

24 Q    And once again, those would be the savings that would have

25 happened, whether or not you had a procurement department or

1 not?

2 A    And again, I would point for the specific area of travel,

3 where most of the savings were determined in this report -- the

4 $14.7 million that they put into savings.  Travel was more than

5 8.9 million, which was -- the Behring Point report points out

6 to be soft dollars, in terms of possible savings.

7 Q    That's right.  And that was, again, because of the

8 reduction of force at Expanets, correct?

9 A    Reduction of force and change in business practices for

10 travel.

11 Q    Okay.  I'd ask you to move through -- you're on Exhibit

12 Number 2 -- to the January 31, 2003 letter, on NorthWestern

13 letterhead, to Patrick Coleman.  Are you familiar with that

14 document?

15 A    I'm sorry.  Could you tell me that again?

16 Q    It's right behind the end of the --

17 A    Oh, I'm sorry.

18 Q    I believe there's a separation page, that marks this as

19 Exhibit 3, to Mr. Coleman's response to the claim objection.

20 A    You're referring to the separation agreement?

21 Q    Yes.  The letter that goes with it.

22 A    Okay.

23 Q    Are you familiar with that document?

24 A    I am familiar with it.

25 Q    And was that document in NorthWestern's books and records?

**J&J COURT TRANSCRIBERS, INC.**

Shrum - Direct/Dennison                    76

1  A    Yes, it was.

2  Q    Okay.  And Mr. Coleman was -- was Mr. Coleman provided

3  this letter in person, in a meeting?

4  A    Yes, he was.

5  Q    And this was a meeting to basically advise him of what?

6  A    This meeting was to advise him that he was being severed

7  from the company, and that we were offering him a severance

8  agreement package.

9  Q    And did he ever accept the severance agreement package?

10 A    No, he did not.

11 Q    In connection with the prior exhibit, which were the

12 calculations that -- on the, I guess the reductions -- who

13 prepared those, if you know?

14 A    Those were prepared by Mr. Coleman's department.

15 Q    Were those prepared by Mr. Coleman, or people working at

16 his direction?

17 A    I believe it was people working under Mr. Coleman's

18 direction, but reviewed by Mr. Coleman.

19 Q    Now, was Mr. Coleman in a supervisory authority in the

20 procurement department?

21 A    Yes, he was.

22 Q    And did he -- he had, I guess, supervisory control over

23 those individuals working for him?

24 A    That is correct.

25 Q    Bonus calculations, which is Exhibit 4 to Mr. Coleman's

**J&J COURT TRANSCRIBERS, INC.**

1 claim -- response to claim objection -- it follows the

2 severance letter.

3 A    Yes.

4 Q    Based on your review of the information available at

5 NorthWestern, including the Behring Point report, do you agree

6 with these projected bonus calculations?

7 A    No, I do not.

8 Q    Okay.  And is the primary differential here the soft costs

9 and the failure to reduce those other costs, such as the

10 external costs, the Expanets, and the other internal costs?

11 A    That is a primary driver for the year 2002.  But then, the

12 expected savings in '03, '04, and '05 are inconsistent with

13 what the business was at NorthWestern at that point.  We no

14 longer had Expanets, Blue Dot, Cornerstone, or those

15 businesses.  So there's no savings associated with those, in

16 those subsequent years.

17 Q    And Mr. Coleman was no longer employed by NorthWestern, in

18 connection with those subsequent years, correct?

19 A    That is correct.

20 Q    In fact, his -- he was separated -- as shown by the letter

21 of separation -- in January of 2003, with a last employment

22 date of February 28th?

23 A    That is correct.

24 Q    And that's also consistent with the other books and

25 records, including this payroll information?

1  A    That is correct.

2  Q    And I believe we've already discussed NorthWestern's

3  response to the relocation expenses, and I will not take you

4  back through that.  As you sit here today, is it NorthWestern's

5  position that Mr. Coleman is entitled to any amount of allowed

6  claim?

7  A    The only potential allowed claim would be with regards to

8  the relocation expenses that -- again, we did not have that on

9  file -- any books and records of those, until this file claim

10 -- when this claim was filed.

11 Q    And -- thank you.  And even though that he has identified

12 certain categories as of the date of this hearing, you've not

13 received any independent evidence, establishing amounts due for

14 any category of moving expenses, is that correct?

15 A    That is correct.

16         MS. DENNISON:  Your Honor, I have no further

17 questions of this witness.

18         THE COURT:  Mr. Coleman?  Mr. Coleman?  Are you

19 there, Mr. Coleman?

20         MR. COLEMAN:  Yes, sir.  Yes, Your Honor.

21         THE COURT:  All right.  You may ask -- do you have

22 any questions of this witness?

23         MR. COLEMAN:  My first question is of the Court.  I

24 have not seen Exhibit 3.  Is there a way in which I can be

25 given Exhibit 3, and have time to review that?

1          THE COURT:  Has he been provided a copy of this
2   exhibit?

3          MS. DENNISON:  No, Your Honor.

4          THE COURT:  All right.  We'll get you a copy.  What
5   else?

6          MR. COLEMAN:  Well, I'd also like to renew my request
7   to have witnesses available, to respond to Mr. Shrum's
8   testimony and to request a reconsideration for an extension.

9          THE COURT:  Do you have any questions of this
10  witness?

11         MR. COLEMAN:  I will, once I have the available --
12  the exhibit.

13                      CROSS EXAMINATION

14  BY MR. COLEMAN:

15  Q   I can ask him if he is aware that the methodology
16  developed for the calculation of the savings was developed by a
17  third party, and not by either myself or my team.  Is that
18  true, Roger?

19  A   Could you restate that again, please, in the form of a
20  question.  I didn't understand that as a question.

21  Q   Yeah.  Are you aware that the actual calculation of the
22  operational excellence, the savings methodology was not
23  developed by myself, but was developed by a third party?

24  A   I'm not aware of that.

25  Q   Were you aware that the CEOs of all the individual

1  entities had approved the calculation and methodology of the
2  savings?

3  A    I'm not aware of that.

4  Q    Were you aware that the CEOs had been reviewing them
5  savings (sic) on a monthly basis, as part of the operational
6  excellence meeting and had -- through June through December of
7  the year in question -- reviewed and approved those savings
8  calculations each and every month?

9  A    I'm not aware that they -- I know that there was reviews
10 that were done.  I'm not aware that they approved those
11 findings.  I'm not aware of any approvals, no.  There's nothing
12 in the books and records to reflect any approval of those
13 savings, I should say.

14 Q    Did you review the e-mails, between my team and the CEOs
15 of the individual entities for the time period in question?

16 A    No, I did not.

17          MR. COLEMAN:  Your Honor, I believe I would have
18 further questions for this witness, but not until after I've
19 had an opportunity to review the exhibit that's been prepared
20 and referred to as developed by Behring Point.

21          THE COURT:  All right.  There's no further questions.
22 Any redirect?

23          MS. DENNISON:  No, Your Honor.

24          THE COURT:  You're excused, sir.  Any other
25 witnesses?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. DENNISON:  No, Your Honor.

2          THE COURT:  All right.  Let the record show that the

3   debtor has completed its evidence on the objection to the claim

4   of Patrick Coleman, and that Mr. Coleman has requested

5   additional time, in which to submit documentation in support of

6   his claim.  The Court is convinced, however, based upon the

7   exhibits which he has submitted, that there's no basis for any

8   of the claim which he has submitted.  Through the letter,

9   February 5, 2002, he was to be given an annual performance

10  bonus -- contingent upon annual procurement of sales -- of

11  savings, and it would be one percent of the first $10 million.

12  The witness has testified that there was no savings.

13          The severance letter was issued to Mr. Coleman on

14  January the 31st, 2003, in which he was eligible for severance

15  pay of twelve weeks -- which he did not take -- which would

16  have been paid on March 7, 2003.  The IRS requires that that be

17  paid on a bonus of 27 percent withholding.  He was also to be

18  paid for any unused vacation -- hours of vacation -- and his

19  healthcare coverage would end on February 28th.

20          The documents that have been submitted by Mr. Coleman

21  to support a claim in excess of $4 million, are based upon

22  years 2003, 2004, and 2005, that far -- that exceeds any

23  reasonable estimates, but not only that; are beyond the date of

24  his severance.  And so therefore, he could not be performing

25  those services for the debtor in that year.

**J&J COURT TRANSCRIBERS, INC.**

1          I further reject the performance savings of twelve

2   thirty one two thousand two, based upon the testimony of Mr.

3   Shrum.  If there is any amount of money due Mr. Coleman, based

4   upon the severance agreement, he was eligible for twelve weeks

5   of severance pay.  And the claim will be disallowed, in the

6   amount of -- will be allowed only in that amount.  And all

7   balance of the claim will be rejected.

8          Next matter?

9          MS. DENNISON:  Thank you, Your Honor.  The last

10  matter --

11         MR. COLEMAN:  Wait.  Your --

12         MS. DENNISON:  -- is Item Number --

13         MR. COLEMAN:  Your Honor?

14         THE COURT:  Yes.

15         MR. COLEMAN:  Do I have to --

16         THE COURT:  There will be an order issued by the

17  Court, Mr. Coleman.  And you will have an opportunity to review

18  that order and take whatever steps you wish, to protect your

19  rights from that order.

20         MR. COLEMAN:  Okay.  All right.  Thank you, Your

21  Honor.

22         MS. DENNISON:  Your Honor, just as a --

23         THE COURT:  Thank you.

24         MS. DENNISON:  -- matter of closing of the evidence,

25  I want to just be sure the evidence was admitted, in connection

83

 1  with the --

 2          THE COURT:  They're all admitted.

 3          MS. DENNISON:  Thank you, Your Honor.  As a clean up

 4  matter, with regard to the motion to compel, also just request

 5  that all of those exhibits be deemed as admitted.

 6          THE COURT:  Right.  You make the computation of the

 7  severance, and submit the order with that.

 8          MS. DENNISON:  Thank you, Your Honor.  With regard to

 9  Matter Number 24, this is a motion to approve settlement

10  agreement between Keith Kovak (phonetic), as personal

11  representative for the estate of Donald Kovak, et al.  Your

12  Honor, this matter is -- only one objection was received.  And

13  that was in connection with the Magten.

14          For the record, this is a piece of litigation that

15  was filed in the Montana State District Court, involving injury

16  and wrongful death.  The settlement includes a (sic) allowed

17  claim of $50,000.  And that is based on the allegations set

18  forth in the claim, and the fact that this matter is the

19  subject of an appeal to the Montana Supreme Court.  And the

20  debtor believes this is a reasonable settlement, and would ask

21  for approval at this time.

22          THE COURT:  The motion is granted.

23          MS. DENNISON:  Thank you, Your Honor.  With regard to

24  Matter Number 25, this is the motion to approve settlement

25  agreement between NorthWestern Corporation, Douglas Fisher

84

1  (phonetic) and Sheila Fisher.  I would note for the Court that
2  the only objection received was Magten's.  There are no other
3  objecting parties, and the Plan Committee has indicated its
4  support for this settlement.

5       This settlement is for $190,000 allowed claim, plus
6  the right to pursue any policy proceeds that may be available
7  under the Associated Electric and Gas Insurance Services
8  Limited policy, that's identified in the motion.  NorthWestern
9  believes that this is a reasonable settlement, particularly, in
10  light that it results in a significant cap in NorthWestern's
11  self-insured retention amount, and would ask for approval of
12  this settlement at this time.  And note for the record that the
13  claim amount is well in excess of $2 million.

14       THE COURT:  The motion is granted.

15       MS. DENNISON:  Thank you, Your Honor.  Moving on to
16  Matter Number 26.  This is the motion to approve the settlement
17  agreement between NorthWestern Corporation and Rebecca Meyer
18  (phonetic), as personal representative for the estate of
19  Orville Meyer.  We received an objection from Magten, which the
20  Court has noted.  And we've also received an objection from
21  National Union.  The order has been revised to, we understand,
22  National Union's consent, saying that the -- in connection
23  with, they don't have an objection to the settlement, itself,
24  but wanted additional language in the order.

25       For the record here, Your Honor, this involves a

**J&J COURT TRANSCRIBERS, INC.**

1  piece of litigation in the Montana Second Judicial District,
2  involving personal injury and death, with damages claimed in
3  excess of $5 million.  The settlement amount is $100,000
4  allowed claim, plus the ability to pursue certain insurance
5  proceeds on a policy held by National Fire Insurance Company.
6  The debtor would note that this is also a cap to the
7  self-insured retention amount.  And the debtor believes that
8  the $100,000 allowed claim is in the best interest of the
9  estate.  And I note that counsel for National Union is now at
10  the podium.

11          MR. CASARINO:  Good afternoon, now, Your Honor.

12          THE COURT:  (Inaudible) matter with the amendment to
13  reserve the rights to National Union?

14          MS. DENNISON:  That's correct.

15          MR. CASARINO:  Your Honor, Marc Casarino, on behalf
16  of National Union.  With the revisions to the order, that
17  debtor's counsel has agreed to, we withdraw our objection.

18          THE COURT:  All right.  Thank you, very much.

19          MR. CASARINO:  Your Honor, that being the only matter
20  I have before you, may I be excused?

21          THE COURT:  You may.

22          MR. CASARINO:  Thank you, Your Honor.

23          THE COURT:  Number 27?

24          MS. DENNISON:  Thank you, Your Honor.  Did we get --
25  was Number 26 approved, Your Honor?  Was it granted?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          MS. DENNISON:  Thank you, Your Honor.  Matter Number

3   27 is the debtor's motion for order, pursuant to Bankruptcy

4   Rule 9019, approving settlement between NorthWestern

5   Corporation and Dan Newell (phonetic).  The only objection to

6   this was Magten's, Your Honor.  And at this point, based on the

7   papers the debtor has provided, we'd ask for the Court to

8   approve the allowed claim of $850,000 for Mr. Newell.

9          THE COURT:  That preserves his right to the 92,203,

10  which has been previously granted, correct?

11         MS. DENNISON:  That's correct, Your Honor.

12         THE COURT:  All right.  The motion is granted.

13         MS. DENNISON:  Thank you.  Matter Number 28 has

14  already been disposed of, Your Honor.  That was the Milbank

15  settlement.  Matter Number 29 is the motion for order, pursuant

16  to Bankruptcy Rule 9019, approving settlement agreement between

17  NorthWestern Corporation and First Interstate Bank and Mazula

18  Parking Commission.  This settlement, Your Honor, is for a

19  $330,000 allowed claim.  It's a claim that was in excess of

20  $500,000.  It -- or $500 million, excuse me.  And it involves

21  environmental CIRCLA and other claims.

22         The debtor has a dispute -- or had a significant

23  dispute -- in connection with how the Uniform Purchase

24  Agreement should be interpreted, and believes that this amount

25  is a reasonable settlement.  And the Plan Committee is in

**J&J COURT TRANSCRIBERS, INC.**

1  support thereof.  And at this time, we would ask the Court
2  approve a $330,000 allowed claim.
3          THE COURT:  One of the objections, that was voiced by
4  Magten on this claim ,is that it's a late filed claim.  What is
5  your answer?
6          MS. DENNISON:  Your Honor, the claim was not properly
7  scheduled.  And notice wasn't given.  So, the debtor had two
8  choices; to amend the schedules and put the claim in, and
9  provide these individuals with an opportunity to object.
10 Either way, we would have still ended up with a claim, because
11 the debtor didn't properly schedule it and notice was not
12 given.
13          THE COURT:  All right.  The motion will be granted.
14          MS. DENNISON:  Thank you, Your Honor.  Matter Number
15 30 is the motion for order, pursuant to Bankruptcy Rule 9019,
16 approving stipulation by and between -- or between and among --
17 NorthWestern Corporation and Richard R. Hylland.  The only
18 objection received is Magten.
19          Mr. Hylland's claim was in excess of $30 million.
20 This settlement is the result of months of negotiation, and
21 disposes of -- with certain limited exceptions -- all of the
22 Hylland claims in the NorthWestern bankruptcy, for an allowed
23 claim of $2,928,630.  And at this point, we would ask that this
24 settlement be approved.  And I note that Mr. Demmy is at the
25 podium.

1          THE COURT:  The motion to approve the Hylland claim
2  is granted.

3          MS. DENNISON:  Thank you, Your Honor.

4          MR. DEMMY:  Thank you.  Your Honor, may I inquire --
5  well first, I should note that the order has been revised, from
6  when it was originally filed.  And we have agreement on the
7  form of order.  I just would like to confirm with Ms. Dennison
8  that that is the case.  And the order that I saw yesterday
9  afternoon would be presented to the Court.

10         MS. DENNISON:  Yes, Mr. Demmy.  Your order will be
11 submitted under certification of counsel, since it did change.
12 And I don't have it with me, but we will submit it later today.
13 So that you will -- once submitted -- and can confirm that it
14 is the revised order.

15         MR. DEMMY:  Thank you.  And --

16         THE COURT:  Have you seen the revised order?

17         MS. DENNISON:  I have seen the language for the
18 revised order, Your Honor.  I do not have the hard copy with
19 me.

20         THE COURT:  All right.  Submit it to counsel, before
21 you give it to me, so I know --

22         MS. DENNISON:  Yes, yes.  That's --

23         THE COURT:  -- you've come to an agreement.

24         MS. DENNISON:  We would submit it under a
25 certification of counsel this afternoon.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. DEMMY:  And in that regard -- I appreciate that.
2   In that regard, may I inquire of the Court; if we submit it on
3   certification, is it likely that the order would get entered
4   today?  You know, timing is a material term in all of these
5   agreements with claimants.  And we'd like to see the order
6   entered as quickly as possible.

7        THE COURT:  As soon as I get the order, I'll fax it
8   back out to -- for docketing.

9        MR. DEMMY:  Thank you very much, Your Honor.

10       THE COURT:  If that's given to me today, it will be
11  sent out today.

12       MR. DEMMY:  Thank you.

13       THE COURT:  All right.

14       MS. DENNISON:  Your Honor, the next matter is the
15  motion for order, pursuant to Bankruptcy Rule 9019, approving
16  settlement agreement between NorthWestern Corporation, Reiser
17  War (phonetic) and Carol War.  The only objection on file was
18  that of Magten.  The Plan Committee is in support of the
19  settlement.  This is a settlement of $200,000 of allowed claim,
20  plus insurance proceeds, to the insurance policy identified in
21  the motion, which is with Associated Electric and Gas Insurance
22  Services.

23       The claim amount was north of $11 million.  And
24  through this settlement the debtor has reduced its self-insured
25  retention amount, and risks thereon for a much greater

1 settlement.  At this point, the debtor would ask for approval

2 of the War settlement.

3          THE COURT:  The motion is granted.

4          MS. DENNISON:  Thank you, Your Honor.  Matter Number

5 32 is the motion to approve the settlement between NorthWestern

6 Corporation and James J. Murphy.  This is following up on the

7 Court's instruction for the debtor, to determine the allowed

8 claim.  We have reached agreement with Mr. Murphy, that that

9 allowed claim should be $267,000 -- $267,460.  And I understand

10 that the order has been worked out, as between Mr. Gellert and

11 my office in Atlanta.  And we propose that the form of order be

12 submitted under certification of counsel this afternoon.

13          THE COURT:  Very well.  The motion for a settlement

14 will be granted.

15          MS. DENNISON:  Thank you, Your Honor.

16          MR. GELLERT:  Your Honor, this is Ronald Gellert.  I

17 just have a -- I guess, a housekeeping question -- with respect

18 to the entry of that order.  There has been a notice of appeal

19 filed in that matter.  And --

20          THE COURT:  I found that out.  There is an appeal.

21 And my position on that is it does not dev-est me of

22 jurisdiction, because this matter is not included with any of

23 the issues that could have been raised on appeal, pursuant to

24 the order.

25          MR. GELLERT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right?

2          MR. GELLERT:  Thank you, Your Honor.

3          THE COURT:  All right.

4          MS. DENNISON:  Matter Number 33, Your Honor, is the
5    debtor's motion for order, pursuant to Bankruptcy Rule 9019,
6    approving settlement between NorthWestern Corporation and Merle
7    Lewis.  This results in a settlement of -- providing for an
8    allowed claim of $6,500,000 in allowed claim.  The debtor filed
9    a motion to shorten time.  And I note, for the record, the
10   debtor is cognizant of the transfer of the matter  -- for
11   discovery purposes -- to Judge Baxter.  But the debtor is
12   hoping that this Court would be willing to consider this
13   settlement, so it could proceed, to effectuate the settlement
14   with Mr. Lewis.

15         The Plan Committee is in support of the settlement.
16   This settlement results with a significant reduction of the
17   claim, as filed by Mr. Lewis.  And the debtor believes that
18   it's appropriate for the settlement to be approved at this
19   time, were this Court willing to do so.

20         THE COURT:  The motion is granted.  And the
21   settlement is approved with Charter.

22         MS. DENNISON:  Thank you, Your Honor.

23         MR. LEVITSKY:  Thank you, Your Honor.  Neal Levitsky,
24   for Merle Lewis.  We would also like to see if that order could
25   be docketed today.  We understand Your Honor's very busy.

**J&J COURT TRANSCRIBERS, INC.**

92

1 Thank you.

2 THE COURT: I can -- the orders -- I think I have --
3 I've got a copy of that order.

4 MS. DENNISON: Yes, Your Honor. There was certain
5 language that --

6 THE COURT: What did you have to change?

7 MS. DENNISON: Yes. There was some language that was
8 changed in that order. And we will send over the final order
9 this afternoon. I don't have the final copy.

10 THE COURT: Well, can you get those to me by noon?

11 MS. DENNISON: Yes, Your Honor. We can certainly get
12 them to you by noon.

13 THE COURT: All right. We'll get it out today.

14 MR. LEVITSKY: Thank you, Your Honor.

15 THE COURT: I don't know when it will be docketed,
16 but it will be signed by me today.

17 MR. LEVITSKY: I understand.

18 MS. DENNISON: Thank you, Your Honor.

19 THE COURT: All right.

20 MS. DENNISON: With regard to Matter Number 34, this
21 is the motion of NorthWestern Corporation and net (phonetic) -
22 - this motion has also been filed in the net exit case, Your
23 Honor, seeking to settle claims with John Charters. Today, we
24 seek approval of settling the NorthWestern Claim Number 559.
25 This claim results in the payment by NorthWestern of $250,000

**J&J COURT TRANSCRIBERS, INC.**

1 in allowed claim.  The debtor filed a motion short in time.
2 And there have been no objections.  And the Plan Committee has
3 indicated its support for this settlement.

4         This settlement arises out of an employment contract
5 that was made between the claimant and NorthWestern, and
6 results in a significant amount of the claim, if viewed in its
7 totality.  NorthWestern has submitted, in the pleadings, that
8 it's reasonable and the best interest of the debtor, and would
9 request that the Court approve this settlement as to
10 NorthWestern at this time, and that the proposed order be
11 entered.

12         THE COURT:  How did you arrive at the 6.5 million?

13         MS. DENNISON:  For Mr. Lewis' claim?  That's a
14 combination, Your Honor, of amounts that he was owed under
15 certain non-qualified plans, because he was excluded from
16 those.  That would include the TPAP, the traditional pension
17 equalization plan, the SISP, which is -- thank you --
18 Supplemental Income Plan, temporary medical benefits, that the
19 company determined were owed to Mr. Lewis, and a component for
20 fees and costs, that was appropriate, given the level of Mr.
21 Lewis' claim.

22         THE COURT:  Is the order that's submitted on this
23 settlement agreeable to counsel?

24         MS. DENNISON:  No, Your Honor.  The order that was
25 filed on the Lewis matter has had -- has certain language that

**J&J COURT TRANSCRIBERS, INC.**

1  was added in earlier this week.  It does not affect the amount

2  of the allowed claim, but it does deal with the carve-out,

3  based on certain other claims, which would include -- exclude -

4  - minority shareholder indemnification claims, net exit tax

5  identification claims, and other items that have been

6  identified.

7           THE COURT:  Counsel?

8           MR. LEVITSKY:  Your Honor, that's correct.  Just for

9  the record, we filed a proof of claim in excess of -- just

10 under $13 million.  Thereafter, we hired an economist and had

11 some calculations done, using the Federal Reserve discount

12 rates, which we thought were more appropriate than that which

13 NorthWestern was using.  And the claim amounts we were coming

14 back for were around eight and a half million.  So, this is a

15 compromise.

16          THE COURT:  The motion will be granted, and the order

17 will be entered.

18          MR. LEVITSKY:  Thank you.

19          MS. DENNISON:  Should we move to Matter 34, Your

20 Honor, on John Charters?  This is --

21          THE COURT:  Which one?

22          MS. DENNISON:  This is the last item on the calendar.

23 This was when we actually filed the motion short in time on.

24 It involves a settlement between NorthWestern net exit and John

25 Charters.  And today, we're seeking approval to settle the net

**J&J COURT TRANSCRIBERS, INC.**

1 exit -- or, excuse me -- the NorthWestern claim, for an allowed
2 claim of $250,000.  The Plan Committee has indicated its
3 support of this settlement.  It arises out of an employment
4 contract, as between Mr. Charters and NorthWestern, and results
5 in a significant reduction of Mr. Charters' overall asserted
6 claim.

7         THE COURT:  All right.  The Charter agreement is
8 approved.

9         MS. DENNISON:  Thank you, Your Honor.  That concludes
10 the agenda.  I will hand out the orders, other than those that
11 will need to be submitted under certification of counsel, which
12 would be Mr. Hylland, Mr. Lewis.  We'll also be sending over
13 the Newell order separately, this afternoon.

14         THE COURT:  I have one question for you.  When I
15 received the agenda plus the books, there were three additional
16 bound volumes that were submitted -- sent to me.  I don't know
17 what for.  But they involved the Magten fee appeal.  And I have
18 no interest in that matter anymore.

19         MS. DENNISON:  I apologize for that, Your Honor.  On
20 that, I would confess it's a mystery to me, as well.  We'd be
21 happy to take those binders off the Court's hands.

22         THE COURT:  Well, why don't you have somebody come up
23 here?  And they can take them back and mail them back.

24         MS. DENNISON:  Thank you, Your Honor.  If that -- if
25 I could approach, as to hand up the orders at this time?  Thank

**J&J COURT TRANSCRIBERS, INC.**

1  you.  Mr. Knapp has just reminded me about inquiry, as to the

2  next omnibus hearing date.

3         THE COURT:  Good question.  I'm going to get together

4  with Nancy and Jennifer.  Nancy, I'll call you when I get back

5  to chambers.  And we'll get something lined out.  There's some

6  other problems coming up.  I'll get to scheduling.  And I've

7  got to talk to her first.  We haven't got anything set yet.

8         MS. DENNISON:  Thank you, Your Honor.

9         THE COURT:  All right.  Court will be adjourned.

10         MS. DENNISON:  Thank you.

11                    *  *  *  *  *

12              C E R T I F I C A T I O N

13         I, Shirley Nenno, court approved transcriber, certify

14  that the foregoing is a correct transcript from the official

15  electronic sound recording of the proceedings in the

16  above-entitled matter, to the best of my ability.

17

18  _____    DATE: August 19, 2005

19  SHIRLEY NENNO

20  J&J COURT TRANSCRIBERS, INC.

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**